Thomas R. McCarthy*
Bryan Weir*
Cameron T. Norris*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Ph.: (703) 243-9423
Email: tom@consovoymccarthy.com

Michael L. Testa Jr.
TESTA HECK TESTA & WHITE P.A.
424 W. Landis Avenue
Vineland, NJ 08360
Ph.: (856) 691-2300
Email: mtestajr@testalawyers.com

*Counsel for Plaintiffs*

*admitted pro hac vice*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., REPUBLICAN NATIONAL COMMITTEE, NEW JERSEY REPUBLICAN STATE COMMITTEE,<br><br>Plaintiffs,<br><br>v.<br><br>TAHESHA WAY, in her official capacity as Secretary of State of New Jersey,<br><br>Defendant. | No. 3:20-cv-10753-MAS-ZNQ<br><br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs, Donald J. Trump for President, Inc., the Republican National Committee, and the New Jersey Republican State Committee, bring this action against Defendant Tahesha Way, in her official capacity as Secretary of State of New Jersey, to have A4475 declared unlawful, to enjoin its enforcement, and to obtain all other appropriate relief.

1

## PARTY ADDRESSES (L. Civ. R. 10.1)

*Plaintiffs*                                    *Defendant*

Donald J. Trump for President, Inc.        Secretary Tahesha Way
725 5th Avenue - 15th Floor                125 W. State Street
New York, NY 10022                         Trenton, NJ 08325

Republican National Committee
310 First Street S.E.
Washington, DC 20003

New Jersey Republican State Committee
150 West State Street - Suite 230
Trenton, NJ 08608

## <u>INTRODUCTION</u>

1.      On the eve of the November 2020 election, New Jersey has decided to hastily rewrite its election code with new legislation—A4475—which provides for universal vote-by-mail balloting. New Jersey's new system will violate eligible citizens' right to vote because this rushed shift to universal vote-by-mail elections facilitates fraudulent and invalid votes. Such votes dilute the legitimate votes of honest citizens and deprive them of their right to vote in violation of the Fourteenth Amendment.

2.      New Jersey is well aware of this problem. It has a long history of issues with voting by mail. Countless individuals have been convicted of voter fraud tied to absentee ballots over the last decade. And that tradition unsurprisingly recurred when the Governor ordered universal vote-by-mail for local elections in May of this year in response to COVID-19. The Attorney General has charged four individuals in Paterson, NJ—including one sitting city council member and one candidate for city council who nominally won his race—on charges arising from a scheme to collect and illegally mail in hundreds of absentee ballots in that election. That scheme led to a crisis in Paterson, requiring that the city hold another election between the indicted candidate and

2

his opponent because it is impossible to determine just how many fraudulent ballots were cast. Notwithstanding that experience, New Jersey has *expanded* universal vote-by-mail to the entire state for the November election.

3.     AA475 also violates the federal statutes that set one Election Day for all voters in presidential and congressional races. A4475 conflicts with those statutes because it (1) allows votes to be canvassed starting 10 days before Election Day and (2) allows mail-in votes to be cast after Election Day.

4.     For all these reasons and more, A4475 is illegal and must be enjoined.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction because this action arises under the Constitution and laws of the United States. 28 U.S.C. §§1331 & 1343.

6.     Venue is proper because a substantial part of the events giving rise to the claims occurred in this District, and the Defendant resides in this District. *Id.* §1391.

## PARTIES

7.     Plaintiff Donald J. Trump for President, Inc. is the principal committee for President Donald J. Trump's reelection campaign with its headquarters at 725 Fifth Avenue, 15th Floor, New York City, NY 10022.

8.     Plaintiff Republican National Committee (RNC) is a national political party with its principal place of business at 310 First Street S.E., Washington D.C., 20003.

9.     The RNC organizes and operates the Republican National Convention, which nominates a candidate for President and Vice President of the United States.

10.     The RNC represents over 30 million registered Republicans in all 50 states, the District of Columbia, and the U.S. territories. It is comprised of 168 voting members representing

state Republican Party organizations.

11.     The RNC works to elect Republican candidates to state and federal office. In November 2020, its candidates will appear on the ballot in New Jersey for federal, state, and local offices. In elections for the U.S. House of Representatives, for example, the Cook Political Report lists four New Jersey races as "competitive"—including two "toss ups."

12.     The RNC has a vital interest in protecting the ability of Republican voters to cast, and Republican candidates to receive, effective votes in New Jersey elections and elsewhere. The RNC brings this suit to vindicate its own rights in this regard, and in a representational capacity to vindicate the rights of its member voters and candidates.

13.     The RNC also has an interest in preventing the New Jersey's sweeping changes to its election laws. Major or hasty changes confuse voters, undermine confidence in the electoral process, and create incentive to remain away from the polls. Thus, A4475 forces the RNC to divert resources and spend significant amounts of money educating voters on those changes and encouraging them to vote regardless.

14.     Plaintiff New Jersey Republican State Committee (NJGOP) is a political party in New Jersey with its principal place of business at 150 West State Street, Suite 230, Trenton, NJ 08608.

15.     NJGOP represents over 1.39 million registered Republican voters in New Jersey as of August 1, 2020.

16.     NJGOP has the same interests in this case, and seeks to vindicate those interests in the same ways, as the RNC.

17.     Defendant Tahesha Way is the Secretary of State of New Jersey. Secretary Way is New Jersey's chief elections officer and oversees all elections within New Jersey. Her duties

include ensuring that all election laws and campaign disclosure requirements are enforced, certifying the official lists of candidates for elections, and certifying election results. She is sued in her official capacity.

## BACKGROUND

### I.    The Perils of Hastily Moving to Universal Vote-By-Mail Without the Necessary Safeguards

18.    Creating opportunities for ineligible voters to cast ballots invites fraud and undermines the public's confidence in the integrity of elections—all of which violate the right to vote.

