Thomas R. McCarthy*
Bryan Weir*
Cameron T. Norris*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Ph.: (703) 243-9423
Email: tom@consovoymccarthy.com

Michael L. Testa Jr.
TESTA HECK TESTA & WHITE P.A.
424 W. Landis Avenue
Vineland, NJ 08360
Ph.: (856) 691-2300
Email: mtestajr@testalawyers.com

*Counsel for Plaintiffs*

\* *Admitted pro hac vice*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

DONALD J. TRUMP FOR PRESIDENT,
INC., REPUBLICAN NATIONAL
COMMITTEE, NEW JERSEY
REPUBLICAN STATE COMMITTEE,

Plaintiffs,

v.

TAHESHA WAY, in her official capacity
as Secretary of State of New Jersey,

Defendant.

No. 3:20-cv-10753-MAS-ZNQ

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR ORDER
TO SHOW CAUSE WHY A
PRELIMINARY INJUNCTION SHOULD
NOT ISSUE**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

    A.   Congress has established one uniform, national Election Day to combat undue influence and fraud. ............................................................................................ 2

    B.   New Jersey has a well-documented history of voter fraud tied to mail-in ballots.......... 4

    C.   The perils of hastily moving to universal vote-by-mail without the necessary safeguards ...................................................................................... 9

    D.   New Jersey has authorized a universal vote-by-mail general election, counting votes before Election Day, and accepting votes cast after Election Day...................... 12

    E.   Ballots mailed after Election Day will arrive in time to be counted—and some of those will not have postmarks........................................................................ 14

LEGAL STANDARD........................................................................................................... 17

ARGUMENT ....................................................................................................................... 17

    I.   Plaintiffs are likely to succeed because A4475 violates federal law. ................................. 17

        A.   Federal law prohibits counting ballots until Election Day. ............................................ 18

        B.   Federal law requires that all votes be cast on or before Election Day. .......................... 21

    II.   The preliminary-injunction equitable factors favor Plaintiffs. ......................................... 24

CONCLUSION..................................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Arizona Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ........................................................ 26

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
    570 U.S. 1 (2013) ......................................................................... 17

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018) .................................................................. 26

*Berne Corp. v. Gov't of Virgin Islands*,
    120 F. Supp. 2d 528 (D.V.I. 2000) .................................................. 26

*Council of Alternative Political Parties v. Hooks*,
    121 F.3d 876 (3d Cir. 1997) ....................................................... 24, 25

*Crawford v. Marion Cty. Election Bd.*,
    553 U.S. 181 (2008) ................................................................ 10, 26

*Eu v. San Francisco Cty. Democratic Cent. Comm.*,
    489 U.S. 214 (1989) ...................................................................... 26

*Ex parte Siebold*,
    100 U.S. 371 (1879) ................................................................... 2, 17

*Ex parte Yarbrough*,
    110 U.S. 651 (1884) ...................................................................... 19

*Foster v. Love*,
    522 U.S. 67 (1997) ..................................... 2, 3, 17, 19, 20, 21, 22, 23, 24

*Gallagher v. N.Y. State Bd. of Elec.*,
    — F. Supp. 3d —, 2020 WL 4496849 (S.D.N.Y. Aug. 3, 2020) .............. 15, 22

*Golden v. Gov't of the Virgin Islands*,
    2005 WL 6106401 (D.V.I. Mar. 1, 2005) ......................................... 25

*Gonzalez v. Arizona*,
    677 F.3d 383 (9th Cir. 2012) ......................................................... 18

*Griffin v. Roupas*,
    385 F.3d 1128 (7th Cir. 2004) ....................................................... 11

*Harkless v. Brunner*,
    545 F.3d 445 (6th Cir. 2008) ......................................................... 18

*Issa v. Sch. Dist. of Lancaster*,
    847 F.3d 121 (3d Cir. 2017) ...................................................... 17, 25

*Love v. Foster*,
    90 F.3d 1026 (5th Cir. 1996) ..................................................... 23, 24

*Maddox v. Bd. of State Canvassers*,
    149 P.2d 112 (Mont. 1944) ........................................................... 21

*Millsaps v. Thompson*,
    259 F.3d 535 (6th Cir. 2001) ..................................................... 2, 4, 23

*Penn. Democratic Party v. Republican Party of Penn.*,
    2016 WL 6582659 (E.D. Pa. Nov. 7, 2016) ...................................... 25

*Project Vote v. Blackwell*,
  455 F. Supp.2d 694 (N.D. Ohio 2006).................................................. 24

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006)............................................................................ 24, 26

*Reynolds v. Sims*,
  377 U.S. 533 (1964)................................................................................ 25

*Sikkelee v. Precision Airmotive Corp.*,
  822 F.3d 680 (3d Cir. 2016).................................................................. 24

*Smiley v. Holm*,
  285 U.S. 355 (1932).................................................................................. 2

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.*,
  307 F.3d 243 (3d Cir. 2002).................................................................. 26

*Texas Democratic Party v. Abbott*,
  961 F.3d 389 (5th Cir. 2020)................................................................. 10

*United States v. Berks Cty.*,
  250 F. Supp. 2d 525 (E.D. Pa. 2003)..................................................... 25

*Voting Integrity Project, Inc. v. Bomer*,
  199 F.3d 773 (5th Cir. 2000) .................................................................. 2

*Voting Integrity Project, Inc. v. Bomer*,
  61 F. Supp. 2d 600 (S.D. Tex. 1999)...................................................... 21

*Voting Integrity Project, Inc. v. Keisling*,
  259 F.3d 1169 (9th Cir. 2001) ................................................ 3, 21, 23, 24

## CONSTITUTIONAL PROVISIONS & STATUTES

Act of May 23, 1872, ch. 198, 17 Stat. 157 ........................................ 20, 23

An Act Concerning the Establishment of Mail-in Ballot Drop Boxes Before Each
  Election and Vote-by-Mail Procedures for the November 2020 General
  Election, NJ LEGIS 72 §2(a) (2020) ..................................................... 13

An Act Concerning the Establishment of Mail-in Ballot Drop Boxes Before Each
  Election and Vote-by-Mail Procedures for the November 2020 General
  Election, NJ LEGIS 72 §2(b) (2020) ........................................... 13, 16, 22

An Act Concerning the Establishment of Mail-in Ballot Drop Boxes Before Each
  Election and Vote-by-Mail Procedures for the November 2020 General
  Election, NJ LEGIS 72 §2(m) (2020) ............................................... 13, 22

2 U.S.C. §1.............................................................................................. 3, 22

2 U.S.C. §7....................................................................................... 3, 18, 22

2 U.S.C. §8.................................................................................................. 19

3 U.S.C. §1....................................................................................... 3, 18, 22

3 U.S.C. §2.................................................................................................. 19

N.J. Stat. §19:62-1 .................................................................................... 12

N.J. Stat. §19:62-10(a) ............................................................................. 12

N.J. Stat. §19:63-18 .................................................................................. 12

N.J. Stat. §19:63-22 ...................................................................................... 12, 13

