## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., ET AL., | Case No. 3:20-cv-10753-MAS-ZNQ |
| Plaintiffs, | |
| v. | |
| TAHESHA WAY, in her official capacity as Secretary of State of New Jersey, | *Document Electronically Filed* |
| Defendants. | |

## MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE
## WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

**CAMPAIGN LEGAL CENTER**
Danielle Lang*
Molly Danahy*
1101 14th Street NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200

**NEW JERSEY INSTITUTE FOR SOCIAL JUSTICE**
Ryan P. Haygood
Andrea McChristian*
Henal Patel
60 Park Place, Suite 511
Newark, New Jersey 07102
Telephone: (973) 624-9400

**DLA PIPER LLP (US)**
B. John Pendleton, Jr.
Marc A. Silverman
Jenny X. Zhang
Daniel C. Harkins**
51 John F. Kennedy Parkway, Suite 120
Short Hills, New Jersey 07078-2704
Phone:  (973) 520-2561

*Counsel for League of Women Voters of New Jersey and NAACP New Jersey State Conference*
*Pro Hac Vice*
**Pro Hac Vice* application forthcoming

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................1

FACTUAL OVERVIEW ...................................................................4

    A.    The Pandemic .................................................................4

    B.    New Jersey Passes A4475 to Allow All Eligible Voters to
           Vote During the Pandemic Without Risking their Safety ...................6

    C.    Procedural History ............................................................9

ARGUMENT ...............................................................................10

I.    Plaintiffs Lack Standing ...............................................................10

II.    Plaintiffs Are Not Entitled To A Preliminary Injunction ............................14

    A.    Plaintiffs Fail to Establish a Likelihood of Success Because
           A4475 is Constitutional ........................................................15

    B.    Plaintiffs Fail to Show They are Likely to Suffer Irreparable
           Harm Based on Speculative Assertions of Voter Fraud ....................29

    C.    The Balance of Equities and Public Interest Support A4475 .............31

CONCLUSION .............................................................................38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Abbott*,
  954 F.3d 772 (5th Cir. 2020) ..............................................................31

*Am. Civil Rights Union v. Martinez-Rivera*,
  166 F. Supp. 3d 779 (W.D. Tex. 2015) ............................................12

*Benisek v. Lamone*,
  138 S. Ct. 1942 (2018) .........................................................................36

*Caplan v. Fellheimer Eichen Braverman & Kaskly*,
  68 F.3d 828 (3d Cir. 1995) ..........................................................14, 29

*Delaware Riverkeeper v. Simpson*,
  No. CIV.A. 07-2489, 2008 WL 755947 (E.D. Pa. Mar. 17, 2008) ...................23

*Donald J. Trump For President, Inc., v. Cegavske*,
  2:20-cv-01445, 2020 WL 5626974 (D. Nev. Sept. 18, 2020) ...............13, 14, 37

*Fishman v. Schaffer*,
  429 U.S. 1325 (1976).............................................................................37

*Foster v. Love*,
  522 U.S. 67 (1997).........................................................................18, 19

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018).........................................................................11

*Gonzales v. Carhart*,
  550 U.S. 125 (2007).............................................................................16

*Hollingsworth v. Perry*,
  570 U.S. 693 (2015).......................................................................10, 11

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977).............................................................................14

*Jones v. United States Postal Serv.*,
   -- F. Supp. 3d --, 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020) ......................27

*Kansas v. Hendricks*,
   521 U.S. 346 (1997) ........................................................................................16

*Lance v. Coffman*,
   549 U.S. 437 (2007) ........................................................................................11

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................10, 12

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ........................................................................................31

*Millsap v. Thompson*,
   259 F.3d 535 (6th Cir. 2001) .................................................................18, 19, 20

*Paher v. Cegavske*,
   No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813 (D. Nev. Apr.
   30, 2020) ....................................................................................................12, 13

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) .......................................................................................31, 36

*Republican Nat. Comm. v. Common Cause R.I.*,
   No. 20A28, 2020 WL 4680151 (U.S. Aug. 13, 2020) .......................................12

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
   140 S.Ct. 1205, 2020 WL 1672702 (U.S. Apr. 6, 2020) ...................................36

*Sec'y of Labor v. Koresko*,
   378 F. App'x 152 (3d Cir. 2010) .....................................................................33

*South Bay United Pentecostal Church v. Newsome*,
   140 S.Ct. 1613 (2020) ................................................................................16, 31

*United States v. Hays*,
   515 U.S. 737 (1995) ........................................................................................11

*Valley Forge Christian College v. Americans United for Separation of
   Church and State*,
   454 U.S. 464 (1982) ........................................................................................13

iii

*Voting Integrity Project, Inc. v. Bomer*,
    199 F.3d 773 (5th Cir. 2000) .......................................................18, 19, 22

*Voting Integrity Project, Inc. v. Bomer*,
    61 F.Supp. 2d 600 (S.D. Tex. 1999).................................................19

*Voting Integrity Project, Inc. v. Keisling*,
    259 F.3d 1169 (9th Cir. 2001) ........................................................19

*Williamson v. Optical of OK Inc.*,
    348 U.S. 483 (1955).........................................................................16

*Winter v. Nat'l Res. Defense Council, Inc.*,
    555 U.S. 7 (2008).............................................................................14

**Statutes**

2 U.S.C. § 7 ........................................................................................17, 18

3 U.S.C. § 1 ..............................................................................................18

3 U.S.C. § 2 ..............................................................................................18

Ariz. Stat. 16-550, 16-1551 .....................................................................21

Colo. Stat. 1-7.5-107.5 .............................................................................21

Fla. Stat 101.68 ........................................................................................21

**Other Authorities**

Executive Order 177 ..................................................................................6

U.S. Const. art. I, § 4.................................................................................15

U.S. Const. art. II, § 1 ...............................................................................15

## <u>PRELIMINARY STATEMENT</u>

Nothing is more fundamental to a true democracy than the right to vote. When this right is protected and exercised in fair and free elections, democracy thrives.  In contrast, when the franchise is denied or undermined, democracy suffers.  A crucial function of the government is to ensure that voters have meaningful access to the ballot and that those ballots are counted.

The United States Constitution grants states the right to regulate the conduct of federal elections, including the manner in which they are held.  Accordingly, the New Jersey State Legislature (along with dozens of other states) has made the judgment to promote and foster voting rights, in part, through mail-in voting, which accommodates the needs of citizens unable or unwilling to travel to polling locations on Election Day—whether due to illness, employment, education, or other obligations that render voters unavailable.  That judgment is all the more important in the context of COVID-19–a unprecedented pandemic that has already claimed the lives of more than 16,000 people in New Jersey.

All voters, regardless of whether they vote in person or through the mail, have the right to have their ballots counted.  Assembly Bill No. 4475 ("A4475") seeks to ensure that validly cast ballots will be counted in a timely manner, and that voters are not denied the right to vote due to vagaries in the mail system. Plaintiffs Donald J. Trump for President, Inc., the Republican National Committee

("RNC"), and the New Jersey Republican State Committee ("NJ RSC") (collectively "Plaintiffs") argue that New Jersey's expansion of mail-in voting under A4475 impermissibly extends Election Day backward and forward in violation of federal law.  This is simply not true.

