# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# TRENTON VICINAGE

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., REPUBLICAN NATIONAL COMMITTEE, NEW JERSEY REPUBLICAN STATE COMMITTEE,<br><br>        Plaintiffs,<br><br>    v.<br><br>TAHESHA WAY, in her official capacity as Secretary of State of New Jersey,<br><br>        Defendant. | Hon. Michael A. Shipp, U.S.D.J.<br><br>Civil Action No. 20-10753 (MAS-ZNQ)<br><br><br>**CIVIL ACTION**<br><br>**(ELECTRONICALLY FILED)** |

## BRIEF IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Jeremy M. Feigenbaum
State Solicitor
Joseph Fanaroff
Michael C. Walters
Assistant Attorneys General
    Of Counsel and on the Brief

Susan M. Scott
Nicole E. Adams
Matthew J. Lynch
Steven Gleeson
Eric Reid
Erin Hodge
Kathryn Morris
Deputy Attorneys General
    On the Brief

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 112
Trenton, New Jersey 08625
*Attorney for Defendant Tahesha Way*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................1

COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY .............4

    A.    History of Vote-by-Mail in New Jersey................................4

    B.    COVID-19 and New Jersey's Emergency Orders .......................6

    C.    The July 7, 2020 Primary Election and USPS Processes.....................8

    D.    Executive Order 177 and Codifying Legislation ................................12

    E.    The Instant Lawsuit ................................................17

STANDARD FOR PRELIMINARY INJUNCTION................................19

ARGUMENT ................................................................20

  I.    PLAINTIFFS WILL NOT SUCCEED ON THE MERITS ........................20

    A.    Plaintiffs Lack Standing To Pursue Their Claims ..............................20

    B.    Plaintiffs' Claims Lack Merit........................................26

        1.    *Canvassing Ballots Before Election Day Does Not Conflict With Federal Law Setting The Date Of The Election* ................................................27

        2.    *New Jersey Is Not Allowing Voting After Election Day And Has Instead Adopted Postmarking Rules Necessary To Prevent The Disenfranchisement Of Voters Who Validly Vote On Time* .............................34

II.    THE REMAINING FACTORS MILITATE AGAINST GRANTING PRELIMINARY INJUNCTIVE RELIEF................................42

CONCLUSION ................................................................50

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Freedom Forge Corp.*,
    204 F.3d 475 (3d Cir. 2000) ........................................................................19, 45

*Am. Beverage Corp. v. Diageo N. Am., Inc.*,
    936 F.Supp.2d 555,610-12 (W.D. Pa. 2013) ....................................................43

*Am. Civil Rights Union v. Martinez-Rivera*,
    166 F. Supp. 3d 779 (W.D. Tex. 2015) .............................................................22

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018).......................................................................................46

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983).............................................................................................21

*Conestoga Wood Specialties Corp. v. Sec. of U.S. Dep't of Health &
    Human Servs.*,
    13-144, 2013 WL 1277419 (3d Cir. Feb. 8, 2013)...........................................19

*Cont'l Grp. v. Amoco Chem. Corp.*,
    614 F.2d 351 (3d Cir. 1980) ..............................................................................45

*Crookston v. Johnson*,
    841 F.3d 396 (6th Cir. 2016) .............................................................................45

*Disability Rights Pa. v. Pa. Dep't of Human Servs.*,
    No. 19-737, 2020 WL 1491186 (M.D. Pa. Mar. 27, 2020)...............................25

*Doris Behr 2012 Irrevocable Trust v. Johnson & Johnson*,
    No. 19-8828, 2019 WL 1519026 (D.N.J. 2019)................................................43

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
    373 U.S. 132 (1963)...........................................................................................28

*Foster v. Love*,
    522 U.S. 67 (1997)................................................................................29, 32, 36

*Frank v. Walker*,
  574 U.S. 929 (2014)................................................................................45

*Gallagher v. N.Y.S. Board of Elections*,
  No. 20-05504, 2020 WL 4496849 (S.D.N.Y. 2020) ...................................40, 41

*GoNannies, Inc. v. GoAuPair.com, Inc.*,
  464 F.Supp.2d 603 (N.D. Tex. 2006) ....................................................43

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977)................................................................................22

*Jones v. Governor of Fla.*,
  950 F.3d 795 (11th Cir. 2020) ..............................................................48

*Kos Pharms. Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004) .........................................................19, 20

*Lance v. Coffman*,
  549 U.S. 437 (2007)................................................................................23

*Lane v. New Jersey*,
  725 F. App'x 185 (3d Cir. 2018) ...........................................................20

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)..........................................................................21, 25

*Maryland v. King*,
  567 U.S. 1301 (2012)..............................................................................48

*Millsaps v. Thompson*,
  259 F.3d 535 (6th Cir. 2001) .........................................................*passim*

*N. Carolina v. Covington*,
  137 S. Ct. 1624 (2017)............................................................................46

*Pa. Democratic Party v. Boockvar*,
  No. 133 MM 2020, 2020 Pa. LEXIS 4872 (Pa. September 8, 2020) ................41

*Pharmacia Corp. v. Alcon Labs.*,
  201 F.Supp.2d 335 (D.N.J. 2002).........................................................43

*Project Vote v. Blackwell*,
    455 F. Supp.2d 694 (N.D. Ohio 2006) ............................................................45

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006).........................................................................................45, 46

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) .............................................................................19

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
    140 S. Ct. 1205 (2020)......................................................................................45

*Republican Party of Pa. v. Cortés*,
    218 F.Supp.3d 396 (E.D. Pa. 2016) ..................................................................47

*Reynolds v. Sims*,
    377 U.S. 533 (1964).........................................................................................46

*Roudebush v. Hartke*,
    405 U.S. 15 (1972)...........................................................................................27

*Smiley v. Holm*,
    285 U.S. 355 (1932).........................................................................................27

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014).........................................................................................23

*Truck Ctr., Inc. v. Gen'l Motors Corp.*,
    847 F.2d 100 (3d Cir. 1998) .............................................................................19

*Trump for President v. Cegavske*,
    --- F.Supp.3d ----, 2020 WL 5626974 (D. Nev. Sept. 18, 2020).................*passim*

*United States v. Classic*,
    313 U.S. 299 (1941).........................................................................................27

*Veasey v. Perry*,
    574 U. S. 951 (2014)........................................................................................45

*Voting Integrity Project, Inc. v. Bomer*,
    199 F.3d 773 (5th Cir. 2000) ......................................................................*passim*

*Voting Integrity Project v. Keisling*,
    259 F.3d 1169 (9th Cir. 2001) ................................................................29, 30, 31

*Washington v. Trump*,
    --- F.Supp.3d ----, 2020 WL 5568557 (E.D. Wa. Sept. 17, 2020) ....................39

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ...............................................................................21

**Federal Statutes**

2 U.S.C. § 1 ...........................................................................................*passim*

2 U.S.C. § 7 ...........................................................................................*passim*

3 U.S.C. § 1 ...........................................................................................*passim*

3 U.S.C. § 7 .............................................................................................12, 26

**State Statutes**

15 Del. C. § 5510 ...............................................................................................31

10 ILCS 5/18A-15..............................................................................................34

10 ILCS 5/19-8...................................................................................................34

26 Okl. St. Ann. § 14-125 ..................................................................................31

Ariz. Stat. §16–550(B), §16-551........................................................................31

Cal. Elec. Code § 3020(b)..................................................................................34

Conn. Gen. Stat. § 9-150a..................................................................................31

D.C. Code § 1-1001.05(10A).............................................................................34

Fla. Stat. § 101.68 ..............................................................................................31

H.R.S. § 15-108, §11-152...................................................................................31

K.S.A. 25-1132 ..................................................................................................34

K.S.A. § 25-1134 ...............................................................................................31

Mont. Code Ann., § 13-13-241 ....................................................................31

N.C. Gen. Stat. § 163-231(b) .....................................................................34

N.J.S.A. § 19:36-1 ......................................................................................12

N.J. Stat. Ann. App. A:9-30 to -63 ..............................................................7

N.J. Stat. Ann. § 19:31-15 ............................................................................7

N.J. Stat. Ann. § 19:34-13(b) ...............................................................*passim*

N.J. Stat. Ann. §§ 19:57-1 to -40 .................................................................4

N.J. Stat. Ann. § 19:63-1 to -31 ...................................................................4

N.J. Stat. Ann. § 19:63-3 ..............................................................................5

N.J. Stat. Ann. § 19:63-12 ............................................................................5

N.J. Stat. Ann. §§ 19:63-12, -16(a) ..............................................................5

N.J. Stat. Ann. §§ 19:63-13, -16(a) ..............................................................5

N.J. Stat. Ann. § 19:63-16(a) ........................................................................5

N.J. Stat. Ann. § 19:63-16(d)(1) ...................................................................5

N.J. Stat. Ann. § 19:63-17 ............................................................................6

N.J. Stat. Ann. § 19:63-17(b)(1) ...................................................................6

N.J. Stat. Ann. § 19:63-17(c) ........................................................................6

N.J. Stat. Ann. § 19:63-31 .....................................................................28, 35

N.J. Stat. Ann. §19:63-31(a) .......................................................................13

N.J. Stat. Ann. § 19:63-31(m) ..............................................................*passim*

N.J. Stat. Ann. § 19:63-31(p) ................................................................16, 49

N.J. Stat. Ann. §§ 26:13-1 to -31 .................................................................7

Neb. Rev. Stat. §32-1027 ............................................................................31

NV Rev. Stat. § 293.317 .........................................................................34

O.R.S. § 254.478, § 260.705 ..................................................................31

Texas Elec. Code § 86.007 .....................................................................34

Va. Code 24.2-709 ..................................................................................34

V.T.C.A., Election Code § 87.0241, § 87.041 ........................................31

W. Va. Code, § 3-3-5, § 3-6-9 ................................................................34

**Other Authorities**

Assembly Bill No. 4475 .....................................................................*passim*

Executive Order 103 (2020).......................................................................7

Executive Order 105 (2020).......................................................................7

Executive Order 144 (2020)...................................................................7, 8

Executive Order 164 (2020).....................................................................12

Executive Order 177 (2020)...............................................................*passim*

Executive Order 186 (2020).......................................................................7

N. Webster, An American Dictionary 433 (C. Goodrich & N. Porter
        eds. 1869).........................................................................................29

## PRELIMINARY STATEMENT

Our system of federalism grants to the States primary authority to oversee and manage the elections that take place within their borders, including the elections for federal offices. Never have those elections responsibilities been more important, or presented greater challenges, than in the midst of a global pandemic.