19.    According to the Commission on Federal Election Reform—a bipartisan commission chaired by former President Jimmy Carter and James Baker, and cited extensively by the U.S. Supreme Court—absentee voting is "the largest source of potential voter fraud." *Building Confidence in U.S. Elections* 46, https://bit.ly/3dXH7rU (*Carter-Baker Report*). Many well-regarded commissions and groups of diverse political affiliation agree that "when election fraud occurs, it usually arises from absentee ballots." Michael T. Morley, *Election Emergency Redlines* 2, https://bit.ly/3e59PY1 (Morley, *Redlines*).

20.    Such fraud is easier to commit, easier to meaningfully scale, and harder to detect with absentee voting than in-person voting sites. As one federal court put it, "absentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004).

21.    "Absentee balloting is vulnerable to abuse in several ways": For one, ballots are sometimes "mailed to the wrong address or to large residential buildings" and "might get intercepted." *Carter-Baker Report* 46. For another, voters "who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to

intimidation." *Id.* And "[v]ote buying schemes are far more difficult to detect when citizens vote by mail." *Id.* For example, "[i]ndividuals can sign and sell their absentee ballot," or "[o]ne spouse can coerce the other to sign the ballot and hand it over to them to vote fraudulently."

22.     Empirical data shows that this risk of abuse is magnified by the fact that "many states' voter registration databases are outdated or inaccurate." Morley, *Redlines* 2.

23.     A 2012 study from the Pew Center on the States—which the U.S. Supreme Court cited in a recent case—found that "[a]pproximately 24 million—one of every eight—voter registrations in the United States are no longer valid or are significantly inaccurate"; "[m]ore than 1.8 million deceased individuals are listed as voters"; and "[a]pproximately 2.75 million people have registrations in more than one state."

24.     Similarly, a 2010 study by the Caltech/MIT Voting Technology Project found that roughly 9% of listed registration records in the United States are invalid. On top of those invalid records, "in the typical state 1 in 65 records is duplicative, meaning that the same registrant is listed multiple times." The same study found that "[i]n the typical state, 1 in 40 counted votes in the 2008 general election cannot be matched to a registrant listed as having voted" and that "1 in 100 listed registrants is likely to be deceased."

25.     These discrepancies result from bureaucratic failures, intentional fraud, and inadvertent mistakes.

26.     Because of these widespread inaccuracies in a state's voter registration records, a state that sends ballots to all registered voters will necessarily send ballots to persons ineligible to vote or others with fake registrations, invalid registrations, outdated registrations, and to the deceased. Placing hundreds of thousands of ballots "outside of both election officials' control and the hands of the voters who are supposed to be casting them raises a serious threat to both the

actual and perceived integrity of the electoral system." Morley, *Redlines* 3.

27.     These risks are compounded by the practice of ballot harvesting—that is, coordinated efforts to have third parties collect absentee ballots from voters and drop them off at polling places or elections centers.

28.     Ballot harvesters are usually politically motivated third parties—campaign workers, union members, political activists, paid personnel, or volunteers. They go door-to-door and offer to collect and turn in ballots for voters. "In some documented cases, the workers collecting the ballots have entered into voters' homes to help them retrieve and fill out their ballots."

29.     "Ballot harvesting gives third parties who may be completely unknown to both the voter and election officials the opportunity to potentially tamper with absentee ballots" in any one of a number of ways. Morley, *Redlines* 5. For instance, "[h]arvesters may pressure voters into giving them blank ballots or casting their votes a certain way," or, "[w]hen a voter has voted for the 'wrong' candidate, the harvester may surreptitiously change the vote, include additional votes to void the ballot, or simply dispose of the ballot rather than returning it." *Id.*

30.     These forms of misconduct have the potential for widespread, scalable abuse and are incredibly difficult to detect. The practice is "especially concerning when third parties who are not related to the voter—and who may not even be known to the voter—are permitted to harvest unlimited numbers of ballots, frequently without having to identify themselves to election officials or note their identity on the ballots' envelopes." Morley, *Redlines* 4.

31.     To be sure, application-based mail-in ballots can be a legitimate feature of a state's election process, when coupled with adequate procedural safeguards to deter fraud. But given the many risks discussed above, in most states it is an *alternative* implemented carefully and slowly

and *only with* such safeguards in place.

32.     Federal law also recognizes the risks of voting by mail and thus requires certain first-time voters to present identification. *See* 52 U.S.C. §21083(b).

33.     In reaction to COVID-19, several states have altered, or tried to alter, their ordinary election practices to universal vote-by-mail for 2020 elections.

34.     Much of the push toward universal vote-by-mail has been driven by litigation initiated by the Democratic Party. The Democratic National Committee, state Democratic parties, and several affiliated groups have filed lawsuits across the country to force a hurried transition to universal vote-by-mail, eliminate voter-identification requirements, and remove other existing safeguards. Democrats pushed these changes long before COVID-19 because they believe that the resulting virtually unregulated and unsupervised environment will help their electoral prospects.

35.     But COVID-19 does not warrant throwing out longstanding safeguards that protect the integrity of elections. In fact, it makes those safeguards *more* important. "[E]ven when voter registration records are accurate, voters may not be staying at their addresses of record. If stay-at-home orders remain in place, voters may be staying with family or friends for the duration of the quarantine." Morley, *Redlines* 3. "Thus, automatically mailing out millions of ballots to addresses where voters may not be located will lead to millions of unaccounted-for ballots, facilitates ballot theft, and can lead to inadvertent or intentional double voting." *Id.*

36.     The lack of safeguards has had a systemic negative impact in jurisdictions that switched to universal vote-by-mail for their Spring 2020 elections. For example, Nevada conducted its first ever all-mail primary in June. The Las Vegas Review-Journal reported that, within the first week of voting, photographic evidence surfaced of numerous ballots "tossed in trash cans and littering apartment mailbox areas."