U.S. Const. art. I, §4, cl. 1 ............................................................................ 2, 17

U.S. Const. art. II, §1, cl. 4 ........................................................................... 2, 17

## OTHER AUTHORITIES

Cong. Globe, 28th Cong., 2d. Sess. (1844) ......................................................... 19

Cong. Globe, 42d Cong., 2d Sess. (1871) .................................................... 20, 23-34

*Election Fraud Cases, New Jersey*, The Heritage Foundation .................................... 7

*Eric Holder: Here's How the Coronavirus Crisis Should Change U.S. Elections—
  For Good*, TIME (Apr. 14, 2020) ................................................................... 10

Exec. Order No. 105 (Mar. 19, 2020) .................................................................. 7

Exec. Order No. 144 (May 15, 2020) ................................................................... 4

Exec. Order No. 177 (Aug. 14, 2020) ............................................................ 12, 13

Jon Levine, *Confessions of a voter fraud: I was a master at fixing mail-in ballots*,
  N.Y. Post (Aug. 29, 2020) ............................................................................ 7

Lisa Lerer, *Washington: Where Everyone Votes By Mail*,
  N.Y. Times (Apr. 15, 2020) .......................................................................... 11

Marc E. Elias, Twitter (May 3, 2020) ................................................................ 10

*N.J. Reports 7 New COVID-19 Deaths, 464 New Cases As Transmission Rate
  Stays Below Key Mark for Spread of Virus*, NewJersey.com (Aug. 15, 2020) ............. 13

President Jimmy Carter & Secretary of State James Baker, *Report of the
  Commission on Federal Election Reform, Building Confidence in U.S.
  Elections* (Sept. 2005) .............................................................................. 10

## INTRODUCTION

On the eve of the November 2020 election, New Jersey decided to hastily rewrite its election code with new legislation—A4475—that provides for universal vote-by-mail balloting, and impermissibly extends Election Day both forward and backward from its statutorily mandated date. In its haste, New Jersey has opened the door to voter fraud and widespread confusion in the upcoming election.

Sadly, voter fraud is an unfortunate tradition in the Garden State. Countless individuals have been convicted of voter fraud tied to absentee ballots over the last decade. Not surprisingly, fraud and other irregularities plagued the State when the Governor ordered universal vote-by-mail in May of this year in response to COVID-19. The Attorney General has charged four individuals in Paterson, NJ—including one sitting city council member and one candidate for city council who nominally won his race—on charges arising from a scheme to collect and illegally mail in hundreds of ballots in that election. That scheme led to a crisis in Paterson, requiring that the city hold another election between the indicted candidate and his opponent because it is impossible to determine just how many fraudulent ballots were cast. That regretful episode in Paterson should have been a warning sign suggesting that the State proceed with caution. Yet the State blew through that warning sign by *expanding* universal vote-by-mail to the entire state for the November election.

New Jersey compounded this problem by altering its Election Day deadlines. In a trio of statutes, Congress has set a uniform election day for Americans to cast their votes for congressional and presidential candidates. Congress passed those statutes to end the practice where States voted on different dates, and early vote counts influenced how later-voting Americans cast their ballots, and to combat fraud. A4475 conflicts with those statutes in two ways. First, it allows New Jersey election officials to begin counting votes 10 days before Election Day. Second, it allows New

Jersey voters to cast ballots *after* Election Day because officials must accept unpostmarked ballots up to two days after the polls close. These provisions establish conditions likely to incentivize and facilitate the same kind of fraud and confusion that have plagued New Jersey elections for years. As a result, they should be enjoined.

## **BACKGROUND**

**A.    Congress has established one uniform, national Election Day to combat undue influence and fraud.**

Though the Elections Clause grants states power to set the time, place, and manner of congressional elections, U.S. Const. art. I, §4, cl. 1, it also subordinates that power to federal law. The Clause expressly reserves to "Congress" the power to "at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." *Id*. Congress also bears similar power under the Electors Clause to "determine the Time of chusing the Electors" for the offices of President and Vice President. *Id*. art. II, §1, cl. 4. "[T]hese comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). Legislation enacted pursuant to this authority protects "the fundamental right [to vote] involved." *Id*.; *Ex parte Siebold*, 100 U.S. 371, 382 (1879) (noting Congress's power to set the time of elections protects the "rights of citizens to vote"); and is therefore judicially enforceable in a suit brough under Section 1983, *see Foster v. Love*, 522 U.S. 67 (1997) (adjudicating challenge to State statutes allegedly in conflict with the uniform Election Day brought under Section 1983); *Millsaps v. Thompson*, 259 F.3d 535, 542 (6th Cir. 2001) (same); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 774 (5th Cir. 2000) (same).

Plaintiffs' claims here arise from federal statutes embodying a crucial exercise of those powers: Congress's decision to establish "the Tuesday next after the 1st Monday in November" as the uniform, national "day for the election" of members of Congress, 2 U.S.C. §7; *see id*. §1, and for appointing electors for President and Vice President, 3 U.S.C. §1. This trio of statutes "mandates holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster*, 522 U.S. at 70. And they are valid exercises of Congress's power. "By establishing a particular day as 'the day' on which these actions must take place, the statutes simply regulate the time of the election, a matter on which the Constitution explicitly gives Congress the final say." *Id*. at 71-72; *see also Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1170 (9th Cir. 2001) ("Without question, Congress has the authority to compel states to hold these elections on the dates it specifies.").

These statutes serve sound policy goals. A uniform, national Election Day prevents "the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States." *Foster*, 522 U.S. at 73. Before Congress adopted a uniform Election Day during the Reconstruction era, the "diversity of" federal election dates gave "'some states'" and "'some parties'" an "'undue advantage'"; as one Senator from Maine put it when opposing a uniform Election Day, "'we want in the future, as we have had in the past, the position of indicating to the country the first sentiment on great political questions.'" *Keisling*, 259 F.3d at 1173. Beyond that, Congress established a uniform, national Election Day as a "'check to frauds in elections, to double voting, to the transmission of voters from one State to another, and [to] allow the people to vote for their Representatives undisturbed by considerations which they ought not to take at all into account.'" *Id*. at 1174 (quoting Cong. Globe, 42 Cong., 2d Sess. 618 (1872)); *see also id.* at 1172-73 (uniform election day proposed as solution to "great frauds"

3

committed in presidential elections (quoting Cong. Globe, 28th Cong., 2d Sess. 15 (1844)));

*Millsaps*, 259 F.3d at 541 ("[A] review of the legislative history of these provisions demonstrates that Congress wanted to prevent States that voted early from unduly influencing those voting later [and] to combat fraud by minimizing the opportunity for voters to cast ballots in more than one election.").