Plaintiffs' erroneous interpretation of A4475, federal law, and the U.S. Constitution rests on a contrived reading of the law and an implausible chain of speculative contingencies—none of which Plaintiffs have demonstrated are reasonably or even remotely likely.  As such, Plaintiffs lack standing and have failed to demonstrate any risk of irreparable harm.  In particular, Plaintiffs blindly speculate that New Jersey election officials may subject themselves to criminal penalties by ignoring A4475's explicit prohibition against announcing election results while tabulating mail-in ballots before Election Day (Count I).  Similarly, Plaintiffs also postulate that New Jersey voters who wish to subvert the election will attempt to do so by mailing in their ballots after the election, on Wednesday, November 4, 2020, in the hopes that they will both evade postmarking and be received by election officials the next day, such that they will be counted pursuant to A4475 (Count II).  But, again, Plaintiffs present no evidence that this is reasonably likely and ignore the United States Postal Service ("USPS") policies and practices that make it less than remotely likely.  This alone is fatal to

Plaintiffs' request for a preliminary injunction.  Emergency relief cannot rest on speculative contingencies unsupported by factual evidence.

Moreover, the balance of equities tips the scale against Plaintiffs.  None of Plaintiffs' members (let alone anyone) will be harmed by their speculative vote dilution theory.  Instead, should the Court enjoin the implementation of A4475, *all* New Jersey voters—regardless of party affiliation—would be harmed.  While there is no reasonable evidence that ballots cast after Election Day will be counted under A4475, there *is* reason to believe that valid ballots cast on or before Election Day may not be counted absent A4475.  These concerns are heightened in light of the expected surge in mail-in voting due to the COVID-19 pandemic.  Enjoining A4475 at this late stage when the voting has already begun will create mass confusion, suppress voting, and infringe on New Jersey citizens' right to vote. Election officials have already begun to deliver mail-in ballots to New Jersey's active, registered voters.  The League of Women Voters of New Jersey ("LWVNJ") and NAACP New Jersey State Conference ("NJ NAACP") (collectively "Intervenor-Defendants") along with other outreach groups have already conduced significant voter education efforts, encouraging their members and the larger electorate to protect their health and safety while exercising their right to vote.  All of this is jeopardized by Plaintiffs' eleventh hour request for an

injunction.  As such, the Court should deny Plaintiffs' motion for a preliminary injunction.

## FACTUAL OVERVIEW

### A.    The Pandemic

COVID-19 is a highly contagious and potentially fatal respiratory disease caused by the novel SARS-CoV-2 virus.[1]  The World Health Organization ("WHO") officially declared COVID-19 as global pandemic on March 11, 2020.[2] As of today, COVID-19 has infected more than 31 million people worldwide and killed approximately one million.  Each passing day these statistics move higher.

New Jersey has been hit especially hard by COVID-19.  Approximately 203,000 New Jersey residents have been infected,[3] and more than 16,000 have

---

[1] *See* U.S. Food & Drug Administration, *Oversight of the Trump Administration's Response to the COVID-19 Pandemic* (June 23, 2020), attached hereto as Exhibit 1 to the Certification of B. John Pendleton, Jr. Esq. in Opposition to Plaintiffs' Motion for Order to Show Cause Why A Preliminary Injunction Should Not Issue, dated September 25, 2020 ("Pendleton Cert.").

[2] *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19* (March 11, 2020), attached hereto as Exhibit 2 to Pendleton Cert.

[3] *See* State of New Jersey Department of Health, *New Jersey COVID-19 Dashboard – Cases and Trends*, available at https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml (last visited Sept. 25, 2020).

died.[4]  And the risk is not behind us.  The current transmission rate in New Jersey is 1.15, meaning that the virus is still spreading.[5]

Among those most at risk are older adults, people with medical conditions, communities of color, pregnant and breastfeeding women, and persons with disabilities.[6]  A recent analysis found that, in each county in New Jersey, Black or Latino communities had the highest rates of coronavirus.[7]  The actual toll on communities of color in New Jersey is likely worse than reported, as evidence shows that death rates of Black, Hispanic, and Asian people in New Jersey this year are significantly higher than normal.[8]  These residents, all of whom have an equal right to vote, are encouraged to take "extra precautions," including avoiding "close contact with other people" and "indoor spaces," that are "more risky than outdoor spaces."[9]  Accordingly, to ensure that the right to vote may still be enjoyed

---

[4] *See id*.

[5] *See id*.

[6] *See* Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) – Older Adults* (Sept. 11, 2020), attached hereto as Exhibit 3 to Pendleton Cert.

[7] Richard A. Oppel Jr., *et al*., *The Fullest Look Yet at the Racial Inequity of Coronavirus*, THE NEW YORK TIMES (July 5, 2020), attached hereto as Exhibit 4 to Pendleton Cert.

[8] Anna Flagg, *et al*., *COVID-19's Toll on People of Color Is Worse Than We Knew*, THE MARSHALL PROJECT (August 21, 2020), attached hereto as Exhibit 5 to Pendleton Cert.

[9] *See* Center for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) – Deciding to Go Out* (Sept. 11, 2020), attached hereto as Exhibit 6 to Pendleton Cert.

by all, including those most at risk, New Jersey has implemented a plan for broad

mail-in voting.

During congressional testimony on Oversight of the Trump Administration's

Response to the COVID-19 Pandemic, officials from the President's coronavirus

task force testified on September 23 that the risk is not abating and will reach its

peak during the flu season—*during* the election.  Dr. Anthony S. Fauci, Director of

the National Institute of Allergy and Infectious Diseases, testified:

> While it remains unclear how long the pandemic will last,
> COVID-19 activity will likely continue for some time. It
> is also unclear what impact the ongoing COVID-19
> pandemic will have on health care and public health
> systems during the upcoming influenza season. If there is
> COVID-19 and flu activity at the same time, this could
> place a tremendous burden on the health care system
> related to bed occupancy, laboratory testing needs,
> personal protective equipment and health care worker
> safety.[10]

**B.    New Jersey Passes A4475 To Allow All Eligible Voters To Vote During
       The Pandemic Without Risking Their Safety**

On August 14, 2020, Governor Murphy signed Executive Order 177 creating

a "modified vote-by-mail (VBM) election for the November 3rd General Election"

to provide vote-by-mail ballots to all active registered voters for the election and to

provide secure drop boxes or polling locations for voters to deposit their ballots,

---

[10] Anthony S. Fauci, M.D., *et al*., U.S. Department of Health and Human Services,
*Senate Committee on Health, Education, Labor and Pensions*: *COVID-19: An
Update on the Federal Response* (2020), attached hereto as Exhibit 7 to Pendleton
Cert.

should they choose.[11]  In doing so, Governor Murphy remarked "COVID-19 has impacted nearly every aspect of our lives, from our health and safety to how we participate in our democracy."[12]  He explained: "[t]his virus continues to threaten public health, and with today's announcement, we are ensuring that New Jersey voters do not have to make a decision between exercising their right to vote and protecting their well-being."[13]  Secretary of State Tahesha Way remarked that "[e]very voter deserves to participate in free, fair, and safe elections," and that, by "sending every New Jersey voter their ballot in the mail, we are protecting the health of voters, elections workers, and our democracy."[14]