Faced with the spread of a virus that has already claimed the lives of 200,000 Americans and over 14,000 New Jersey residents, New Jersey enacted a number of changes to the operations of this year's elections. As state officials explained, certain adjustments were necessary to protect the health of voters and poll workers, as well as to ensure that every resident—including the elderly and residents with underlying medical conditions—could safely exercise their right to vote. Most notably, the State ordered that this year's election would be conducted primarily by mail. Active voters would receive a mail-in ballot, which they could return in person, place in a secure drop box, or put in the mail on or before November 3, 2020. Polling locations would also be open that day for residents who wished to vote in person.

To ensure the success of the vote by mail election, a number of other questions had to be addressed. The first issue that arose was how to ensure that votes cast on or before Election Day would properly be counted. This issue was unique to the mail. When a voter casts her vote in person, the Board knows whether she submitted it on or before Election Day. But if a voter submits a ballot by mail, a lag exists between

when the voter submits it and when it arrives to the Board. The State thus identified

three sources of evidence that would show any ballot had timely been put in the mail:

a postmark by the U.S. Postal Service ("USPS") showing a ballot was submitted on

or before Election Day; communication from USPS stating that a ballot was placed

in the mail on or before Election Day, even if a postmark erroneously says otherwise;

or, if USPS fails to postmark a ballot (through no fault of the voter), the fact that the

Board of Elections received the ballot within 48 hours of Election Day. The State

found the 48-hour delivery timeframe offered evidence of on-time mailing because

representations from USPS officials and a range of public reporting confirmed that

this was the minimum amount of time it would take for a ballot to be delivered.

The next problem involved how best to handle the actual counting of ballots.

County Boards of Elections quickly identified that they were trapped between a rock

and a hard place. On the one hand, reviewing and recording votes on mail-in ballots

takes more time and resources than machine voting, and the Boards were correctly

anticipating record numbers of mail-in ballots. On the other, the deadline by which

the count must be complete had not changed. To ensure on-time completion of ballot

counts, New Jersey followed the lead of over fourteen states in allowing Boards to

begin their counts prior to Election Day. Like those states, the Legislature adopted

strict requirements to bar disclosure of this information before the polls had closed

on Election Day, and made violating those rules a third degree crime.

2

At the last minute, Plaintiffs have filed this motion to enjoin these rules from remaining in effect. The question that Plaintiffs raise is one of preemption: whether New Jersey has contravened the federal statutes stating that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election." The answer, of course, is no: in New Jersey, Election Day remains November 3, 2020. That is the date on which in-person polling stations are open; by which voters have to submit their ballots in person or in a drop box; by which they must place their ballot in the mail; and on which the Boards of Elections may release vote totals. Nothing about that changes just because Boards of Elections can count (but not release) votes before that time; early counting has long been the practice in other states, and case law interpreting the federal election date statutes are in accord. Nor does anything about that analysis change merely because New Jersey is counting ballots received after Election Day. Federal law establishes the day for the election, but says nothing regarding how to figure out whether a particular ballot was cast on time. Because federal law is wholly silent on that issue, it has been left to the States, and New Jersey's approach is well justified by the evidence in this case.

Not only does their claim fail on the merits, but the equities strongly counsel against granting Plaintiffs election eve relief. Plaintiffs decided to wait weeks after New Jersey announced a number of its elections rules, and weeks after filing their Complaint, to seek preliminary relief from this court. Beyond undermining their own

claims of harm, that decision means an injunction would be especially disruptive to the election, and it would work serious harms to the voters. Federal courts have long understood that they should avoid any interference with an impending election—let alone one where thousands of ballots have already been cast. And that is especially true here, where any ruling from the federal courts that bars elections officials from counting ballots before November 3 would disrupt timely counting of ballots, and where any order that stops New Jersey from counting a ballot received shortly after Election Day would disenfranchise thousands of voters who properly cast their votes by the deadline. This Court should decline Plaintiffs' invitation to interfere with the State's election in such a dramatic way based on an unprecedented legal theory.

## <u>COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY</u>

### A.     History of Vote-by-Mail in New Jersey.

The right to vote without appearing at a polling location on Election Day has existed in New Jersey for over 60 years, beginning with the limited use of "absentee ballots" for military voters. *See* N.J. Stat. Ann. §§ 19:57-1 to -40. Over the decades, numerous amendments to the Absentee Voting Law expanded the ability of voters to vote by mail, leading to the adoption in 2009 of the Vote By Mail Law, N.J. Stat. Ann. §§ 19:63-1 to -31 (amended by P.L. 2020, c. 72), which allows any qualified voter to apply to vote by mail without having to demonstrate an inability to appear at the voter's polling location on Election Day. Subsequent amendments ensured that

voters could choose to cast their ballot by mail in all future elections in which they are eligible to vote. *See* N.J. Stat. Ann. § 19:63-3.

Once a voter has requested a mail-in ballot, the voter receives a mail-in ballot packet, which includes a ballot and two envelopes known as the "inner" and "outer" envelopes. N.J. Stat. Ann. § 19:63-12. After the voter completes the ballot, the voter places the ballot in the inner envelope and seals the envelope, which is distinguished by a certificate attached to the flap. N.J. Stat. Ann. §§ 19:63-13, -16(a). Voters must print their name and address on the ballot certificate and sign it. *See* N.J. Stat. Ann. § 19:63-16(a). To ensure the vote remains secret, the voter places the sealed inner envelope within the outer envelope, which is pre-addressed to the County Board of Elections, and then seals the outer envelope. N.J. Stat. Ann. §§ 19:63-12, -16(a). The ballot is to be mailed or hand delivered to the appropriate county Board of Elections, or its designee, by the voter or a third party designated by the voter, who is known as a bearer. *See* N.J. Stat. Ann. § 19:63-16(d)(1).

Upon receipt of a ballot, the Board of Elections must promptly open the outer envelope, remove the inner envelope, and review the signature and information on the certification of the inner envelope. The Board will compare the signature with the voter's signature in the Statewide Voter Registration System ("SVRS");[1] if the

---

[1] The SVRS is the official repository for the State's election records, including the number of mail-in ballots issued by the county clerks for an upcoming election, the

Board is not satisfied that the voter is entitled to vote or that the ballot conforms to the requirements of the Vote by Mail Law, then the Board shall reject the ballot, but must provide the voter with an opportunity to "cure" their ballot. *Id.*[2]

**B.     COVID-19 and New Jersey's Emergency Orders.**

As this Court is aware, the 2020 election is taking place under unprecedented conditions. Coronavirus Disease 2019 ("COVID-19") is a highly contagious, deadly disease without a vaccine or cure. This virus has claimed the lives of over 200,000 Americans, including over 14,000 New Jersey residents. *See* Ex. 1;[3] Ex. 2 (noting that "[s]ince the first known US Covid-19 death on February 6, an average of more than 858 people have died from the disease every day"). That includes a number of recent cases and deaths: "At least 428 new coronavirus deaths and 54,874 new cases were reported in the United States on Sept. 21." Ex. 3; *see id.* ("health departments

---

number of voted mail-in ballots returned to the county Boards of Elections, and the number of Active registered voters in each county. *See id.* ¶3.

[2] The New Jersey Legislature recently amended N.J. Stat. Ann. § 19:63-17 to include a process by which voters receive a pre-deprivation notice that the Board of Elections has determined their mail-in or provisional ballot is either missing a signature or that the signature does not match the signature in the voter's voting record. Within 24 hours after the Board decides to reject a mail-in or provisional ballot on the basis of a missing or discrepant signature, the Board must send a cure letter to the voter. *See id.* § 19:63-17(b)(1). If the voter returns the completed cure form by the appropriate date and "the information provided verifies their identity, the ballot shall be counted irrespective of the prior signature deficiency." *Id.* § 19:63-17(c).

[3] "Ex." refers to the exhibits attached to the Declaration of Matthew J. Lynch.

are reporting roughly 40,000 positive test results every day—more than double the number in May when many states began reopening").

At the start of the unfolding health crisis, on March 9, 2020, Governor Murphy invoked his statutory powers under the Civilian Defense and Disaster Control Act, N.J. Stat. Ann. App. A:9-30 to -63, and the Emergency Health Powers Act, N.J. Stat. Ann. §§ 26:13-1 to -31, to declare a State of Emergency and the State's first Public Health Emergency. *See* N.J. Exec. Order 103 (March 9, 2020). As the spread of the virus has continued to unfold across the country and across the world, the Governor has declared that the Public Health Emergency continues to exist every thirty days, as required by state law. *See, e.g.,* N.J. Exec. Order 186 (Sept. 25, 2020).

Some of the State's measures related to the fact that this unprecedented health emergency is unfolding contemporaneously with local, state, and federal elections. As relevant here, on May 15, 2020, Governor Murphy signed Executive Order 144 ("EO 144"), which directed "[a]ll elections that take place on July 7, 2020, shall be conducted primarily via vote-by-mail ballots." EO 144 ¶1.[4] EO 144 directed that mail-in ballots be sent to all active[5] registered Republican and Democratic voters

---

[4] This was not the Governor's first elections-related emergency order. *See, e.g.,* N.J. Exec. Order 105 (Mar. 19, 2020) (postponing various elections in March and April, and establishing the rules to govern elections held in May); N.J. Exec. Order (Apr. 8, 2020) (postponing certain elections until July 7, 2020).