37.     On May 8, 2020, one Clark County voter found "about a dozen ballots pinned to the complex's bulletin board or otherwise thrown around." Over the next few days, he found many more in nearby trash cans. In a different apartment complex, another voter saw ballots "sticking out of residents' mailboxes and 'at least a dozen' were sitting in garbage cans." Another resident received a ballot at her home addressed to her deceased mother.

38.     A U.S. Postal Service worker serving the area witnessed the breadth of the problem. She recounted that, over the course of multiple days, she saw an "influx of absentee ballots"—as a many as 100 in a single day—that were "'no good,'" often because they had been sent to recipients who had moved or died. "In all, she said, there were thousands [of ballots] sitting in crates with no additional safeguards and marked to be sent back to the county."

39.     Recent media reports confirm just how widespread those problems were. For the 2020 primary election, Clark County mailed out 1,325,934 ballots. Of that total, 223,469 were returned as undeliverable.

40.     Of those 223,469 undeliverable ballots, 58 percent belonged to inactive voters. But "93,585 undeliverable ballots belonged to voters classified as active in Clark County's voter rolls." Those more than 93,000 ballots returned as undeliverable from registered voters do not include the countless numbers of not-returned-as-undeliverable ballots observed strewn about apartment complexes, garbage cans, and other locations in Clark County as described above. The number of those kinds of ballots—which also should have been returned as undeliverable but were not—will never be known. Moreover, Clark County's voter rolls also contain more than 2,200 people who are deceased.

41.     Other states had issues just keeping up with their application-based mail-in ballots. For Wisconsin's April 2020 primary election, "the Wisconsin Election Commission received over

1.3 million requests for absentee ballots…, almost 1 million of which were completed and returned by mail to the election offices. This was an increase of over 440 percent from the April 2016 election."

42.     Given this substantial increase, it's no surprise that errors occurred in processing those absent ballots. For example, "[t]hree tubs of absentee ballots from Appleton and Oshkosh were found at the Milwaukee Processing & Distribution Center (P&DC) after polls closed on April 7, 2020." And—despite Postal Service guidance stating that "all ballots should be postmarked by machine or by hand"—the Milwaukee Election Office received "about 390 voter completed ballots with varying postmark issues including illegible postmarks, lack of a postmark, undated postmarks, or hand-stamped postmarks."

43.     For New York's June 2020 primary election, "[m]ore than 414,000 New York City residents voted by absentee ballot in the June 23 primary, which is more than 10 times the number of absentee ballots cast in the 2016 primary, according to court documents." On August 3—more than six weeks after the election—results of the primary election between Rep. Carolyn Maloney and Suraj Patel for New York's 12th District remained unknown. On that day, a federal district judge in New York "ordered the counting of certain mail ballots that arrived after Election Day but without a postmark to prove when they were sent."

44.     It is still not known why absentee ballots were delivered without a postmark to election offices in New York even though the Postal Service's "policy is to postmark all ballots, and the city was assured it would happen." But a manager at a New York postal processing facility testified during the lawsuit over the absentee ballots and "offered two possibilities." "First, postmarking machines can reject mail if, for example, it isn't 'folded over properly.' On Election Day, USPS staff were ready to grab bypassed ballots and postmark them by hand." That happened

"'for thousands of ballots'" on Election Day, but the manager "wasn't sure … if this happened before June 23." Second, "most prepaid mail usually skips postmarking altogether and goes 'directly to a sortation machine.'" "On Election Day, USPS staff overrode that procedure and forced everything through the postmarking system. But again, [the manager] wasn't sure about before June 23, saying it was 'very possible' that some ballots went straight to sorting."

45.     News reports do not disclose whether the Postal Service would invoke those manual-override processes on days *after* an Election Day to ensure postmarks were affixed both to improperly folded mail and to prepaid ballots placed in the mail after an election. Even so, the Postal Service's pre-election performance alone led the co-chair of the New York State Board of Elections to testify that he "'do[esn't] have a great deal of confidence in the U.S. Postal Service.'"

## II.     New Jersey's History of Absentee Ballot Voter Fraud Shows It Is Ill-Equipped to Rapidly Shift to Universal Vote-By-Mail Elections.

46.     New Jersey has a sordid history of illegitimate elections. For starters, it has had documented problems with keeping accurate voter rolls. In 2016, the Asbury Park Press performed an investigation of New Jersey's voter rolls and found a full 2,460 active voters who had been dead for at least *five* years, and nearly sixty of them had apparently cast votes *after they died.* The study also found that there were 920 active voters that were ostensibly 106 years old or older. Another study in 2005 found that 4,755 people who were listed as deceased voted in the 2004 general election. And 4,397 people who were registered to vote in more than one county voted twice.

47.     Voter fraud is likewise notoriously common in New Jersey. Examples abound over the last decade.

- In 2010, over a dozen people were arrested and charged with voter fraud and tampering with absentee ballots to get Councilman Rigo Rodriguez elected in Paterson, New

Jersey. Councilman Rodriguez won the election by just 41 votes in a recount after 49 previously uncounted absentee ballots were included in the final tally. He and his wife were later arrested on charges of witness tampering in an effort to cover up the voter fraud. Rodriguez ended up serving his entire four-year city-council term before agreeing to a permanent ban from holding office in exchange for the charges to be dropped.

- In 2012, a Belleville resident was found guilty of election fraud, conspiracy, absentee-ballot fraud, forgery, and tampering with public records or information. Along with his co-conspirators, he tampered with documentation for absentee ballots in the November 2007 general election by submitting ballots on behalf of voters who had never received the ballot nor cast a vote.