> **B.   New Jersey has a well-documented history of voter fraud tied to mail-in ballots.**

New Jersey has a long history of problems with voting and voting by-mail in particular. To start with, the state has had issues with keeping accurate voter rolls. One study in 2005 found that 4,755 people who were listed as deceased voted in the 2004 general election. David W. Chen, *Among Voters in New Jersey, G.O.P. Sees Dead People*, New York Times (Sept. 16, 2005), https://nyti.ms/3g2mZW2 (attached as Ex. 1). And 4,397 people who were registered to vote in more than one county voted twice. *Id.* Another study in 2016 found a full 2,460 active voters who had been dead for at least *five* years, and nearly sixty of them had apparently cast votes *after they died.* Paul D'Ambrosio & Susanne Cervenka, *NJ dead are registered voters, but no evidence of fraud*, Asbury Park Press (Oct. 19, 2016), https://bit.ly/31257qm (attached as Ex. 2). The study also found that there were 920 active voters that were ostensibly 106 years old or older. *Id.*

New Jersey also had issues with undeliverable and misplaced ballots. New Jersey conducted a universal vote-by-mail election during the July primary. *See* Exec. Order No. 144 (May 15, 2020), https://bit.ly/34293Jq. In Hunterdon County, for example, 1,500 ballots were returned as undeliverable. *See* Katie Kausch, *Can Vote-by-mail Be Fixed for November Election? Election Officials Warn of Problems*, NJ.com (July 25, 2020), https://bit.ly/3461III (attached as Ex. 3). Just last week, Sussex County *discovered 1,666 ballots from the July 7 primary* in a mislabeled bin, and then still chose to canvass them. K. Morel, *1,666 uncounted Sussex County*

*ballots from July primary just found in 'mislabeled' bin*, N.J. Herald (Sept. 14, 2020), https://njersy.co/3hyzGZq (attached as Ex. 4). And there were numerous reports of stacks of ballots being left in apartment buildings. *See, e.g.*, D. Wildstein *Reports of vote-by-mail ballots undelivered, tossed aside by postal workers*, N.J. Globe (April 25, 2020), https://bit.ly/32vae2V (attached as Ex. 5). In the end, there were over 5.5 million people that the Secretary of State deemed entitled to vote in that election, yet only 1.47 million of them actually returned their ballots. Secretary of State Tahesha Way, Official Primary Election Turnout (Aug. 26, 2020), https://bit.ly/33r00Ql (attached as Ex. 6). That means millions of ballots left election officials' custody and were never returned.

Voter fraud is likewise notoriously common in New Jersey. Consider just a few examples over the last decade.

- In 2010, over a dozen people were arrested and charged with voter fraud and tampering with absentee ballots to get Councilman Rigo Rodriguez elected in Paterson, New Jersey. Councilman Rodriguez won the election by just 41 votes in a recount after 49 previously uncounted absentee ballots were included in the final tally. Joe Malinconico, *Councilman and Wife Arrested in Voter Fraud Case*, TAP into Paterson (Dec. 2, 2010), https://bit.ly/2Y7gIlV (attached as Ex. 7). He and his wife were later arrested on charges of witness tampering in an effort to cover up the voter fraud. *Id.* Rodriguez ended up serving his entire four-year city-council term before agreeing to a permanent ban from holding office in exchange for the charges to be dropped. David Wildstein, *Patterson: The Rigo Rodriguez story*, N.J. Globe (June 26, 2020), https://bit.ly/2EoN4BE (attached as Ex. 8).

- In 2012, a Belleville resident was found guilty of election fraud, conspiracy, absentee-

ballot fraud, forgery, and tampering with public records or information. N.J. Office of the Atty' Gen., *Former Campaign Worker in Essex County Convicted at Trial of Engaging in Ballot Fraud in 2007 Races in 29th Legislative District*, NJ.gov (Sept. 28, 2012), https://bit.ly/3asBJfS (attached as Ex. 9). Along with his co-conspirators, he tampered with documentation for absentee ballots in the November 2007 general election by submitting ballots on behalf of voters who had never received a ballot nor cast a vote. *Id.*

- In 2015, a Hoboken resident pleaded guilty to using the mail system to aid a voter-bribery scheme. Corey McDonald, *Hoboken man pleads guilty to participating in 2015 vote-by-mail fraud scheme*, Hudson Cty. View (Oct. 8, 2019), https://bit.ly/312MkLz (attached as Ex. 10). He provided voters with applications for mail-in ballots, offered them payment for casting them for a certain candidate, reviewed the ballots, and then delivered funds to voters after the election. *Id.*

- In 2018, another Hoboken resident pleaded guilty to conspiracy to use mail to promote a voter bribery scheme during the 2013 municipal election. John Heinis, *Feds: Hoboken woman pleads guilty to promoting vote-by-mail fraud scheme*, Hudson Cty. View (Nov. 8, 2018), https://bit.ly/3h26hHS (attached as Ex. 11). She and her associates (at the direction of a city council candidate) agreed to pay voters $50 each in exchange for mail-in votes. *Id.* The city council candidate was convicted the following year due to the scheme. Ron Zeitlinger, *Raia sentenced to 3 months in prison for Hoboken cash-for-votes scheme*, NJ.com (Dec. 2, 2019), https://bit.ly/2CB8JGo (attached as Ex. 12).

- In 2019, Elmwood Park's mayor resigned from his position in the face of charges of

6

election fraud. Jerry DeMarco, *Elmwood Park Mayor Charged with Voter Fraud, Resigns*, Brook-Elmwood Daily Voice (Apr. 29, 2019), https://bit.ly/3g0wJ3o (attached as Ex. 13). Investigators determined that between March 2017 and November 2018, the mayor "had interfered with the secrecy of the election process by completing portions of the application for vote by mail ballot, primary election ballot certifications and general election ballot certifications of registered voters in the borough." *Id.*

These are just a handful of the many examples of voter fraud and impropriety that have occurred in New Jersey in recent memory. *See Election Fraud Cases, New Jersey*, The Heritage Foundation, https://herit.ag/2DNVGC8 (collecting cases); Jon Levine, *Confessions of a voter fraud: I was a master at fixing mail-in ballots*, N.Y. Post (Aug. 29, 2020), https://bit.ly/33pRDV7.

Given New Jersey's long history of voter fraud, it is unsurprising that Governor Murphy's forced switch to universal vote-by-mail earlier this year ended poorly. On March 19, the Governor ordered that all pending elections would occur on May 12 and that the elections "shall be conducted solely via vote-by-mail ballots, which will automatically be sent to all registered voters without the need for an application to receive a vote-by-mail ballot." Exec. Order No. 105 (Mar. 19, 2020), https://bit.ly/2DYUeNd. Over 30 municipalities held nonpartisan municipal, school board, or special elections completely by mail on May 12. The results were disastrous. To start with, ten percent of ballots that were cast were invalidated. Colleen O'Dea, *One in 10 Ballots Rejected in Last Month's Vote-by-Mail Elections*, N.J. Spotlight (June 10, 2020), https://bit.ly/2PZCZxq (attached as Ex. 14). That is more than 3 times as many invalidated mail-in votes as the 2018 general election in New Jersey. *Id.*