On August 28, 2020, to "ensure[] a safe and inclusive General Election" during of COVID-19, the New Jersey Legislature passed (and Governor Murphy signed) A4475.[15]  A4475 states that the "November 2020 General Election shall be conducted primarily via vote-by-mail ballots, which will be sent to all 'Active'

---

[11] *See* State of New Jersey Governor Phil Murphy - Coronavirus Updates and Information, *Governor Murphy Signs Executive Order to Protect Public Health by Mailing Every Active Registered Voter a VBM Ballot Ahead of the General Election* (August 14, 2020), attached hereto as Exhibit 8 to Pendleton Cert.
[12] *See id.*
[13] *See id.*
[14] *See id.*
[15] *See* Jessie Gomez, *NJ approves three bills to support November vote-by-mail General Election*, NORTHJERSEY.COM (Aug. 30, 2020), attached hereto as Exhibit 9 of Pendleton Cert. (Governor Murphy remarking that  "COVID-19 has caused us to reevaluate the way we typically hold our elections . . . . Even in the face of a pandemic, we are firmly committed to ensuring a safe and inclusive General Election.").

registered voters without the need for an application to receive a vote-by-mail ballot." P.L. 2020, c. 72 § 2(a). Most relevant here are A4475's provisions related to the counting of mail ballots received after Election Day and the timeline for counting mail ballots as they are received.

As to the former, to account for the "increase in vote-by-mail ballots and to ensure that registered voters' efforts to vote are not impacted by delays in the postal service, every vote-by-mail ballot that is postmarked on or before November 3, 2020, and that is received by November 10, 2020, at 8:00 p.m. shall be considered valid and shall be canvassed, assuming the ballot meets all other statutory requirements." *Id.* at § 2(m). The law further provides that:

> [e]very ballot without a postmark, and ballots mis-marked and confirmed by the post office that those ballots were received by the post office on or before November 3, 2020, that is received by the county boards of elections from the United States Postal Service within 48 hours of the closing of polls on November 3, 2020, shall be considered valid and shall be canvassed, assuming the ballot meets all other statutory requirements.

*Id.* The law provides that mail-in voters will be "entitled to deposit the voter's completed mail-in ballot in a ballot drop box established by the county board of elections." *Id.* at § 1(a). All ballot boxes are required to be a "secured drop box" that will be in a place "equipped with security cameras that allow for surveillance of the ballot drop box." *Id.* at § 1(b)(2).

With respect to counting of mail ballots, A4475 provides: "[A] county board of elections may begin opening the inner envelopes and canvassing each mail-in ballot from the inner envelopes no earlier than ten days prior to the day of the election." *Id.* The law requires that the Secretary of State "establish guidelines concerning the early canvassing process," and "[i]f a county board of elections begins opening the inner envelopes and canvassing the mail-in ballots from the inner envelopes prior to the day of the election, the county board shall implement the measures necessary to ensure the security and secrecy of the mail-in ballots." *Id.*

In all cases, the "contents of the mail-in ballots and the results of the ballot canvassing shall remain confidential and shall be disclosed only in accordance with the provisions of Title 19 of the Revised Statutes, regulations and guidelines concerning the disclosure of election results, and in no circumstances disclosed prior to the close of polls on the day of the election." *Id.*

## C.   Procedural History

On August 18, 2020, Plaintiffs filed this lawsuit, claiming Executive Order 177 was unlawful. *See* Dkt. No. 1. On August 31, 2020, the LWVNJ and the NJ

NAACP moved to intervene. *See* Dkt. No. 15. Their motion to intervene was granted on September 23, 2020. *See* Dkt. No. 46.

On September 8, 2020, the Court held a telephone conference to determine whether Plaintiffs intended to file an order to show cause before the November election. Plaintiffs informed the Court that they planned on filing an amended complaint. On September 11, 2020, Plaintiffs filed the Amended Complaint claiming that A4475 was illegal and should be enjoined. *See* Dkt. No. 33 ¶ 4. On September 16, 2020, Plaintiffs filed a Motion for an Order to Show Cause Why a Preliminary Injunction Should Not Issue. *See* Dkt. No. 35.

## ARGUMENT

## I.   PLAINTIFFS LACK STANDING

Though Plaintiffs are wrong on the merits, the Court need not reach the issues because Plaintiffs lack standing to pursue their claims. To demonstrate standing, Plaintiffs bear the burden to establish: (1) an injury-in-fact that is "concrete and particularized" and "actual or imminent," (2) "the injury is fairly traceable to the challenged action," and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

To demonstrate a cognizable injury-in-fact, Plaintiffs "must possess a *direct stake* in the outcome of the case," meaning that the injury must "affect[] [them] in

10

a personal and individual way." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2015) (emphasis added).  Litigants that press only a "generalized grievance"—in which they "claim[] only harm to [their] and every citizen's interest in proper application of the Constitution . . . and seek[] relief that no more directly and tangibly benefits [them] than it does the public at large"—fall short of meeting this requirement.  *Id.* (internal citations omitted); *see also United States v. Hays*, 515 U.S. 737, 743 (1995) (collecting cases).

Dilution of an individual voter's power to elect representatives, under some circumstances—such as through the drawing of district lines—constitutes an injury-in-fact to the affected voter.  *See Gill v. Whitford*, 138 S. Ct. 1916, 1929–31 (2018) (citing *Baker v. Carr*, 369 U.S. 186, 206 (1962)).  But the "right to vote is 'individual and personal in nature,'" *id.* at 1929 (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)), and, to confer standing, "a plaintiff must prove that the value of her own vote has been 'contract[ed].'"  *Id.* at 1935 (Kagan, J., concurring) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 7 (1964)).  Plaintiffs here—a presidential campaign, as well as national and state political party organizations—fail to articulate how they or their members are at risk of having their vote contracted.  Instead, Plaintiffs' contentions are precisely the type of undifferentiated, follow-the-Constitution grievances that do not amount to concrete and particularized injuries-in-fact. *See, e.g., Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curium) (denying standing because the

11

"injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed").

Just last month, the Supreme Court stated that the same parties here "lack[ed] a cognizable interest" in enforcing a witness signature requirement on absentee ballots. *Republican Nat. Comm. v. Common Cause R.I.*, No. 20A28, 2020 WL 4680151, at \*1 (U.S. Aug. 13, 2020). Likewise, other courts have rejected the assertion that litigants like Plaintiffs suffered an injury-in-fact based on similar fraud-based "dilution" claims. *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813, at \*5 (D. Nev. Apr. 30, 2020) ("Plaintiffs' [vote dilution] argument is difficult to track and fails to even minimally meet the first standing prong."); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution[ is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact."). Plaintiffs assert the same theory of harm here and it should fail for the same reasons.

Even if Plaintiffs' generalized and speculative claims were sufficient to establish injury— and they are not—their purported injuries are not traceable to A4475. To have standing, "there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendants, and not the result of the independent action of

some third party not before the court." *Lujan*, 504 U.S. at 560–61.  Plaintiffs have not connected the challenged conduct—New Jersey Legislature's enactment of A4475, which permits and provides mail-in voting to every active voter throughout the State—with the dilutive injury they assert.