[5] An "active voter" is any registered voter whose voter registration address does not appear in question under N.J. Stat. Ann. § 19:31-15. When a county commissioner

and that applications to vote by mail be sent to all Unaffiliated voters and inactive registered Democratic and Republican voters. *Id.* ¶¶1-2. The ballot return envelopes, and all applications, were required to have prepaid postage for delivery to the county Boards of Elections. *Id.* ¶3. EO 144 also directed the Boards of Elections to canvass any ballot postmarked on or before July 7, 2020 and received by July 14, 2020 at 8:00 p.m. *Id.* ¶14. It also directed the Secretary of State and county election officials to coordinate with the USPS to facilitate the proper delivery of ballots. *Id.* ¶20.

### C.  The July 7, 2020 Primary Election and USPS Processes.

On July 7, 2020, New Jersey held its Primary Election largely through vote by mail. The Primary Election was successful, but a number of Boards of Elections did encounter difficulties concerning timely canvassing and counting of the ballots. After all, the county Boards of Elections received a substantially larger number of mail-in and provisional ballots than in any previous election. *See, e.g.*, Declaration of Kimberly Campisi ("Campisi Decl.") ¶¶2-3; Declaration of Beth A. McGuckin ("McGuckin Decl.") ¶¶2-3; Declaration of Linda Von Nessi ("Von Nessi Decl.")

---

of registration receives information from the USPS concerning a change of address for a USPS "service customer" indicating a registered voter has moved to a different address, then the commissioner of registration will update the voter's address if the new address is within the county. If the new address is not within the county or the mail is returned as undeliverable, the commissioner will undertake the confirmation process to confirm the change of address. Failure of the voter to respond to the confirmation notice, and the voter failing to vote for a period spanning two general elections for federal office, will cause the voter to be removed from the SVRS.

¶¶2-3. To take a few examples, Camden saw an increase from approximately 20,200 mail-in ballots and 1,219 provisional ballots in the 2016 Primary Election to more than 78,490 mail-in ballots and 14,870 provisional ballots in the July 2020 Primary Election, Campisi Decl. ¶¶2-3; Ocean County saw an increase from approximately 5,928 mail-in and 278 provisional ballots to more than 90,000 mail-in and 12,390 provisional ballots, McGuckin Decl. ¶¶2-3; and Essex County went from roughly 2,672 mail-in and 2,135 provisional ballots to approximately 104,925 mail-in and 11,744 provisional ballots, Von Nessi Decl. ¶¶2-3.

Due to the increased number of returned mail-in ballots, certain county Boards of Elections had to obtain judicial orders to continue canvassing and counting ballots beyond the deadline to deliver results to the county clerks for certification, which was on July 24, 2020. *See, e.g.*, Declaration of Robert Giles, Director, N.J. Div. of Elections ("Giles Decl."), ¶11 (noting the boards in Camden, Monmouth, Middlesex, and Somerset needed extensions of at least a week); Campisi Decl., ¶¶8-11; s*ee also* Matter of July 7, 2020 Primary Election, Docket No. CAM-L-2501-20; Matter of July 7, 2020 Primary Election, Docket No. MID-L-5141-20; Matter of July 7, 2020 Primary Election, Docket No. MON-L-2296-20.

Another issue concerned postmarking of ballots. On May 29, 2020, USPS sent a letter to election officials across the state detailing aspects of its delivery process and how they might affect the election-related mail. *See* Ex. 4; Giles Decl., ¶6. That

letter, which was signed by USPS General Counsel and Executive Vice President Thomas Marshall, advised that "[a]s a general matter, all Election Mail (including ballots) mailed from individual voters to state or local election officials must be sent by First-Class Mail." Ex. 4 at 1. The letter noted that "[m]ost domestic First-Class Mail is delivered in 2-5 days." *Id.* But it warned that delivery could also take longer: "[t]o account for delivery standards and to allow for contingencies (e.g., weather issues or unforeseen events), voters should mail their return ballots at least 1 week prior to the due date established by state law." *Id.* at 2.

The Primary Election ultimately bore out concerns regarding the postmarking process. On July 8, 2020, a number of Boards of Elections received ballots that were postmarked July 8, which would have made them ineligible for canvassing, but also received correspondence from USPS stating that those ballots had in fact been in the custody of the USPS on July 7, 2020, making them duly cast votes. *See* Giles Decl., ¶12 ("If these ballots had been sent on or before July 7, 2020 and otherwise complied with the statutory requirements, then the board could count and canvass them."); Ex. 5 (letter from USPS "confirm[ing] the Postal Service's understanding that ballots delivered to election officials in New Jersey on July 8, 2020, with a postmarked date of July 8, 2020, were received by the Postal Service on or before July 7, 2020."); Campisi Decl., ¶¶4-7; McGuckin Decl., ¶¶4-7; Von Nessi Decl., ¶¶4-7; N.J. Exec. Order 177 (Aug. 14, 2020) ("EO 177") (discussing letters from USPS "advising that

mail-in ballots were in the mail system on or before the July Primary Election, notwithstanding the postmark on the ballots"). USPS provided *6,935* ballots that had been properly cast by the date of the 2020 Primary Election but that were incorrectly postmarked to the following day. *See* Giles Decl., ¶¶11-12.

Subsequent events drew additional attention to the USPS processes governing mail delivery times and the postmarking of ballots. On July 30, 2020, the Secretary again received a letter from the USPS, reiterating many of the points in his May 29, 2020 letter. *See* Giles Decl. ¶¶7-8. USPS explained that "[i]n particular … under our reading of New Jersey's elections laws, certain deadlines for requesting and casting mail-in ballots are incongruous with the Postal Service's delivery standards." Ex. 6 at 1. USPS reiterated that "most domestic First-Class Mail is delivered 2-5 days after it is received by the Postal Service." *Id.* And it noted that "[t]o allow enough time for ballots to be returned to election officials, domestic voters should generally mail their completed ballots at least one week before the state's due date." *Id.* at 2. The letter identified that some of New Jersey's "deadlines appear to be incompatible with the Postal Service's delivery standards and the recommended timeframe noted above. As a result, to the extent that the mail is used to transmit ballots to and from voters, there is a significant risk that, at least in some circumstances, ballots may be requested in a manner that is consistent with your election rules and returned promptly, and yet not be returned in time to be counted." *Id.*

**D.    Executive Order 177 and Codifying Legislation.**

On August 14, 2020, Governor Murphy issued EO 177 in order to protect the public health in connection with the November 3, 2020 General Election.[6] The Order recognized that, "pursuant to 3 U.S.C. §1, the presidential election shall be held on the Tuesday after the first Monday in November, which is November 3, 2020," that under "3 U.S.C. §7 and N.J.S.A. 19:36-1, the State's electors for President and Vice President must meet and vote on the first Monday after the second Wednesday in December," and that results "must be certified in advance of the federal deadline for the meeting of electors." EO 177 at 3-4. The Executive Order added that "the dates for the November General Election and the meeting of electors are established by federal law and cannot be changed." *Id.* at 4.

Because "the COVID-19 emergency and its impact are likely to extend for an as-yet-undetermined period of time," and because that "emergency makes it difficult for election officials, candidates, and voters to properly plan and prepare for and fully participate in the general election on November 3, 2020," the State took action. *Id.* at 2-3. The State began by acknowledging that extensive in-person voting could generate "hardships and health risks for voters, poll workers, and candidates alike,"

---

[6] One month prior, the Governor "issued Executive Order No. 164 (2020), which postponed any election scheduled between July 7, 2020 and November 3, 2020, until November 3, 2020, and declared that no other elections may be held or proceed prior to November 3, 2020." EO 177 at 2.

that "Boards of Elections had difficulty retaining poll workers," and that "failing to offer voters a ready alternative to reporting to public polling locations to vote in the upcoming November General Election … will hinder public participation in the democratic process, particularly among elderly and immune-compromised voters." *Id.* at 4-5. As a result, EO 177 ordered that the "November General Election shall be conducted primarily via vote-by-mail ballots." *Id.* at 6.

On August 27, 2020, the State Legislature adopted Assembly Bill No. 4475 ("A4475"), which was signed into law the following day by Governor Murphy. P.L. 2020, c. 72. The Legislature codified the actions the Governor took in establishing a vote-by-mail election. Pursuant to A4475, all active registered voters will be sent a mail-in ballot for the November 3, 2020 General Election at least 29 days before the election in a manner to ensure the ballot's timely receipt and return. *See* N.J. Stat. Ann. §19:63-31(a). As under EO 177, ballot return envelopes will all have prepaid First-Class postage. *Id.* §19:63-31(b). Further in line with EO 177, A4475 provides for in-person voting by provisional ballot for anyone who so chooses, subject to health and safety standards, and requires that accommodations be made for voters with disabilities. *Id.* §§ 19:63-31(e), (g). Each county must therefore open a specific number of polling places on Election Day. *Id.* § 19:63-31(e). Voters can also return their mail-in ballots at polling places that day. *Id.* § 19:63-31(h). Moreover, voters may return ballots to drop boxes established by the Boards of Elections, *id.* § 19:63-

13

31(z), which must be secured, at locations equipped with surveillance cameras, and made available 24 hours a day. *Id.* § 19:63-16.1b(2)(a). The statute requires that each county have no fewer than 10 secure drop boxes. *Id.* §§ 19:63-16.1b(2)(b)-(c).

As relevant to this case, both EO 177 and A4475 established rules governing the dates by which ballots must be submitted and then received to be counted in the election. Because the date of the election is November 3, 2020, all voters are required to cast their vote by that date. As a result, under New Jersey law, any voter that votes in person or that submits their mail-in ballot in person, including by submitting their ballot at a designated drop box, must do so by 8:00 p.m. on November 3, 2020. *Id.* § 19:15-2 ("The district boards shall open the polls for such election at 6:00 A.M. and close them at 8:00 P.M."); *id.* § 19:63-16.1(a) ("Each mail-in ballot deposited in a ballot drop box by the time designated under the current law for the closing of the polls for that election shall be considered valid and shall be canvassed.").