- In 2015, a Hoboken resident pleaded guilty to using the mail system to aid a voter-bribery scheme. He provided voters with applications for mail-in ballots, offered them payment for casting them for a certain candidate, reviewed the ballots, and then delivered funds to voters after the election.

- In 2018, another Hoboken resident pleaded guilty to conspiracy to use mail to promote a voter bribery scheme during the 2013 municipal election. She and her associates (at the direction of a city council candidate) agreed to pay voters $50 each in exchange for mail-in votes. The city council candidate was convicted the following year due to the scheme.

- In 2019, Elmwood Park's mayor resigned from his position in the face of charges of election fraud. Investigators determined that between March 2017 and November 2018, the mayor "had interfered with the secrecy of the election process by completing

portions of the application for vote by mail ballot, primary election ballot certifications

and general election ballot certifications of registered voters in the borough."

48.     These are just a handful of the many examples of voter fraud and impropriety that

have occurred in New Jersey.

### III.     New Jersey's Standard Mail-In Ballot Laws.

49.     As a general matter, the New Jersey Legislature has chosen *not* to conduct universal

vote-by-mail elections, except in very limited circumstances—or to automatically send absentee

ballots to all voters. Before two weeks ago, New Jersey law contains two sets of provisions

governing mail-based voting.

50.     The first set, New Jersey Statutes §19:63-3, allows voters to cast application-based

mail-in ballots as an alternative to in-person voting in any election. Importantly, a voter must

submit a written application at least seven days before the election in order to receive a mail-in

ballot. N.J. Stat. §19:63-3.

51.     New Jersey law specifies the information that a mail-in ballot application must

contain. The application must be in writing, be signed by the applicant, and contain the applicant's

voting residence and the address to which the ballot will be sent. N.J. Stat. §19:63-3. The

legislature has explicitly mandated that the "county clerk *shall not transmit a mail-in ballot* for

any election to any person who: is deemed by a county commissioner of registration to be an

inactive voter; or notifies the clerk in writing that the person no longer wishes to receive such a

ballot for any election; or is no longer eligible to vote and whose registration file has been

transferred to the deleted file pursuant to R.S.19:31-19." *Id.* (emphasis added).

52.     The New Jersey Legislature has established a strict timeline for sending

application-based mail-in ballots. *See* N.J. Stat. §19:63-9. Clerks are directed to send ballots to

13

those who have requested them starting on or before the 45th day before the election. *Id.* Between the 45th day and the 13th day before an election, clerks are directed to send mail-in ballots within three days of receipt of an application. *Id.* After the 13th day and before the 7th day before an election, clerks are directed to send mail-in ballots within two days of receipt of an application. *Id.*

53.     New Jersey law also provides the deadlines for receiving application-based mail-in ballots. All ballots received by the close of the polls are counted N.J. Stat. §19:63-18. In addition, all ballots that are postmarked by election day and received "within 48 hours after the time of the closing of the polls" are counted. N.J. Stat. §19:63-22.

54.     The second set of provisions that govern mail-in voting, New Jersey Statutes §19:62-1, provides the rules for elections conducted wholly by mail. Universal vote-by-mail elections are allowed in very narrow circumstances: only for a municipality that has a "population of 500 or fewer persons" and the governing bodies of the municipality *and* county affirmatively vote to allow a wholly mail-in election. N.J. Stat. §19:62-1. In such elections, the ballot must be "received by the county board of elections no later than the time established for the closing of the polls for that election." N.J. Stat. Ann. §19:62-10.

**IV.     New Jersey's Reponses to COVID-19, Governor Murphy's Issuance of Executive Order 177, and the Legislature's Codification of that Order in Response to This Lawsuit.**

55.     New Jersey reacted to COVID-19's introduction into the country much as other States did. On March 9, 2020, Governor Murphy declared a Public Health Emergency and State of Emergency in New Jersey due to the COVID-19 pandemic. Exec. Order No. 103 (Mar. 9, 2020), https://bit.ly/2PXNzFw. A week later he suspended gatherings of more than fifty people, ceased in-person school instruction, and closed down casinos, gyms, movie theaters, and other large gathering spaces. Order No. 104 (Mar. 16, 2020), https://bit.ly/311KV81. In addition, he ordered that "[o]ther non-essential retail, recreational, and entertainment businesses must cease daily

operations from 8:00 p.m. until 5:00 a.m.," and must limit occupancy while open. *Id.*

56.    On March 21, Governor Murphy issued a stay-at-home order, directing "[a]ll New Jersey residents [to] remain home or at their place of residence," subject to a few exceptions. Exec. Order No. 107 (Mar. 21, 2020), https://bit.ly/3arfnv6. The order directed individuals to "practice social distancing and stay six feet apart whenever practicable" and cancelled "[g]atherings of individuals, such as parties, celebrations, or other social events." *Id.* The order also closed "brick-and-mortar premises of all non-essential retail businesses" and directed "[a]ll businesses or non-profits in the State … [to] accommodate their workforce, wherever practicable, for telework or work-from-home arrangements." *Id.*

57.    On April 29, New Jersey began reopening by allowing state parks and golf courses to operate with certain restrictions. Exec. Order No. 133 (Apr. 29, 2020), https://bit.ly/2PXT9rq. Governor Murphy based this decision on his finding that "New Jersey is no longer seeing an increase in the number of new cases of COVID-19 that are being reported on a daily basis, and the State is experiencing a decrease in the number of individuals visiting emergency departments and being admitted to hospitals for COVID-19." *Id.*