But those statistics don't even begin to reveal the extent of the voter fraud that stemmed from the Governor's March order. Consider the City of Paterson. There, Alex Mendez beat his

opponent Bill McKoy by merely 240 votes in a bid for a city council seat. David Wildstein, *Evidence of massive voter fraud in Paterson election, court records show*, N.J. Globe (June 14, 2020), https://bit.ly/312nrzD (attached as Ex. 15). Almost immediately, however, officials encountered evidence of massive voter fraud. It began with the discovery of nearly 900 votes that were mailed in bulk from three individual mailboxes, including more than 300 ballots that came from a single mailbox all rubber-banded together. *Id.*

Next, there were widespread reports of people being listed as having voted, but who say they never even received their ballots. J. Dienst and J. Valiquette, *Corruption Allegations Keep Growing in Paterson Vote-By-Mail Election*, NBC News N.Y. (May 13, 2020), https://bit.ly/3fWilc9 (attached as Ex. 16). One woman was shown an official list of people who voted that lived on her block. She confirmed that there were eight people on the list, plus herself, who she knows didn't vote. *Id.* A councilman reported he knew of at least another dozen cases of the same thing happening. *Id.*

In the weeks following the election, the New Jersey Attorney General conducted an investigation into voter fraud and discovered an illegal conspiracy to get Mendez elected. *Evidence of massive voter fraud*, *supra*, Ex. 15. McKoy's attorneys revealed the AG's findings in a lawsuit to challenge the election's outcome. The election, they explained, "was rife with nonfeasance, malfeasance, and straight up voter fraud. It was a failure at every level, from the mailing of VBMs to their delivery, from the actual casting of the ballots to the receiving of same by the Board of Elections and their counting." *Id.* In particular, a campaign worker for Mendez "confessed to investigators working on behalf of the [New Jersey Attorney General's] office to having stolen ballots out of mailboxes, both completed and uncompleted, on behalf of and at the direction of the Mendez campaign." *Id.*

On June 25, the Attorney General charged Mendez, a sitting councilmember, and two others with multiple felonies related to election fraud, including illegally collecting absentee ballots and submitting fraudulent voter registrations. J. Dienst, *Paterson City Council Vice President Among 4 Charged With Voting Fraud in May Special Election: NJ AG*, NBC News N.Y. (June 25, 2020), https://bit.ly/31Qengk (attached as Ex. 17). Yet despite his indictment and the extensive evidence of voter fraud, Mr. Mendez refused to withdraw his candidacy and still planned to take office on July 1. That lead to a New Jersey judge issuing an injunction preventing Mendez from doing so. In issuing his decision, the judge explained:

> I don't see how I could let the people of Paterson have to accept the fact that this was a fair and free election, that it was a full expression of their intent. … I just think it would be a tremendous undermining of the voting system, the public trust to let Mr. Mendez be sworn in tomorrow.

J. Dienst, *Judge Blocks Paterson Councilman-Elect Facing Voter Fraud Charges From Taking Office*, NBC News N.Y. (June 30, 2020), https://bit.ly/310AT6R (attached as Ex. 18). So instead of declaring McKoy the winner, and with charges pending against Mendez, Paterson will conduct another election for the council seat. J. Malinconico, *Bitter rivals agree to 'do-over' in disputed Paterson election*, Paterson Press (Aug. 11, 2020), https://njersy.co/345qyZw (attached as Ex. 19).

## C.    The perils of hastily moving to universal vote-by-mail without the necessary safeguards.

A4475 is part of a broader push to advance the electoral prospects of the Governor's political party. Much of the move toward universal vote-by-mail has been driven by litigation initiated by the Democratic Party in reaction to COVID-19. The Democratic National Committee, state Democratic parties, and several affiliated groups have filed lawsuits across the country to force a hurried transition to universal vote-by-mail and to remove the safeguards meant to protect the integrity of the ballot. Democrats have pushed for these changes long before COVID-19. But unable to persuade legislatures, Democrats have turned to the courts and, like here initially, the

executive branch of the state. *See, e.g.*, *Eric Holder: Here's How the Coronavirus Crisis Should Change U.S. Elections—For Good*, TIME (Apr. 14, 2020), bit.ly/3eAiW2W ("Coronavirus gives us *an opportunity* to revamp our electoral system ...." (emphasis added)). According to the Democrats' top lawyer—who represents intervenor DCCC in this case, *see* Doc. 10—"If [these lawsuits] gain 1 percent of the vote [for Democrats], that would be among the most successful tactics that a campaign could engage in." Marc E. Elias, Twitter (May 3, 2020), bit.ly/2XiI74A.

But COVID-19 is no basis to throw out longstanding safeguards that protect the integrity of elections. In fact, it makes those safeguards *more* important. "As Justice Stevens noted, 'the risk of voter fraud' is 'real.'" *Texas Democratic Party v. Abbott*, 961 F.3d 389, 413 (5th Cir. 2020) (Ho, J., concurring) (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.)). It is widely agreed that voting by mail is "the largest source of potential voter fraud." President Jimmy Carter & Secretary of State James Baker, *Report of the Commission on Federal Election Reform, Building Confidence in U.S. Elections* 46 (Sept. 2005), https://bit.ly/3dXH7rU (*Carter-Baker Report*); *see also Texas Democratic Party*, 961 F.3d at 414 (Ho, J., concurring) ("[C]ourts have repeatedly found that mail-in ballots are particularly susceptible to fraud."). Well-regarded commissions and groups of diverse political affiliation agree that "when election fraud occurs, it usually arises from absentee ballots." Michael T. Morley, *Election Emergency Redlines* 2, https://bit.ly/3e59PY1 (Morley, *Redlines*) (attached as Ex. 20). Such fraud is easier to commit, easier to meaningfully scale, and harder to detect with absentee voting than in-person voting sites. Ballots are sometimes "mailed to the wrong address or to large residential buildings" and "might get intercepted." *Carter-Baker Report* 46. Absentee voters "who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation." *Id.* And "[v]ote buying schemes are far more difficult to detect

when citizens vote by mail." *Id.* After all, "absentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004).

This risk of abuse is magnified by the fact that "many states' voter registration databases are outdated or inaccurate." Morley, *Redlines* 2. A 2012 study from the Pew Center on the States found that "[a]pproximately 24 million—one of every eight—voter registrations in the United States are no longer valid or are significantly inaccurate"; "[m]ore than 1.8 million deceased individuals are listed as voters"; and "[a]pproximately 2.75 million people have registrations in more than one state." The Pew Center on the States, *Inaccurate, Costly and Inefficient: Evidence that America's Voter Registration System Needs an Upgrade* 1 (Feb. 2012), https://bit.ly/2FpyLhj (attached as Ex. 21). Because of these widespread inaccuracies in a state's voter registration records, a state that sends ballots to all registered voters will necessarily send ballots to persons ineligible to vote or others with fake registrations, invalid registrations, outdated registrations, and to the deceased. Placing hundreds of thousands of ballots "outside of both election officials' control and the hands of the voters who are supposed to be casting them raises a serious threat to both the actual and perceived integrity of the electoral system." Morley, *Redlines* 3.