Plaintiffs claim that the provisions of A4475 permitting the counting of vote-by-mail ballots in the days before Election Day and permitting the counting of ballots received within 48 hours of Election Day without a postmark will somehow result in increased voter fraud in New Jersey.  They further argue that this increase in voter fraud will dilute their members' votes.  But Plaintiffs' claim that *some* completed ballots *may* be mailed after election day, *may* not be postmarked, *may* arrive within one day, and if counted *may* dilute the votes of New Jersey voters presents a speculative chain of events that is insufficient to demonstrate standing.  As the District Court of Nevada recently explained, even accepting Plaintiffs' "parade of administrative problems in Wisconsin, New Jersey, Connecticut, and New York" as true, "plaintiffs' pleadings allude to vote dilution that is impermissibly generalized," and the "alleged injuries are speculative as well."  *Donald J. Trump For President, Inc., v. Cegavske*, 2:20-cv-01445, 2020 WL 5626974 at *6 (D. Nev. Sept. 18, 2020).

Likewise, Plaintiffs lack associational standing because any purported injury is no more personal to their members than to "the public at large" and thus amounts to no more than "generally available grievance[s] about the government."

*Paher*, 2020 WL 2089813, at *7 (quoting *Lujan*, 504 U.S. at 573-74); *see also Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 485 (1982) ("The proposition that all constitutional provisions are enforceable by any citizen simply because citizen are the ultimate beneficiaries of those provisions has no boundaries.").

It is the same situation here.  The Trump campaign does not represent any New Jersey voters.  *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  While the RNC and NJ RSC arguably represent New Jersey voters, their members' alleged injury is no different than that alleged to be suffered by any New Jersey voter.  A4475 applies to all New Jersey voters—whether affiliated with any party or no party.  *See Cegavske*, 2020 WL 5626974, at *7.

## II.   PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat'l Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  To meet this burden, a plaintiff must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm absent preliminary relief, that the balance of equities favors them, and that an injunction would be in the public interest.  *Id.* at 20.  The purpose of a preliminary injunction "is to protect the moving party from irreparable injury until the court can render a meaningful decision on the merits."

14

*Caplan v. Fellheimer Eichen Braverman & Kaskly*, 68 F.3d 828, 839 (3d Cir. 1995).

Plaintiffs fail to carry their burden.  *First*, they have not (and cannot) demonstrate likelihood of success.  A4475 is a constitutional action of New Jersey's legislative power—a power reserved for it under the United States Constitution.  *Second*, the balance of harms and the public interest both weigh strongly against Plaintiffs.  Whatever speculative injury Plaintiffs might suffer from New Jersey's choices in regulating mail-in voting is far outweighed by the need to provide millions of New Jersey voters with the option to avoid a polling place during the worst pandemic in over a century, and to ensure that those New Jersey voters who choose that option are not disenfranchised as a result.

## A. Plaintiffs Fail To Establish A Likelihood Of Success Because A4475 Is Constitutional

### 1. A4475 Is Within New Jersey's Constitutional Prerogative To Set The Time, Place, And Manner Of Its Elections

The Elections Clause provides that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature."  U.S. Const. art. I, § 4.  The Electors Clause provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President, U.S. Const. art. II, § 1.  It is undisputed that this is precisely the action taken by the New Jersey Legislature:  On August 8, 2020,

the State Legislature passed A4475 to permit and facilitate mail-in voting during the November elections.

A4475 should be reviewed with particular deference in light of its tailored response to the COVID-19 pandemic.  The Supreme Court has reinforced that "when [politically accountable] officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *South Bay United Pentecostal Church v. Newsome*, 140 S. Ct. 1613 (2020) (quoting *Marshall v. U.S.*, 414 U.S. 417, 427 (1974)); *see also Gonzales v. Carhart*, 550 U.S. 125, 163 (2007); *Kansas v. Hendricks*, 521 U.S. 346, 360 n.3 (1997); *Williamson v. Optical of OK Inc.*, 348 U.S. 483, 487 (1955).  "Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people."  *South Bay United Pentecostal Church*, 140 S. Ct. at 1613–14.

Here, A4475 ensures that the legislative body most familiar with the circumstances and needs of their communities has made the informed choice as to how to safely conduct New Jersey's election.  The New Jersey Legislature enacted A4475 in order to provide broad vote-by-mail balloting in the midst of the COVID-19 pandemic—a disease that has wreaked havoc in New Jersey and killed

approximately eight percent of New Jerseyans it has infected.[16]  These legislators best understand the risk that COVID-19 poses to each of their communities and the capability of each county to run expanded vote-by-mail elections, as tested by the history of the widespread use of absentee voting in New Jersey and the predominately positive results from the primarily vote-by-mail July primary elections.  Moreover, as the most densely populated state in the country, New Jerseyans are uniquely susceptible to COVID-19—a disease that preys on people in close proximity to one another.

       2.     *New Jersey's Early Counting Of Votes Is Permissible*

Plaintiffs argue that A4475 violates federal law because it contradicts Congress's decision to establish the Tuesday after the first Monday in November as the national election day.  *See* Moving Br. at 3-4.  Plaintiffs' theory is that "counting" votes prior to Election Day "conflicts with Congress's designation of a single national Election Day."  *Id*. at 18.  They are wrong because, regardless of the wisdom of New Jersey's policy choice to begin tabulating ballots (and it is New Jersey's choice), those votes will be kept in secret and not "consummated" until Election Day, in accordance with federal law.  Federal law states that "the

---

[16] *See* State of New Jersey Department of Health, *New Jersey COVID-19 Dashboard – Cases and Trends*, available at: https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml (last visited Sept. 25, 2020).

Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election."  2 U.S.C. § 7.  Further, "[t]he electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November."  3 U.S.C. § 1.  It also provides that a state should make a "*choice* on the day prescribed by law," 3 U.S.C. § 2 (emphasis added).

The Supreme Court has explained that "Congress's object" in enacting 2 U.S.C. § 7 was "to remedy more than one evil arising from the election of members of Congress occurring at different times in the different States."  *Foster v. Love*, 522 U.S. 67, 73 (1997) (quoting *Ex parte Yarbrough*, 110 U.S. 651, 661 (1884)).  Congress was concerned with a situation where "the results of an early federal election in one State can influence later voting in other States."  *Id.*  It did not want "news from . . . States that held their elections prior to the presidential election" influencing those states that voted later.  *Id.*  The Court in *Foster* also made clear that: "This case thus does not present the question whether a State must always employ the conventional mechanics of an election. We hold today only that if an election does take place, it may not be consummated prior to federal election day."  *Id.* at 72, n.4.