But the State also recognized that more was needed to ensure that votes which were validly submitted by mail on or before November 3, 2020 were still properly canvassed as valid ballots. *See* EO 177 at 5 (finding USPS "advised that voters must use First-Class postage to return their ballots to the county Boards of Elections so that it will be delivered 2-5 days after it is received by the Postal Service, and recent reports have indicated that mail is taking longer for delivery than is typical"); N.J. Stat. Ann. § 19:63-31(m) (noting a need "to ensure that registered voters' efforts to

14

vote are not impacted by delays in the postal service"). To mitigate risks associated with delays in delivery, "every vote-by-mail ballot that is postmarked on or before November 3, 2020, and that is received by November 10, 2020, at 8:00 p.m. shall be considered valid and shall be canvassed, assuming the ballot meets all other statutory requirements." N.J. Stat. Ann. § 19:63-31(m). And to address documented evidence that USPS mis-marked or never postmarked some ballots, "every ballot without a postmark, and ballots mis-marked and confirmed by the post office that those ballots were received by the post office on or before November 3, 2020, that is received by the county boards of elections from the [USPS] within 48 hours of the closing of polls on November 3, 2020, shall be considered valid and shall be canvassed, assuming the ballot meets all other statutory requirements." *Id.*

A4475 also addressed challenges involved with counting this influx of mail-in ballots. As of September 1, 2020, there are 5,817,923 Active registered voters in New Jersey, meaning at least 5,817,923 mail-in ballots will be sent out for the 2020 General Election. *See* Giles Decl. ¶4. Turnout for the 2016 General Election was 68%. *Id.* ¶5. If turnout for the November 2020 General Election is comparable to that of 2016, the Boards can expect 3 mail-in ballots will be returned, in contrast to the 355,771 total mail-in ballots returned in the 2016 General Election.[7] Despite that

---

[7] For instance, in Camden County, the Board of Elections expects to receive over 260,000 mail-in ballots for the November 2020 General Election, far more than the approximately 78,490 mail-in ballots it received in the 2020 Primary Election. *See*

volume, the deadline for completing the ballot count remains the same. Boards of canvassers must certify the results on or before November 20, 2020; clerks must transmit the results to the Secretary on or before November 23, 2020; and no extensions may be obtained for either date. *See* N.J. Stat. Ann. § 19:63-31(p).

To "account for the increase in vote-by-mail ballots," and ensure the State can meet the necessary deadlines despite COVID-related challenges, New Jersey allows a county Board of Elections to "begin opening the inner envelopes and canvassing each mail-in ballot from the inner envelopes no earlier than ten days prior to the day of the election." *Id.* § 19:63-31(m); *see also* Campisi Decl., ¶14 (noting challenges involved with conducting the expeditious count of high volume of ballots and need to begin counting process prior to November 3). To ensure no reporting of that count takes place until after the close of the polls on election night, A4475 specifies that "[t]he contents of the mail-in ballots and the results of the ballot canvassing shall remain confidential and … in no circumstances disclosed prior to the close of polls on the day of the election." N.J. Stat. Ann. § 19:63-31(m). Indeed, anyone authorized to canvass ballots that reveals the contents of a mail-in ballot prior to closing of the polls is guilty of a third degree crime. *Id.* § 19:34-13(b). And were that not enough,

---

Campisi Decl., ¶¶2, 15. The Ocean County Board of Elections expects about 320,000 returned mail-in ballots, an increase from about 90,000 in the 2020 Primary Election. McGuckin Decl., ¶¶2, 11. And the Essex County Board of Elections expects about 364,086 returned mail-in ballots, up from the approximately 104,925 received in the 2020 Primary Election. Von Nessi Decl., ¶¶2, 11.

the law says "[t]he Secretary of State shall establish guidelines concerning the early canvassing process," and that any county which begins canvassing ballots before November 3, 2020, "shall implement the measures necessary to ensure the security and secrecy of the mail-in ballots." *Id.* § 19:63-31(m).[8]

### E.    The Instant Lawsuit.

On August 18, 2020, Plaintiffs filed their first Complaint for Declaratory and Injunctive Relief against New Jersey Governor Philip D. Murphy and New Jersey Secretary of State Tahesha Way, alleging that EO 177 violated the Elections Clause and Electors Clause of the U.S. Constitution and 3 U.S.C. § 1. ECF 1. Plaintiffs also alleged that New Jersey's vote-by-mail procedures deprived New Jersey citizens of the right to vote in violation of the Fourteenth Amendment. *Id.* at ¶¶32-37. Among other claims, Plaintiffs challenged the provision of EO 177 that allowed for ballots without postmarks to still be canvassed as preempted. *Id.* at ¶¶125, 149-52. Plaintiffs sought a declaratory judgment that EO 177 is unconstitutional and asked this Court

---

[8] For example, for boards that use the Dominion ICC system to scan mail-in ballots, the computer and program used to tally results of mail-in ballots and process reports is password-protected and accessible only to authorized individuals of the board staff and Dominion's staff. Campisi Decl., ¶19. This program has an audit trail to report who logged into the system and what they did, including whether they ran reports. *Id*. Ballots, when not being processed by staff, are kept in secured, locked areas. *Id*. ¶20. Other boards are installing cameras in the counting rooms or any other room where ballots are processed, requiring anyone handling ballots to sign an affidavit swearing to the secrecy of ballots, and even confirming that they will not under any circumstances run preliminary tallies of results. Von Nessi Decl., ¶15.

to enjoin Defendants from implementing and enforcing EO 177. *Id.* at 36-37. But Plaintiffs did not file any motion seeking temporary or preliminary relief.

On August 27, 2020, the Legislature passed A4475, which codified EO 177 and was signed by Governor Murphy on August 28, 2020. P.L. 2020, c.72. Exactly two weeks later, on September 11, 2020, Plaintiffs filed the Amended Complaint. ECF 33. The Amended Complaint abandoned the claims against Governor Murphy, leaving Secretary Way as the lone defendant. In the Amended Complaint, Plaintiffs reiterate their claim that the State violated 3 U.S.C. § 1 and 2 U.S.C. §§ 1 and 7 by permitting mail-in ballots without postmarks to be counted if received within two days of Election Day, and add a new claim that the State violated those same statutes by permitting county Boards of Elections to begin canvassing mail-in ballots before Election Day. ECF No. 33 ¶¶ 109-17. They also reiterate their claim that New Jersey is violating the Fourteenth Amendment by sending mail-in ballots to active voters, and they further claim that A4475 violates the Equal Protection Clause by allegedly resulting in counties using different procedures for canvassing provisional ballots. *Id.* ¶¶118-37. Plaintiffs seek a declaratory judgment that A4475 is unconstitutional along with injunctive relief against its enforcement. *Id.* at 30.

On September 16, 2020, just 38 days before election officials are permitted to begin canvassing ballots for the November 3, 2020 General Election and one month after initially filing their Complaint, Plaintiffs filed an Order to Show Cause seeking

18

to enjoin implementation and enforcement of the portions of A4475 that relate to its rules governing postmarks and to its determination that the Boards of Elections could begin to canvass ballots prior to November 3. *See* ECF 35. But Plaintiffs explicitly did *not* move for preliminary relief as to their remaining claims. *Id.*

## STANDARD FOR PRELIMINARY INJUNCTION

"[T]he grant of injunctive relief," courts have explained, "is an extraordinary remedy which should be granted only in limited circumstances." *Truck Ctr., Inc. v. Gen'l Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1998); *see also, e.g., Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (the "dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat"). "Such stays are rarely granted" in the Third Circuit because "the bar is set particularly high." *Conestoga Wood Specialties Corp. v. Sec. of U.S. Dep't of Health & Human Servs.*, 13-144, 2013 WL 1277419, *1 (3d Cir. Feb. 8, 2013). To grant relief, the court must ask whether these factors are met:

> (1) A likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.

*Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

The moving party always has the burden of "meet[ing] the threshold for the first two 'most critical' factors." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). And even if the moving party satisfies those first two tests, a court must

19

still "consider[] the remaining two factors"—the balance of the equities and public interest—"and determine[] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Kos Pharms*, 369 F.3d at 708. Finally, "[a] party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Lane v. New Jersey*, 725 F. App'x 185, 187 (3d Cir. 2018) (citation omitted).

## ARGUMENT

### I. PLAINTIFFS WILL NOT SUCCEED ON THE MERITS.

Plaintiffs cannot demonstrate a sufficient likelihood of success on their claims for two reasons: they lack standing, and the claim that New Jersey is violating federal laws that set the date of the election lacks merit. Either is enough to reject this motion for preliminary relief; together, they are overwhelming.

#### A. Plaintiffs Lack Standing To Pursue Their Claims.

Plaintiffs' first problem is that they have no standing to pursue the claims that they press in this case. In their Complaint, they allege each plaintiff has standing "to vindicate its own rights [and] the rights of its member voters and candidates" from the harm they will suffer at the hands of New Jersey's elections rules, Am. Compl. ¶12, and that they all have organizational standing because New Jersey's changes to the elections rules "confuse voters, undermine confidence in the electoral process, and create incentive to remain away from the polls," in turn "forc[ing] the RNC [and

20

the NJGOP] to divert resources and spend significant amounts of money educating voters on those changes and encouraging them to vote regardless," *id.* ¶13. Plaintiffs have not done enough to show standing sufficient to seek relief enjoining either New Jersey's postmarking standards or the timing of the State's ballot counts.

In order to establish standing for the purpose of an application for preliminary injunction, Plaintiffs must show (rather than merely allege) that they will suffer an "'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical'"; that there is a "causal connection between the injury and the conduct complained of" such that the injury is "fairly traceable to the challenged action"; and that it is "likely, as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs bear the burden at each step, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 301 (3d Cir. 2012), and because they are seeking an injunction, must show a substantial risk of future injury, which is an objective inquiry that transcends a plaintiff's "subjective apprehensions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983).

Plaintiffs' contention that they have standing to challenge A4475's treatment of postmarks falls short. To show associational standing to bring claims against that provision, Plaintiffs must show that (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the

organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs' theory is that A4475's rules allow individuals to cast ballots after close of Election Day but nevertheless to have their votes counted, thus diluting the impact of their members' timely-received votes. That is insufficient to establish associational standing because—as another court found in dismissing an identical claim—"alleged injury of vote dilution" from postmark rules "is impermissibly generalized and speculative." *Trump for President v. Cegavske*, --- F.Supp.3d ----, 2020 WL 5626974, *4 (D. Nev. Sept. 18, 2020).