58.    Two weeks later, Governor Murphy allowed non-essential construction and curbside pickup at non-essential businesses. Exec. Order No. 142 (May 13, 2020), https://bit.ly/31T4fTX. He also opened "[a]ll public and private beaches, boardwalks, lakes, and lakeshores." Exec. Order No. 143 (May 14, 2020), https://bit.ly/2Y6fnf9. The Governor reiterated that "New Jersey is no longer seeing an increase in the number of new cases of COVID-19 that are being reported on a daily basis, and the State is experiencing a decrease in the number of individuals visiting emergency departments and being admitted to hospitals for COVID-19." *Id.* He added that "New Jersey makes continued progress in its fight against COVID-19." *Id.*

59.     Governor Murphy also allowed elective surgeries and invasive procedures to resume on May 26. Exec. Order No. 145 (May 15, 2020), https://bit.ly/34222s1. He found that "suspension of these surgeries and procedures preserved the capacity of our health care system to deal with the surge of COVID-19 cases, which reached its maximum impact on the health care system in the middle of April." *Id.* Governor Murphy deemed it safe to resume surgeries because, "over the last month … the rates of confirmed COVID-19 spread have decreased drastically." *Id.*

60.     On May 18, the Governor announced his official plan for a phased reopening. He explained: "Through our combined efforts, we have flattened the curve of COVID-19 cases, and we are well-positioned to continue our restart and recovery process. Our multi-stage approach uses science, data, and facts to determine which businesses and activities can reopen according to their risk level and challenges they face to safeguard public health. … We are currently in Stage 1, and we will aim to move through each stage quickly, but also judiciously, with the public health of our communities and all New Jerseyans in mind."

61.     On June 1, Governor Murphy announced that New Jersey could enter Stage 2. He explained that "public health data continues to demonstrate our collective success in flattening the curve of COVID-19 cases and hospitalizations. It is with these favorable metrics, coupled with expanded testing capacity and contact tracing, that we can responsibly enter Stage Two of our multi-stage approach to recovery." Among other things, that allowed childcare centers to reopen, outdoor dining at restaurants, retail stores to open, organized sports activities to resume, and barbers, salons, and swimming pools to reopen. It also raised the limit on outdoor gatherings to 500 people.

62.     Governor Murphy continued to lift restrictions throughout July and August. Through executive order, he lifted the capacity limits on New Jersey transit, opened museums,

libraries, and indoor recreational facilities, and resumed contact practices and competitions for organized sports.

63.     On August 13, Governor Murphy allowed schools to re-open for daily in-person instruction, even though he acknowledged that in-person instruction must take place indoors and that it is difficult to stagger classes to allow for maximum social distancing. Despite that, Governor Murphy is requiring those schools that *don't* return to in-person learning to submit a detailed explanation for why they are unable to comply with basic health and safety measures, and to provide periodic updates justifying their decision. *See* Exec. Order No. 175 (August 13, 2020), https://bit.ly/3iMcY14

64.     The very next day, in a stark departure from his line of orders reopening New Jersey, Governor Murphy issued Executive Order 177 suspending New Jersey's election laws for the November 3 election.  Exec. Order No. 177 (Aug. 14, 2020), https://bit.ly/30ZjBaj. The Order, among other things, mandated that "[t]he November General Election shall be conducted primarily via vote-by-mail ballots, which will be sent to all 'Active' registered voters without the need for an application to receive a vote-by-mail ballot." *Id.* It mandated that "vote-by-mail ballots shall be mailed to all 'Active' voters on or before the 29th day before the November General Election." *Id.* The Governor's Order thus elevates by-mail voting over in-person voting.

65.     The Order further suspended the ballot-return deadline in N.J. Stat. §19:63-22, and provided that "[e]very vote-by-mail ballot that is postmarked on or before November 3, 2020, and that is received by November 10, 2020, at 8:00 p.m. shall be considered valid and shall be canvassed, assuming the ballot meets all other statutory requirements. Additionally, every ballot without a postmark … that is received by the county Boards of Elections from the United States Postal Service within forty-eight (48) hours of the closing of polls on November 3, 2020, shall be

considered valid and shall be canvassed, assuming the ballot meets all other statutory requirements." *Id.*

66.     The Order required that "[a]ny voter who appears at a polling place on the day of the November General Election and does not return a voted mail-in ballot … shall vote via a provisional ballot." *Id.* The Order thus deemed every in-person ballot cast as only a provisional ballot. The exclusive use of provisional ballots will lead to congestion and chaos at in-person voting locations, increasing the likelihood for exceptionally long wait times to vote.

67.     To justify the Order, Governor Murphy stated that "even as the rate of reported new cases of COVID-19 decreased, the ongoing risks presented by COVID-19 have meant that many of the State's current measures must remain in place." *Id.*

68.     Nothing the Governor said in the Order comported with how he has treated every other activity in his state. Indeed, the day *after* he issued the Order, he said that the state's COVID-19 numbers "look very good." He was correct to say so. New Jersey maintained a transmission rate below 1 for several weeks, and is currently reporting a transmission rate of 0.94, meaning "the outbreak is shrinking." And just 585 new cases were reported the day he issued the Order. New Jersey is containing the outbreak much better than other populous states that have reported cases in excess of 35,000 in the last seven days. But those states have not implemented universal vote-by-mail.

69.     The Order was also inconsistent with expert opinion on in-person voting. The day after Governor Murphy issued the Order, Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, said "he believed Americans should be able to safely cast a ballot in-person, so long as they follow necessary social distancing protocols." "Fauci compared the safety of casting a ballot in person to that of an in-person shopping trip to the grocery store in

'counties and cities that are doing it correctly.'" "'They have X's every six or more feet,' he added. 'And it says, Don't leave this spot until the person in front of you left their spot. And you can do that, if you go and wear a mask, if you observe the physical distancing, and don't have a crowded situation, there's no reason why you shouldn't be able to do that.'"