These risks explain why, in most states, by-mail voting is a limited alternative to in-person voting and supported by numerous safeguards. And it also explains why the few states that routinely conduct universal vote-by-mail did not "just flip a switch." Lisa Lerer, *Washington: Where Everyone Votes By Mail*, N.Y. Times (Apr. 15, 2020), nyti.ms/2ZRfmNZ. The transition to universal vote-by-mail elections requires entirely new systems to track and count ballots, new equipment, and massive training and voter-education efforts. Washington, for example, planted the seeds for universal vote-by-mail elections more than a decade before a five-year transition to 100% mail-in voting. *See id.* That deliberate transition allows states to ensure the integrity of

elections and prevent the kinds of voter fraud that can plague mail-in voting.

> **D.     New Jersey has authorized a universal vote-by-mail general election, counting votes before Election Day, and accepting votes cast after Election Day.**

As a general matter—at least until now—the New Jersey Legislature has chosen *not* to conduct universal vote-by-mail elections, or to automatically send absentee ballots to all voters. Instead, New Jersey law contains two sets of statutes governing mail-based voting, both of which require mailed ballots to be either be received or postmarked by election day.

The first set, New Jersey Statutes §19:63-3, allows voters to cast application-based mail-in ballots, commonly known as absentee ballots, as an alternative to in-person voting in any election. Importantly, all such ballots must be received by the close of the polls to be counted, N.J. Stat. §19:63-18, or postmarked by election day and received "within 48 hours after the time of the closing of the polls" to be counted, *id.* §19:63-22.

The second set of provisions governs universal vote-by-mail-in elections. N.J. Stat. §19:62-1. Until now, New Jersey has allowed vote-by-mail elections in very limited circumstances: only for municipalities that have a "population of 500 or fewer persons" and even then only where the governing bodies of those municipalities affirmatively vote to allow them. *Id.* In such elections, the mailed ballots must be "received by the county board of elections no later than the time established for the closing of the polls for that election." N.J. Stat. §19:62-10(a).

On August 14, however, Governor Murphy issued Executive Order 177 ("EO 177" or "Order"), which suspended and rewrote New Jersey's election laws for the November 3 election. Exec. Order No. 177 (Aug. 14, 2020), https://bit.ly/30ZjBaj. The Order, among other things, mandated that "[t]he November General Election shall be conducted primarily via vote-by-mail ballots, which will be sent to all 'Active' registered voters without the need for an application to receive a vote-by-mail ballot." *Id.* ¶1. It mandated that "vote-by-mail ballots shall be mailed to all

'Active' voters on or before the 29th day before the November General Election." *Id.* ¶11. And all "return envelopes shall have prepaid First-Class postage in order to facilitate the proper delivery of all cast vote-by-mail ballots." *Id.* ¶2.

The Order further suspended the ballot-return deadline in N.J. Stat. §19:63-22, and provided that "[e]very vote-by-mail ballot that is postmarked on or before November 3, 2020, and that is received by November 10, 2020, at 8:00 p.m. shall be considered valid and shall be canvassed, assuming the ballot meets all other statutory requirements." *Id.* ¶14.  And "every ballot without a postmark … that is received by the county Boards of Elections from the United States Postal Service within forty-eight (48) hours of the closing of polls on November 3, 2020, shall be considered valid and shall be canvassed, assuming the ballot meets all other statutory requirements." *Id.* To justify the Order, Governor Murphy stated that "even as the rate of reported new cases of COVID-19 decreased, the ongoing risks presented by COVID-19 have meant that many of the State's current measures must remain in place." *Id.* at 3. Yet the very next day, the Governor proclaimed that the state's COVID-19 numbers "look very good." *N.J. Reports 7 New COVID-19 Deaths, 464 New Cases As Transmission Rate Stays Below Key Mark for Spread of Virus*, NewJersey.com (Aug. 15, 2020), https://bit.ly/3h2YCsJ. And New Jersey maintained a transmission rate below 1 for several weeks, and was at the time reporting a transmission rate of 0.94, meaning "the outbreak is shrinking." *Id.*

Plaintiffs filed this lawsuit on August 18 to challenge the Order on several grounds, including that the Governor is barred by the Elections and Electors Clauses of the U.S. Constitution from unilaterally changing New Jersey's election laws. *See* Doc. 1. Perhaps recognizing that the Governor lacked authority to issue the Order, the New Jersey Legislature passed a bill that codified its substantive provisions. *See* An Act Concerning the Establishment of Mail-in Ballot Drop Boxes

13

Before Each Election and Vote-by-Mail Procedures for the November 2020 General Election, NJ LEGIS 72 §§2(a), (b), (m) (2020) ("A4475"). A4475 added an additional provision: it allows "county board[s] of elections [to] begin opening the inner envelopes and canvassing each mail-in ballot from the inner envelopes no earlier than ten days prior to the day of the election." *Id.* §2(m) (codified at N.J. Stat. §19:63-31(m)). The statute, however, does not likewise allow election officials to begin canvassing early in-person ballots before Election Day. The Governor signed A4475 on August 28.

By extending Election Day forward and backward, A4475 facilitates the precise behavior that the federal Election Day statutes were enacted to prevent—avoiding improper influences on elections, letting early returns give certain candidates or parties an advantage, and making fraud easier. *See supra* 2-4. And New Jersey's unfortunate history with mail-in ballots show just how likely A4475 will be to facilitate those issues. *See supra* 4-9. As with the July primary, ballots will leave election officials' custody, the majority of which the intended recipients don't even want. *Supra* 5. That will lead to millions of available ballots that can repurposed—as they were in Paterson—if the canvass for a particular candidate before the election or the result on Election Day do not turn out well.

### E.     Ballots mailed after Election Day will arrive in time to be counted—and some of those will not have postmarks.

A4475's very existence confirms that New Jersey policymakers expect ballots with no postmarks to be received after Election Day. Plaintiffs share that expectation.

The U.S. Postal Service's general policy is not to apply postmarks to postage prepaid envelopes. *See* U.S. Postal Serv., Handbook PO-408 §1-1.3 Postmarks ("Postmarks are not required for mailings bearing a permit, meter, or precanceled stamp for postage, nor to pieces with an indicia applied by various postage evidencing systems."), https://bit.ly/3kftt7l (attached as Ex.

22). But USPS guidance states an exception to that general no-postmarking policy for election mail. Under that guidance, in place since 2018, "all ballots should be postmarked by machine or by hand." Office of Inspector Gen., U.S. Postal Serv., *Management Alert: Timeliness of Ballot Mail in the Milwaukee Processing & Distribution Center Service Area*, Report No. 20-235-R20, 5 (July 7, 2020), https://bit.ly/2YbjBT0 (attached as Ex. 23).

But the 2020 election cycle has confirmed that—despite its policy—USPS does not postmark all ballots. USPS itself acknowledges that "there can be breakdowns or exceptions to this process which would prevent a ballot from receiving a postmark." *Id*. at 7. That happened in Wisconsin's April 2020 primary election, when the Milwaukee Election Office received "about 390 voter completed ballots with varying postmark issues including illegible postmarks, lack of a postmark, undated postmarks, or hand-stamped postmarks." *Id*. at 5. USPS explained that those problems could have resulted from ballots being "double fed on a machine," or when the "machines applying postmarks … run out of ink," or from ballots being "comingled with certain mail that is not processed on machinery that applies a postmark." *Id*. at 7.