Circuit courts that have confronted these authorities have rejected nearly identical arguments that Plaintiffs assert here and agree that early counting is

permissible so long as the election is not "consummated" prior to Election Day. *See Millsap v. Thompson*, 259 F.3d 535, 545 (6th Cir. 2001); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 776 (5th Cir. 2000) ("Because the election of federal representatives in Texas is not decided or 'consummated' before federal election day, the Texas scheme is not inconsistent with the federal election statutes as interpreted by the court in *Foster.*"); *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1176 (9th Cir. 2001) (treating election day as the "consummation" of the process rather than any day during which voting takes place, and holding that an Oregon law was "in compliance with the federal election day statute" because even though "voting takes place, perhaps most voting, prior to election day, the election is not 'consummated' before election day because voting still takes place on that day").[17]

---

[17] Plaintiffs completely ignore these cases.  Worse, they misleadingly claim that *Bomer* upheld early voting because "tallying takes place on Federal Election Day,' rather than before it."   Moving Br. at 21 (quoting *Voting Integrity Project, Inc. v. Bomer*, 61 F.Supp. 2d 600, 604 (S.D. Tex. 1999)).  But Plaintiffs leave out the word "final" from the district court's opinion.  The district court remarked that "election or final selection requires the *final tallying of the submission of votes*," and that the Texas law applied because the "*final tallying of the votes* complies with the federal statute in that the votes are officially counted and reported only on the designated Tuesday after the first Monday in every even year."  *Bomer*, 61 F. Supp. 2d at 604 (emphasis added).  Moreover, the Fifth Circuit decision acknowledges that counting might take place earlier by stating that the law "makes it illegal for election officers to reveal any election results before the polls close on election day."  *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 777 (5th Cir. 2000)

In *Millsap*, for example, the Sixth Circuit expressly rejected the Plaintiffs' theory that early counting violates federal law. 259 F.3d at 545. There, the plaintiffs claimed that an early counting law "conflict[ed] with federal law by allowing voters to participate in the final selection of officeholders prior to federal election day by marking a ballot and tendering it to a local election official." *Id.* The court disagreed. As the court explained, the "final selection' of an officeholder requires more than mere receipt of ballots cast by voters." *Id.*

The same is true here. The law provides that the "final" selection will not be made before Election Day. A4475 allows for early counting, mandates that election officials maintain the secrecy and security of ballots while doing so, and expressly prohibits disclosure of any results prior to Election Day. A4475 provides that "[i]f a county board of election begins opening the inner envelopes and canvassing the mail-in ballots from the inner envelopes prior to the day of the election, the county board shall implement the measures necessary to ensure the *security* and *secrecy* of the mail-in ballots." P.L. 2020, c. 72 § (2)(m). (emphasis added). Moreover, expressly addressing Plaintiffs' concerns, the law requires that

> [t]he contents of the mail-in ballots and the results of the ballot canvassing shall *remain confidential* and shall be disclosed only in accordance with the provisions of Title 19 of the Revised Statutes, regulations and guidelines concerning the disclosure of election results, and *in no*

> *circumstances disclosed prior to the close of polls on the*
> *day of the election.*

*Id.* (emphasis added).  Thus, there will be no result, no appointment, and no

consummation until Election Day.  Accordingly, the law is constitutional and does

not violate federal law.

Finally, Plaintiffs' position would have far-reaching consequences.  Both

Governor Murphy and the sponsors of A4475 have stated the purpose of early

counting is to ensure country election officials have sufficient time to count ballots

and certify results by December 14, when the Electoral College meets to officially

choose a new President.[18]  While Defendant-Intervenors take no position on the

necessity of that policy choice in New Jersey, it is undeniable that states across the

country have long implemented absentee and mail ballot procedures that allow for

counting to begin prior to Election Day in order to ensure a timely counting

process that meets the timeline for the meeting of the Electoral College.

Indeed, many states have long allowed for counting of absentee or mail ballots

prior to Election Day.[19]  And New Jersey is not alone in adjusting its counting

---

[18] Brent Johnson, *In big change, N.J. can start counting mail-in ballots 10 days
before Election Day.  Republicans aren't happy*, NJ.COM (Sep. 5 2020), attached
hereto as Exhibit 10 to Pendleton Cert.

[19] *See, e.g.,* Ariz. Stat. 16-550, 16-1551 (allowing tallying to begin 14 days before
Election Day); Colo. Stat. 1-7.5-107.5 (counting may begin 15 days before
Election Day); Fla. Stat 101.68 (canvasing may begin 22 days before Election
Day); N.C.G.S.A. 163-230.1, 163-234 (tallying may begin two weeks before
Election Day); *see generally* Nat'l Council for State Leg., *VOPP Table 16: When*

timeline during COVID-19 and the expected surge of mail voting.[20] Thus, Plaintiffs are not simply asking this Court to declare New Jersey's policy choice unlawful but also the longstanding election practices of many states across the country on the eve of Election Day. This Court should not accept such a bold and irresponsible invitation.[21]

Meanwhile, Plaintiffs' request to enjoin the early counting provision of A4475 rests on a speculative claim that county election officials will violate A4475 by releasing election results early. That conjecture is wholly unsupported. The law requires confidentiality and punishes those who would violate it. "Under the law, anyone who 'knowingly discloses to the public the contents of a mail-in ballot' before polls close on Election Day could be charged with a third-degree crime. That means violators could face five years in prison and a maximum fine of

_____

*Absentee/Mail Ballot Processing and Counting Can Begin*, attached hereto as Exhibit 11 to Pendleton Cert.

[20] *See* Nat'l Council for State Leg., Absentee and Mail Voting Policies in Effect for the 2020 Election, attached hereto as Exhibit 12 of the Pendleton Cert.

[21] Defendant-Intervenors note that Plaintiffs' position is duplicitous because at the same time that the Plaintiff Trump Campaign for President is arguing before this Court that no votes can even begin to be tallied until Election Day—which would ensure slower final results nationwide—President Trump has insisted that election results should be available on election night: "Must know Election results on the night of the Election, not days, months, or even years later!" A screenshot of President Trump's July 30, 2020 tweet is attached hereto as Exhibit 13 to Pendleton Cert.

$15,000."[22]   These provisions are more than sufficient to protect against the speculative harm Plaintiffs allege.  *See Bomer*, 199 F.3d at 777 ("Also, Texas law makes it illegal for election officers to reveal any election results before the polls close on election day.")

Nor is there any evidence that would-be-violators could evade criminal sanction.  Plaintiffs do not allege nor provide any evidence to suggest that such violations would not be caught or prosecuted.  Indeed, New Jersey's vote-by-mail system includes safeguards to prevent election officials from obtaining early results reports.  "Modern technology allows [county election boards] to determine if someone violates the ban on extracting early results reports since those actions are carefully tracked, and the penalties for early disclosure are appropriately severe."[23]   Thus, Plaintiffs' alleged harms are without merit.

### 3.   *A4475 Does Not Allow Voting After Election Day.*

Plaintiffs claim that A4475 violates federal law by permitting New Jerseyans to "vote" after Election Day, Tuesday, November 3, 2020 (Election Day).  Not so. Plaintiffs' basis for this claim rests on a speculative series of events that Plaintiffs have failed to demonstrate are reasonably likely.  A preliminary injunction is

---

[22] Pendleton Cert., Ex. 10, Johnson, *In big change, N.J. can start counting mail-in ballots 10 days before Election day.  Republicans aren't happy*; *see also* P.L. 2020, c. 72.
[23] *See* Pendleton Cert., Ex. 10, Johnson, *In big change, N.J. can start counting mail-in ballots 10 days before Election Day.  Republicans aren't happy.*

inappropriate when the movant's likelihood of success is entirely speculative.  *See*, *e.g.*, *Delaware Riverkeeper v. Simpson*, No. CIV.A. 07-2489, 2008 WL 755947, at *3 (E.D. Pa. Mar. 17, 2008).