As to why this claim is generalized, courts have long recognized that sweeping arguments made about an overall "risk of vote dilution" that affects every voter is "more akin to a generalized grievance about the government than an injury in fact." *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015). And that is precisely what this case is. *See Cegavske*, 2020 WL 5626974, *4 (dismissing an analogous claim because "claims of a substantial risk of vote dilution amount to general grievances that cannot support a finding of particularized injury as to plaintiffs. Indeed, the key provisions of [state law] apply to all Nevada voters. Plaintiffs never describe how their member voters will be harmed by vote dilution where other voters will not."). Said another way, since the law affects voters equally, and *benefits* voters by ensuring their valid votes count despite USPS delays, this suit

22

is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that fail to confer Article III standing." *Id.* (quoting *Lance v. Coffman*, 549 U.S. 437, 442, (2007)). And as to why Plaintiffs' claim is speculative, evidence confirms that New Jersey's rules regarding postmarks allow for the counting of valid votes, but *not* ones cast after November 3, 2020, thus undercutting Plaintiffs' claims that there is any "substantial risk" that voters will unlawfully but successfully cast ballots after the election ends. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *see infra* at 38-41 (discussing 2+ day USPS delivery times).[9]

These same issues plague Plaintiffs' challenge to the timing of the ballot count in New Jersey. At the outset, it is not obvious what precise injury-in-fact Plaintiffs or their members will suffer if Boards of Elections are allowed to count the ballots they receive. It appears Plaintiffs believe they will be injured if an official unlawfully releases information about the voting totals. But for one, they offer *no* reason to think that presents a "substantial" risk; their argument ignores that "the results of the ballot

---

[9] The causal chain that Plaintiffs are presupposing helps demonstrate why their fears are so speculative. The risk they identify would only come from someone who cares so much about the result of an election that they *unlawfully* mail in a ballot after the election concluded to try and sway the election, even though that same person cared so little about the election that they never bothered submitting the ballot beforehand. And even assuming such a person exists, their scheme would only succeed if USPS fails to postmark their ballot *and* manages to achieve something the evidence shows it has not been doing—deliver the ballot in fewer than two days. Although Plaintiffs include some overblown and irrelevant allegations of other kinds of voter fraud, they offer nothing to show that this particular risk is either real or imminent.

canvassing shall remain confidential" under New Jersey law, N.J. Stat. Ann. § 19:63-31(m); that New Jersey has made it a third degree crime to reveal results before polls close, *id.* § 19:34-13(b); and that other states have allowed counting of ballots prior to Election Day without issue. *See* Ex. 16 at 10 (noting "numerous states, including Florida and Ohio, allow pre-processing already, and leaks in advance of Election Day are nearly unheard of"). Plaintiffs do not provide *any* evidence that these kinds of leaks have arisen in states that permit pre-Election Day canvassing, underscoring that their claims are too speculative to support any injunctive relief.

Still more, forthcoming guidance from the Division of Elections—which will issue before pre-November 3 counting can begin—will further ensure results cannot be disclosed. As Director Giles explains in his declaration, elections staff count the ballots by running them "through scanners that read the votes cast on each ballot." Giles Decl., ¶23. Notably, that "scanner does not automatically display the votes of each ballot or the tabulation of all the ballots while scanning," meaning the software will "only provide[] a tabulation of the results when the county elections staff run a tabulation report." *Id.* To prevent any release of information, the "Boards and Board staff will not be permitted to run the tabulation report prior to November 3, 2020 at 8:00 p.m. Further, the Division of Elections will be conducting an audit of the county boards of elections to ensure that no tabulation report was run prior to November 3,

2020 at 8:00 p.m." *Id.* This is another reason Plaintiffs' concerns are misplaced and why their harm therefore speculative, rather than imminent.[10]

Nor do Plaintiffs meet the test for organizational standing. Courts recognize that an organization has standing to challenge a law only if that law (1) "perceptibly impaired the organization's ability to provide its primary services or carry out its mission" (2) "and ha[s] resulted in a diversion of resources." *Disability Rights Pa. v. Pa. Dep't of Human Servs.*, No. 19-737, 2020 WL 1491186, *5 (M.D. Pa. Mar. 27, 2020). Here, however, Plaintiffs have not demonstrated how the statutes at issue have any meaningful impact on their resources. They do not explain why a rule that helps *protect* ballots cast on or before November 3, 2020 but never postmarked or postmarked late by USPS—a matter entirely in USPS's control—confuses voters or requires Plaintiffs to engage in outreach. Nor do they explain how the decision of a Board to begin their count before November 3 will generate confusion that requires expending more resources either. *See Cegavske*, 2020 WL 5626974, *5 (court stating it is "unpersuaded by plaintiffs' theory of organizational standing" since "Plaintiffs make no showing of their voters' confusion"); *id.* (explaining that "[a]n organization

---

[10] In any event, the claims are generalized. Plaintiffs do not explain how the unlawful disclosure of results by officials would affect their members, including how it would harm their members more than any other voters. *See Cegavske*, 2020 WL 5626974, *4 (rejecting standing where same claim can as easily be raised "by any citizen"); *Lujan*, 504 U.S. at 573-74 (holding that plaintiffs lack standing when injury would "no more directly and tangibly" affect them "than it does the public at large").

cannot simply choos[e] to spend money fixing a problem that otherwise would not affect the organization at all. It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem."). The bare allegations Plaintiffs include do not even state with specificity where they have had to divert resources from or how expenditure of those resources differs from the work they had planned regardless. Simply put, Plaintiffs are unlikely to succeed because their claims will likely be dismissed for lack of standing. *Id.*

B.   Plaintiffs' Claims Lack Merit.

At this stage in the case, Plaintiffs press one overarching argument: that some aspects of New Jersey's elections law are preempted by the federal statutes setting a date for the election. *See* 2 U.S.C. § 7; 3 U.S.C. § 1.[11] Plaintiffs highlight two aspects of New Jersey's elections statute that they find inconsistent with federal election date laws. First, they say, because the date of the election is November 3, the Boards of Elections cannot begin counting ballots until then. Second, they contend, New Jersey may not accept ballots that arrive in the mail within 48 hours of Election Day if the ballots lack a postmark. Neither claim withstands scrutiny.

---

[11] Although Plaintiffs include claims in their briefing regarding the general risks of voter fraud, especially as it relates to voting by mail, that material has no bearing on this motion, which addresses only timing of the counting of ballots and the rules for ballots without postmarks. Although Plaintiffs pled a claim as to the State's vote-by-mail proceedings, they chose not to include it in the instant motion.

26

1. *Canvassing Ballots Before Election Day Does Not Conflict With Federal Law Setting The Date Of The Election.*

Plaintiffs advance the unheard-of theory that no state may begin a process of counting ballots—including ballots cast via "early voting," received by mail, and/or received from military or overseas voters—until the day of the election. *See* ECF 35-1 at 18-21. That rule is inconsistent with both the text and history of the federal election date laws and with longstanding practice by the States. Plaintiffs' rebuttal— that elections officials may *violate* the law's criminal prohibitions and release some results early—both is inaccurate and cannot support their claim of preemption.

Article I, Section 4—known as the Elections Clause—assigns the "states the responsibility for establishing the time, place, and manner of holding congressional elections, unless Congress acts to preempt state choices." *Voting Integrity Project, Inc. v. Bomer* ("*VIP v. Bomer*"), 199 F.3d 773, 775 (5th Cir. 2000). The States enjoy "wide discretion in the formulation of a system" for all elections, including federal elections, *United States v. Classic*, 313 U.S. 299, 311 (1941), and their "discretion and flexibility … has only one limitation: the state system cannot *directly conflict* with federal election laws on the subject." *VIP v. Bomer*, 199 F.3d at 775 (emphasis added); *see also Roudebush v. Hartke,* 405 U.S. 15, 24 (1972) (noting that "unless Congress acts, [the Constitution] empowers the States to regulate the conduct of [federal] elections."); *Smiley v. Holm*, 285 U.S. 355, 366 (1932) (adding this grant of power to the States "embrace[s] authority to adopt a complete code" of regulations

27

governing virtually every aspect of elections, e.g., "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, *counting of votes*, duties of inspectors and canvassers, and making and publication of election returns" (emphasis added)). This Court must uphold the State's elections rules unless state law renders compliance with federal elections rules a "physical impossibility." *Millsaps v. Thompson*, 259 F.3d 535, 549 (6th Cir. 2001) (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)).

New Jersey's law is entirely consistent with the federal election date statutes on which Plaintiffs rely. Under 3 U.S.C. § 1, Congress established that "electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November," meaning November 3, 2020. *See also* 2 U.S.C. §§ 1, 7 (setting the same date "as the day for the election" for House members and Senators). But that is true in New Jersey, where Election Day is November 3, 2020. November 3 is the day counties must open the required number of polling places; November 3 is the day schools are closed to in-person instruction so that they can be used as polling places; November 3 is the day individuals can cast their ballots in person; November 3 is the date by which all voters must submit a ballot, whether in person, in a drop box, or via the mail; and the night of November 3 is the first time that officials in the State may release information regarding vote totals. N.J. Stat. Ann. § 19:63-31. Plaintiffs do not and cannot dispute any of this.