70.    Indeed, even during the height of the pandemic, Wisconsin was able to hold in-person elections successfully while also preserving voters' safety. On election day in Wisconsin, an estimated 413,000 people voted in person. "Experts said a surge [in coronavirus cases] tied to the election would have appeared in statewide data at the end of April, given the incubation period of the coronavirus. But, no surge appeared." And the Center for Disease Control has concluded that "[n]o clear increase in cases, hospitalizations, or deaths was observed after the election."

71.    The Governor's inconsistencies, coupled with the Order's timing amid a nationwide push by the Democratic Party for the same measures, reveal that the Order is less about protecting the health of New Jerseyans and more about protecting the electoral prospects of the Governor's political party.

72.    Plaintiffs filed this lawsuit on August 18 to challenge the Order, in part, on grounds that the Governor does not have the authority under the Elections and Electors Clauses of the U.S. Constitution to unilaterally change New Jersey's ballot laws. *See* Doc. 1.

73.    In response to that claim, the New Jersey Legislature passed a bill—A4475—that codified the above provisions of the Order. The Governor signed A4475 on August 28.

74.    Relevant here, A4475 also allows "county boards of elections to begin opening the inner envelopes and canvassing each mail-in ballot from the inner envelopes no earlier than ten days prior to the day of the election."

75.    A4475, however, does not likewise allow election officials to begin canvassing

early in-person ballots before Election Day.

**V.     New Jersey's Prior Universal Vote-By-Mail Elections Facilitated Widespread Fraud and Confusion**

76.     Not only is A4475 unnecessary and inconsistent with the Governor's Executive Orders dealing with COVID-19, it is destined to lead to the same disastrous result as the Governor's prior Executive Orders allowing universal vote-by-mail.

77.     On March 19, Governor Murphy announced changes to the Spring elections. Among other things, Governor Murphy postponed all elections until May 12. Exec. Order No. 105 (Mar. 19, 2020), https://bit.ly/2DYUeNd. He ordered that "there will be no polling places in the May 12, 2020 elections," and that the election "shall be conducted solely via vote-by-mail ballots, which will automatically be sent to all registered voters without the need for an application to receive a vote-by-mail ballot." *Id.*

78.     Over 30 municipalities held nonpartisan municipal, school board or special elections completely by mail on May 12.

79.     To put it bluntly, the results were disastrous. Ten percent of ballots that were cast were invalidated. That is more than 3 times as many invalidated mail-in votes as the 2018 general election in New Jersey.

80.     But those statistics pale in comparison to what happened in the City of Paterson. There, Alex Mendez beat his opponent Bill McKoy by just 240 votes in a bid for a city council seat. Almost immediately, however, officials encountered evidence of massive voter fraud. It began with the discovery of nearly 900 votes that were mailed in bulk from three individual mailboxes, including more than 300 rubber-banded together from a single a mailbox.

81.     Next, there were widespread reports of people being listed as having voted, but who say they never even received their ballots. One woman was shown an official list of people who

voted that lived on her block. She confirmed that there were eight people on the list, plus herself, who she knows didn't vote. A councilman reported he knew of at least another dozen cases of the same thing happening.

82.     In the weeks following the election, the New Jersey Attorney General conducted an investigation into voter fraud and discovered an illegal conspiracy to get Mendez elected. McKoy's attorneys revealed the AG's findings in a lawsuit to challenge the election's outcome. The election, they explained, "was rife with nonfeasance, malfeasance, and straight up voter fraud. It was a failure at every level, from the mailing of VBMs to their delivery, from the actual casting of the ballots to the receiving of same by the Board of Elections and their counting." In particular, a campaign worker for Mendez "confessed to investigators working on behalf of the [New Jersey Attorney General's] office to having stolen ballots out of mailboxes, both completed and uncompleted, on behalf of and at the direction of the Mendez campaign."

83.     The McKoy campaign explained how the fraud decided the election: "The number of legal votes rejected and illegal votes accepted exceeds the number of votes separating the candidates, and thus are sufficient to change the result of the election." But the detected illegal votes that election officials caught were likely just a fraction of the total fraudulent ballots cast. As the McKoy campaign explained: "It is impossible to know just how many ballots were stolen in this Election. Simply because some ballots were caught does not mean that all were caught. Yet, given the number that were, in fact, rejected, far in excess of the margin in the Election, it seems likely that there were many more of which we will never know for sure."

84.     On June 25, the Attorney General charged Mendez, a sitting councilmember, and two others with multiple felonies related to election fraud, including illegally collecting absentee ballots and submitting fraudulent voter registrations.

85.     Yet despite his indictment and the extensive evidence of voter fraud, Mr. Mendez refused to withdraw his candidacy and still planned to take office on July 1. That lead to a New Jersey judge issuing an injunction preventing Mendez from taking office. In issuing his decision, the judge explained:

> I don't see how I could let the people of Paterson have to accept the fact that this was a fair and free election, that it was a full expression of their intent. … I just think it would be a tremendous undermining of the voting system, the public trust to let Mr. Mendez be sworn in tomorrow.

86.     Governor Murphy later called for Mr. Mendez to step aside, but he refused. So instead of declaring McKoy the winner, and with charges pending against Mendez, Paterson will conduct another election for the council seat.