Similar problems plagued New York's June 2020 primary election. Six weeks after the primary election between Rep. Carolyn Maloney and Suraj Patel for New York's 12th District, results remained unknown, so a federal district judge in New York "ordered the counting of certain mail ballots that arrived after Election Day but without a postmark to prove when they were sent." *An Autopsy of New York's Mail-Vote Mess*, Wall St. J. (Aug. 7, 2020), https://on.wsj.com/3kT7d3y (attached as Ex. 24). In that race, "1,135 of 8,285 absentee ballots received by the NYCBOE within a week of Election Day—more than 13%—were not postmarked," while the number of unpostmarked ballots in another New York primary race was "nearly 10%." *Gallagher v. N.Y. State Bd. of Elec.*, — F. Supp. 3d —, 2020 WL 4496849, at *16 (S.D.N.Y. Aug. 3, 2020).

It is still not known why absentee ballots were delivered without a postmark to election officials in New York even though the Postal Service's "policy is to postmark all ballots, and the city was assured it would happen." *An Autopsy of New York's Mail-Vote Mess*, supra, Ex. 24. But a manager at a New York postal service processing facility testified during the lawsuit over the absentee ballots and "offered two possibilities." *Id.* "First, postmarking machines can reject mail if, for example, it isn't 'folded over properly.' On Election Day, USPS staff were ready to grab bypassed ballots and postmark them by hand." *Id.* That happened "'for thousands of ballots'" on Election Day, but the manager "wasn't sure…if this happened before June 23." *Id*. Second, "most prepaid mail usually skips postmarking altogether and goes 'directly to a sortation machine.'" *Id.* "On Election Day, USPS staff overrode that procedure and forced everything through the postmarking system. But again, [the manager] wasn't sure about before June 23, saying it was 'very possible' that some ballots went straight to sorting." *Id.* News reports do not disclose whether USPS would invoke those manual-override procedures on days after Election Day to ensure postmarks were affixed both to improperly folded mail and to prepaid ballots placed in the mail after the election.

To this end, A4475 requires that "[a]ll vote-by-mail return envelopes shall have prepaid First-Class postage in order to facilitate the proper delivery of all cast vote-by-mail ballots." A4475 §2(b) (codified at N.J. Stat. §19:63-31(b)). The USPS has confirmed that "all Election Mail (including ballots) mailed from individual voters to state or local election officials must be sent by First-Class Mail." Ltr. From Thomas J. Marshall, Gen. Counsel, U.S. Postal Serv., Re: Election Mail, 1 (May 29, 2020), https://bit.ly/2QvyBqw (attached as Ex. 25). And at least some first-class mail sent in New Jersey on a Wednesday *will* arrive the next day. *See* U.S. Postal Serv., FAQs: Types of First-Class Mail?, Article No. 000003138 (Jan. 26, 2020), https://bit.ly/2EyfERB

(attached as Ex. 26) ("In some instances (short distance between ZIP Codes^TM), it is possible for [first-class] delivery to occur in one day."). That means some votes cast the day *after* Election Day will be counted in New Jersey.

## LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction if "(A) they are likely to succeed on the merits of their claims, (B) they are likely to suffer irreparable harm without relief, (C) the balance of harms favors them, and (D) relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017). To establish a likelihood of success in this circuit, "the movant need only prove a 'prima facie case,' not a 'certainty' she'll win." *Id.*; *see also id.* ("We do not require that the right to a final decision after trial be 'wholly without doubt'; the movant need only show a 'reasonable probability' of success.").

## ARGUMENT

### I.    Plaintiffs are likely to succeed because A4475 violates federal law.

Though the Elections Clause grants states power to set the time, place, and manner of congressional elections, U.S. Const. art. I, §4, cl. 1, it also subordinates that power to federal law. The Clause expressly reserves to "Congress" the power to "at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." *Id.* Congress also bears similar power under the Electors Clause to "determine the Time of chusing the Electors" for the offices of President and Vice President. *Id.* art. II, §1, cl. 4. To this end, Congress passed a trio of statutes that "mandate[] holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster*, 522 U.S. at 70; *see supra* 2-4. That Election Day is both "binding on the States" and superior to conflicting state law: "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends,

ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex parte Siebold*, 100 U.S. at 384). As discussed above, regulations made by Congress pursuant to the Elections and Qualifications Clauses protect the "right of suffrage ... a fundamental article of republican government." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 26 (2013) (quoting Federalist No. 52). Preemption thus applies with particular force under the Elections Clauses because "[i]n contrast to the Supremacy Clause, which addresses preemption in areas within the states' historic police powers, the Elections Clause affects only an area in which the states have no inherent or reserved power: the regulation of federal elections." *Gonzalez v. Arizona*, 677 F.3d 383, 392-93 (9th Cir. 2012). In consequence, "the 'presumption against preemption' and 'plain statement rule' that guide Supremacy Clause analysis are not transferable to the Elections Clause context." *Id.* (quoting *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008)).

**A. Federal law prohibits counting ballots until Election Day.**

Section 2(m) of A4475 extends election day in New Jersey forward in time in direct conflict with federal law setting a uniform national Election Day. The bill allows for mail-in ballots to be canvassed up to ten days before the election. But this early counting reintroduces precisely the problem Congress sought to remedy in creating a uniform federal Election Day. Congress has set the "Tuesday next after the 1st Monday in November" as "the day for the election" of members of Congress. 2 U.S.C. §7. The text and legislative history of this provision demonstrate that New Jersey's attempt to count votes prior to the uniform Election Day conflicts with Congress's designation of a single national Election Day.

Consider first the text and structure of the federal election day provisions. The word "day" in 2 U.S.C. §7 is modified by "the," demonstrating the term is meant as a singular moment in time—one single election day, and no other. Moreover, within the same provision, Congress uses

the term "commencing" to describe the start of a new congressional session. By contrast, Congress uses no such indefinite term to describe Election Day, which is not a process spread over time, commencing on a certain day, but is a definite period—"the" Election Day. The structure of federal election law confirms this interpretation. 3 U.S.C. §1 states that presidential electors "shall be appointed … on the Tuesday next after the first Monday in November." Like 2 U.S.C. §7, this provision sets one particular day, and only one day, as the time to appoint presidential electors. Additionally, 3 U.S.C. §7 allows States to "direct" where presidential electors are to meet, 3 U.S.C. §2 allows States to appoint electors in such a "manner" as the State directs if they fail to "on the day prescribed by law," and 2 U.S.C. §8 allows States to prescribe the manner of the election if they fail to make a selection on the uniform Election Day. But nowhere are States given any discretion whatsoever on the timing of the uniform Election Day itself. Federal law is clear—the "choice" is to be made "on the day prescribed by law"—and not sooner. 3 U.S.C. §2; *see also Foster*, 522 U.S. at 70 (federal election law "mandates holding all elections for Congress and the Presidency on a single day throughout the Union").