*First*, Plaintiffs themselves recognize that the predicate to their claim relies on USPS violating its own policy to "postmark all ballots."  Moving Br. at 16. *Second*, even assuming USPS systematically fails to postmark election mail (which plaintiffs have not demonstrated will occur), the claim also depends on late-voted ballots arriving to election officials the day after mailing—a remote possibility at odds with USPS's service standards for First Class Mail.  Indeed, New Jersey's 48-hour rule is tailored to USPS's service standards to allow validly cast ballots sent on or before Election Day but that slip through the postmarking cracks to be counted while excluding any ballots posted after Election Day.  In other words, Plaintiffs ask this Court to require the near certain rejection of validly cast ballots in order to prevent the unlikely possibility that a voter casts a ballot *after* Election Day, that ballot is not postmarked, *and* it travels faster than ordinary USPS service would suggest.

Finally, none of the alleged fraud cited by Plaintiffs surrounding mail-in voting—most of which is not even alleged to have occurred in New Jersey— reflects efforts to subvert an election by counterintuitively waiting to vote until *after* Election Day.  Indeed, such a scheme makes no sense.  By waiting until after

Election Day to submit ballots, wrongdoers would risk of a very high probability that the ballots would be postmarked, *see infra*, and thus rejected. Such a speculative chain of remote possibilities cannot support a likelihood of success on the merits.

      i.    *Plaintiffs Fail to Allege New Jerseyans Will Attempt to Vote After Election Day*

As detailed above, the Complaint is replete with purported examples of "voter fraud"—most of which is alleged to have occurred *outside* of New Jersey. But even the "voter fraud" Plaintiffs have alleged *within* New Jersey cannot support a claim that New Jerseyans are reasonably likely to attempt to vote after Election Day under A4475.

Plaintiffs, for example, detail an alleged "crisis" in Paterson where the city must hold another election for a council seat after the victor and his associates were indicted for election tampering. Compl. ¶¶ 80-87. Plaintiffs claim this suggests that AA4475 "is destined to lead to the same disastrous results." *Id*. ¶ 76. But that is a non-sequitur. *First*, the experience in Paterson illustrates that, contrary to Plaintiffs' assertions, New Jersey has installed a robust system to investigate and prosecute election fraud. The Paterson council seat is still open— Mr. Mendez, the architect of the election tampering, was enjoined from taking office. *Id*. ¶¶ 85-86. *Second*—and more importantly—this anecdote has nothing to do with A4475. Plaintiffs have not reasonably alleged that the experience in

Paterson makes it more likely that New Jersey voters will attempt to mail their ballots after Election Day (or that election officials will accept and count them). The same is true for the other isolated events detailed in the Complaint.  *See*, *e.g.*, *id*. ¶ 47.  Plaintiffs fail to connect the dots between those events—none of which support Plaintiffs' conclusory theories of "rampant" election fraud in New Jersey, *see*, *e.g.*, *id*. ¶ 119—and the act of expanding active New Jersey voters' options to vote safely by providing them with a vote-by-mail ballot.  This alone is fatal to Plaintiffs' claim: they have not demonstrated that A4475 will lead to any hypothetical, post-Election Day votes to be counted.

   ii. *Plaintiffs Have Not Demonstrated A Reasonable Likelihood USPS Will Not Postmark Ballots.*

  Plaintiffs' argument that New Jerseyans may vote after election day under A4475 rests on a threadbare assertion that USPS will routinely fail to postmark ballots, meaning that ballots mailed on *after* Election Day, on Wednesday, November 4 would not reflect the date mailed with a postmark, and, thus, could be counted if received by election officials the next day, Wednesday, November 5. Even assuming *arguendo* Plaintiffs have alleged New Jersey voters are reasonably likely to mail ballots on Wednesday, November 4 (they have not), lack of postmarking is unlikely to be a systemic problem because USPS practice is otherwise.  Indeed, Plaintiffs themselves recognize, at a minimum, that their

allegation is speculative.  Moving Br., at 22 ("A4475 requires election officials to count votes that *could have been cast after* Election Day . . . .") (emphasis added).

While election officials in other states faced the challenge of tabulating un-postmarked ballots during the primaries, Plaintiffs have not alleged these problems occurred in New Jersey.  Nevertheless, the New Jersey legislature, in its discretion, recognized the need to proactively protect the franchise for all New Jersey voters by extending the received-by deadline in the event USPS fails to satisfy its promise to postmark all ballots.  Plaintiffs, however, have failed to carry their burden to demonstrate that un-postmarked ballots are likely to be a far-reaching problem now that USPS (after to the enactment of A4475) is responding to the very errors that occurred during the primary cycle that Plaintiffs identify in order to prevent reoccurrences.  *See*, *e.g.*, *Jones v. United States Postal Serv.*, -- F. Supp. 3d --, 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020) (requiring USPS to develop and distribute a "guidance memorandum" for all USPS managerial staff that "identif[ies] and explain[s]" all USPS "requirements" and "recommended practices" "concerning the treatment of election mail").

   iii. *Plaintiffs Have Not Demonstrated A Reasonable Likelihood First Class Mail Arrives Next Day.*

Even assuming *arguendo* that New Jerseyans are likely to attempt to vote after Election Day and then assuming that USPS is likely to systematically fail to follow its ballot postmark policy—neither of which Plaintiffs have alleged with

meaningful evidentiary proof—Plaintiffs' theory rests on yet another implausible contingency: next day First Class Mail delivery will deliver a ballot sent on November 4 on November 5.  In support, Plaintiffs cite *only* to a single page of USPS's website detailing First Class Mail delivery timelines.  Moving Br., at 16-17, 22-23, Ex. 26.  Because USPS claims "it is *possible* [for First Class Mail] delivery to occur in one day" (emphasis added), Plaintiffs extrapolate that it is *likely* that A4475 moves Election Day forward by allowing voters to mail ballots on Wednesday, November 4 and election officials to receive and count them on Thursday, November 5th (in accordance with the terms of A4475).  This speculative chain of events fails to establish a violation of federal law for the reasons detailed above.

The actual evidence actually suggests that A4475 is narrowly tailored to catch some mail ballots cast *on or before* Election Day that fail to receive the proper postmark and to exclude ballots cast *after* Election Day.  If anything, the 48-hour rule is still likely to exclude some timely ballots if they do not receive a postmark.

Plaintiffs recognize that USPS provides no guaranteed delivery date for First Class Mail.  Moving Br., Ex. 26.  Moreover, USPS's "Service Standard" for First

Class Mail sent from and received within New Jersey is *two* days, not one.[24]  And that is before taking into account the well-publicized problems USPS has recently faced meeting delivery benchmarks.[25]  Indeed, the expectation of this delay is codified in the text of A4475.  *See* P.L. 2020, c.72 § 2(m).  Accordingly, contrary to Plaintiffs' position, it is unlikely any non-postmarked ballots mailed on Wednesday, November 4 would arrive in time to be counted by election officials under A4475.  Plaintiffs' abstract conjecture to the contrary cannot support a likelihood of success on the merits.