28

Instead, Plaintiffs believe that it violates the election date statutes for officials to begin the count of *any* ballots a moment before November 3, 2020. ECF 35-1 at 18-21. That position is inconsistent with the text of these laws. As the Supreme Court has explained in interpreting these statutes, "[w]hen the federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to the combined actions of voters and officials meant to make *a final selection* of an officeholder." *Foster v. Love*, 522 U.S. 67, 71 (1997) (emphasis added). And as every circuit to subsequently grapple with the reach of these statutes has found, this means they speak only to the date for "'consummation' of the process of selecting an official," *Voting Integrity Project v. Keisling* ("*VIP v. Keisling*"), 259 F.3d 1169, 1175 (9th Cir. 2001) (citing *Foster*, 522 U.S. at 72 n.4); *VIP v. Bomer*, 199 F.3d at 776 (holding that because elections refer to the combined actions "meant to make a final selection of an office holder … some acts associated with the election may be conducted before the federal election day without violating the federal election statutes"); *Millsaps*, 259 F.3d at 546 (finding that "so long as any such combined action [on a day other than Election Day] is not intended to make a final selection of a federal officeholder, a State has complied with the federal elections statutes"). As *Foster* noted, that approach fits comfortably with the definition of the statutory terms. *See* N. Webster, An American Dictionary 433 (C. Goodrich & N. Porter eds. 1869) (defining "election" as "[t]he act of choosing a person to fill an office") (cited by *Foster*, 522 U.S. at 72).

Longstanding practice demonstrates that a focus on when the election actually consummates is the only sensible way to read the law. To take one obvious example, "[m]ore than a century ago, some states began to allow absentee voting, and all states currently provide for it in some form; yet Congress has taken no action to curb this established practice." *VIP v. Bomer*, 199 F.3d at 776; *see also VIP v. Keisling*, 259 F.3d at 1175 (describing "long history of congressional tolerance, despite the federal election day statute, of absentee balloting and express congressional approval of absentee balloting when it has spoken on the issue"). That is why states have been allowed to have early in-person voting before Election Day, *see Millsaps*, 259 F.3d at 547; *VIP v. Bomer*, 199 F.3d at 777, or vote by mail for a substantial period prior to Election Day. *VIP v. Keisling*, 259 F.3d at 1176. "In fact, *Foster's* narrow holding suggests that, as long as a State does not conclude an election prior to federal election day, the State's law will not 'actually conflict' with federal law." *Millsaps*, 259 F.3d at 546. In other words, the federal elections date laws have always been understood to provide the end of the voting period, but not to specify the first or only day a state could allow a range of elections-related actions to take place.

Any argument that the federal elections date laws allow for ballots to be *cast*, but not *counted*, before Election Day, is both atextual and ahistorical. Notably, there is no language in 2 U.S.C. §§ 1, 7 or 3 U.S.C. § 1 that suggests such a strange reading, and Plaintiffs have not offered any definitions of the word "election" that suggests

30

Congress was comfortable allowing early voting but not early counting. Worse still, Plaintiffs' position flies in the face of a consistent practice by a number of States. As courts have explained, the federal election date laws should not be read to "result in a declaration that federal law preempts a widely accepted and long-standing electoral practice" by the States that has not been called into question by Congress. *Millsaps*, 259 F.3d at 547; *see also VIP v. Bomer*, 199 F.3d at 776 (treating Congress's decision to tolerate absentee voting as evidence that early voting laws would not conflict with federal statutes); *VIP v. Keisling*, 259 F.3d at 1176 (likewise relying on subsequent practice in reading of the federal election date laws). But that practice is devastating to Plaintiffs' claim: even before the 2020 election, laws of fourteen states permitted some counting, tabulating, and/or tallying of ballots before Election Day. *See* Ariz. Stat. §16–550(B), §16-551; C.R.S.A. § § 1-7.5-107.5; Conn. Gen. Stat. § 9-150a; 15 Del. C. § 5510; Fla. Stat. § 101.68; H.R.S. § 15-108, §11-152; K.S.A. § 25-1134; Mont. Code Ann., § 13-13-241; Neb. Rev. Stat. §32-1027; N.C.G.S.A. § 163-234; 26 Okl. St. Ann. § 14-125; O.R.S. § 254.478, § 260.705; V.T.C.A., Election Code § 87.0241, § 87.041; and U.C.A. § 20A-3-309; Ex. 17 (National Conference of State Legislatures collecting information on such laws and recognizing that these laws can benefit the public by ensuring quicker publication of results after the polls close, but that "[r]esults are not released ahead of time"). Yet although this practice is known, the Federal Government has never sought to put an end to it.

Allowing election administrators to begin counting the ballots, but not report them, is also consistent with the statute's purposes. As prior courts have highlighted, "a review of the legislative history of these provisions demonstrates that Congress wanted to prevent States that voted early from unduly influencing those voting later, to combat fraud by minimizing the opportunity for voters to cast ballots in more than one election, and to remove the burden of voting in multiple elections in a single year." *Millsaps*, 259 F.3d at 541; *VIP v. Bomer*, 199 F.3d at 777 (relying on *Foster* to explain these statutes sought to avoid "distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States, and ... the burden on citizens forced to turn out on two different election days to make final selections of federal officers").

New Jersey law readily coheres with those purposes because, like the above-described laws in fourteen states, results cannot be disclosed from the early count of ballots. *See* N.J. Stat. Ann. § 19:63-31(m) (explaining there are "no circumstances" where such ballot numbers may be "disclosed prior to the close of polls"); *id.* (boards must "implement the measures necessary to ensure the security and secrecy of the mail-in ballots"); Campisi Decl. ¶¶18-21 (detailing a county's procedures to prevent early disclosure). Not only is it prohibited, but state law makes it a third-degree crime to reveal contents of a ballot prior to the closing of the polls, N.J. Stat. Ann. § 19:34-13(b), which carries a potential prison term of three to five years, *id.* § 2C:43-6(a)(3).

32

*See* Ex. 16 at 10 (noting that leaks from states are "nearly unheard of," that they can be avoided with "criminal penalties against leaking results," and that Florida allows processing of ballots 22 days before the election while subjecting officials to "third degree felony penalties if results are released early").[12] Beyond those commands, the State will be requiring that its county elections officials not "run the tabulation report prior to November 3, 2020 at 8:00 p.m.," and the State "will be conducting an audit" to ensure compliance. Giles Decl., ¶23. This is all consistent with the federal election date statutes. *Cf. VIP v. Bomer*, 199 F.3d at 777 (noting Texas's "voting system does not foster either of the primary evils identified by Congress as reasons for passing the federal statutes" because its "law makes it illegal for election officers to reveal any election results before the polls close on election day").

At bottom, "[b]ecause the election of federal officials in [New Jersey] is not decided until [New Jersey] voters go to the polls on federal election day," its law "is not inconsistent with federal election laws." *Id.* at 774. That New Jersey followed the lead of other states in allowing early counting to take place in a safeguarded way, while barring disclosure of those numbers, does not change that analysis.

---

[12] This puts Plaintiffs in the remarkable and unprecedented position of arguing that a state's law is preempted *because a government official might violate its criminal prohibitions*. The State is not aware of any case in which a state statute, which on its face is consistent with federal law, becomes preempted just because someone might break it. That claim is especially weak here because Plaintiffs can offer no evidence to show that this problem has arisen in the other states with similar laws.

2.     *New Jersey Is Not Allowing Voting After Election Day And Has Instead Adopted Postmarking Rules Necessary To Prevent The Disenfranchisement Of Voters Who Validly Vote On Time.*

Plaintiffs' second argument is similarly overblown. Plaintiffs argue repeatedly that "New Jersey cannot permit ballots cast after Election Day to be counted," ECF 35-1 at 22, because "Congress did not intend voting to continue after Election Day," *id.* at 33. New Jersey, of course, agrees. New Jersey is not allowing ballots to be cast after Election Day, and it is likewise not allowing voting to continue after Election Day. Instead, New Jersey is simply requiring that Boards of Elections count ballots timely placed in the mail on or before Election Day, even if they are received by the Boards shortly thereafter.[13] Federal law does not preempt a state's choice to do so, and Plaintiffs have failed to meet their burden to substantiate their factual claim that New Jersey is allowing late-cast votes to be counted.

Plaintiffs' first failing is as a matter of law. There is no doubt that New Jersey law requires all voters to submit their ballots by November 3. As explained above,

---

[13]Indeed, a wide number of states allow for ballots to be counted if postmarked by Election Day without concern, even if they are received after the date of the election. For a few examples, *see* Cal. Elec. Code § 3020(b); D.C. Code § 1-1001.05(10A); 10 ILCS 5/19-8, 10 ILCS 5/18A-15; K.S.A. 25-1132; NV Rev. Stat. § 293.317; N.C. Gen. Stat. § 163-231(b); Texas Elec. Code § 86.007; Va. Code 24.2-709; W. Va. Code, § 3-3-5, § 3-6-9. New Jersey itself has previously allowed for ballots postmarked on or before the date of the election to be counted, although it extended that grace period this year in light of the USPS's recent delays.

that is the day in-person polls will be open; the last day on which voters can submit ballots in a drop box or in person; and, importantly, the last day a voter may lawfully submit their ballot to the Postal Service. *See* N.J. Stat. Ann. §19:63-31. That is why, when a ballot receives a postmark, a ballot with a postmark on or before November 3, 2020 must be accepted (if received within 7 days after Election Day), but a ballot with a postmark after November 3, 2020 shall never be canvassed unless USPS has represented that it had received the ballot on or before Election Day (*and* the ballot is received by the Board within 48 hours). *See id.* § 19:63-31(m) (listing procedures and requirements for the timing of ballots); *supra* at 14-15. In other words, there is no conflict between the New Jersey statute and federal law: both treat November 3, 2020 as the Election Day, *i.e.,* the last day on which ballots may be submitted.

Importantly, there is also no conflict between state and federal law as it relates to ballots without postmarks. The fundamental question New Jersey confronted was how to handle ballots the Boards of Elections receive from the Postal Service shortly after the Election Day, but that lack any postmarks to show whether they were placed in the mail before, on, or after November 3. Bluntly, the issue became an *evidentiary* one: While postmarks typically offer evidence as to the date a ballot was submitted, absent a postmark, what delivery dates provide sufficient proof that a ballot was cast by Election Day? And on that issue, federal law is silent. While the federal laws set Election Day as November 3, 2020, their plain text provides nothing regarding how

35

to figure out whether a ballot was in fact cast by that date. *See* 3 U.S.C. § 1; 2 U.S.C. §§ 1, 7 (establishing date but saying nothing regarding these evidentiary issues). That proves fatal to Plaintiffs' claim: when federal elections laws are silent, the "default" constitutional rule applies and states are empowered to resolve the elections issues. *Foster*, 522 U.S. at 69; *VIP v. Bomer*, 199 F.3d at 775 (noting only limit on "a state's discretion and flexibility in establishing the time, place and manner of elect[ions]" is that it "cannot directly conflict with federal election laws on the subject").