87.     The July primary likewise suffered serious problems. On May 15, Governor Murphy issued an executive order mandating, among other things, that "[a]ll elections that take place on July 7, 2020, shall be conducted primarily via vote-by-mail ballots, which will automatically be sent to all 'Active' registered Democratic and Republican voters without the need for an application to receive a vote-by-mail ballot." Exec. Order No. 144 (May 15, 2020), https://bit.ly/34293Jq. To do so, the executive order suspended a variety of election statutes. For example, the executive order suspended N.J. Stat. §19:63-3(d) and mandated that "[t]he County Clerk shall send vote-by-mail applications to 'Active' voters who are registered as 'Unaffiliated,' and to all 'Inactive' registered Democrats, Republicans, and 'Unaffiliated' voters." *Id.* The executive order further suspended the deadlines in N.J. Stat. §19:63-9, and mandated that "vote-by-mail ballots shall be mailed in compliance with a schedule to be prepared by the Secretary of State." *Id.* Finally, the executive order suspended the ballot-return deadline in N.J. Stat. §19:63-22, and provided that "[e]very vote-by-mail ballot that is postmarked on or before July 7, 2020, and that is received by July 14, 2020, at 8:00 p.m. shall be considered valid and shall be

canvassed." *Id.*

88.     The July primary was plagued with voting problems. To begin, more than 40,000 ballots were rejected. That's *eight times as many* rejected ballots as the 2016 primary election. Hudson County alone had over 6,000 rejected ballots this year, more than the entire state for 2016.

89.     To make matters worse, the primary suffered from constant delays. Although the Secretary of State had set a deadline of July 24 for counties to certify their election results, seven counties did not meet that deadline. The Secretary of State did not certify the results until over a month after the election.

90.     Republican candidate Hirsh Singh contested the results of the primary because "[t]ens of thousands of ballots remain uncounted, rejected or lost, disenfranchising tens of thousands of New Jersey voters." For example, a number of ballots were mistakenly returned to voters due to confusion at the post office. Other ballots were misprinted and mailed to the wrong voters. And one county clerk reported that "her office got back about 1,500 ballots that they sent out," attributing the mistake to "'garbage data' in the system."

## VI.     The Fourteenth Amendment to the U.S. Constitution Prohibits Practices that Promote Fraud and Dilute Valid Votes.

91.     According to the Supreme Court, the Fourteenth Amendment of the U.S. Constitution protects the "the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 77 U.S. 533, 554 (1964). "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555 n.29 (quoting *South v. Peters,* 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

92.     Both direct denials and practices that otherwise promote fraud and dilute the

23

effectiveness of individual votes, such as A4475, thus can violate the Fourteenth Amendment. *See id.* at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

93.    "Every voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962).

94.    Fraudulent votes "debase[]" and "dilute" the weight of *each* validly cast vote. *See Anderson*, 417 U.S. at 227. When it comes to "dilut[ing] the influence of honest votes in an election," whether the dilution is "in greater or less degree is immaterial"; it is a violation of the Fourteenth Amendment. *Id.* at 226.

95.    The Fourteenth Amendment does not tolerate actions such as those in A4475 because automatically sending *ballots* (as opposed to applications for ballots) to *all* voters makes fraud and other forms of illegal voting inevitable.

96.    Ample evidence from here in New Jersey, Nevada, and other jurisdictions demonstrates that voter fraud—or even inadvertent double voting or non-fraudulent illegal voting—is guaranteed when hundreds of thousands of ballots are indiscriminately distributed, regardless of whether a real, eligible, present, or desiring person exists to receive them.

97.    When citizens are denied the right to vote in this way, the validity of the electoral process crumbles. Voters lose their constitutional rights and lose confidence in the process, which deters voting. Candidates are injured by invalid election returns, and parties must divert time and resources to educate voters, get out of the vote, and encourage voters not to lose their faith in the system.

### VII.   A Trio of Federal Statutes Requires Votes to Be Cast On Or Before Election Day.

98.     Congress has established that "[t]he electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President." 3 U.S.C. §1.

99.     2 U.S.C. §7 provides that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter."

100.    2 U.S.C. §1 provides that, "[a]t the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress, at which election a Representative to Congress is regularly by law to be chosen, a United States Senator from said State shall be elected by the people thereof for the term commencing on the 3d day of January next thereafter."

101.    This trio of statutes "mandates holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster v. Love*, 522 U.S. 67, 70 (1997).

102.    The word "election" in 3 U.S.C. §1 means the "combined actions of voters and officials meant to make a final selection of an officeholder." *Foster*, 522 U.S. at 71. It is the consummation of the process of electing an official.

103.    By its terms then, 3 U.S.C. §1 requires that the 2020 general election be consummated on Election Day (November 3, 2020).

104.    A mail ballot is not a legal vote unless it is marked and cast on or before Election Day. States cannot create a process where ballots marked or mailed *after* Election Day can be considered timely.

105.    Consistent with 3 U.S.C. §1, "the Voting Rights Act Amendments of 1970 require that citizens be allowed to vote by absentee ballot in Presidential elections on or before the day of the election." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 777 (5th Cir. 2000). *See* 52 U.S.C. §10502(d).

106.    Those "uniform rules for federal elections" are both "binding on the States" and superior to conflicting state law: "'[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative.'" *Foster*, 522 U.S. at 69 (quoting *Ex parte Siebold*, 100 U.S. 371, 384 (1879)). In other words, if a state law governing elections for federal offices "conflicts with federal law," that state law is "void." *Id.* at 74.

107.    A4475 conflicts with the three statutes setting a uniform Election Day in two ways. First, it extends Election Day forward by allowing early canvassing of ballots. One of Congress's reasons for creating a single election day was stop "the distortion of the voting process threatened when the results of an early federal election in one State can influence voting in other States." *Foster*, 522 U.S. at 73. As one Representative explained, "[u]nless we do fix some time at which, as a rule, Representatives shall be elected, it will be in the power of each State to fix upon a different day, and we may have a canvass going on all over the Union at different times." *Id.* (citation omitted). That would lead to "news from … States that held their elections prior to the presidential election" reaching States that voted later, which granted those early canvassing states "an influence" on the outcome of the election. *Id.* By allowing election officials to begin counting ballots 10 days before Election Day, New Jersey runs afoul of that purpose.