Legislative history confirms the plain meaning apparent from the text and structure. *See Foster*, 522 U.S. at 73 (noting that "Congress's object" was "to remedy more than one evil arising from the election of members of Congress occurring at different times in the different States" (quoting *Ex parte Yarbrough*, 110 U.S. 651, 661 (1884))). Prior to the adoption of the uniform day of election in the Reconstruction Era, Congress had long been concerned about some states allowing multi-day voting in federal elections. For example, in an 1844 debate, Virginia's multi-day voting was a particular target for derision because "it frequently happened that all the votes were not polled in one day." Cong. Globe, 28th Cong., 2d. Sess. 15 (1844). Such multi-day voting led to great "fraud" that could only be remedied by making the election "time … uniform in the

19

States." *Id.* at 29. It was Reconstruction and the vast potential for voter fraud and disenfranchisement—facilitated by multi-day voting—that provided the impetus to finally end the practice by creating a uniform national election day.

Foremost in Congress's mind was the danger of some states counting votes early: "the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States." *Foster*, 522 U.S. at 73 (citing Cong. Globe, 42d Cong., 2d Sess., 141 (1871) (remarks of Rep. Butler)). Congress thus set a single Election Day to prevent "a canvass going on all over the Union at different times," that would lead to "news from … States that held their elections prior to the presidential election" reaching States that voted later, which improperly granted those early canvassing states "an influence" on the outcome of the election. *Id.*; *see also* Cong. Globe, 42 Cong., 2d Sess. 618 ("Whenever you provide that elections shall take place upon the same day, you do interpose a not inconsiderable check to frauds in elections, to double voting, to the transmission of voters from one State to another, and you do allow the people to vote for their Representatives undisturbed by considerations which they ought not to take at all into account."). Moreover, Congress explicitly rejected amendments to allow for multi-day voting. Instead, it granted a one-time exception for the election of 1872, that would allow multi-day voting in States that already provided for it. Act of May 23, 1872, ch. 198, 17 Stat. 157. It is thus clear that Congress had the early counting of votes in mind as an evil to be remedied.

States cannot circumvent this uniform election day by beginning to open and count mail-in ballots prior to election day. *Cf. Foster*, 522 U.S. at 72 n.4 (holding state statute allowing federal election to "consummated" before federal election day to be preempted). By allowing election officials to begin counting ballots 10 days before Election Day, A4475 runs afoul of the text and

purpose of federal election law.[1] Indeed, even in cases upholding early and absentee voting generally, courts have found it relevant that the "tallying takes place on Federal Election Day" rather than before it. *Voting Integrity Project, Inc. v. Bomer*, 61 F. Supp. 2d 600, 604 (S.D. Tex. 1999), *aff'd*, 199 F.3d 773 (5th Cir. 2000). It is only by counting votes on Election Day rather than before, that States can hope to avoid the dangers of multi-day voting that Congress sought to avoid in the creation of a single Election Day. *See id.* ("As the votes are not tallied until the designated Federal Election Day, the casting of early, untallied votes cannot influence later voting in other states."). This Court must reject New Jersey's attempt to circumvent federal laws protecting the people's fundamental right to vote and hold that A4475's early counting provision, Section 2(m), is preempted.

### B. Federal law requires that all votes be cast on or before Election Day.

Federal law also preempts one of A4475's ballot-deadline extensions. The word "election" in 3 U.S.C. §1 means the "combined actions of voters and officials meant to make a final selection of an officeholder." *Foster*, 522 U.S. at 71. That means a mail ballot is not a legal vote unless it is marked and cast on or before the national Election Day, which is the date of the "'consummation' of the process of selecting an official." *Keisling*, 259 F.3d at 1175 (quoting *id.*). Moreover, a ballot is cast not when it is marked, but only when it is actually deposited "in the custody of election officials." *Maddox v. Bd. of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944); *see also id.* ("[V]oting is done not merely by marking the ballot but by having it delivered to the election officials and deposited in the ballot box before the closing of the polls on election day."). A state law governing elections for federal offices "conflicts with federal law" and is therefore "void"

---

[1] The 1872 exception to the uniform election day is instructive. That provision stated that the election "commenc[ed]" on the uniform election day. Act of May 23, 1872, ch. 198, 17 Stat. 157. Here, New Jersey seeks to commence its election early by counting ballots up to ten days before the uniform election day.

when it sets a different date for the consummation of an election than federal law. *Foster*, 522 U.S. at 74. Therefore, New Jersey cannot permit ballots cast after Election Day to be counted.

But that is precisely what New Jersey has done in enacting A4475. The statute provides that "every ballot without a postmark … that is received by the county boards of elections from the United States Postal Service within 48 hours of the closing of polls … shall be considered valid and shall be canvassed." A4475 §2(m) (codified at N.J. Stat. §19:63-31(m)). In other words, A4475 requires election officials to count votes that could have been cast *after* Election Day because, without a postmark, those officials have no way of confirming when a ballot has been cast.

At the same time, A4475 makes it more likely that ballots will lack a legible postmark showing when voters mailed them. The legislation instructs election clerks to send out ballots with "return envelopes" that "have prepaid First-Class postage." A4475 §2(b) (codified at N.J. Stat. §19:63-31(b)). The Postal Service, however, generally does not apply postmarks to postage prepaid envelopes. *See* U.S. Postal Serv., Handbook PO-408, *supra* Ex. 22 ("Postmarks are not required for mailings bearing a permit, meter, or precanceled stamp for postage, nor to pieces with an indicia applied by various postage evidencing systems."). Notwithstanding the Postal Service's apparent policy of disregarding that standard practice for election-related mail, *see supra* 14-15, many ballots will still show up without a postmark. The experiences in Wisconsin and New York confirm that the Postal Service cannot uniformly apply an exception to its default no-postmark policy when the number of mail ballots returned exceed historical levels by an order of magnitude. *Id.*; *see Gallagher*, 2020 WL 4496849, at *5 ("[T]here is uncontroverted evidence that thousands of absentee ballots for the June 23 Primary were not postmarked."). And because the Post Office can deliver first class mail sent within a county just one day after it is mailed, *see* Ex. 26, at 2, that

22

means New Jersey voters can mark their mail-in ballots the Wednesday after Election Day, mail them, and those votes will be counted when they arrive the next day.

A4475's command to count ballots cast after the uniform Election Day irreconcilably conflicts with Congress's decisions in 2 U.S.C. §§1, 7 and 3 U.S.C. §1 to require that "the combined actions of voters and officials meant to make a final selection of an officeholder" be "consummated" on one uniform, national Election Day. *Foster*, 522 U.S. at 71, 72 n.4. New Jersey's election regime can no more require "the combined actions of voters and officials meant to make a final selection of an officeholder" to stop "prior to federal election day"—which was the issue in *Foster*—than allow those combined actions to continue after it. *Id.* Either type of regime "purport[s] to affect the timing of federal elections." *Id.* at 73.