**B.    Plaintiffs Fail To Show They Are Likely To Suffer Irreparable Harm Based On Speculative Assertions Of Voter Fraud**

Plaintiffs seek an order from the Court to halt the carefully considered decision of the New Jersey Legislature based on pure speculation about potential voter fraud.  But, as demonstrated above, Plaintiffs cannot establish standing.  They have demonstrated no non-speculative injury—let alone one specific to

---

[24] *See* USPS, *Service Standards Maps*, available at: https://postalpro.usps.com/ppro-tools/service-standards-maps (last visited Sept. 25, 2020).

[25] *See* Matt Gray, *Your mail is being delayed, unions say.  Here's what's happening inside U.S. post offices in N.J.,* NJ.COM (Aug. 17, 2020), attached hereto as Exhibit 14 to Pendleton Cert.

themselves or their members.  Accordingly, they certainly cannot establish irreparable harm. And lack of irreparable harm is fatal to this motion.

Moreover, even if Plaintiffs had standing, the alleged injury they assert still cannot support a finding of irreparable harm.  First, "[t]here is no evidence to suggest a systematic bias towards one party or another from mail-in voting.  Nor is there any evidence that there is widespread fraud in the use of mail-in ballots."[26] Since 2000, more than 250 million votes have been cast via mailed-out ballots in all 50 states, and in 2018 alone, more than 31 million Americans, or 25.8 percent of election participants, cast their ballots by mail.[27]  "Despite this dramatic increase in mail voting over time, fraud rates remain infinitesimally small."[28]   And there is certainly no evidence that ballots counted early and kept confidential would somehow "dilute" Republican votes or that a stray ballot cast after Election Day and somehow counted would be more likely to harm Republicans than Democrats.

Second, while the complaint is replete with references to alleged "rampant" voter fraud (see, e.g., Compl. ¶ 119), Plaintiffs provide no evidence to support their

---

[26] Elaine Kamarck & Christine Stenglein, *Low rates of fraud in vote-by-mail states show benefits outweigh the risks*, BOOKINGS, (June 2, 2020), attached hereto as Exhibit 15 to Pendleton Cert.  Moreover, based on a study compiled by the Heritage Foundation that aims to examine voter fraud related to mail-in voting, "there is little voter fraud and not nearly enough to justify blocking vote-by-mail system in a pandemic." *Id*.
[27] *Id*.
[28] *Id*.

fearmongering and, indeed, many of their anecdotes suggest that New Jersey has *succeeded*, *not failed*, in preventing voter fraud.[29]  In any event, even assuming these anecdotes constitute fraud (which they do not on a wide scale), Plaintiffs also fail to connect the alleged harms of this fraud to the relief they seek.

## C.    The Balance of Equities and Public Interest Support Defendants

Plaintiffs claim that the "equitable factors" favor them because New Jersey's voting legislation will "confuse voters, undermine confidence in the electoral process, and create incentive[s] to remain away from the polls."  Br. at 25 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)).  Plaintiffs get it exactly backwards.  It is the injunction that Plaintiffs seek that would sow confusion among voters and suppress voting.  The policies Plaintiffs challenged are part and parcel of a larger mail voting policy enacted by the Legislature to protect the right to vote and the safety of New Jersey residents.  The equities and public interest strongly weigh in favor of maintaining that vote by mail policy.

New Jersey voters' have a "strong interest in exercising the "fundamental political right" to vote.  *See Purcell*, 549 U.S. at 4.  And the State of New Jersey has a "strong interest in ensuring the public safety and order."  *Madsen v. Women's*

---

[29] *See*, *e.g.*, Compl. ¶ 88.  The fact that New Jersey rejected thousands of ballots in the primary suggests that New Jersey has implemented a robust process to prevent the counting of fraudulent ballots or ballots that do not meet the statutory requirements.

*Health Ctr., Inc.*, 512 U.S. 753, 768 (1994).  To ensure the public safety and order, public officials are given broad latitude to ensure the safety and health of the people—especially in areas "fraught with medical and scientific uncertainties" as is the case here with COVID-19.  *See*, *e.g., South Bay United Pentecostal Church,* 2020 WL 2813056, at *1 (Roberts, C.J., concurring) ("Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'"); *In re Abbott*, 954 F.3d 772, 795 (5th Cir. 2020) ("[The governor's] interest in protecting public health during such a time is at its zenith.").

To protect New Jerseyans' right to vote, the State of New Jersey has made a considered and measured decision to implement voting legislation to safeguard both its residents' health and safety and their right to vote.  That decision is warrants deference.  Contrary to Plaintiffs' claim that the pandemic is waning in New Jersey, the opposite is sadly true.  As of September 25, the transmission rate in New Jersey is 1.15, meaning the outbreak may again be spreading exponentially.[30]  Over sixteen thousand New Jersey residents have died from complications of COVID-19—approximately eight percent of all confirmed cases in the state.[31]

---

[30] *See* Pendleton Cert., ¶ 18, Ex. 16.
[31] *See id.*

Total reported cases have increased 31% in the past two weeks.[32]  The current projections show all trends rising throughout October to much higher rates on Election Day, including infections and deaths.[33]  The CDC warns that "[e]lections with only in-person voting on a single day are higher risk for COVID-19 spread because there will be larger crowds and longer wait times."[34]

Accordingly, whether by necessity or choice, many New Jersey voters will continue to exercise social distancing and remain sheltered in their homes in early November, thus necessitating the ability to vote easily and safely by mail with confidence that their ballots will be counted.  Without this opportunity, voters will be forced to choose between casting a ballot in person and safeguarding their health—resulting in effective disenfranchisement.  The portions of A4475 that Plaintiffs challenge are relevant to both the Legislature's assessment of how to process a surge of mail ballots in an orderly fashion and the crucial need to provide voters with confidence that their validly cast ballots will not be rejected due to the vagaries of the post office.

---

[32] *See* The New York Times, *New Jersey Covid Map and Case Count* (updated Sept. 25, 2020), available at: https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html (last visited Sept. 25, 2020).

[33] *See* The Institute for Health Metrics and Evaluation, *COVID-19 Projections* (updated Sept. 24, 2020), available at: https://covid19.healthdata.org/united-states-of-america/new-jersey?view=total-deaths&tab=trend (last visited Sept. 25, 2020).

[34] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) – Considerations for Election Polling Locations and Voters* (June 22, 2020), attached hereto as Exhibit 17 to Pendleton Cert.

A4475's 48-hour rule is designed to prevent disenfranchisement of voters who cast ballots lawfully.  Some validly-cast votes will not be counted if A4475 is not enforced because, while there is no evidence the USPS will systemically fail to follow its postmark rules, some ballots cast on or before Election Day likely will arrive afterwards without postmarks.  The few non-postmarked ballots arriving in that 48-hour window will overwhelmingly, if not exclusively, be ones cast on or before Election Day.  Plaintiffs ask for these lawful voters to be disenfranchised based on speculation that USPS will exceed its service standards.