In fact, Plaintiff cannot offer a workable theory that squares with any reading of the federal election date laws. Although it is not entirely clear from their briefing, Plaintiffs appear to be taking the position that under federal law, any ballot received after Election Day itself can *never* be counted unless there is a postmark proving that it was submitted on or before November 3, 2020. But that would mean that if a Board receives a ballot at 10:00 a.m. on November 4, 2020 that has no postmark, it cannot be counted—even as Plaintiffs would agree the ballot was unquestionably submitted timely. That view, that the delivery date can never supply useful evidence of on-time mailing (even as postmarks can), lacks any basis in the text or logic of 3 U.S.C. § 1 or 2 U.S.C. §§ 1 and 7. But the alternative—where Plaintiffs agree this hypothetical ballot could be canvassed, but simply take issue with the State's two-day window— fares no better. Once one accepts that federal election date laws would not bar states from using delivery dates as evidence, then Plaintiffs' entire preemption argument

36

falls apart, as they are simply quibbling over the particular deadline that New Jersey has decided to use as evidence. Whatever the merits of that dispute, that is a question federal law does not answer, and so preemption does not apply.

Reading the federal election date laws to allow New Jersey to adopt its rules on postmarking also comports with the underlying purposes of those laws. As courts have explained, "all courts that have considered the issue have viewed statutes that facilitate the exercise of the fundamental right to vote as compatible with the[se] federal statutes." *Millsaps*, 259 F.3d at 545; *see also Bomer*, 119 F.3d at 777 ("[w]e cannot conceive that Congress intended the federal Election Day statutes to have the effect of impeding citizens in exercising their right to vote. The legislative history of the statutes reflects Congress's concern that citizens be able to exercise their right to vote."). As in those cases, New Jersey adopted its rules to ensure that votes validly cast by Election Day were rightly counted, notwithstanding any delays or failures to postmark ballots by the USPS. Just as polls are held open for those who are in line, ballots are counted when properly submitted on or before Election Day and received sufficiently quickly. That effort to prevent voter disenfranchisement, and to ensure the counting of *valid* votes, is not preempted by federal law.

In addition to its legal flaws, Plaintiffs' claim also fails on the facts: available evidence, including recent findings by other courts, confirm New Jersey was correct that a ballot received by a Board of Elections within 48 hours of November 3, 2020,

37

has been submitted on or before Election Day, even where the Postal Service failed to place a postmark upon it. As explained above, USPS sent multiple relevant letters to the State regarding the delivery processes and times of mail, including for ballots, consistently indicating that ballots take at least 2-5 days to be delivered. *See* Ex. 4 at 1-2 (May 29, 2020 USPS letter noting "[m]ost domestic First-Class Mail is delivered in 2-5 days," but that it can take longer, and "voters should mail their return ballots at least 1 week prior to the due date established by state law"); Ex. 6 at 1 (July 30, 2020 USPS letter stating "most domestic First-Class Mail is delivered 2-5 days after it is received by the Postal Service"). Nor were those letters alone. *See, e.g.,* Ex. 7 at 1, 2, 6, 9 (USPS Inspector General Audit Report, "Processing Readiness of Election and Political Mail During the 2020 General Elections," noting repeatedly that "First-Class Mail only takes 2 to 5 days to be delivered"); Ex. 8 at 313 (testimony in similar litigation from Manager of USPS Distribution Center in Manhattan that the "flow of mail does not allow for [delivery] to be the same day," and that it would instead take two days for delivery of ballots via first-class mail).

Recent evidence regarding recent delays in USPS service further confirm that a ballot received by the Board of Elections on or before November 5, 2020, will have been submitted on or before November 3. *See, e.g.*, Ex. 9 (Aug. 12, 2020 USPS Post Master General Briefing showing First Class Mail performance standards dropped from being met about 95% of the time in March to roughly 85% in August); Ex. 10

(Aug. 31, 2020 USPS Letter showing First-Class Mail performance standards being met about 10% less often on August 22, 2020 than in August of 2019); Ex. 12 (Sept. 24, 2020 article describing high-level USPS "operational changes that led to mail backups across the country," and adding that "[b]y one estimate, nearly 350 million pieces, or 7 percent, of the country's first-class mail were affected over a five-week span" by USPS operational changes); Ex. 11 (July 10, 2020 presentation stating that USPS was terminating extra or late transportation trips); Ex. 13 (finding that "[o]n-time mail delivery fell abruptly following [USPS's] July 2020 directives ordering operational changes to mail service and delivery"); Ex. 18 (describing the delay in receipt of medication "of nearly 25 percent"). The Postmaster General himself has recognized that his efforts "had unintended consequences that impacted our overall service levels," and noted that other prior USPS developments likewise "caus[ed] an increase in delayed mail between processing facilities and delivery units." Ex. 19. That is why one court has already concluded as a matter of fact that "[s]tatistics show there has been a drastic decrease in delivery rates." *See Washington v. Trump*, --- F.Supp.3d ----, 2020 WL 5568557, *5 (E.D. Wa. Sept. 17, 2020) (based on the record evidence, tying the slowdown to USPS policies that include "eliminating overtime," "decommissioning sorting machines," "removing mailboxes," "reducing operating hours," and removing authorization for "late trips" and "extra trips").

Available evidence likewise confirms that New Jersey's adoption of this two-day window was necessary to prevent the disenfranchisement of thousands of voters who validly cast their ballots on time. As the USPS OIG has explained, even though USPS has a policy of affixing postmarks to ballots, some ballots will not receive a postmark due to "(1) envelopes sticking together when processed on a machine; (2) manual mail processing; or (3) personnel unaware that all return ballots, even those in prepaid reply envelopes, need to receive a postmark." Ex. 7 at 3. That is, of course, no fault of the voter, who cast her ballot on time. And evidence from a number of recent elections confirms the seriousness of the threat. *See Gallagher v. N.Y.S. Board of Elections*, No. 20-05504, 2020 WL 4496849, *5 (S.D.N.Y. 2020) ("[D]espite the postal service's best efforts, there is uncontroverted evidence that thousands of absentee ballots [in New York City] for the June 23 Primary were not postmarked."); Ex. 14 at 5 (report by USPS OIG noting that in most recent primary, the "Milwaukee Election Office reported their receipt of about 390 voter completed ballots with varying postmark issues"); *id.* at 3 (describing USPS's "inconsistent postmarking of ballots"). Nor was New Jersey immune: during the Primary Election, over 6,000 votes were mismarked by the USPS. *See* Giles Decl., ¶13; Campisi Decl., ¶4 (noting that in Camden County, 400 ballots were mismarked by the USPS). The rule Plaintiff proposes would mean that ballots sent on time but never postmarked could not be

counted, thus disenfranchising thousands of voters who cast their ballots on or before Election Day—based only on USPS errors out of the voters' control.

Case law, including the fact finding by other jurists, aligns with the evidence the State has provided here. As one judge concluded, she could say with "with a high degree of confidence" that ballots received in the mail by New York City Boards of Elections within two days of a primary date had actually been mailed by voters either on or before that primary. *Gallagher*, 2020 WL 4496849, *17. Indeed, a number of courts have recently *required* states to accept mail-in ballots received by the boards shortly after Election Day, even absent a postmark, given these factual findings. *See id.* (requiring city to count ballots received within two days of the election because contrary holding "would do nothing to advance the state's interest in ensuring ballots are cast by Election Day, and would result in timely cast votes being needlessly rejected"); *Pa. Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 Pa. LEXIS 4872, *89 (Pa. September 8, 2020) (ballots without a postmark or with an illegible postmark "presumed" to have been mailed by Election Day and must be canvassed unless a "preponderance of the evidence" shows it was mailed after Election Day). If courts can require such ballots to be considered, *a fortiori* the State can decide that the same evidentiary presumption is appropriate based on similar evidence.

Against all this—and despite taking over a month after the State first adopted its postmarking rule to file the instant motion—Plaintiffs rely on a single "Frequently

Asked Questions" page on the USPS website, posted January 26, 2020, which says only that "[i]n some instances (short distance between ZIP Codes), it is possible for delivery to occur in one day." Pl. Ex. 26. But there are many reasons why this single sentence is not enough to call into question an entire state law. For one, this January 2020 posting predates delays that plagued the USPS this year—delays that Plaintiffs did not acknowledge in their briefing—and that undermine any possibility of a one-day delivery. For another, this generalized posting says nothing about whether a one-day delivery is possible in a period of high traffic, which is expected around Election Day. Still more, the FAQ is contradicted by evidence in this case, including USPS letters, OIG reporting, testimony in other cases, and public reporting. And strikingly, Plaintiffs have not identified cases in which a ballot was received by a Board within one day of being put in the mail, where by contrast the State has identified thousands of duly cast ballots that would have been disenfranchised by the contrary rule. Even on their own theory, Plaintiffs must do more to establish that New Jersey's use of a two-day delivery deadline as evidence of on-time submission is preempted.

## II.   THE REMAINING FACTORS MILITATE AGAINST GRANTING PRELIMINARY INJUNCTIVE RELIEF.

Even if this Court believes that Plaintiffs have shown a sufficient likelihood of success, this Court should not grant them relief. For one, Plaintiffs have failed to demonstrate any harm from the challenged provisions. For another, injunctions are

heavily disfavored when they affect an election at this late stage, and the injunction requested in this case would be particularly disruptive.