108.    Second, A4475 extends Election Day beyond November 3. It allows ballots that are not postmarked to be counted if they are received within 48 hours of the polls closing. Because

mail sent locally can arrive within one day of being sent, *see* U.S. Postal Serv., FAQs: What are the Types of First-Class Mail?, Article No. 000003138 (Jan. 26, 2020), https://bit.ly/2EyfERB, A4475 allows individuals to cast a vote *after* election day and to have that vote counted.

## CAUSES OF ACTION

### COUNT I
### Violation of 3 U.S.C. §1, 2 U.S.C. §7, 2 U.S.C. §1

109.    Plaintiffs incorporate all their prior allegations.

110.    A4475 permits election officials to begin canvassing mail-in ballots—but not early in-person ballots—10 days before Election Day.

111.    Federal law prohibits canvassing ballots before Election Day. Because A4475 allows election officials to begin canvassing 10 days before the election, federal law preempts it.

112.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional and federal rights unless Defendant is enjoined from implementing and enforcing A4475.

### COUNT II
### Violation of 3 U.S.C. §1, 2 U.S.C. §7, 2 U.S.C. §1

113.    Plaintiffs incorporate all their prior allegations.

114.    Federal law prohibits voting after Election Day. A4475 permits absentee ballots that have not been postmarked to be counted if they are received two days after Election Day (based on a presumption that those ballots were mailed on or before Election Day). And absentee ballots are mailed to the county clerk for the county in which the voter resides. They are delivered by the U.S. Postal Service via First Class mail.

115.    The delivery time for First Class mail from one place in any New Jersey county to another place within the same county can be a single day.

116.     A4475 thus allows ballots to be cast after Election Day but still counted as lawfully cast votes in the 2020 general election. Federal law preempts A4475 as a result.

117.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional and federal rights unless Defendant is enjoined from implementing and enforcing A4475.

### COUNT III
### Violation of the Right to Vote (42 U.S.C. §1983)

118.     Plaintiffs incorporate all their prior allegations.

119.     A4475 requires automatic mailing ballots to all active voters and makes voter fraud and other ineligible voting inevitable—especially given New Jersey's rampant history of voter fraud.

120.     Dilution of honest votes, to any degree, by the casting of fraudulent or illegitimate votes violates the right to vote. *Reynolds*, 377 U.S. at 555; *Anderson*, 417 U.S. at 226-27; *Baker*, 369 U.S. at 208.

121.     New Jersey's new voting system facilitates fraud and other illegitimate voting practices, and therefore violates the Fourteenth Amendment to the U.S. Constitution.

122.     Defendant has acted and will continue to act under color of state law to violate the Fourteenth Amendment.

123.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendant is enjoined from implementing and enforcing A4475.

### COUNT IV
### Violation of the Equal Protection Clause (42 U.S.C. §1983)

124.     Plaintiffs incorporate all their prior allegations.

125.    "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another. It must be remembered that the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

126.    In particular, the Equal Protection Clause imposes a "minimum requirement for nonarbitrary treatment of voters" and forbids voting systems and practices that distribute election resources in "standardless" fashion, without "specific rules designed to ensure uniform treatment." *Bush*, 531 U.S. at 105-06; *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477-78 (6th Cir. 2008).

127.    The Supreme Court has instructed that the "formulation of uniform rules" is "necessary" because the "want of" such rules may lead to "unequal evaluation of ballots." *Bush*, 531 U.S. at 106.

128.    A4475 requires every in-person voter to cast a provisional ballot.

129.    Each voter who casts a ballot in-person thus will be forced to follow the statutory procedure for voting provisionally.

130.    By deeming every in-person ballot a provisional ballot, A4475 massively increases the volume of provisional ballots that must be processed.

131.    This massively increased volume of provisional ballots raises grave concerns about increased lines and wait times to vote and the State's ability to properly process each and every provisional ballot.

132.    It will be impossible for county officials to properly inventory, transport, and

canvass the massively increased volume of provisional ballots by the prescribed statutory process.

133.   County officials thus will be forced to adopt alternative procedures for processing provisional ballots and determining their validity.

134.   This risks New Jersey counties adopting arbitrary and varying procedures without "specific rules designed to ensure uniform treatment." *Bush*, 531 U.S. at105-06.

135.   A4475 thus will result in New Jersey's counties "us[ing] varying standards to determine what [i]s a legal [provisional] vote," contrary to the Equal Protection Clause. *Bush*, 531 U.S. at 107.

136.   Defendant has acted and will continue to act under color of state law to violate the Equal Protection Clause of the Fourteenth Amendment.

137.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendant is enjoined from implementing and enforcing A4475.

**WHEREFORE,** Plaintiffs ask this Court to enter judgment in their favor and provide the following relief:

a.   A declaratory judgment that A4475 violates the Fourteenth Amendment and 3 U.S.C. §1.

b.   A permanent injunction prohibiting Defendant from implementing and enforcing A4475;

c.   A temporary restraining order and preliminary injunction granting the relief specified above during the pendency of this action;

d.   Plaintiffs' reasonable costs and expenses, including attorneys' fees; and

e.   All other preliminary and permanent relief that Plaintiffs are entitled to, and that the Court deems just and proper.

Dated: September 11, 2020                                Respectfully submitted,

*/s/ Michael L. Testa Jr.*
Thomas R. McCarthy*
Bryan Weir*
Cameron T. Norris*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Ph.: (703) 243-9423
Email: tom@consovoymccarthy.com

Michael L. Testa Jr.
TESTA HECK TESTA & WHITE P.A.
424 W. Landis Avenue
Vineland, NJ 08360
Ph.: (856) 691-2300
Fax: (856) 691-5655
Email: mtestajr@testalawyers.com


*admitted pro hac vice*