Other statutes confirm that Congress did not intend voting to continue after Election Day. First, federal law specifically enumerates only two instances in which an election for federal office can be held at a later date: "(1) in states that required a majority vote for election, a runoff could be held between federal election day and January when officials take office; and (2) an election could be held on a different date if a vacancy occurred in the office." *See Love v. Foster*, 90 F.3d 1026, 1029 (5th Cir. 1996), *aff'd*, 522 U.S. 67 (1997) (citing 3 U.S.C. §8). New Jersey is not free to create a third "COVID" exception. That is Congress's job. *See Foster*, 522 U.S. at 71-72; *see also Keisling*, 259 F.3d at 1170 ("Without question, Congress has the authority to compel states to hold these elections on the dates it specifies.").

Second, the Reconstruction Congress enacted the Act of May 23, 1872 to alleviate concerns that Texas could not logistically hold an election on one day given its size and lack of established precincts. It was "a one-time exception to the statutory and constitutional requirement for a uniform day for selection of electors to address the circumstances of Reconstruction-era Texas."

*Millsaps*, 259 F.3d at 542 (citing Cong. Globe, 42d Cong., 2d Sess. 3407-08). This provision's existence *assumes* that votes cannot be cast under any circumstances after the uniform Election Day, which cannot be "continued for more than one day" by a State without congressional permission. 17 Stat. 157. If votes could be validly cast after the uniform Election Day, this provision would be a nullity. *Id.*

A4475 also conflicts with the sound policy goals behind the uniform Election Day, which, again, prevents "the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States." *Foster*, 522 U.S. at 73. Before Congress adopted a uniform Election Day during the Reconstruction era, the "diversity of" federal election dates gave "some states" and "some parties" an "undue advantage." *Keisling*, 259 F.3d at 1173. Under A4475, persons dissatisfied with Tuesday's election returns have an opening to try to distort and improperly influence any races whose preliminary outcomes displease them. This is precisely the type of fraud and gamesmanship the uniform Election Day was meant to prevent. *See Love*, 90 F.3d at 1029 ("I think it will be fair for everybody that on the day when one votes all should vote, and that the whole question should be decided then." (quoting Cong. Globe, 42d Cong., 2d Sess. 112 (1871) (remarks of Congressman Butler))).

In sum, because A4475's directive to count ballots regardless of whether they were cast after the uniform Election Day "conflicts with federal law such that compliance with both state and federal regulations is impossible," *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 688 (3d Cir. 2016), it infringes upon Plaintiffs' fundamental right to vote, and it "is void," *Foster*, 522 U.S. at 74.

## II.     The preliminary-injunction equitable factors favor plaintiffs.

The recent history of voter fraud in New Jersey demonstrates that A4475 is likely to irreparably damage the integrity of the November election. Prior to New Jersey's making these

hasty changes to its election laws, the State could neither count mail-in ballots before Election Day nor accept mail-in ballots without postmarks received after Election Day. A4475 thus threatens to confuse voters, undermine confidence in the electoral process, and create "incentive[s] to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). And that is an irreparable harm, *see Project Vote v. Blackwell*, 455 F. Supp.2d 694, 707-08 (N.D. Ohio 2006) (that people "will continue to be dissuaded from engaging in an important [election-related] activity" constitutes an "irreparable injury"), because it "cannot be alleviated after the election," *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997).

The damage to the individual, fundamental rights of Plaintiffs' voting members is also irreparable. A4475 washes away many of the procedures and safeguards that the New Jersey Legislature enacted, inviting illegitimate practices that will dilute the votes of honest voters in violation of the Constitution. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). When the state likely violates a plaintiff's rights concerning an election, "it clearly follows that denying [Plaintiffs] preliminary injunctive relief will cause them to be irreparably injured." *Hooks*, 121 F.3d at 883; *see also Penn. Democratic Party v. Republican Party of Penn.*, 2016 WL 6582659, at *7 (E.D. Pa. Nov. 7, 2016) (holding "that a violation of voting rights would work an irreparable harm for which there is no adequate remedy at law"); *Golden v. Gov't of the Virgin Islands*, 2005 WL 6106401, at *4 (D.V.I. Mar. 1, 2005) (burdening a plaintiff's "voting rights" is irreparable harm). At the very least, Plaintiffs have "demonstrated a reasonable probability," if not a certainty, that many votes cast after election day will be counted in violation of federal law, thereby diluting the votes of Plaintiffs' members. *Issa*, 847 F.3d at 142. Plaintiffs have thus demonstrated that "irreparable harm is 'likely' in the absence of relief." *Id.* Defendant, however, will suffer no comparable injury.

Neither can Defendant complain about undue expense or delay, which "are likely to be minimal and are far outweighed by the fundamental right at issue." *United States v. Berks Cty.*, 250 F. Supp. 2d 525, 541 (E.D. Pa. 2003) (preliminarily enjoining unlawful voting procedures less than two months before the election in part because "Defendants still have ample time to make modifications"). Therefore, "[s]ince there is no basis for concluding that preliminary relief will negatively impact the November [2020] election, these constitutional rights can and should be protected immediately." *Hooks*, 121 F.3d at 884.

Finally, granting a preliminary injunction is in the public interest, which "demands respect for … constitutional rights." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 258 (3d Cir. 2002). "In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights, including the voting and associational rights of [Plaintiff] political parties, their candidates, and their potential supporters." *Hooks*, 121 F.3d at 883-84.

General speaking, the public interest obviously weighs in favor of enjoining the government from violating federal law. *See Berne Corp. v. Gov't of Virgin Islands*, 120 F. Supp. 2d 528, 537 (D.V.I. 2000) ("[I]t is undeniable that the public interest weighs in favor of enjoining the government from violating federal law."); *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) ("It is clear that it would not be equitable or in the public's interest to allow the state ... to violate the requirements of federal law, especially when there are no adequate remedies available."). And more specifically, there is a "compelling [public] interest in preserving the integrity of [the] election process"—both actual and perceived. *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989); *Crawford*, 553 U.S. at 197 (plurality op. of Stevens, J.) ("[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process."). Radical,

abrupt, and complex changes to election law undermine integrity, *see Purcell*, 549 U.S. at 4-5, especially where the changes transparently threaten an increased risk of illegitimate voting. "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Id.* at 4; *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (recognizing "the public interest in orderly elections").

## <u>CONCLUSION</u>

For these reasons, the Court should enter a preliminary injunction.


Dated: September 16, 2020                     Respectfully submitted,

                                              */s/ Michael L. Testa Jr.*
                                              Thomas R. McCarthy*
                                              Bryan Weir*
                                              Cameron T. Norris*
                                              CONSOVOY MCCARTHY PLLC
                                              1600 Wilson Boulevard, Suite 700
                                              Arlington, VA 22209
                                              Ph.: (703) 243-9423
                                              Email: tom@consovoymccarthy.com

                                              Michael L. Testa Jr.
                                              TESTA HECK TESTA & WHITE P.A.
                                              424 W. Landis Avenue
                                              Vineland, NJ 08360
                                              Ph.: (856) 691-2300
                                              Fax: (856) 691-5655
                                              Email: mtestajr@testalawyers.com


                                              * *Admitted pro hac vice*