Plaintiffs, on the other hand, have not demonstrated any likely injury that would occur absent an injunction.  Plaintiffs' speculative claims of voter fraud fall well below the standard for preliminary injunctive relief.  *See Sec'y of Labor v. Koresko*, 378 F. App'x 152, 154 (3d Cir. 2010) ("However, the vague and speculative assertions of reputational injury set forth in the defendants' motion were well short of the level of 'substance' required to obtain preliminary injunctive relief.").  Indeed, they fail to demonstrate standing to bring these claims.  As one court has perceptively noted, "a preoccupation with mostly phantom election fraud leads to real incidents of disenfranchisement, which undermine rather than enhance confidence in elections." *One Wisconsin Inst., Inc. v. Thomsen,* 198 F. Supp. 3d 896, 903 (W.D. Wis. 2016)*, order enforced,* 351 F. Supp. 3d 1160 (W.D. Wis. 2019)*, and aff'd in part, vacated in part, rev'd in part sub nom. Luft v. Evers,* 963

34

F.3d 665 (7th Cir. 2020).  Indeed, vote-by-mail fraud is virtually nonexistent.[35]

Millions of Americans vote by mail—one in four voters did so in the last two

federal elections.  Yet an exhaustive investigation found only 491 instances of

vote-by-mail fraud committed between 2000 and 2012, a period in which billions

of votes were cast.[36]  A database maintained by the Heritage Foundation, a

conservative think tank, also reflects the incredibly low rate of voter fraud in

connection with voting by mail in particular—only 16% of the small number of

fraud cases were in connection with voting by mail.[37]  The experience of Oregon—

which was the first to move to all vote-by-mail elections, in 1998—is illustrative.

The same Heritage Foundation database reflects only two cases of absentee voter

fraud in Oregon.[38]  In addition, during the 2016 presidential election, the Oregon

attorney general prosecuted just 10 cases of voter fraud out of over 2 million votes

---

[35] *See, e.g.*, Wendy R. Weiser & Harold Ekeh, *The False Narrative of Vote-by-Mail Fraud*, BRENNAN CENTER FOR JUSTICE (Apr. 10, 2020), attached hereto as Exhibit 16 of Pendleton Cert.;  Matt Barretto *et al.*, *Debunking the Myth of Voter Fraud in Mail Ballots*, UCLA LPPI VOTING RIGHTS PROJECT, UNIV. N. M. CTR. FOR SOC. POLICY, UNION OF CONCERNED SCIENTISTS (Apr. 14, 2020), attached hereto as Exhibit 19 to Pendleton Cert.; Pendleton Cert., Ex. 15, Kamarck & Stenglein, *Low rate of fraud in vote-by-mail states show benefits outweigh the risks*.
[36] Corbin Carson, *Election Fraud in America*, NEWS21 (Aug. 12, 2012), attached hereto as Exhibit 20 of Pendleton Cert.
[37] Pendleton Cert., 19, Barretto, *Debunking the Myth of Voter Fraud in Mail Ballots*
[38] *Id.*

cast.[39]  The incidents cherry-picked by Plaintiffs on New Jersey's apparent "history" of prosecutions on voting fraud do not demonstrate a likelihood that would occur in the future.  To the contrary, it shows that in the limited instances where fraud may have occurred, New Jersey has taken swift action.

Moreover, New Jersey voters have already been educated on A4475,[40] and should be allowed to rely on it. The Intervenor-Defendants have spent significant time and resources on voter education efforts to ensure their members and all New Jersey voters understand the implications of A4475 and will see their vote count in November. Thus, an injunction in favor of Plaintiffs would only create confusion.

An injunction is against the public interest where it would "work[] a needlessly chaotic and disruptive effect upon the electoral process." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) (citing *Fishman v. Schaffer*, 429 U.S. 1325, 1330 (1976)).  The Court has cautioned that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–

---

[39] *Id.*

[40] *See, e.g.*, New Jersey Department of State, Division of Elections, *2020 New Jersey Voter Information Portal- Vote by Mail* (updated Sept. 24, 2020), attached hereto as Exhibit 21 to Pendleton Cert.; Brent Johnson, '*Everybody gets a ballot.' Murphy says to N.J. to have mostly mail-in voting in November election because of COVID-19*, NJ.COM (Aug. 14, 2020), attached hereto as Exhibit 22 to Pendleton Cert.*;* Tracey Tully, *New Jersey Will Hold Mail-in Election in November, Over Trump's Objections*, THE NEW YORK TIMES (Aug. 14, 2020), attached hereto as Exhibit 23 of Pendleton Cert.

5; *see also Boockvar*, 2020 WL 5554644, at *14.  And "as an election draws

closer, that risk will increase." *Id.*  The Supreme Court "has repeatedly

emphasized that lower federal courts should ordinarily not alter the election rules

on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*,

140 S. Ct. 1205, 2020 WL 1672702, at *1 (U.S. Apr. 6, 2020).

Here, at the very last minute, despite filing this action over a month ago,

Plaintiffs only now seek to enjoin New Jersey's vote by mail plan. *See Benisek*

138 S. Ct. at 1944 ("A party requesting a preliminary injunction must generally

show reasonable diligence.").  In fact, only after the Court convened a status

hearing did Plaintiffs do anything.  As the District Court of Nevada recently held,

"Plaintiffs ask for a remedy to cure the 'confusion' caused by AB 4, yet they have

positioned this case for last minute adjudication before the general election."

*Cegavske*, 2020 WL 5626974, at *11.  So too here.  Enjoining the law this late

would cause much more confusion than it would prevent. *See Fishman*, 429 U.S.

at 1330 (denying injunction where the "Presidential and overseas ballots have

already been printed; some have been distributed. The general absentee ballots are

currently being printed" and finding injunction would have a "chaotic and

disruptive effect upon the electoral process").

Accordingly, the equities therefore fall on Defendant's side and the

application for the preliminary injunction should be denied.

## <u>CONCLUSION</u>

Defendant-Intervenors respectfully request that the Court deny Plaintiffs'

motion.

Dated: September 25, 2020

NEW JERSEY INSTITUTE FOR SOCIAL
JUSTICE

Ryan P. Haygood
Andrea McChristian*
Henal Patel
rhaygood@njisj.org
amcchristian@njisj.org*
hpatel@njisj.org
60 Park Place, Suite 511
Newark, New Jersey 07102
Telephone: (973) 624-9400

**CAMPAIGN LEGAL CENTER**

Danielle M. Lang*
Molly E. Danahy*
dlang@campaignlegal.org
mdanahy@campaignlegal.org
1101 14th Street. 4th Floor
Washington, DC 20005
Telephone: 202-736-2200

*Pro hac vice*
**Pro hac vice* application
forthcoming
*Counsel for Defendant-Intervenors
LWVNJ And NJ NAACP*

**DLA PIPER LLP (US)**

*/s/ B. John Pendleton, Jr.*

B. John Pendleton, Jr.
Marc A. Silverman
Jenny X. Zhang
Daniel C. Harkins**
john.pendleton@us.dlapiper.com
marc.silverman@us.dlapiper.com
jenny.zhang@us.dlapiper.com
daniel.harkins@us.dlapiper.com
51 John F. Kennedy Parkway,
Suite 120
Short Hills, New Jersey 07078-
2704
Phone: (973) 520-2561

38