At the outset, the timing of Plaintiffs' efforts to challenge the General Election belies their contention that they are suffering from irreparable harm. It is black letter law that "Plaintiffs' delay in filing" their motion for preliminary relief "undermines any arguments of immediate irreparable harm." *Doris Behr 2012 Irrevocable Trust v. Johnson & Johnson*, No. 19-8828, 2019 WL 1519026, \*4 (D.N.J. 2019); *see also, e.g., Pharmacia Corp. v. Alcon Labs.*, 201 F.Supp.2d 335, 382 (D.N.J. 2002) (noting that a delay can "knock[] the bottom out of any claim of immediate and irreparable harm," and that it is a "dispositive basis" for rejecting an injunction); *Am. Beverage Corp. v. Diageo N. Am., Inc.*, 936 F.Supp.2d 555,610-12 (W.D. Pa. 2013) (collecting cases). It is no surprise that courts look skeptically on such motions—delays show "there is no apparent urgency to the request for injunctive relief" and thus no need for courts to step in on a preliminary basis, *GoNannies, Inc. v. GoAuPair.com, Inc.*, 464 F.Supp.2d 603, 609 (N.D. Tex. 2006), and increase the risk that the preliminary injunction would "fundamentally alter[] the status quo," *Acierno*, 40 F.3d at 647.

Such delay was present here. Governor Murphy issued EO 177 on August 14, 2020, and Plaintiffs filed a complaint on August 18, 2020—but without seeking any preliminary relief. ECF 1. On August 27, 2020, the New Jersey Legislature passed A4475, codifying EO 177, which Governor Murphy signed on August 28, 2020. P.L.

43

2020, c.72. Two weeks later, after a conference with this Court, Plaintiffs filed an Amended Complaint. ECF No. 33. An additional five days later, on September 16, 2020, just 38 days before county election officials are permitted to begin canvassing ballots for the General Election, Plaintiffs sought preliminary relief. ECF 35. Their delays, *40 percent* of the time between issuance of EO 177 and the General Election, sharply undermine the urgency of Plaintiffs' request. Indeed, by the date of this brief, a number of counties have already begun mailing their ballots and, in some instances, ballots have been completed and received by the Boards. *See* Giles Decl., ¶ 27.

Even absent such delay, Plaintiffs' claims of irreparable harm are weak. With respect to postmarking, even though Plaintiffs baldly assert that a voter could mail a ballot *after* Election Day and have it counted in New Jersey, the evidence shows this is not true; ballots received by the Boards of Elections within 48 hours of Election Day will have been sent on or before Election Day. *See supra*, 38-42. And regarding the challenge to the counting of ballots, Plaintiffs speculate that early counting will lead to pre-election publication of results. But A4475 establishes "[t]he contents of the mail-in ballots and the results of the ballot canvassing shall remain confidential," N.J. Stat. Ann. § 19:63-31(m), and makes it a crime to reveal results before the polls close, *id.* § 19:34-13(b), and the State is issuing binding guidance to further eliminate any possibility of early disclosure, *see* Giles Decl., ¶23. While Plaintiffs assume that officials will violate the law—without evidence that this happens elsewhere—"the

44

risk of irreparable harm must not be speculative." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000); *see also Cont'l Grp. v. Amoco Chem. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (adding "injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties").[14]

On the other side of the ledger, the harms of an injunction are significant. As a general matter, courts have explained that injunctions on the eve of an election are heavily disfavored. This doctrine, often called the "*Purcell* principle," stands for the proposition that "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell*, 549 U.S. 1; *Frank v. Walker*, 574 U.S. 929 (2014); and *Veasey v. Perry*, 574 U. S. 951 (2014)); *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) ("call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful

---

[14] Plaintiffs' brief reliance on case law fares no better. First, Plaintiffs say that New Jersey law will confuse voters or undermine the election, citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006). But *Purcell* addressed limits placed on federal court interference with an election, not whether and when the State's democratically accountable and expert branches can adjust the operations of an election in light of an unprecedented public health crisis. Second, relying upon *Project Vote v. Blackwell*, 455 F. Supp.2d 694, 707-08 (N.D. Ohio 2006), Plaintiffs claim that New Jersey law will "dissuade" voters from engaging in election-related activity. *Project Vote*, however, arose out of a challenge to an Ohio election code that created criminal penalties for any voter registration worker who failed to return forms to the appropriate agency within ten days. A4475, designed to protect the right to vote and have one's ballot counted, and designed to ensure that elections officials are able to properly complete the count of ballots on time, could hardly be more different.

45

reason for doing so"); *Benisek v. Lamone*, 138 S. Ct. 1942, 1944-45 (2018) (finding injunction against public interest as it would take effect shortly before election).

There are good reasons for this well-established rule: "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4-5; *see also N. Carolina v. Covington*, 137 S. Ct. 1624, 1626 (2017) (noting that, in elections cases, a court must assess the "extent of the likely disruption" to the upcoming election, and "the need to act with proper judicial restraint when intruding on state sovereignty," before granting relief); *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (explaining that the federal "court[s] can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree").

The costs of this demanded injunction would be especially onerous. Start with the postmarking claim. By this time, the public has already been advised of the rules that govern the General Election. Boards, state and county officials, and the media alike have advised that all active, registered voters will be mailed a ballot without a need to apply, and most importantly, that the voters may choose to mail ballots up to and including on Election Day. *See* Von Nessi Decl., ¶19 (noting one Board has "already informed voters that it will consider valid those ballots without a postmark

46

received by the Board within 48 hours of the closing of the polls"); McGuckin Decl., ¶20 (same); Giles Decl., ¶19 (describing official radio messages informing voters to submit their ballots "by 8 pm November third"); Ex. 15 (illustrative media article describing state law), ¶25. As a result, voters are operating under the entirely correct understanding that November 3, 2020 is the deadline for returning their ballots, and that they are protected by the State's rules even if USPS later errs.

But if the court enjoins A4475 on the eve of the election, advice to voters will need to look quite different, since there can no longer be the same confidence that a ballot put in the mail on or shortly before November 3, 2020 would still be counted. That will lead inexorably to practical concerns regarding voter confusion at this late date. *See* Von Nessi Decl., ¶19 (an injunction would leave the Board with "only a short amount of time to inform voters of an important change to election procedures" and risks leaving the voters "confused or frustrated by receiving new and conflicting instructions so close to the election"); McGuckin Decl., ¶20 (same); *Republican Party of Pa. v. Cortés*, 218 F.Supp.3d 396, 404-405 (E.D. Pa. 2016) (finding that last minute intervention in an election "risks practical concerns including disruption, confusion or other unforeseen deleterious effects"). And again, Plaintiffs have only themselves to blame for the state of affairs; they chose to allow a month to go by, all while the State and third parties advised voters on New Jersey's mail-in ballot rules and postmarking, without seeking the relief they now demand. *See Cegavske*, 2020

WL 5626974, *7 (noting, in these plaintiffs' challenge to Nevada postmarking rules, that they "ask for a remedy to cure the 'confusion' caused by [the state law], yet they have positioned this case for last minute adjudication before the general election").

An injunction against New Jersey's postmarking rule will also harm the public interest because it would result in the disenfranchisement of voters. *See supra* at 11 (noting USPS delivered a total of 6,935 ballots to the Boards of Elections properly cast in time for the July 7 primary but that USPS mis-marked as July 8). In recent elections, as explained above, *thousands* of ballots arrived to the Boards of Elections without a postmark. Because the representations from the USPS and other third party evidence demonstrate that ballots received within 48 hours of Election Day were in fact mailed on or before November 3, 2020, that means Plaintiffs' rule will lead to the rejection of thousands of valid ballots. *See, e.g., Jones v. Governor of Fla.*, 950 F.3d 795, 831 (11th Cir. 2020) ("The public, of course, has every interest in ensuring that their peers who are eligible to vote are able to do so in every election."). That interest is even stronger where, as here, it is codified into law—a reflection that the Legislature, acting as representatives of the public, recognized the postmarking rule would better ensure its residents the exercise of their right to vote. *See Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers) (noting that the State is harmed when a democratically enacted law is enjoined).

An injunction against the counting of any ballots prior to November 3 would also work a disruption in the election and undermine the public interest. As discussed above, early counting is necessary on account of the anticipated amount of mail-in and provisional ballots for the 2020 General Election. *See* Campisi Decl., ¶¶12, 4-16 ("Due to the drastically increased number of mail-in and provisional ballots to be received by the Board and the limited time provided for the review process for provisional ballots, the Board will have to begin canvassing mail-in ballots prior to Election Day."); McGuckin Decl., ¶¶11-14; Von Nessi Decl., ¶¶11-14; *supra* at 16 (noting sharp increases in mail-in ballots as compared to the 2016 General Election). Despite that increase, the deadlines by which ballots must be counted are unchanged given the need to comply with federal deadlines. *See* N.J. Stat. Ann. § 19:63-31(p) (board meets to certify results on or before November 20, 2020; no extension may be obtained); *id*. (clerks transmit certified results to Secretary on or before November 23, 2020; no extension may be obtained); *id.* § 19:21-1 (December 8, 2020 deadline for Board of State Canvassers to certify General Election results).

Given that certain of these Boards required judicial orders extending their time to count ballots that they will not be able to obtain in the General Election, *see* Giles Decl., ¶11; Campisi Decl., ¶¶8-11, the fact that Boards of Elections are expecting to receive upwards of three times as many mail-in ballots for this election compared to the primary demonstrates the imperative need for authorizing some pre-November

3 counting. *See, e.g.*, Campisi Decl., ¶¶2, 14. Were the court to enjoin the Boards of Elections from doing so, the Boards would instead have to hire and train additional staff in a matter of just a few weeks, even mere days, before an election, which would disrupt their elections preparations. *Id.* ¶15; McGuckin Decl., ¶13; Von Nessi Decl., ¶13. Recruiting and training poll workers, and canvassing ballots, will be especially difficult in light of the need to maintain social distancing at Board facilities. *Id.* Especially given the weakness of Plaintiffs' claims, these considerations offer compelling reasons to deny Plaintiffs the preliminary injunction they now seek.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunctive Relief should be denied.

> Respectfully submitted,
>
> GURBIR S. GREWAL
> ATTORNEY GENERAL OF NEW JERSEY
>
> By: /s/ Matthew J. Lynch _____

50