**Exhibit 8**

K7u5gal1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  EMILY GALLAGHER, et al.,

4              Plaintiffs

5         v.                          20 Civ. 5504 (AT)
                                      Skype Preliminary
6  NEW YORK STATE BOARD OF           Injunction Hearing
7  ELECTIONS, et al.,

8              Defendants

9  ------------------------------x
                                      New York, N.Y.
10                                    July 30, 2020
                                      9:30 a.m.
11
   Before:
12
                     HON. ANALISA TORRES
13
                                      District Judge
14
                     APPEARANCES
15
   COHEN & GREEN
16     Attorney for Plaintiffs
   REMY GREEN
17     -and-
   LAW OFFICE OF ALI NAJMI
18     Attorney for Plaintiffs and Plaintiff Intervenors
   ALI NAJMI
19     -and-
   JONATHAN WALLACE
20
   ADVOCATES FOR JUSTICE, CHARTERED ATTORNEYS
21     Attorney for Intervenor Plaintiffs
   ARTHUR Z. SCHWARTZ
22

23

24

25

K7u5gal1

```
 1                      APPEARANCES (CONTINUED)

 2    NEW YORK STATE
      OFFICE OF THE ATTORNEY GENERAL
 3         Attorney for Defendant NYS Bd. of Elections
      OWEN T. CONROY
 4
      NEW YORK CITY LAW DEPARTMENT
 5    OFFICE OF THE CORPORATION COUNSEL
           Attorney for Defendant NYC Bd. of Elections
 6    STEPHEN E. KITZINGER

 7    NEW YORK CITY BOARD OF ELECTIONS
      RAPHAEL SAVINO
 8         Deputy General Counsel
      STEPHEN RICHMAN
 9         General Counsel

10    NEW YORK STATE BOARD OF ELECTIONS
      BRIAN QUAIL
11         General Counsel

12    AUDREY STRAUSS
           Acting United States Attorney for the
13         Southern District of New York
      BY:  ILAN STEIN
14         Assistant United States Attorney

15

16

17

18

19

20

21

22

23

24

25
```

K7u5gal1

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | (Hearing resumed)                                                      |
| 2  | LAW CLERK:  This hearing is open to the public and the                 |
| 3  | press.  Those listening in are reminded to please mute their           |
| 4  | phones for the duration of the hearing.  Recording of this             |
| 5  | proceeding is strictly prohibited.                                     |
| 6  | Judge Torres is now presiding.                                         |
| 7  | THE COURT:  Good morning, everyone.                                    |
| 8  | We are going to continue the hearing this morning with                 |
| 9  | additional witnesses to be called by the plaintiffs.                   |
| 10 | Plaintiffs, would you call your first witness of this morning?         |
| 11 | MR. NAJMI:  Thank you.  Good morning, your Honor.  It                   |
| 12 | is Ali Najmi on behalf of the plaintiffs.  At this time we             |
| 13 | would like to call Allen Tanko on behalf of the United States          |
| 14 | Postal Service.                                                        |
| 15 | THE COURT:  How do you spell his name?                                 |
| 16 | MR. NAJMI:  I believe it is A-L-L-E-N and T like Tom,                  |
| 17 | A-N-K-O.                                                               |
| 18 | MR. STEIN:  Your Honor, this is Ilan Stein on behalf                   |
| 19 | of the postal service.  I want to confirm that that's the              |
| 20 | correct spelling.  Your Honor, I also wanted to ask if you             |
| 21 | would permit me to make objections and act as counsel during           |
| 22 | this proceeding.                                                       |
| 23 | THE COURT:  Yes.  That reminds me that I should ask                    |
| 24 | the counsel to make their appearances now that we are starting         |
| 25 | this morning.                                                          |

K7u5gal1

 1          MX. GREEN:  Good morning, your Honor.  This is Remy

 2    Green, counsel for the plaintiffs from Cohen and Green.

 3          MR. SCHWARTZ:  Arthur Schwartz.  I am here for the

 4    intervenors.  I am connected by phone at the moment.  Judge,

 5    just so you know, at 10:30 I am going to defer the rest of

 6    whatever I do to Mx. Green and Mr. Wallace because I have a

 7    major arbitration that I have to begin.

 8          THE COURT:  Okay.  What other attorneys are present?

 9          MR. CONROY:  Owen Conroy for the New York State office

10    of the Attorney General on behalf of the State defendants.

11    Good morning, your Honor.

12          MR. KITZINGER:  Good morning, your Honor.  Steve

13    Kitzinger New York City Law Department for the Board of

14    Elections and the New York City defendants.

15          MR. STEIN:  Good morning, your Honor.  Ilan Stein from

16    the U.S. Attorney's office on behalf of the postal service.

17          THE COURT:  Yes, Mr. Stein, you may make objections on

18    behalf of your client.

19          MR. STEIN:  Thank you, your Honor.

20          MR. QUAIL:  And, Judge, this is Brian Quail with the

21    New York State Board of Elections counsel to the agency.

22          THE COURT:  Anyone else?

23          MR. NAJMI:  Judge, this is Ali Najmi.  Just for the

24    record, I would like to object to Mr. Stein's application.  He

25    is not counsel to a party in this matter, plaintiff or

K7u5gal1                    Tanko – Direct

1   defendant or interevenors and I think it doesn't make -- to me,

2   having a witness on the stand with their own counsel shooting

3   objections or interfering in the process is not a proper course

4   of trial.

5          THE COURT:  Overruled.

6          So, do we have any further counsel?  All right, then.

7   ALLEN TANKO,

8       called as a witness by the Plaintiff,

9       having been duly sworn, testified as follows:

10         THE COURT:  You may inquire.

11         MR. NAJMI:  Thank you.

12  DIRECT EXAMINATION

13  BY MR. NAJMI:

14  Q.  Mr. Tanko, good morning.  My name is Ali Najmi.  I am an

15  attorney for the plaintiffs.

16  A.  Good morning.

17  Q.  I would like to just begin with finding out more about your

18  role at the post office.  Could you -- I understand that you

19  are a marketing manager as a title.  What does that mean?

20  A.  I oversee several departments for the cities of Manhattan

21  and Bronx.  I oversee the entire retail portion which includes

22  all of our retail sites, our consumer affairs department

23  including any complaints that deal with either commercial

24  customers or residential customers.  I also have a small

25  business development team that deals with small businesses.

1   And that's basically it.  I also oversee the bulk mail

2   acceptance unit which accepts all mail inducted through New

3   York City.

4   Q.  And the list of items that you have control over, they are

5   specific to Manhattan and the Bronx?

6   A.  Only specific -- I only deal with specifically Manhattan

7   and the Bronx.  With the postal service we have 66 districts

8   nationwide and since New York City is so large it's the only

9   city that's split into two districts.  So, one of the districts

10  covers only Manhattan and the Bronx while the other district,

11  which is known as Triborough District covers Staten Island,

12  Brooklyn, and Flushing.

13  Q.  Just Flushing or all of Queens?

14  A.  I really don't know that answer.  I am assuming it is all

15  of Queens.  I know it is the 113 zip, I believe, so anything

16  with the 113 three-digit zip code.

17  Q.  This case is related to absentee ballots, postmarks, the

18  Board of Elections of the State and City are the defendants.

19  How do you interact with either the Board of Elections or

20  matters related to ballots, absentee ballots, in your position?

21  A.  So, I have what was known as a political mail coordinator,

22  her name was Laurie Dickerson, and she did all of the -- she

23  was my coordinator in all of our dealings with the Board of

24  Elections.  We have had -- we deal with the Board of Elections

25  consistently throughout the entire election process.  I believe

K7u5gal1                         Tanko – Direct

1    our first meeting with them was probably back in March or

2    April –– I don't have the exact date –– but it is something we

3    normally do.  We sit down with them, we go over when the

4    expectation that the absentee ballots are going to be mailed,

5    we go over the actual ballot to make sure it is meeting the

6    specifications for our mailings.  We work very Closely with

7    them to ensure that this whole process is going through

8    seamlessly.

9            THE COURT:  Mr. Tanko, are you the generally official

10   from the postal service dealing with the elections or are there

11   other people that correspond to the Triborough division that

12   are also essentially in the same kind of position that you are?

13           THE WITNESS:  Yes.  That would –– I am assuming what

14   you would, that would be Ms. Simmons –– or it is actually

15   Ms. Medina who takes on my role in the Triborough district but

16   from what I understand she is on vacation at this point.

17           THE COURT:  So, as far as you understand, were there

18   meetings between Ms. Medina and the Board of Elections?

19           THE WITNESS:  I don't –– I do not know that answer.

20           THE COURT:  Okay.

21           You may continue, Mr. Najmi.

22           MR. NAJMI:  Thank you, Judge.

23   BY MR. NAJMI:

24   Q.  If Ms. Medina is your equivalent in the Triborough

25   district, just so I understand your structure, the consumer

K7u5gal1                    Tanko - Direct

1   affairs manager in your district is below you?  You are the

2   supervisor to that person?

3   A.  That would be correct.

4   Q.  Okay.

5         Well, then would there be a political mail coordinator

6   in the Triborough district?

7   A.  Yes, there would be.

8   Q.  Can you just tell me a little bit about the hierarchy here?

9   In your district you are the marketing manager.  Below you

10  would be the consumer affairs manager?

11  A.  Correct.  I have a consumer affairs manager, I have a

12  retail manager, I have a business solutions manager who is also

13  the BMU manager who also ad hoc'd at my political mail

14  coordinator.  So, she did both jobs at the same time because it

15  is not a -- our political mail coordinator job is not a

16  full-time assignment, not a yearly assignment; it is something

17  we add on to someone's additional duties and then we supplement

18  any work that they need to do in their old job with other

19  individuals.

20  Q.  I see.  When do you make the distinction to delegate

21  political mail coordinator duties?

22  A.  Usually around March.  I mean, it is a year-round position

23  but some of the duties are not -- you know, especially like

24  from, let's say, sometimes in the summer months, especially

25  right now there is not a lot going on so we don't see a lot of

K7u5gal1                    Tanko - Direct

1   political mail, we don't see a lot of election mail so there is

2   not a lot of processes that we need to follow up on at this

3   point.

4   Q.  I see.

5        And with respect to meetings with the Board of

6   Elections, were you present for all the meetings or many of the

7   meetings or was your political coordinator ever at meetings

8   without you?

9   A.  My political coordinator, she ran all of the meetings with

10  the Board of Elections.  I was not present during this time.  I

11  was, however, present during our postmortem meeting which we

12  recently had with the Board of Elections after this election

13  process to see what we can tighten up and what we can -- what

14  items that we need to be correcting.  So, I had one of those

15  meetings roughly about three weeks ago with them.

16  Q.  We will get to that meeting in a few minutes?

17        THE COURT:  Mr. Najmi, I am hearing sort of a

18  mumbling.  I don't know if it is your microphone but I am not

19  hearing you clearly.

20        MR. NAJMI:  Judge, I don't know.  I am not doing

21  anything differently than yesterday.  Is it better now?

22        THE COURT:  Yes.  You sound better.

23        MR. NAJMI:  Okay.  Maybe I just have to be louder.

24  BY MR. NAJMI:

25  Q.  Mr. Tanko, can you tell me a little bit about your career

K7u5gal1                         Tanko - Direct

1    at the post office?  How long have you worked at the United

2    States post office and what did you do before you were the

3    marketing manager of this district?

4    A.   I have worked for the postal service for 36 years.  Before

5    becoming the marketing manager in New York I worked for our

6    corporate office in Connecticut and I was an operations

7    programs analyst that kind of -- my expertise was back office

8    operations on the clerical side including retail operations.

9    Q.   With a 36-year career in the United States Postal Service

10   you must be very familiar with all of the handbook and rules

11   that the postal service has, correct?

12   A.   Well, I am familiar.  I wouldn't say in certain aspects I

13   am an expert because we have varying operations that maybe I

14   have never worked in but I do -- I have a working knowledge of

15   it.

16   Q.   So, what is the United States Postal Service policy with

17   regards to postmarking prepaid postage?

18   A.   Prepaid postage.  So, our policy is when it is a prepaid

19   postage where it doesn't have to be cancelled, that normally we

20   do not cancel them.  However, most of the mail will now receive

21   a cancellation because now we run it through what is known as

22   an advanced facer and canceler.

23   Q.   When you say "now" what do you mean by that?  As of last

24   week or as of January 2020?

25   A.   So, I wish -- I don't know that specific answer but I do

K7u5gal1                          Tanko - Direct

1    know that in my conversations with my plant manager all mail --

2    all letter mail goes through what is known as advanced facer

3    canceller and it faces the mail, pulls out mail that should not

4    be running on our automation, and then it will give it a

5    cancellation date.

6    Q.  But when did this start?

7    A.  You know, I do not know that answer when the AFCSs were put

8    into place.

9              THE COURT:  Well, was it in 1920?  Was it 1960?

10             THE WITNESS:  I would probably say it was probably in

11   the early 2010, right around there.  So, it has been in place

12   for a good 10 years, I would say.  I can get you the direct

13   answer, I just don't have it.

14   BY MR. NAJMI:

15   Q.  I think that's fine.  If you are representing it is around

16   2010 then that's fine -- or around there.  The point I am

17   getting to was that the policy that was in place before January

18   1, 2020, before this election.

19   A.  That is correct.

20   Q.  And you mentioned there is an automated system that goes

21   through the envelopes and imposes a cancellation.  By

22   cancellation we mean a postmark; is that right?

23   A.  Correct.  Correct, cancellation would mean a postmark.

24   Q.  Can you describe for me what that process looks like?  Is

25   it -- how is this -- what does this automated process look

K7u5gal1                          Tanko - Direct

1    like?

2    A.   So, when we receive collection mail -- and that's anything

3    from a collection blue box or anything coming from a retail

4    counter, it is actually jackpotted in what we refer to as these

5    orange hampers.  And these orange hampers all, for the most

6    part with only letter mail, okay, gets dumped on to this big

7    vat and this big vat comes in and it starts -- it starts

8    sorting the letters, it starts trying to put them in the

9    correct direction, etc.  So, this is all on automated

10   operation.  And what the main -- the main purpose of that

11   machine is to -- and hence what we call it, an advanced -- it

12   faces the mail and it cancels the mail.

13            THE COURT:  Would you restate that, please?

14            THE WITNESS:  So, it puts it in the right direction so

15   the machines can read.  So if it is upside down it is going to

16   put it right side up or it will make sure that all the letters

17   you are seeing are all in the same direction and then it will

18   put a cancellation on it and it will get it ready for automated

19   processing.

20   BY MR. NAJMI:

21   Q.   Where does this occur?  In Manhattan?

22   A.   It occurs in various locations.  We have, in the two

23   districts we are referring to in New York it happens in our

24   Morgan facility which is on 29th Street and Ninth Avenue, and

25   it also happens -- I believe it happens in the Brooklyn plant,

K7u5gal1                         Tanko - Direct

1    and I know there is another plant in the Triborough district

2    but I do not know where it happens there, that's out of my

3    purview.

4    Q.  So you mentioned this automated policy -- I hear an echo

5    but I don't know if somebody else needs to be put on mute.

6            With respect to this automated system to cancel and

7    impose postmarks you mentioned it was for letter mail only?

8    A.  That would be correct.

9    Q.  What does letter mail mean?

10   A.  Anything that will be referred to as meeting our

11   requirements as letter mail.  So, I don't have a template in

12   front of me but it would be something that -- I don't have a

13   template in front of me but I am going to use something -- so

14   maybe something to that effect right over here.

15   Q.  Just for the record, I would just want to be clear that

16   Mr. Tanko displayed a folded piece of paper that seemed to be

17   8.5 by 11.  Mr. Tanko, do you mean like a regular business

18   envelope that we are all used to receiving?

19   A.  That is correct, but however it would vary on size also.

20   Q.  So --

21   A.  I mean, it could go up to five inches.  There is a template

22   that we use and, you know, it determines whether or not this

23   pace is automation compatible.

24   Q.  Now, the absentee ballot envelope, is that considered

25   letter mail?  Because that envelope is certainly a different

K7u5gal1                         Tanko - Direct

1    size.

2    A.  Yes, it would be.

3    Q.  So is it your testimony, though, that the act of imposing a

4    postmark on every absentee ballot envelope is one that it goes

5    through an automated process?

6    A.  Can you repeat that question for me?  You broke up a little

7    bit.

8    Q.  Okay.  Is it your testimony that every absentee ballot

9    envelope in New York goes through an automated process for

10   postmarking?

11   A.  I cannot validate that every single envelope that was

12   mailed went through this automation process.  I can say that

13   that's our process but I cannot validate that that occurred.

14   Q.  What could occur in a facility that leaves open the

15   possibility that a ballot envelope would not go through an

16   automate process?

17   A.  So, there are certain things that can happen and I'm going

18   to be, you know, when we deal with millions of pieces every

19   single day there are things what we refer to as piggybacking

20   letters where they get caught from the glue or anything to that

21   effect that it won't get a cancellation.  Okay?  It could be

22   that when the envelope might be slightly damaged or wet from

23   the collection process.  So, sometimes that advance facer

24   canceler will reject that piece and send it to another location

25   because it doesn't want to damage the machine.

K7u5gal1                        Tanko - Direct

1    So, there are other reasons that I know of but I am

2    also not an expert in the Advanced Facer Canceler.

3    Q.  Did you tell me all of the reasons you are aware of?

4    A.  It could be misdirected.  There are different reasons that

5    maybe I'm not also aware of because, once again, I am not an

6    expert.

7    Q.  I understand that?

8    A.  Okay.

9    Q.  I understand that, Mr. Tanko.  I appreciate that.  I am not

10   offering you as an expert, I just want to know what you know.

11   A.  Okay.

12   Q.  What does misdirected mean?

13   A.  Let's say there is wrong label on the machine that got

14   misdirected and went to a different operation.

15   Q.  I don't know this technology.  There is a wrong label on

16   the machine?

17   A.  Not on the machine, on the tray label.  I'm sorry, I

18   misspoke.  So each -- so, in other words, if the tray label is

19   incorrect, okay, on the tray, and it gets sent to a different

20   operation, it may not come to the Advanced Facer Canceler.  So,

21   when we are dealing with so many millions of pieces a day there

22   are things that could happen that maybe they don't make it to

23   the Advanced Facer Canceler but, once again, I am not an expert

24   on that to give you, you know --

25   Q.  I understand that.

K7u5gal1                          Tanko - Direct

1           THE COURT:  Mr. Tanko, you are not testifying as an

2      expert concerning the machine.  The value of your testimony is

3      that you have 36 years, almost four decades of working at the

4      post office and so you have, I am sure, a great deal of

5      knowledge about what happens to the mail and that's what

6      Mr. Najmi is trying to get at.

7           THE WITNESS:  Okay.  So, you know, maybe I can

8      elaborate a little bit on the process that we have in place and

9      I don't mean to cut to the chase but I will go over what the

10     processes the New York District put in place to ensure these

11     ballots had a postmark.

12           MR. NAJMI:  Thank you.

13           THE COURT:  That would be very helpful.

14           THE WITNESS:  Okay?  I don't want to overstep

15     boundaries but I guess I am going to try to cut to the chase a

16     little bit.

17           So, in our discussions with the Board of Elections we

18     understand the need and they were very adamant about making

19     sure that every single piece got a postmark and we agreed to

20     make that happen.  So, in discussions with my plant partners,

21     okay, who work over in the Morgan facility, any pieces that

22     they have seen that came to the BRM that didn't have a

23     postmark, they were going to postmark it by hand.  Okay?  So,

24     that's what their responsibility was for us in the New York

25     district.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    BY MR. NAJMI:

2    Q.  I just want to expand on that.  That you were going to

3    ensure that every piece received a postmark and, going another

4    step, even to ensure it got a postmark by hand if it was

5    rejected from the automated system?

6    A.  Correct.

7    Q.  How do you track if something is rejected from the

8    automated system?

9    A.  We do not.

10   Q.  How do you know that something got rejected from the

11   automated system?

12   A.  Well, we would like -- it goes to a rejected bin and we

13   would look at them from there, okay, but we don't track -- at

14   least -- I don't have that information about the amount of

15   pieces.  Furthermore, each one of our three sites -- we had one

16   in Tremont Station in the Bronx, we had one in Bowling Green

17   Station in Manhattan, and we also have one in Village Station

18   in Manhattan -- each one of these sites were the ones where the

19   business reply mail for these absentee ballots were actually

20   processed and during these -- and each day we required the

21   local management to count the amount of BRM pieces that were

22   there, to count the amount of pieces that were not postmarked

23   and to -- if they came to them without a postmark for whatever

24   reason there may be, they were also to postmark it at that

25   location.

K7u5gal1                          Tanko - Direct

1           THE COURT:  "BRM".  What does that mean?

2           THE WITNESS:  That means business reply mail.  That

3    was the mailing venue that the Board of Elections determined

4    that they were going to use to get these ballots returned to

5    them, which is the equivalent of First Class Mail.  It doesn't

6    have any postage on it, the postage is prepaid.  Once the

7    postage -- we deduct the postage once they receive that ballot

8    back so we count them and we charge them as appropriate.

9    BY MR. NAJMI:

10   Q.  Can you just repeat when you said you spoke with, to ensure

11   that whatever gets rejected by the automated system and is in

12   the rejected bin gets a hand-postmarked stamp, you mentioned a

13   separate facility?

14   A.  That would be the in-plant support manager Michael

15   Calabrese and I worked closely with him and we did that.  First

16   we go through the Advanced Facer Canceler to make sure that it

17   gets a cancellation and the rejected ones or anything that we

18   see, they would get done by the plant.  And then, finally, if

19   any of those get through we are actually doing a manual

20   inspection of every single piece to ensure that there was a

21   cancellation.

22   Q.  You mentioned that there were the plans, these other

23   facilities where a lot of this happened.  I just want to be

24   clear about which facility they're doing what.  You mentioned

25   that you have the Morgan facility on 29th Street and Ninth

K7u5gal1                          Tanko – Direct

1    Avenue?

2    A.   That is correct.

3    Q.   But then you mentioned the Bowling Green facility and

4    another facility.  How many facilities –– if somebody mailed a

5    ballot, an absentee ballot from the Manhattan or the Bronx in

6    your district –– let's say I live in the South Bronx and I

7    mailed my absentee ballot in; where does it go first?

8    A.   Where does it go first?  You mailed it in, I am assuming,

9    in a blue collection box, correct?

10   Q.   Yes.  Hypothetically I put it in the corner blue mailbox on

11   my street.

12   A.   So, it would be picked up by one of our collection routes

13   which we collect every single box daily and there is a specific

14   time listed on each one.  Then it would be brought back to the

15   local post office.  So, it gets brought back to the local post

16   office –– so depending on what your local post office would be

17   in the Bronx –– and then it would be sent directly to the

18   Morgan facility for processing.  Now, Manhattan does it ––

19   Manhattan does it a little differently.  Manhattan's

20   collections are all centralized out of one facility so rather

21   than bringing it back to the local post office in Manhattan

22   because of the proximity of everything that's close by, they

23   bring it directly to the processing facility.

24   Q.   So it –– sorry, Judge?

25           THE COURT:  I wanted to know where that is in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K7u5gal1                          Tanko - Direct

1    Manhattan.

2              THE WITNESS:  That would be the Morgan facility on

3    29th and Ninth Avenue.

4    BY MR. NAJMI:

5    Q.  Wait.  Just to be clear, in Manhattan when it gets picked

6    up from the blue box it does not go to the local post office?

7    A.  That would be correct.

8    Q.  Do you know what the process is in Brooklyn?

9    A.  I do not.

10   Q.  Now, once it is at the Morgan facility that's where it goes

11   through this automated process?

12   A.  You are correct.

13   Q.  And the rejected bins are in the Morgan facility?

14   A.  That is correct.

15   Q.  And your support manager who received the directions from

16   you to hand-postmark anything that was in the rejected bin is

17   in the Morgan facility?

18   A.  That is correct.

19   Q.  And do you know if this process is specific to your

20   district?

21   A.  No, I do not.  I cannot, you know, I can't -- since we have

22   66 different districts so we all work, you know -- we all have

23   the same directive however certain processes may be adjusted.

24   Some of the processes that I have in New York they may not have

25   to do in different areas but that was the agreement that I made

K7u5gal1                        Tanko - Direct

1    with the Board of Elections to ensure that our processes were

2    in place.

3    Q.   Who is above -- in the postal office hierarchy and

4    governance, is there somebody that oversees all the district

5    managers like yourself, let's say, for the City of New York,

6    the five boroughs?  Is there somebody above all the managers

7    that you have to answer to?

8    A.   So.  Can you -- so, let me talk about hierarchy a little

9    bit, maybe I can help you out.

10   Q.   Yes.

11   A.   I am a direct report to the district manager.  Okay?

12   Q.   Okay.

13   A.   So, the district manager, she has six direct reports that

14   report direct to her which includes the postmaster of Manhattan

15   and the Postmaster of Bronx.

16   Q.   So the district manager is the highest person in the

17   district?

18   A.   That is correct.

19   Q.   Are you aware if there was any meeting between the upper

20   level of the United States Postal Service and the City of New

21   York that involve all the district managers of the five

22   boroughs?

23   A.   I'm not aware.  Most of the political mail landscape she

24   has delegated to me and my team so I handled most of those type

25   of operations.

1   Q.   What is the name of the district manager?

2   A.   Lorraine Castellano.

3   Q.   Is it fair to say that Manager Castellano gave you

4   discretion to come up with a system on your own and with your

5   team to ensure that these postmarks are placed?

6   A.   That is correct.

7   Q.   Did you report back this system to Manager Castellano to

8   get approval?

9   A.   I'm not sure I understand your question.

10  Q.   This process that you have come up with, did the District

11  Manager Castellano have to approve it before you implemented

12  it?

13  A.   We had discussions but there was no formal approval.

14  Q.   Okay.

15  A.   She understood the process.

16  Q.   Was there any other quality control measure that you took

17  to ensure postmarks occurred in your district on absentee

18  ballots?

19  A.   So, the main thing that we looked at here is in the three

20  facilities that's what we referred to as the last mile.  So, in

21  the three facilities I mentioned, which were Tremont Station,

22  Bowling Green Station and Village Station, these three

23  facilities were required every day to report out to us how many

24  pieces were returned, how many pieces needed a postmark, the

25  date of those postmarks and etc., just so that was our -- at

K7u5gal1                    Tanko - Direct

1   least that was my kind of, like -- how can I put this?  It was

2   my last failsafe to ensure that the processes were in place.

3   Now, not only that, I visited the sites multiple times to

4   ensure that the processes were in place and if they had any

5   questions about the process, I personally visited all three

6   sites at least two to three times.  As a matter of fact,

7   Bowling Green I was there almost daily when we first had the

8   process roll out just to make sure we were doing the correct

9   thing.

10  Q.  So, I just want to ask some questions about how long would

11  it take for a ballot envelope to go through this automated

12  process.  So if I am a voter let's stick with the Bronx.  If I

13  am in the Bronx and I deposit my ballot -- let's say

14  hypothetically I didn't get my ballot from the Board of

15  Elections until June 23rd.

16          THE COURT:  There is someone that needs to mute

17  because we are getting a lot of feedback here.

18          Go ahead, Mr. Najmi.

19          MR. NAJMI:  Thank you, Judge.

20  BY MR. NAJMI:

21  Q.  I am going to ask you -- actually, let me step back.  This

22  hypothetical is I'm a voter in the South Bronx.  On June 22nd I

23  receive my ballot in the afternoon mail.  I promptly fill it

24  out, I walk to the corner, and I put the ballot in the blue box

25  at 4:00 on June 22nd.  When is that piece of mail going to get

K7u5gal1                          Tanko - Direct

1   a postmarked under your system?

2   A.  So, within that system it would depend on when the

3   collection time for that box would be.  Okay?  So each

4   collection box has a specific time that the box has collected.

5   If it is deposited.

6            THE COURT:  Let us assume that the collection time is

7   5:00 and that the mail was deposited at 4:00.

8            THE WITNESS:  Okay.  So, in that assumption it should

9   receive a postmark because it is a First Class Mail piece

10  within one to three business days.

11  BY MR. NAJMI:

12  Q.  Okay.

13  A.  Since it is a first -- and that's where we have to get at.

14  Our service standard for First Class Mail is one to three days

15  depending on the location that it is going to.

16  Q.  Okay.  So --

17           THE COURT:  One moment there.  You said depending on

18  the location it is going to.  So, we know the location that it

19  is going to, it is going, headed towards the Board of

20  Elections.  So, can you be more specific?

21           THE WITNESS:  So normally, if it is in with our

22  three -- what we refer to as our three-digit service zone

23  between the Bronx and Manhattan it is the three-digit service

24  zone we are looking at, that would be one to two days.

25  BY MR. NAJMI:

K7u5gal1                    Tanko - Direct

1    Q.  Wait.  I'm sorry.  I missed that.  If it is in where it is

2    one to two days?

3    A.  If it is within our three-digit service zone.

4                THE COURT:  What is that?

5                THE WITNESS:  Across the nation we have zip codes.

6    Okay?  All of Manhattan is zip code 100 with two other digits

7    next to it so we refer to that as the three-digit 100 area.

8    The Bronx is 104.  So, we have many partners that we work with

9    as mail comes in that we try to make that service standard.

10   So, certain locations in Long Island, you know, depending on

11   the logistics and transportation, if they can get it to us that

12   would be a one to two-day service commitment.  Okay?  If you

13   are mailing the piece from, say, from Buffalo, New York, it is

14   probably not going to make that one to two-day commitment, that

15   might be one to three days depending on whether or not it has

16   to go surface by truck, or air transportation.

17               THE COURT:  That commitment of one to two days within

18   the three-digit service zone, is that the same in each borough?

19   Does each borough commit to that one to two day postmarking?

20               THE WITNESS:  I can talk to the postal service goals

21   and policies but that's what -- if it is coming from -- like, I

22   will tell you this much.  In Manhattan and Triborough districts

23   we are within that one to two service zones with other partners

24   which includes Brooklyn, Staten Island, and Flushing.

25               THE COURT:  Here is my question.  I want to get the

K7u5gal1                          Tanko - Direct

1   details straight.  I am in the Bronx, I am in a 104 zip code,

2   my blue mailbox on the corner is within that 104 zone and I

3   deposit my ballot there.  That ballot, I understand and correct

4   me if I am wrong -- anybody -- is going to a borough board of

5   election or is it going to one central Board of Elections

6   location?

7          MR. KITZINGER:  Your Honor, this is Steve Kitzinger

8   from the New York City Law Department.

9          It is going to the borough of the voter's residence.

10  So, if the voter is registered to vote from the Bronx, it will

11  go to the Bronx office regardless of where it is mailed from.

12         THE COURT:  Okay.  All right.

13         MR. NAJMI:  Sorry, Judge.  I just wanted to see if

14  Mr. Tanko could answer the question.

15         THE COURT:  I'm not finished with my question.  You

16  will pick up when I am finished.

17         MR. NAJMI:  Yes, Judge.

18         THE COURT:  All right, Mr. Tanko.  I am a Bronx

19  resident.  I place my ballot in a 104 blue receptacle and I do

20  that on the 22nd of June 2020.  What you are saying to me is

21  that you are committing to seeing that that is postmarked

22  within one to two days; is that correct?

23         THE WITNESS:  That would be correct.

24         THE COURT:  Okay.

25         THE WITNESS:  Our service commitment is one to two

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K7u5gal1                        Tanko - Direct

1    days.  There is not a guarantee with First Class Mail.  There

2    is not a guarantee.

3              THE COURT:  A ballot that's been deposited before the

4    last pickup on June 22nd may be postmarked on the 23rd or the

5    24th; am I correct?

6              THE WITNESS:  You would be correct.

7              THE COURT:  Okay.  Now, is that the same for each of

8    the boroughs as far as their three-digit zone?  In other words,

9    the 100 zone in Manhattan, does that Manhattan person that

10   deposits it there have the same commitment that you just made

11   of a one to two-day postmark?

12             THE WITNESS:  Yes.  Same commitment if it is within

13   that three digit area.

14             THE WITNESS:  Yes.  Now, is that the same in each

15   borough, that if the person in Brooklyn who lives in Brooklyn

16   within that three-digit zone deposits it in a timely way on the

17   22nd before the last pickup in the blue receptacle, that person

18   is also, has the benefit of that two-day commitment that it

19   would arrive at the Brooklyn office of the Board of Elections

20   on June 23rd or June 24th and be postmarked with those dates?

21             THE WITNESS:  So, we are dealing with a lot of

22   logistics on how the plant works so I can't -- I can't say with

23   a firm commitment that that's going to happen because a lot

24   of --

25             THE COURT:  I misspoke.  I misspoke.  Let me correct

K7u5gal1                        Tanko - Direct

1   myself.

2           The person in Brooklyn who timely deposits on June

3   22nd can expect with that one to two-day standard a postmark of

4   the 23rd or the 24th.  It is a separate question of when it

5   actually reached the Board of Elections.  I confused the two in

6   my last question but I want you to address that first question:

7   Deposits on the 22nd in a timely manner, does that Brooklyn

8   resident get the benefit of that two-day commitment?

9           THE WITNESS:  So I'm going to talk hypothetically

10  because I'm not from that district but I would say yes.  If the

11  same scenario had applied to Manhattan -- you rephrase that to

12  a Manhattan question -- our service commitment is that's going

13  to get a postmark within that two-day period.

14          THE COURT:  So are you saying that you are not certain

15  if the same service commitment exists in the other three

16  boroughs of the city?

17          THE WITNESS:  So I believe they do but, once again, I

18  am not -- I am not authority in that district because we are

19  two separate districts and on behalf of that district manager I

20  would prefer not to comment on his operations in that way.

21          THE COURT:  And who is the person that can answer this

22  question for each of the other three boroughs?  That's my

23  question.

24          THE WITNESS:  Mr. Stein, I would probably say that

25  would be Ms. Simmons.

K7u5gal1                          Tanko - Direct

1           THE COURT:  And what borough is that?

2           THE WITNESS:  She is the -- she is from the Triborough

3      district which encompasses those three boroughs we discussed --

4      Staten Island, Brooklyn, and in Flushing.

5           THE COURT:  Mr. Stein, we are going to take a pause

6      and you are going to contact Ms. Simmons and I want her as a

7      witness.

8           MR. STEIN:  Your Honor, absolutely.  My understanding

9      is she is in the lobby in the waiting area.

10          THE COURT:  Oh.  All right.

11          MR. STEIN:  She is going to be the next witness.

12          THE COURT:  Excellent, excellent, excellent.

13          You may pick up the questioning, Mr. Najmi.

14          MR. NAJMI:  Thank you, Judge.

15     BY MR. NAJMI:

16     Q.  I just want to get back.  So, it is a one to two-day

17     commitment that it would get a postmark within one to two days

18     of being dropped in the blue box assuming it is dropped in the

19     blue box at a time during the day before the last collection

20     time of that day.  Is that right?

21     A.  Correct.  That is correct.

22     Q.  But that's not a guarantee; is that correct?

23     A.  That is correct.  I will preface it to say that our only

24     guaranteed service would be Express Mail.

25          THE COURT:  Mr. Tanko, would you characterize that

                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

K7u5gal1                    Tanko - Direct

1   two-day commitment as an aspirational goal?

2              THE WITNESS:  Yes, I will say that our performance for

3   First Class Mail, when we measure our First Class Mail

4   performance, normally we make that 95 to 97 percent of the time

5   when we look at our specific metrics.

6              THE COURT:  So, that commitment is substantially

7   fulfilled if those are the statistics.  Is that what you are

8   saying?

9              THE WITNESS:  That is correct.

10              THE COURT:  Okay.

11              MR. NAJMI:  Judge, can I proceed?

12              THE COURT:  You may.

13   BY MR. NAJMI:

14   Q.  So, I just want to have another hypothetical, just to be

15   clear on the date stamping.  If I am a voter in the Bronx and I

16   get my ballot on June 23rd -- I'm sorry.  Let me rephrase.

17   Withdrawn.

18              If I am a voter in the Bronx and I get my ballot on

19   June 22nd and I put it into the blue box after the last

20   collection time from that box on June 22nd, is it possible that

21   that ballot envelope would not receive a postmark before June

22   23rd or before?

23              Should I say it again?

24   A.  You need to say that one again.

25   Q.  Sorry.  Let me be clear.

K7u5gal1                           Tanko - Direct

1          I am a voter in the Bronx.  I put my ballot envelope

2     into the blue post box on the corner on June 22nd after the

3     last collection time of the day from that box.  Let's just say

4     hypothetically the collection time is 5:00, I put it in the box

5     at 7:00.  Is it possible that that ballot would not receive a

6     postmark of June 23rd?

7     A.  Yes.

8     Q.  If I am a voter in the Bronx and I put my ballot into a

9     blue box on June 23rd at 9:00 a.m. in the morning, is it

10    possible that that ballot would not receive a postmark of June

11    23rd?

12    A.  Yes.  It could be the 24th depending on the time that

13    operation is run, especially since some of those operations are

14    run, what we refer to is tour 3, which is in the middle of the

15    night.  So, if that operation is run at 1:00 that that's

16    following day also.  So, you know, we are dealing with a lot of

17    logistics on how the plant works so it is possible --

18    Q.  It is possible that if I am a voter in the Bronx and I put

19    it in the post box on June 23rd at 9:00 a.m., it is possible

20    that I would not receive a postmark of June 23rd?

21    A.  That's correct.

22    Q.  In fact, under this system, if I am a voter in the Bronx

23    and I put a ballot envelope, at any time on June 23rd in the

24    blue box on the corner, it's possible that that would never

25    receive a postmark of June 23rd?

K7u5gal1                    Tanko - Direct

1    A.  I would not say never.  There is a possibility, depending

2    on the workload in the plant.  If they are a little ahead of

3    schedule they may be able to process it earlier.  There is a

4    lot of things that go into that so I can't confirm or deny that

5    at this point.

6    Q.  Okay.  Well, it is your testimony that it is possible that

7    it could not receive the postmark?

8    A.  It could not -- there is a possibility it could not receive

9    the postmark.

10   Q.  And you stated that the only -- because this is First Class

11   Mail that your commitment, although not a guarantee, your

12   commitment is one to two days.  The only guarantee you said is

13   Express Mail?

14   A.  That is correct.

15   Q.  What is the guarantee of Express Mail?

16   A.  So, if you were to Express Mail -- I will use a

17   hypothetical too.  If you were to Express Mail your ballot

18   through a post office in the Bronx, we guarantee delivery the

19   next day if it is within that specific parameter.  So, what I

20   mean by that is that we might not offer Express Mail service

21   from New York to Montana because we just can't guarantee that

22   service.  Within New York we can.  So, we would guarantee that

23   service, say yes, this will be delivered the next day, and if

24   it is not delivered the next day and/or attempted, then we

25   would refund your postage for that.

K7u5gal1                        Tanko - Direct

1           So, that's what we mean by a guarantee.

2     Q.  Is it possible that these absentee ballot envelopes -- I am

3     going to wait for the Judge.

4           THE COURT:  I'm sorry.  I'm sorry.  Go ahead.  I was

5     listening.

6     Q.  Okay.  Is it possible, Mr. Tanko, that these absentee

7     ballot envelopes could have been sent Express Mail?

8     A.  I'm not understanding that.  What ballots are we referring

9     to?

10    Q.  The ballots -- the same questions I have been asking this

11    entire time, these absentee ballot envelopes, the same one that

12    you developed the system for to postmark, everything we have

13    been talking about today.  Is there anything unique about this

14    ballot envelope that prevents it from being an Express Mail

15    service?

16    A.  Well, yes, because it's not an Express Mail service.  An

17    express -- so, it the Bronx constituent that you keep going

18    back to, if they were to mail it Express Mail there is certain

19    criteria that we have.  They have to prepare an envelope.

20    Correct?  So, we need to -- that service would transfer from a

21    Business Reply Mail service over to an Express Mail service

22    which would guarantee that service that they requested.

23    Q.  Is it possible to do the sort of bulk mail as Express Mail?

24    Was it possible for the Board of Elections and the State of New

25    York to have gone to the United States Postal Service and say

K7u5gal1                    Tanko - Direct

1  we want these to be treated like Express Mail and we will pay

2  for it?

3  A.  It's -- you know, we don't discriminate against any mailer

4  so if they wanted to do this Express Mail service then we would

5  have done that.  That would be a little extreme and that would

6  be a lot of work on our end to make sure that all of those

7  Express Mails make a commitment.  I had never seen anything

8  like that before but based on the number of ballots that they

9  mailed out, that would be -- that would be a whole

10  transformation on how we perform delivery.  But, we would make

11  sure we got it done.

12  Q.  I want to be clear that there is nothing that would have

13  prevented, either in the United States Postal Service policies

14  and protocols and systems, for New York State to have requested

15  Express Mail as the way these ballot envelopes should have been

16  handled?

17  A.  We would not have denied them that request.

18  Q.  If something is sent by Express Mail -- let's just say I'm

19  going to present another hypothetical.  If the Board of

20  Elections had asked you or had said we want all these ballot

21  envelopes to be treated like Express Mail, we want that

22  guarantee of next day, could they have crafted an envelope that

23  a voter receives that doesn't require the voter to spend any

24  money and that gets that guarantee?

25  A.  I think so but I'm not a hundred percent sure there.  I

K7u5gal1                    Tanko - Direct

1   would have to research that a little bit because, once again,

2   that's a little out of my purview of expertise.  Okay?  I would

3   probably defer to our sales staff to see, you know, all right,

4   what are the criteria that they can make here?  That's a tough

5   question for me.  Okay?  I think so, but I'm not a hundred

6   percent sure.

7   Q.  Okay.  But in your 36 years of service with the post

8   office, was there a way to do this better?

9   A.  To do what better?

10  Q.  To guarantee that if a voter deposited their ballot into

11  the custody of the United States Postal Service on either June

12  22nd or June 23rd that it would have guaranteed a postmark of

13  at least no later than June 23rd?

14          MR. STEIN:  Objection.

15          THE COURT:  Overruled.  You may answer.

16          THE WITNESS:  If cost is not an option?  Yes.

17          I mean, every single ballot could have been sent out

18  Express Mail and they could have figured out a way to do that.

19  So, I mean, we offer those type of services but, you know, when

20  we talk about cost it's, you know, you are looking at an

21  Express Mail piece that is 300 times the cost of a normal

22  letter.

23  BY MR. NAJMI:

24  Q.  Is it 300 times the cost?

25  A.  Well, a Business Reply Mail piece I think runs about 42

K7u5gal1                          Tanko - Direct

1   cents to mail out and be processed.  An Express Mail piece is

2   over $20.

3   Q.  Per piece?

4   A.  Per piece.

5   Q.  Even if you did it in bulk?

6   A.  Well, that's where sales comes along and there is a

7   possibility that you can receive a discount and I am not privy

8   to that type of information.

9   Q.  Okay.  But is it fair that there could be unique deals or

10  sales or contracts made, agreements made with the sales team at

11  the United States Postal Service and any client, including New

12  York State?

13          MR. CONROY:  Objection.  Asked and answered.

14          THE COURT:  Overruled.

15          You may answer.

16          THE WITNESS:  Once again, that would be a question for

17  the sales staff.  I know they come up with a lot of agreements

18  with a lot of our clients to help reduce certain rates.  So I

19  know it is possible but I do not know the particulars regarding

20  that.

21  BY MR. NAJMI:

22  Q.  Who is on the sales staff in your district that would know

23  your answer?

24  A.  That would be either Greg Bonar, who works for the United

25  States Postal Service sale staff out of the New York district,

K7u5gal1                    Tanko – Direct

1    or Inez Fernandez, and they are the two sales managers.

2                (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K7UQgal2                           Tanko - Direct

1    BY MR. NAJMI:  (Continued)

2    Q.  Who did you interact the most with at the board of

3    elections, either you or your political mail coordinator, who

4    was the counterpoint at the Board of Elections that worked with

5    you and your team?

6              MR. CONROY:  This is Owen Conroy.  Can we just be

7    clear here about whether we're talking about the city board or

8    the state board?

9    Q.  Mr. Tanko, did you interact with the city board, the state

10   board, or both?

11   A.  Only with the city board.  I've never interacted with the

12   state board.

13   Q.  So the question is limited to the city board then.

14   A.  That would be Dawn Sandow and Georgea --

15   Q.  Kontzamanis?

16   A.  Kontzamanis.  I cannot pronounce her last name.  She makes

17   fun of me because of it, but yes.

18   Q.  You how do you --

19   A.  So we work with them, you know, very closely.

20   Q.  OK.  Did you ever see an email or some communication with

21   either of them about ballot envelopes not having postmarks

22   being received by them?

23   A.  Yes, we have.

24   Q.  And what did you do when you received that email or

25   communication?

K7UQgal2                        Tanko - Direct

1    A.  So, two things.  I said that, you know, it was my

2    understanding -- and these are the numbers that I referred to

3    -- that we had 20 ballots out of Bronx and 20 out of Manhattan

4    that did not receive a postmark, OK.  I said to Dawn and

5    Georgea, I'd say, well, if you give them back to us, we'll make

6    sure that they receive a postmark based on the date that they

7    received it because that was our commitment to them.  Their

8    response to me was they cannot return it to us as per board of

9    elections guidelines, which is fine.

10   Q.  Do you know the date this happened?

11   A.  I'm sorry?

12   Q.  Do you know when this communication happened?

13   A.  Early mid June, right around there.  I could check my

14   records.  I just don't have them in any memory.

15          The other thing they had talked about that there were

16   ballots in Brooklyn that also did not receive a postmark, so I

17   know there was an investigation going on in Brooklyn regarding

18   items that didn't receive a postmark, but I'm not able to

19   comment on them because, once again, that's a different purview

20   than --

21          THE COURT:  Mr. Tanko, I have a question.

22          So you're saying that you're aware that ballots were

23   not postmarked in more than one borough.  Is that correct?

24          THE WITNESS:  That is correct.  But, once again, this

25   is all -- this is all what we received from the board of

K7UQgal2                          Tanko - Direct

1    elections.  I have actually never seen these ballots that did

2    not have postmarks.

3             THE COURT:  I have another question.

4             Mr. Najmi used the word guarantee.  You used the words

5    service commitment, and you said that in your district you've

6    met the service commitment goals at about a rate of 95 to

7    97 percent.  Is that correct?

8             THE WITNESS:  That would be correct.

9             THE COURT:  OK.  So if a ballot had to be, absolutely

10   had to be postmarked by June 23, based on your service

11   commitment, by what day would it have to have been mailed?

12   Assuming a timely placement in the blue box, you know, before

13   pickup.

14            THE WITNESS:  Talking in generalities?  Because, you

15   know, we're dealing with so many pieces, I would probably say

16   June 21.

17            THE COURT:  OK.  So --

18            THE WITNESS:  OK.  And these are generalities I'm

19   speaking in, so ...

20            THE COURT:  But you were specific about how well your

21   district performs, which is actually very, very well if you

22   consider a 95 to 97 percent rate of meeting your goal.

23            THE WITNESS:  So can I comment on that also a little?

24   Because in dealing with our board of election partners we were

25   getting ballots on June 23, and we dealt with all of the mail

K7UQgal2                          Tanko - Direct

1    service providers coming up from Albany and from Orange County

2    Press that kind of did these ballots, that dropped them off in

3    my bulk mail acceptance unit late at night.  So we stayed open

4    later to get them processed.  We had many telecoms made with

5    our plant partners, so they would make sure that they would get

6    delivered on the 23rd.  We worked with the Board of Elections

7    for two or three days in a row as they tried to get more

8    absentee ballots out.  So we did a lot of things to help that

9    process along to get them delivered.

10            THE COURT:  So are you saying that when you received a

11   lot of ballots on the 23rd that you saw to it that they were

12   postmarked the 23rd?

13            THE WITNESS:  So, let's -- I'm going to talk about two

14   different things.  These ballots we're referring to were mailed

15   by the board of elections on the 22nd, 21st, 23rd; it was on

16   those dates that they mailed them out.

17            THE COURT:  You're talking about going from the board

18   of elections to the voter.

19            THE WITNESS:  Correct.

20            THE COURT:  Not the voter to the board of elections.

21            THE WITNESS:  Correct.

22            THE COURT:  So you're saying that they mailed out --

23   could you give me an estimate of how many of these ballots that

24   they mailed out to the voters on the 22nd or 23rd by date?

25            THE WITNESS:  I have those numbers.  I just don't know

K7UQgal2                          Tanko - Direct

1    them off the top of my head.  I would say --

2                THE COURT:  I can give you time to look them up,

3    Mr. Tanko.

4                THE WITNESS:  Can I have a moment?

5                THE COURT:  Yes, absolutely.

6                THE WITNESS:  OK.

7                (Pause)

8                THE WITNESS:  So I do see on June 22 we had a drop

9    shipment of 32,000 pieces that we received on June 22.

10               THE COURT:  And so that shipment from the board of

11   elections, were you trying to make it arrive by the 23rd?  Was

12   that your objective?

13               THE WITNESS:  What we did is that in dealing with our

14   plant partners -- which includes the Triboro District, we did

15   work with them -- is that any ballots that were received on

16   that day, you know, we understand the commitment for, you know,

17   the constituents of New York was that, listen, we got to give

18   them the opportunity to get that ballot postmarked and mailed.

19   So we worked very hard on trying to get -- ensuring that those

20   pieces were delivered on those days, so --

21               THE COURT:  In doing that, in working so hard to get

22   those ballots to the voters, did you have the expectation that

23   if the voter received it by the 22nd that they would be able to

24   return it to the board of elections with a postmark by the

25   23rd?  Did you have that expectation?

K7UQgal2                         Tanko - Direct

1          THE WITNESS:  I don't know if I even thought about

2    that expectation.  Our commitment is to the mailer and trying

3    to do the best we can.  Like we understood what was going on,

4    the ballots were mailed late, but we wanted to try to make sure

5    that we did everything we could to get them delivered on time

6    because we knew about the 23rd postmark issue.  I wouldn't say

7    that the postal service or even myself had an expectation that

8    they would or wouldn't be done.  I would probably say since

9    we're just a conduit, a delivery service of this, that would be

10   more of a board of elections question I would assume than a

11   post office question.

12         THE COURT:  But you just told me that in order for a

13   ballot to be postmarked by the 23rd based on your service

14   commitment, you just told me that it needed to be mailed by the

15   21st.

16         THE WITNESS:  That is correct.

17         THE COURT:  So if you were receiving ballots from the

18   board of elections that were going out to voters, do you think

19   that it was likely that the voter would be able to mail it back

20   to the board of elections with a postmark of June 23?

21         THE WITNESS:  It's likely, but, once again, that

22   depends on the -- I would assume that that depends on, you

23   know, the type of information the board of elections provided

24   the constituents.

25         THE COURT:  No, this is a mechanical type of question.

K7UQgal2                              Tanko - Direct

1          THE WITNESS:  OK.

2          THE COURT:  We start with your premise that in order

3    to get a postmark of the 23rd, it needed to have been put in

4    the mailbox on a timely basis by the 21st.  That's where we

5    start.

6          THE WITNESS:  Under normal service commitments, yes.

7          THE COURT:  Under normal service commitments.

8          And so if you have coming into your facilities on

9    June 22 ballot envelopes that need to get to the voter in order

10   for the voter to return that by mail with a postmark of

11   June 23, my question is, how likely is it that that could be

12   accomplished?

13         THE WITNESS:  So, I'm going to -- so, those that are

14   delivered -- that we received on the 22nd, are being delivered

15   on the 23rd.  If the constituent goes in her mailbox and picks

16   it out and checks everything off, and then brings -- the only

17   other thing that that constituent could do would be to bring it

18   to the post office itself, get a postmark from the post office,

19   and we would postmark it right there for them.

20         Our direction -- our direction for all our offices was

21   if a constituent did that, abide by it and make that postmark

22   for them that, yes, it was mailed on this date.  Had they just

23   dropped it in a blue collection box, most likely that postmark,

24   it may -- it may or may not happen.

25         THE COURT:  Well, how likely is it that that would

K7UQgal2                        Tanko - Direct

1   happen?

2            THE WITNESS:  I think using your own scenario, if they

3   did it the same day and they got that piece of mail and said

4   it's got to be there, I got to mail it today, it would not

5   have -- I doubt that it would have gotten a postmark on the

6   23rd.

7            THE COURT:  Because it would not have been placed in

8   the receptacle in the time period that you've described as

9   enough time to meet your service commitment.  I sound a little

10  convoluted, but do you understand my question?

11           THE WITNESS:  Yes.  And I would agree a hundred -- I

12  would agree that what you just said would be correct.

13           THE COURT:  So backing up a little bit, and I'm asking

14  the question of those 30,000 ballots that you got on the 22nd

15  and then you said you got more on the 23rd --

16           THE WITNESS:  I have to check.  I haven't been able to

17  locate that number yet.

18           THE COURT:  Well, this is a number that's very

19  important to me, so I will give you the time to find this.  We

20  know that it was thousands that you received on the 22nd.  And

21  would you agree that there was a slim chance that a voter's

22  ballot could have been returned by the voter and receive a

23  postmark of the 23rd had they received it on the 23rd in their

24  mail whenever that mail comes in, and then immediately run to

25  their mail receptacle.  Isn't it highly unlikely that it would

K7UQgal2                          Tanko - Direct

1    get that June 23 postmark?

2              THE WITNESS:  Yes.

3              THE COURT:  OK --

4              THE WITNESS:  Not impossible, but unlikely.

5              THE COURT:  And give us a percentage.

6              THE WITNESS:  If they were to mail it and drop it in

7    that -- so, in other words, it depends on the constituent.

8    What does the constituent do with that piece of mail?  They got

9    it --

10             THE COURT:  On the 23rd, and immediately --

11             THE WITNESS:  -- they went to a blue collection box

12   and mailed it.  Once again, it depends on whether or not --

13   what time was that collection box hit.  If it was -- if they

14   dropped it after the collection box hit, it's not going to get

15   a hit on the 23rd.

16             THE COURT:  I understand that.  Let's say they go to a

17   collection box, and they put it in before the last collection.

18             THE WITNESS:  So it would -- in this instance, it

19   would depend on the processing operations in the plant when

20   we're talking about that overnight thing.  It's a possibility

21   it can get hit on the 23rd or it's a possibility it can get hit

22   on the 24th, depending on the workload in the plant at that

23   point in time.

24             THE COURT:  But you have a sense though of how a

25   typical piece of mail is treated.  So what percentage of

K7UQgal2                          Tanko - Direct

1    likelihood is it that the person who puts it timely on the 23rd

2    in the mailbox before the collection time, what is the

3    percentage of likelihood that it is going to be canceled with a

4    postmark of June 23?

5              THE WITNESS:  That is -- once again, I am not an

6    expert in the plant operations, and I don't know the specific

7    time frames on when the AFCS runs.  So if I'm going to use an

8    estimate, maybe 40 percent?

9              THE COURT:  Maybe --

10             THE WITNESS:  That's just strictly an estimate based

11   on my limited knowledge of the plant operations.  I'm sorry if

12   I can't give you a better answer than that.

13             THE COURT:  You're saying that you would estimate that

14   there's a possibility that up to 40 percent would receive the

15   June 23 postmark?

16             THE WITNESS:  Yes.

17             THE COURT:  But 40 percent is certainly not a majority

18   of that mail.  In other words, 60 percent would not receive

19   that postmark?

20             THE WITNESS:  It would be postmarked most likely the

21   following day based on the overnight clock that we work with.

22             THE COURT:  Now, based upon what you understand was

23   going on in the local post offices, to the extent that an

24   individual voter asked for manual -- well, I don't know if it's

25   manual or not -- but postmarking in person at the window on the

K7UQgal2                        Tanko - Direct

23rd, do you have a sense of whether those pieces were being

postmarked?

          THE WITNESS:  I have not heard anything that those --

that any piece was not postmarked.  We gave direction to all of

the postmasters and the station managers that if this occurred,

we are not to deny any constituents a postmark if they want to

come in and get their piece postmarked.  That was our

direction.

          THE COURT:  Another question.  Of those pieces of mail

that you received from the board of elections, those thousands

of pieces of mail that you received on the 22nd, what portion

of those were delivered by the 23rd?

          THE WITNESS:  Once again, no guarantees here because

you know, we can't track those individual pieces of mail.

However, based on the direction we gave the offices, 98,

99 percent of that mail was delivered.  There were certain zip

codes that are out of the three-day range that we were not

going to make that commitment because these pieces were mailed

to Chicago or Florida, and there's no way that those pieces

were going to make that.

          THE COURT:  But within that three-digit zone, is there

something that you did differently compared to what you would

normally do when you received mail because -- what made it so

that you were going to get that mail delivered by the 23rd,

that 98 percentage delivery?

K7UQgal2                         Tanko - Direct

1         THE WITNESS:  So those X amount of pieces -- and I'm

2    only going to speak for the New York District because that's

3    what I can speak to.  What we did was we isolated all these

4    pieces by specific five-digit zip code, so we identified them

5    in a five-digit zip code, put them on a special run --

6         THE COURT:  What does that mean *special run*?

7         THE WITNESS:  So we put them on a -- you know what we

8    refer to as 32,000 pieces, that's not a lot for us, you know,

9    for us in the processing.  So we put it on a DBCS machine that

10   kind of sorts it by zip code, and what we did is that we took

11   all of those pieces, and we can get a count run of those

12   pieces, and what we did is we took those and we attached them

13   to our express mail service.  So all of the express mail pieces

14   that we normally get are -- normally our process is they go in

15   a special orange envelope in an orange bag so they're not

16   missed and all this stuff.  And we took all of those pieces and

17   we put them in an orange -- in that orange envelope so we kind

18   of -- we decided to upgrade that service on our own to ensure

19   that the constituents had an opportunity to get that postmark

20   on that date.  That's what we did locally.  And in this we had

21   telecoms with the local station managers and the postmasters to

22   say, you need to watch out for this mail because we're going to

23   get it delivered, and we want to make sure the constituents

24   have the opportunity to get a postmark by the 23rd.

25        THE COURT:  So I'm still confused a bit.  I thought

K7UQgal2                          Tanko - Direct

1    that you were talking about the 32,000 pieces of mail that were

2    received by you from the city board of elections that you were

3    trying to get to the voters.  Is that the mail that you were

4    giving essentially the express mail treatment?

5              THE WITNESS:  That's correct.

6              THE COURT:  OK.  Now, what about when you were

7    receiving from the voters mail that you were aware of needed to

8    get postmarked by the 23rd?  Did that get that special

9    accelerated express mail treatment?

10             THE WITNESS:  There's no way for us to kind of do that

11   because they all come -- when we're dealing with all of this

12   collection mail that comes in, it's all mixed together with

13   all -- everyone else's kinds of mail.  So it's very difficult

14   for us to say, hey, let's go to this blue collection box and

15   pull out -- we don't have the capability to do that.

16             THE COURT:  So, the answer is no because it really was

17   not a practical option.  Is that correct?

18             THE WITNESS:  That would be correct, and that's not

19   something I think we have ever done isolating specific pieces

20   of mail out of collection sites, at least not at the local

21   level that I'm aware of.

22             THE COURT:  Go ahead, Mr. Najmi.

23             MR. NAJMI:  Thank you, Judge.

24   BY MR. NAJMI:

25   Q.  So, on June 22, you know that 32,000 pieces of mail would

K7UQgal2                          Tanko - Direct

1   be provided to you by the BoE to get to voters?

2   A.  Yes.  I have to -- I'm going to check that number because

3   I'm just, you know, it's a cursory number, OK?  It might be a

4   little more, might be a little less.

5   Q.  For the record, I would like to know the number of pieces

6   of mail provided by the BoE to your district on June 20, 21,

7   22, 23 and 24, if that's possible.  Whenever you can get me

8   that information, I'd like to know that.

9              THE COURT:  Mr. Tanko, do you have anyone in your

10   office who might be able to assist in getting these numbers for

11   you while you are testifying?

12             THE WITNESS:  Yes, but I would have to make a phone

13   call.

14             THE COURT:  All right.  I'll give you that

15   opportunity.  We'll take a pause, and you can go ahead and mute

16   yourself so you can talk privately with your staff.

17             THE WITNESS:  Thank you.

18             (Pause)

19             THE COURT:  I think this would actually be a good time

20   for our ten-minute break.  So let's return at 11:11.

21             MR. NAJMI:  Thank you, your Honor.

22             (Recess)

23             THE WITNESS:  I did talk to my staff in getting that

24   information we discussed.  It might take them a little bit of

25   time to collect that data.

K7UQgal2                          Tanko - Direct

1          THE COURT:  All right.  Then I would just remind you,

2     Mr. Tanko, that you remain under oath.

3          THE WITNESS:  Understood.

4          THE COURT:  Mr. Najmi, you may continue.

5          MR. NAJMI:  OK.  Thank you, Judge.  I actually had

6     gotten disconnected for a minute so I missed what Mr. Tanko was

7     saying about the data I requested.

8          THE COURT:  He said his staff is accessing it.

9          MR. NAJMI:  OK.

10    BY MR. NAJMI:

11    Q.  Mr. Tanko, I know your staff is accessing that data that I

12    asked for, but generally do you recall ballots being brought

13    by -- sent by the board of elections to the United States

14    Postal Service to get to voters on June 24?

15         MR. KITZINGER:  Objection, your Honor.  I believe this

16    case is about ballots not receiving postmarks, not when they

17    were delivered to the post office or returned and postmarked,

18    whether delayed or timely.

19         THE COURT:  You may answer.

20         MR. NAJMI:  This case is also about late postmarks,

21    and this question and when they were received by the post

22    office is material to that.

23         MR. CONROY:  I would just join in Mr. Kitzinger's

24    objection.  I think the case in the complaint is about an

25    executive order and whether that caused the U.S.P.S. to not

K7UQgal2                          Tanko - Direct

1   postmark certain envelopes, and none of this testimony has

2   anything to do with that question.

3          THE COURT:  Overruled.  You may continue.

4          MR. NAJMI:  Thank you.

5   BY MR. NAJMI:

6   Q.  Mr. Tanko, were any absentee ballots that were supposed to

7   be mailed to voters brought to the United States Postal Service

8   on June 24?

9   A.  I have to -- once again, they're collecting those records

10  for me.  As soon as I have them, I can supply you with that

11  answer.

12  Q.  But, generally speaking, do you know if there were any that

13  were there on June 24?

14  A.  Not with any certainty can I answer that question, so I'm

15  not -- I would rather take a look at the actual data that's

16  going to be presented.

17  Q.  OK.  You had mentioned that -- earlier you had mentioned

18  that after you had received the communication, I think from BoE

19  staff, about postmarks not being made in early to mid June, you

20  responded, you also said that you understood there was an

21  investigation into this matter in Brooklyn.  Is that right?

22  A.  I understand that there was an investigation.

23  Q.  Can you tell me everything you know about that

24  investigation?  What is that investigation?

25  A.  So, once again, that is -- once again, that is a portion of

K7UQgal2                          Tanko - Direct

1   the Triboro District regarding that investigation about how it

2   was done within that jurisdiction, so I am not -- I have some

3   hearsay in that, but I don't know anything for the specific

4   instance on what happened.

5   Q.  I'm asking what you do know.

6   A.  What I do know is that based on an email --

7           MR. KITZINGER:  Objection.  He testified that it would

8   be hearsay; that he doesn't personally have knowledge of this;

9   and that the -- it's at a Triboro Office District, and that

10  witness will be testifying next.

11          THE COURT:  So, we're going to sustain that objection,

12  and you will -- you can put these questions to Ms. Simmons.

13          MR. NAJMI:  OK.

14  Q.  You mentioned earlier there was a post mortem meeting with

15  the board of elections.  What did you mean by that, and when

16  did that meeting happen?

17  A.  Once again, I'd have to check my records.  I believe -- you

18  know, it happened in early July where we met -- myself a member

19  of my staff met with Dawn Sandow and Georgea Kont -- I'm not

20  saying her name.

21  Q.  Kontzamani?

22  A.  Kontzamanis, and we were just reviewing what we could do

23  better for the presidential election.  How could we work

24  together and improve our processes for the presidential

25  election.  I mean, the election -- I mean the election coming

K7UQgal2                    Tanko - Direct

1   in November.

2   Q.   What were the results of that meeting?

3   A.   There are certain items that we are going to review.  We

4   are going to have another pre-meeting in August.  We're going

5   to try to get all the major players involved to ensure that

6   we're all on the same page.  From a district perspective, you

7   know, we were not adjusting anything that we currently do

8   because we felt that from a postal service perspective in the

9   New York District, we were successful.  And I will continue to

10  do that in the November election.

11  Q.   Is it fair to say that one of the things that could be done

12  better is that the board of elections could get the post office

13  ballots earlier?

14          MR. CONROY:  Objection.

15          MR. KITZINGER:  Objection.

16          THE COURT:  Overruled.  You may answer.

17  A.   That is not something we discussed.  I'm looking at it from

18  the perspective of what the postal service can do better for

19  them.  As far as when the ballots are mailed --

20          THE COURT:  Is there someone who is not muting?  I

21  don't want to hear background noise.

22          Go ahead, Mr. Tanko.

23  A.   So from a postal service perspective, that wasn't part of,

24  you know, when -- we provide a delivery service.

25  Q.   Right.

K7UQgal2                          Tanko - Direct

1   A.   OK?  And based on our understanding with postmarks and our

2   commitment to ensure that the postmarks are done and we're

3   delivering the mail timely, that was the basis around this

4   conversation.

5   Q.   Right.  I understand that you cannot control when the board

6   of elections gets you ballots to mail out.  I understand that.

7   But in order for you to perform better and for the United

8   States Postal Service to perform better, is it fair to say that

9   the earlier you receive ballots, the more efficient this could

10  be?

11             MR. KITZINGER:  Objection.

12             THE COURT:  Overruled.

13             Mr. Najmi, it is so obvious to deduce that if he gets

14  the mail earlier, he can deliver it earlier.  So let's not go

15  there.

16             MR. NAJMI:  OK.  One second for me to review my notes,

17  Judge.

18             (Pause)

19             MR. NAJMI:  Judge, other than having those numbers

20  come back in, I don't have any additional questions for

21  Mr. Tanko.  Perhaps when I do receive that data, I would have

22  additional questions.

23             THE COURT:  OK.  So we will then go to Mr. Conroy's

24  cross-examination.

25             And, Mr. Tanko, when you get the information that

K7UQgal2                         Tanko - Cross

1   we're looking for, you'll let me know.

2                 THE WITNESS:  Understood.

3                 THE COURT:  Cross-examination.

4   CROSS-EXAMINATION

5   BY MR. CONROY:

6   Q.  Thank you, your Honor.

7                 Good morning, Mr. Tanko.  My name is Owen Conroy and,

8   I represent the New York State defendants in this case.

9   A.  Good morning.

10  Q.  Good morning.  I wanted to just take a second to ask you

11  about the one- to two-day standard you testified about for

12  pieces of mail to receive a postmark after they're dropped off

13  in a U.S.P.S. drop box.  Does that standard apply equally to

14  both stamped mail and postage prepaid mail?

15  A.  Wow, OK.  So, this has to do with plant processes, OK, and

16  we got -- I'm going to be cautious here in the way I answer it

17  because some of the metered mail that does come in already has

18  that postmark date, and it doesn't need to be postmarked.

19                So, if you're talking about a Pitney Bowes meter,

20  those pieces of mail may not have to go on the Advanced

21  Facer-Canceler because they already have a metered strip on it.

22                Now, once again, I'm going to say I'm not an expert in

23  those plant operations, but I do know sometimes those trays of

24  mail might get bypassed in there.  So I would say not every

25  piece would go through that Advanced Facer-Canceler, OK?

K7UQgal2                          Tanko - Cross

1    Q.   Understood.  I guess maybe it would be helpful if I

2    narrowed the question a little bit.

3              So are you aware that for the June 2020 primary, the

4    New York local boards of election provided voters with postage

5    prepaid return envelopes for their absentee ballots?

6    A.   That is my understanding.

7    Q.   And so would there be any difference for those pieces of

8    mail, whether that particular type of postage paid mail was

9    used or an old-fashioned stamp?

10   A.   Can you rephrase that question again?  I want to make sure

11   I understand.

12   Q.   I apologize for being unclear.

13             So we have been talking about the one- to two-day

14   standard for a piece of mail to go from the drop box until the

15   time it receives a postmark.  So, would there be any difference

16   for the particular type of mailing that contained these

17   absentee ballots whether those pieces of mail had an

18   old-fashioned stamp or were postage prepaid as they were for

19   the June 2020 primary?

20   A.   Those pieces of mail that you mentioned, whether it has a

21   stamp or a business reply mail, would be treated equally.

22             THE COURT:  In other words, are you saying, Mr. Tanko,

23   that the postage prepaid ballot envelope would not get there

24   any faster than a regular stamp?

25             THE WITNESS:  That is correct.

K7UQgal2                          Tanko - Cross

1   Q.  And not any slower as well.  Is that right?

2   A.  That is correct, it would be the same -- it goes through

3   the same processes.  The only, you know, the only difference

4   there is that the business reply mail that came through the

5   ballots needs to go through another process to be counted at

6   the local level and charged appropriately.  But that is a

7   first-class piece of mail and it falls, once it gets to the

8   local unit, it's handled the exact same way.  For plant

9   operations, it's treated equally, the same way.

10  Q.  OK.  Thank you.

11          And then I wanted to touch on -- I think you had

12  testified about reports from the New York City Board of

13  Election about some ballots missing postmarks during the

14  June 2020 primary.  Is that right?

15  A.  That is correct.

16  Q.  Do you have any idea about the quantity of ballots that

17  they reported to you had missing postmarks?

18  A.  From what I understand, in the New York District, there

19  were 20 in the Bronx and 20 in Manhattan.  Once again, that's

20  the numbers I received from the board of elections.  I did hear

21  that there were different amounts in the other boroughs also,

22  but I don't have those numbers.

23  Q.  Understood.  And so --

24          MX. GREEN:  Objection.  Move to strike as hearsay

25  because he doesn't have personal knowledge.

K7UQgal2                          Tanko - Cross

1           THE COURT:  Sustained as to what happened elsewhere

2   and outside of his district.

3   Q.  So just focusing on your district, that was 40 total was

4   the report?

5   A.  Mmm-hmm.  Yes.

6           THE COURT:  Is that yes?

7           MR. CONROY:  I'm sorry Judge?

8           THE COURT:  I just said is that a yes?

9           THE WITNESS:  Yes.

10  Q.  And that is out of approximately, if you can estimate how

11  many absentee ballots being returned by voters within your

12  district?

13  A.  From June 1 through June 24, we processed 135,476 business

14  reply mail returns.

15  Q.  So, out of 135,476 in your district, 40 were reported to

16  have missing postmarks?

17  A.  That is correct.

18          MR. CONROY:  I have no further questions.  Thank you.

19          THE COURT:  Redirect.

20          MR. NAJMI:  None.

21          THE COURT:  Then we'll go to Mr. Kitzinger for the

22  city's cross.

23          MR. KITZINGER:  Thank you, your Honor.

24

25

K7UQgal2                        Tanko – Cross

 1  CROSS-EXAMINATION

 2  BY MR. KITZINGER:

 3  Q.   Good morning, Mr. Tanko.  My name is Steve Kitzinger.  I'm

 4  an attorney with the New York City Law Department.  I represent

 5  the Board of Elections of the City of New York in this

 6  proceeding.

 7  A.   Good morning.

 8  Q.   Good morning.  I wanted to go back to the beginning of your

 9  testimony where we were talking about the AFC machines, and you

10  talked about where -- a situation where envelopes might not

11  receive postmarks.  And I believe you talked about piggybacking

12  letters or damaged or wet envelopes, correct?

13  A.   Correct.

14  Q.   Does it make a difference if those piggybacked letters or

15  damaged or wet envelopes have permit prepaid business reply

16  mail, election mail here, or stamps on them in terms of whether

17  or not they get or fail to get the postmark?

18  A.   No.

19  Q.   So, it's equally as likely that a ballot envelope with a

20  stamp on it will not get postmarked as a ballot envelope with

21  business reply mail permit on it, correct?

22  A.   They're all treated the same.

23  Q.   Thank you.

24          And your understanding is that election mail should be

25  postmarked, correct?

K7UQgal2                        Tanko - Cross

1    A.   It is -- going back to actual national policy on postmarks,

2    items that have a permit number normally are not postmarked;

3    but once again, with the change in the Advanced Facer-Canceler,

4    we do get a postmark on most mail.  And our agreement with our

5    local board of elections is that we would have a commitment

6    that we would have all mail postmarked by them, which is why we

7    put specific other processes in place to try to ensure that the

8    best we could.

9              THE COURT:  I have a question I want to ask first.

10             Mr. Tanko, did the local postmasters receive any

11   instructions, either from the regional office or the national

12   office, with regard to placing postmarks on absentee ballots?

13             THE WITNESS:  Yes.

14             THE COURT:  And what was that?

15             THE WITNESS:  That we are to have a process in place

16   to ensure that all return ballots received a postmark.

17             THE COURT:  And when did you get that directive?

18             THE WITNESS:  That was continuous.  Our meeting

19   started -- I guess our preliminary meeting started in February

20   of 2020, and we would have weekly and/or biweekly meetings with

21   our headquarters and area counterparts to make sure that our

22   processes were in place.

23             So, I believe that directive came from both

24   headquarters and our area level, so from both.  Plus, we have a

25   meeting with them, all the marketing managers in the northeast

K7UQgal2                        Tanko - Cross

1    area region where they reviewed it, and we went over all the

2    expectations for the political mail season, and we actually had

3    meetings with the station managers during this time.  Of

4    course, they were all Zoom meetings because of COVID-19 that

5    caused a little bit of you, know -- caused us to be at a little

6    bit of adversity, I'll say.

7              THE COURT:  Go ahead, Mr. Kitzinger.

8    BY MR. KITZINGER:

9    Q.  Mr. Tanko, are you familiar with postal service product

10   election mail, and Kit 600?

11   A.  Yes.

12   Q.  Isn't it true that U.S.P.S. Kit 600, which is the fax sheet

13   for election mail, says that since 2014 election mail that is

14   approved by mail piece design analyst is to be postmarked?

15   A.  Yes.

16   Q.  And do you know whether or not the ballot envelopes were

17   approved by mail piece design analysts?

18   A.  I do know that they were approved by a mail piece design

19   analyst at one of the initial meetings with the board of

20   elections.  I don't have that date in front of me, but I do

21   know that when we had the initial board of elections meeting,

22   we brought a mail piece design analyst with us, and they, you

23   know -- I have the approval date somewhere around here.  The

24   approval date for the mail piece design was -- I was looking it

25   up today -- somewhere between May 7 and May 18 it was approved,

K7UQgal2                              Tanko - Cross

1    but I don't have the exact date.

2    Q.   Thank you.

3         And you testified earlier that the city board was, I

4    think your word was, adamant that every ballot envelope be

5    postmarked, correct?

6    A.   That is correct.

7    Q.   And they made that clear on numerous occasions, correct?

8    A.   That is correct.

9    Q.   And in connection with that, the postal service committed

10   and assured the city board of elections that every -- to the

11   best of its ability, it would ensure that every ballot envelope

12   was postmarked, correct?

13   A.   That is correct.

14   Q.   And you also counted all of the business reply mail ballots

15   as a part of that process, correct?

16   A.   That is correct.

17   Q.   And that was actually necessary in order to properly bill

18   for the costs of the mailings, correct?

19   A.   That is correct.

20   Q.   Now, you talked about service commitments.  Is that for

21   delivery, that service commitment?

22   A.   Yes, for delivery.

23   Q.   OK.  And delivery does not typically occur on the same day

24   as postmarking, correct?

25         THE COURT:  All right.  I just want to wind back here

K7UQgal2                              Tanko - Cross

1     a moment.

2              Mr. Tanko, I understood that when you were speaking

3     about that one- to two-day service commitment that you were

4     saying that had to do with the date the mail was postmarked,

5     not necessarily when it was delivered.

6              THE WITNESS:  Then I -- then somewhere then I misspoke

7     because when we talk about a one- to two-day service

8     commitment, that's the day from it's dropped until it gets

9     delivery.  We do not have, as far as I know in 37 years, a

10    service commitment for a postmark.  For everything that we do,

11    it's a one- to two-day service commitment for delivery of that

12    piece of mail.

13             THE COURT:  And the date of the postmark and the date

14    of the delivery are not necessarily the same.  Is that correct?

15             THE WITNESS:  That is correct.  It could be, you know,

16    the mail processing plant could postmark -- could postmark the

17    day it was dropped or the day it before it was dropped, and

18    most likely those could be delivered the following day.  So

19    even though it received a postmark on X, Y and Z date, it could

20    be delivered that following day, or even two to three days

21    later depending on where the final destination is.

22             THE COURT:  But within your zone, the 100 and the 104,

23    it's your testimony that the service commitment is delivery

24    within one to two days?

25             THE WITNESS:  Correct.

K7UQgal2                        Tanko - Cross

1              THE COURT:  Go ahead.

2    BY MR. KITZINGER:

3    Q.  Would it be fair to state that as a rule, mail is

4    postmarked within 24 hours of pickup by the postal service?

5    A.  I would -- I'm not comfortable answering that question

6    because of my limited knowledge of the plant operations.  I

7    wish I could answer that question, but I don't want to -- I

8    would say probably, but I would definitely like to refer to

9    somebody who has more knowledge than I do in this instance.

10             THE COURT:  Is there someone that you know of who

11   would be able to answer that question readily?

12             THE WITNESS:  I could contact them, but that's --

13             THE COURT:  OK.  Mr. Stein?

14             MR. STEIN:  Yes, your Honor.

15             THE COURT:  OK.  I want that witness.  And so if you

16   would -- do you have email the email address, Mr. Tanko, of

17   Mr. Stein?

18             THE WITNESS:  I do.

19             THE COURT:  OK.  I would like for you to email to him

20   the name and the contact information, telephone and email of

21   this individual who can answer that question so that that

22   person can be called as a witness today.

23             THE WITNESS:  OK.  Would you like me to do that now?

24             THE COURT:  I would.  Thank you.

25             (Pause)

K7UQgal2                         Tanko - Cross

1          MR. NAJMI:  Judge, while Mr. Tanko does that, can I

2    get a read-back of your last question?

3          THE COURT:  Go ahead.  Please read back.

4                         (Pause)

5                         (Reporter read back appropriate

6    portions)

7          THE COURT:  Mr. Tanko, the person you're referring to,

8    is that a person who would able to speak operations only within

9    the 100 or 104 zip codes or citywide?

10         THE WITNESS:  Only in the 100 and 104 zip code.

11         THE COURT:  I also want to get a witness who can

12   testify as to the Triboro District.  And so would you know who

13   that person is?

14         THE WITNESS:  No, but Ms. Simmons probably would.

15         THE COURT:  So, Mr. Stein, I would like you to contact

16   Ms. Simmons and let Ms. Simmons that I want to get that witness

17   today.

18         MR. STEIN:  Of course, your Honor.

19         THE COURT:  I want to make sure that we have court

20   reporter.

21         Mr. Tanko, were you able to email the individual?

22         THE WITNESS:  Yes, I was able to email the

23   individual's name and email address and phone number to

24   Mr. Stein.

25         THE COURT:  Do you know whether or not that person is

K7UQgal2                          Tanko - Cross

1   contactable right now?  In other words, are they on duty?  Are

2   they in?

3          THE WITNESS:  Yes, he is in.  He just texted me, so I

4   am going to -- I guess we can wait for him.  I do have

5   information on the reports that you had asked for.

6          THE COURT:  Oh, good.

7          THE WITNESS:  I'm waiting for volume totals, but what

8   I do know is that the board of elections of the dates in

9   question from June 20 through June 24, they inducted mail

10  into -- inducted ballots into the mail stream on June 22 and on

11  June 24.  And I'm waiting to hear for those numbers.  I don't

12  have them.  I'm waiting for the staff to get those.

13         MR. KITZINGER:  This is Steve Kitzinger.  Are we on

14  the record right now?

15         THE COURT:  We certainly are.

16  BY MR. KITZINGER:

17  Q.  How can you determine that they were ballots on the 24th as

18  opposed to other mail?

19  A.  You're right, Mr. Kitzinger, I cannot assume that they're

20  ballots.  I can just assume that they mailed mail pieces.

21         THE COURT:  And I can ask Mr. Kitzinger.  Does the

22  board of elections mail out 30,000 pieces of non-ballot mail?

23         MR. KITZINGER:  The board of elections does

24  significant mailings with some frequently, but it's my

25  understanding that the last ballots went out on the 22nd

K7UQgal2                          Tanko - Cross

1   because I've been advised that the last order was sent to the

2   printer on the 21st and they drove it to the Manhattan Post

3   Office on the 22nd for induction into the postal service

4   system.

5            THE COURT:  All right.  You may continue your

6   questions.

7            MR. KITZINGER:  Thank you, your Honor.

8   BY MR. KITZINGER:

9   Q.  It's correct that overnight mail is about $25 per unit,

10  correct?

11  A.  Roughly.  I don't have that number in front of me, but...

12  Q.  And is that something that's done typically on a prepaid

13  basis?

14  A.  Not on a prepaid basis, not typically.

15  Q.  And do you know -- so if a voter received a ballot on the

16  22nd in the mail, that voter could have brought it to a postal

17  service location on the 22nd or 23rd and asked for a manual

18  cancellation, correct?

19  A.  That is correct.

20            (Continued on next page)

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K7U5gal3                      Tanko - Cross

1    BY MR. KITZINGER:

2    Q.  And postal service guidelines and directives require that

3    the postal workers apply that cancellation, correct?

4    A.  That is correct.

5    Q.  Now, you also talked about some of those ballots received

6    on the 22nd were being delivered or scheduled for delivery to

7    places outside of your zone, I think you said Chicago and

8    Florida.  Is that correct?

9    A.  They were from various three-digit areas.  I'm going to try

10   to remember but I think there roughly were about 2,000 of those

11   pieces that we knew that we couldn't make the commitment or try

12   to make it delivered the next day because they were out of our

13   three-digit area where we could do the best we can to get it

14   delivered.

15          THE COURT:  So, when you received, on the 22nd, those

16   32,000-odd pieces of mail, did you indicate that they were

17   going to get that Express Mail treatment?  Was that understood

18   by the Board of Elections?

19          THE WITNESS:  I do not --

20          THE COURT:  You don't know what was in their head but

21   you certainly remember what you said.

22          THE WITNESS:  Correct.  I don't know if we even had --

23   we understood the expectation.  I do not know whether or not we

24   even discussed this with the local board of elections.  I think

25   this is something that we committed to do on our own so I don't

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

K7U5gal3                          Tanko - Cross

1    think I had conversations with Ms. Sandow or Georgea

2    Kontzamanis on this issue.  It was something that the postal

3    service, we knew what that expectation was and we were going to

4    try our best to make sure the constituents had the ability to

5    vote.

6    BY MR. KITZINGER:

7    Q.  And, you do know what that expectation was based on your

8    communications with the New York City Board of Elections staff,

9    correct?

10   A.  Yes, we knew.  I mean, it had to be postmarked by the 23rd

11   or it could have been dropped at the Board of Elections by a

12   specific date and it escapes me at the moment, I think it was

13   the 29th.  Is that correct?

14   Q.  No, it could be returned by mail up to the 30th but that's

15   not --

16   A.  Okay.  I'm sorry.  Okay?

17   Q.  Those are issues of the election law.

18          Now, is it fair to say that -- well, strike that.

19          Mail is postmarked at the post office area where it is

20   sent from, not where it is delivered to; correct?

21   A.  Correct.

22   Q.  So, if someone mailed an absentee ballot application from

23   Florida and had it postmarked on the 16th of June, based on

24   your experience when would the Board of Elections in the City

25   of New York, in either the Manhattan or Bronx office, be likely

K7U5gal3                          Tanko - Cross

1   to receive it?

2   A.  Once again, based on our service commitments I would

3   probably say that would probably be a two to four-day window.

4   Q.  So they might not have received it until the 20th?

5   A.  Correct.

6   Q.  So turnaround time getting ballots printed and inducted

7   into the mail system within two days -- not even two business

8   days, two calendar days -- was pretty good, don't you think?

9   A.  Can you just rephrase?

10  Q.  Well, if they receive the ballot application on the 20th

11  and they process the application and have the ballot printed

12  and delivered for induction into the postal service system by

13  the 22nd, that would be a pretty good turnaround time, don't

14  you think?

15  A.  Well, I do not know the Board of Elections, how they do

16  their processes, but in my personal opinion I kind of think

17  that two days is pretty good.

18  Q.  Thank you.

19       Do you know how many absentee ballot applications the

20  postal service mailed out -- sorry not the postal service --

21  the Board of Elections of the City of New York mailed out in

22  connection with the June 23rd primary election?

23  A.  I believe it is close to 3.5 million.  I would have to look

24  at that number but I don't know the number off the top of my

25  head.

K7U5gal3                    Tanko - Redirect

1   Q.  And I believe you said it is about 42 cents per unit for

2   reply?  Approximately.

3   A.  I have that right in front of me so I will take a look

4   at -- no, it doesn't give me the price per piece.  Would I say

5   approximately.  Okay?  I can get you that, I just don't have it

6   at the top of my head.

7   Q.  But sending it out by overnight mail would increase that

8   cost by about 60 times, correct?

9   A.  It would be much more expensive.

10  Q.  So, if we are talking about $25 per unit and 3.5 million

11  units, we are talking about somewhere in the neighborhood of

12  $90 million for that single mailing, correct?

13  A.  I would have to do the math but it's a large number.

14          MR. KITZINGER:  And that's all of the questions I have

15  for you right now.  Thank you.

16          THE WITNESS:  Thank you.

17  REDIRECT EXAMINATION

18  BY MR. NAJMI:

19  Q.  Thank you.  I want to get clarity -- we are waiting on the

20  numbers for those dates, we are still waiting on the exact

21  numbers, correct?

22  A.  We are still waiting on the numbers, I am waiting for them

23  to give them to me.  As soon as he has it I will give it to

24  you.

25          THE COURT:  In the meantime then I'm going to ask some

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K7U5gal3                        Tanko - Redirect

1    questions, Mr. Tanko.

2            I have been reading in the press recently that there

3    are steps that are being taken at the national level to slow

4    the mail.  Is that something that you are seeing?  Are there

5    practices that are being put in place or about to be put in

6    place to slow the mail?

7            THE WITNESS:  So, I would say -- I can comment on the

8    practices that have been put in place recently and one of the

9    things that we are really committing to is making sure that all

10   of our transportation leaves on time.  So, there have been some

11   times where our transportation nationwide has been late because

12   it is not meeting specific partners and we are holding

13   transportation up to try to get as much mail as we can within

14   that window.  Once it misses that window, then it might miss

15   that next service commitment.  So, this is helping us identify

16   where we are having struggles in our processing operations and

17   where do we need to fix it.  But, now our commitment is that

18   every single trip, whether it be from a plant, a network

19   processing center, or a post office, according to our plans we

20   are moving those trucks on time with the mail.

21           So, I don't know if in the press it talks about

22   slowing the service down.  I see it as our opportunity to

23   identify where our struggles are and where we can improve.  But

24   it doesn't adjust our service commitments based on, you know,

25   all of the policies that have been put forth recently.

K7U5gal3                      Tanko - Redirect

1          THE COURT:  So you don't feel that any new policy is

2     impeding the delivery of the mail or will impede?

3          THE WITNESS:  No, I do not believe -- based on my

4     knowledge about what happens in New York I do not believe so.

5     We have been having discussions and telecons every day.  There

6     are certain delays that we are reporting but we are working on

7     correcting those so we are making those.  And I do not have

8     those numbers in front of me but, you know, most of it has to

9     do with priority mail that we are not making the connections

10    properly, at least right now, but we are going to work on it.

11         THE COURT:  Do you have those numbers yet for us?

12         THE WITNESS:  Let me see and I will just be with you

13    in one moment.

14         MR. STEIN:  Your Honor, if I may?  This is Ilan Stein

15    just to provide the court with an update.

16         I was able to get in touch with Michael Calabrese who

17    can testify about the processing plant, the logistics, and the

18    postmark in question.  He works in Manhattan.  What he told me

19    is that that plant processes the mail for the entire City for

20    the postmarking issue.

21         THE COURT:  Oh.

22         MR. STEIN:  And so I don't know if we will need

23    someone from the Tri-Borough district to testify on that issue.

24    Mr. Calabrese, he has a meeting at noon that he thinks will

25    take 15 minutes or 20 minutes.  But, he said he is otherwise

K7U5gal3                              Tanko - Redirect

1    available.

2                 THE COURT:  Wonderful.

3                 Mr. Tanko?

4                 THE WITNESS:  Yes.  So, I have the totals.  The totals

5    on June 22nd were 34,359; and the totals on June 24th were

6    1,874 pieces.  For clarification purposes I have asked my staff

7    to see if they have a picture of that mailing on the 24th so we

8    could see exactly what it was.

9                 THE COURT:  But your understanding is that mailing on

10   the 22nd, that those were ballots?

11                THE WITNESS:  That is my understanding.  That was

12   the -- that was when we worked really hard and put different

13   processes in place to make sure that that mailing got home as

14   much as we possibly could.

15                THE COURT:  Well, thank you, Mr. Tanko, for doing your

16   part to see that voting is made possible.

17                All righty.  I am then going to have plaintiffs call

18   their next witness.

19                THE WITNESS:  Should I wait in the waiting room or can

20   I log off?  Please give me some sort of direction.

21                THE COURT:  Well, you can log off.  Is there any

22   reason that we may want to recall Mr. Tanko?

23                MR. NAJMI:  No.

24                MR. KITZINGER:  No.

25                THE COURT:  So, you are done.  You are excused.  Thank

K7U5gal3                          Tanko - Redirect

1     you.

2               THE WITNESS:  Thank you very much, everyone.

3               (Witness excused)

4               MR. NAJMI:  Your Honor, I don't know what is going on

5     on the call, I just heard a dial-in, but the plaintiffs would

6     like to call Sherilyn Simmons of the United States Postal

7     Service next.

8               THE COURT:  Is Ms. Simmons with us by video

9     conference?

10              LAW CLERK:  Judge, this is Jeffrey.  I don't believe

11    Ms. Simmons is with us yet.

12              THE COURT:  Mr. Stein, you can contact Ms. Simmons?

13              MR. STEIN:  Certainly.  And Judge, just so you know, I

14    know that Ms. Simmons was having trouble this morning but she

15    was able to get into the waiting room at 9:30.  I will call her

16    to make sure she can get back on.

17              LAW CLERK:  Judge, Ms. Simmons has been let into the

18    room.

19              Ms. Simmons, if you can identify yourself?

20              MR. STEIN:  Your Honor, this is Ilan Stein.  I am on

21    the phone with Ms. Simmons and I see her name in the list of

22    participants.  She went out of the meeting and came back in and

23    I don't know if it is a matter of her having to be admitted

24    into the hearing but she has logged in.

25              THE COURT:  Mr. Then?

K7U5gal3                          Tanko - Redirect

1          LAW CLERK:  Yes, I can confirm that she has been

2    admitted.  It does seem that she is either muted or her video

3    camera is not on.

4          THE COURT:  All right.

5          LAW CLERK:  So, I would ask that if she sees on her

6    screen the two icons near the bottom, one that has a microphone

7    and one that has a video camera, if she can confirm that those

8    are highlighted in blue?  That will mean that the camera and

9    video is on.

10         MR. STEIN:  Let me talk to her one moment.

11         (pause)

12         MR. STEIN:  Your Honor, this is Ilan Stein.

13         So, Ms. Simmons is present and she has her audio

14   working but it sounds like she doesn't have, for some reason on

15   her computer, that she doesn't have the video option available

16   to her and so I don't know --

17         MR. NAJMI:  Judge, you are on mute.

18         THE COURT:  She is not seeing to the left of the blue

19   circle with the microphone, she is not seeing to the left of

20   that circle a blue circle that has an old fashioned looking

21   camera, movie camera?

22         MR. STEIN:  That's right, that's what she tells me,

23   that she has the other buttons, the other options but not the

24   camera option.

25         LAW CLERK:  Judge, if you permit me, can I walk

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Ms. Simmons through a last attempt here.

2              THE COURT:  Please.

3              (Discussion off record)

4              THE COURT:  In the meantime, is there another witness

5    who can be called?

6              MR. STEIN:  Your Honor, this is Ilan Stein.  I can

7    reach out to Mr. Calabrese to see if he is available.

8              THE COURT:  Thank you.

9              (pause)

10             MR. STEIN:  Your Honor, this is Mr. Stein. I called

11   Mr. Calabrese.  It went to voice mail.  I emailed him and asked

12   him to join the meeting as he is free.  I will let the Court

13   know as soon as I hear from him.

14             THE COURT:  In the meantime I understand Ms. Simmons

15   is trying to work this out with her IT people.

16             MR. STEIN:  Yes, your Honor.

17             MX. GREEN:  Well, your Honor while we are here and we

18   don't have anything else to do, I think at the close of this we

19   were going to renew our judicial notice motion anyway.  Perhaps

20   we can argue that?

21             THE COURT:  Yes.  Go ahead.

22             MX. GREEN:  So I think a good amount of the stuff that

23   we asked for judicial notice of is ultimately going to come in

24   anyway -- I'm sorry -- not going to, has ultimately come in

25   anyway.  But, I would like to start with what I think is the

K7U5gal3                      Tanko - Redirect

1    most important fact we have asked judicial notice of which is

2    that mail takes at least one -- and often at least -- three

3    days to arrive at its location.  I think that in the motion

4    itself we provided good authority for the proposition that

5    Courts can take notice of that.  In the opposition to that the

6    state board argued, and I think that the principle they argued

7    is correct that if you are talking about a case where there is

8    an individual piece of the mail, right, where the question in

9    the case is did this particular check arrive on this particular

10   day, that the general principle can't be noticed in the same

11   way in proving what day a particular piece of mail arrived.

12   But, what we are talking about here is a class action where the

13   question is not when any particular piece of mail arrived but

14   the question of whether, when you take a look at in AD 50, for

15   example, the thousand plus, and across Brooklyn the more than

16   2,000 pieces of mail that arrived on June 24th and then June

17   25th and then June 26th, the question is that we know for a

18   fact that a very, very large number of those would have

19   necessarily been mailed on election day.  The individual piece

20   of mail argument doesn't really apply so I think the Court can

21   absolutely take judicial notice of the fact that it takes at

22   least one day for mail to be delivered and for a majority of

23   things to be delivered after June 24th.  For example, on June

24   25th it is going to be a 90 percent or 95 percent for those

25   pieces of mail and for mail delivered on June 26 it is going to

K7U5gal3                    Tanko - Redirect

1    be 90 or 92 percent.  Right?  So, I think the Court absolutely

2    can take judicial notice of that -- and ought to --

3    particularly given how difficult it would be to provide direct

4    evidence of every single piece of mail involved in this case.

5    And, you know, I don't think without discoveries and kind of we

6    have already had an extensive subpoena process but I can't

7    imagine what the subpoena process would look like even in an

8    ordinary case to find that information for thousands of pieces

9    of mail.

10             So, I think that's the most important point that I

11   would like to get to on the judicial notice piece.  As to the

12   rest of it, if we are talking about what was, I believe

13   Plaintiff's Exhibit 7 and 8, in the memo from the Wisconsin

14   Election Commission, I think that a lot of the material there

15   addressed -- and the reason I submitted it -- it addresses well

16   some of your Honor's questions about the postmark process and

17   the kinds of things that people think about in addressing

18   postmark issues.  I think it does a very good job of setting

19   out how the post office handles these things and, yes, it is

20   only one state's perspective but it is a directly on-point

21   perspective of an election handled during a pandemic.  And if I

22   were aware of other states having published that kind of

23   literature I obviously would submit it but I think, you know,

24   while it doesn't necessarily have direct bearing on anything

25   else, I think it does answer your Honor's questions which I

1    understood was the purpose of this hearing.  And so, I would

2    ask your Honor, in addition to the other purposes you have

3    already taken notice of it for, to take notice of it insofar as

4    it answers some of your questions.

5          Then, beyond that, I think the only thing remaining

6    would be noticing statements that the various defendants have

7    made in the press and that's really the only thing we have been

8    asking for on the news articles.  And to that, while I am

9    arguing this, Mr. Kellner sent an e-mail out to press last

10   night talking about this case.  I can submit I think it was

11   quote treated by a reporter and I don't have a copy of the

12   e-mail, but I can submit the tweets or we can ask the State

13   Board to provide a copy of that e-mail but I would also ask for

14   notice of Mr. Kellner's statement to the press in that regard.

15         THE COURT:  I will hear first from the state.

16         MR. CONROY:  Thank you, your Honor.

17         So, I think starting with the requests to take

18   judicial notice of the transit time of pieces of mail, I think

19   the way counsel just articulated their request for notice is a

20   little different than how it was described in the written

21   submission.  In the written submission the request was that the

22   Court should find or take notice of the fact that every piece

23   of mail that arrived the day after election day necessarily was

24   mailed the day before and, as articulated just now, it was a

25   little different.  It was this a large percentage or a large

K7U5gal3                          Tanko - Redirect

1      number of pieces of mail that arrived the day after election

2      day were sent by election day and that's a critical

3      distinction, right, because that's the whole point of the

4      postmark requirement.  It is because for any individual piece

5      of mail that arrives after election day -- and every state does

6      this that accepts mail after election day, the only objective

7      evidence that it was cast on or before election day is the

8      postmark.  And there are policy considerations and certainly

9      legislation here in New York considering whether to expand that

10     window.  But, this goes to the exactly the point of this case

11     which is that for any specific piece of mail it is not a

12     guarantee.  And so, it may be the case that a large percentage

13     were sent on or before election day but not every single one

14     and so it would be inappropriate to take judicial notice of

15     that fact.

16             As to the election commission report, again, I guess I

17     am not totally clear about what they are seeking the Court to

18     take notice of.  I think the way your Honor articulated the

19     ruling yesterday was that, you know, you sort of appreciated

20     that this was some recommendation by some individuals and

21     that's fine as far as it goes but, you know, there is no basis,

22     there is no evidence of to what extent Wisconsin election laws

23     or the geography or the facts on the ground or how mail works

24     there is different or similar to New York.  Obviously New York

25     City -- there is nothing like New York City in Wisconsin, as

K7U5gal3                         Tanko - Redirect

1   far as I know.  So, it is not -- I think counsel said directly

2   on point to the questions that your Honor asked.  Your Honor

3   asked questions about the process in New York and the State

4   defendants have provided a good deal of information in response

5   to those questions, the City and Borough witnesses as well and

6   that's the evidence in this case, not an out-of-context

7   recommendation from -- I think the testimony yesterday was it

8   was a partisan group making particular suggestions.

9           And then, as to the statements in the press.  So, the

10  issue here is that it is not appropriate to accept these news

11  articles for the truth of the matter asserted.  What the rule

12  is is that the Court can take notice that some piece of

13  information had been published in a news article as of a

14  certain date and so it sort of goes out in the world as of that

15  date.  The problem is that they are pointing to a Gothamist

16  article that was published after the June 2020 primary and they

17  want to use that, it appears, as some evidence that problems

18  were flagged before the June 2020 primary to making some

19  argument that the State or City Board were on notice of

20  particular issues.  I mean, I think there was plenty of

21  testimony yesterday, especially from Commissioner Kellner,

22  about what the State Board at least was or was not looking at

23  and attempting to address in advance of this primary as well as

24  long before that.  So, I don't really know what that gets them

25  but, again, I think the rule is clear that it would be

K7U5gal3                          Tanko - Redirect

1    inappropriate to take notice of any particular news article for

2    the truth of any statements contained therein.

3              MX. GREEN:  If I may respond?

4              THE COURT:  No.

5              I don't like doctrine of taking judicial notice.  I

6    think it is some sort of a weird run-around.  The timing of

7    mail delivery is absolutely key to this case.  I will be making

8    findings of fact and conclusions of law on that issue.

9              MX. GREEN:  Fair enough.

10             THE COURT:  I am certainly not going to reference

11   statements in the press to rely on the truth of the matter

12   asserted.  I suppose it is possible that I might reference

13   something just to note that a statement was made but that is

14   not also a source that I would be relying on.  I am interested

15   in the facts developed at this hearing and so the answer is no.

16             MX. GREEN:  Okay.  Thank you, your Honor.

17             MR. CONROY:  Thank you, your Honor.

18             MR. KITZINGER:  Thank you, your Honor.  And just for

19   the record, the City would have joined in the State's objection

20   but it is unnecessary at this point.

21             THE COURT:  I knew that.

22             MR. KITZINGER:  Thank you, your Honor.

23             MX. GREEN:  How are we doing with Ms. Simmons?

24             MR. STEIN:  She tells me that IT personnel are there

25   now working on it.  That's the latest that I heard.  That was

K7U5gal3                        Tanko - Redirect

1    two minutes ago.

2              THE COURT:  Okay.  One thing that you may suggest is

3    if the computer that they're working at is not cooperating --

4              THE WITNESS:  Hello?  Good afternoon.

5              MR. STEIN:  Your Honor, that is Ms. Simmons.

6              (Discussion off record)

7              THE COURT:  Now, Mr. Stein, how about the other

8    gentleman, Mr. Calabrese?

9              MR. STEIN:  I called him five minutes ago.  He said he

10   would be on shortly.  If it is okay, maybe I will give him a

11   call back now to get an update.

12             THE COURT:  Thank you.

13             MR. STEIN:  Of course.

14             (pause)

15             LAW CLERK:  Mr. Calabrese is in the hearing room.

16   Mr. Calabrese, if you are there, could you please state your

17   name?  I see Mr. Calabrese's name as trying to join.

18             (Discussion off record)

19             THE COURT:  I am not seeing his image.

20             Mr. Calabrese, have you clicked on the blue icon

21   that's a video camera?  Double click?

22             THE WITNESS:  It says it is running.

23             THE COURT:  Does anybody see Mr. Calabrese?

24             MR. KITZINGER:  No.

25             MR. CONROY:  I do not, your Honor.

K7U5gal3                        Tanko - Redirect

 1            THE WITNESS:  It should be going through my web cam.

 2      Hold on.

 3            (Discussion off record)

 4            THE COURT:  I see you.  Wonderful.

 5            THE WITNESS:  I can't see myself.

 6      MICHAEL CALABRESE,

 7          called as a witness by the Plaintiff,

 8          having been duly sworn, testified as follows:

 9            MR. NAJMI:  Judge, I just want to make sure that

10      Ms. Simmons is not in the hearing room and is in the lobby when

11      we do this examination.

12            THE COURT:  Mr. Then?

13            LAW CLERK:  I have removed her from the room so she is

14      no longer here.

15            THE COURT:  All right.  You may inquire, Mr. Najmi.

16            MR. NAJMI:  I know you had certain questions for this

17      witness.

18            THE COURT:  I am very happy to ask my questions.

19            MR. NAJMI:  Okay.

20            THE COURT:  So, Mr. Calabrese, can you tell us about

21      your career at the postal service?

22            THE WITNESS:  I have just over 14 years with the

23      postal service.  I started out on Long Island, I had several

24      managerial positions in customer service and now the plant.  My

25      title now is the manager in plant support at Morgan P&DC.

K7U5gal3                       Tanko - Redirect

1          THE COURT:  Does your function, or shall we say does

2     your plant process mail of all five boroughs of the city?

3          THE WITNESS:  Yes.  We process the collection mail

4     volume so anything that's deposited by a customer -- letters

5     and flats in the five boroughs -- we process it here.

6          THE COURT:  And so when you say deposit it, do you

7     mean this, for example, one of the blue mailboxes on the

8     Street?

9          THE WITNESS:  Yes.  Anything that's dropped into a

10    blue collection box or over, like, the window at your regular

11    hometown post office retail site.

12         THE COURT:  So I am trying to understand how long it

13    takes for two things to happen.  Let's assume that on June 21st

14    of this year that I put an absentee ballot into one of the blue

15    boxes and I put it in well before the last collection time.  I

16    have two questions.  Now, that piece of mail, let us assume

17    that it is coming from Manhattan and going to the Manhattan

18    City Board of Elections address so from Manhattan to Manhattan,

19    the mailbox is in Manhattan.  On June 21st I put the absentee

20    ballot in, it is a prepaid envelope.  I have two questions:

21    When is it going to be postmarked?  And, when will it arrive at

22    the Board of Elections?

23         THE WITNESS:  So, it will be postmarked the same day.

24    If you drop it in on the 21st before the collection time it

25    will be postmarked the same day.  From there it would, without

K7U5gal3                          Tanko - Redirect

1    manually pushing anything ahead of a service standard, it would

2    be delivered the day after; not the 22nd, by the 23rd it would

3    be delivered to the Board of Elections.

4              THE COURT:  So, are you saying then that the standard

5    is two days from the date it is deposited on time in that blue

6    mailbox, that that's the delivery standard?

7              THE WITNESS:  The delivery standard is two days for

8    anything local like that.

9              THE COURT:  So is it the same if I mail it from my

10   Bronx address to the Bronx Board of Elections?

11             THE WITNESS:  Same service standard, the exact same

12   process.

13             THE COURT:  Is it the same service standard for every

14   one of the boroughs?

15             THE WITNESS:  Yes.  Our service standard in Brooklyn,

16   Queens, Staten Island is two days as well.

17             THE COURT:  So, I am a bit confused because we had

18   another witness -- can somebody mute themselves?  Because I am

19   hearing maybe what is a radio or something.  I am still hearing

20   background noise that sounds like a radio.  Okay.

21             So, I am confused because I had the impression that if

22   you deposit it on time before the last pickup that it was not

23   so clear -- now, this is on the 21st of June -- that it was not

24   so clear, we are really not a hundred percent sure that it is

25   going to get a June 21st postmark or a June 22nd postmark.

K7U5gal3                          Tanko - Redirect

1            THE WITNESS:  I'm sorry.  Somebody muted me in the

2      middle of your question and the computer took over the sound.

3            THE COURT:  Okay.

4            So, I have some confusion about when postmarking takes

5      place because I heard some testimony that gave me the

6      impression that the amount of time may vary, that it is not so

7      certain.  So, let us assume that the Bronx resident puts it in

8      the Bronx blue mailbox before the last collection time.  Are

9      you saying that with a hundred percent certainty that that is

10     getting a June 21st postmark or might some of that mail, let's

11     say, get a June 22nd or a June 23rd postmark?

12           THE WITNESS:  The only reason -- the commitment is

13     that it gets a June 21st postmark.  Now, if something happened,

14     you know, a circumstance beyond someone's control where it fell

15     in a crack or something like that, then, yeah, it could get a

16     postmark at a later date but the commitment would be that a

17     hundred percent of the mail collected during the proper time

18     would get a postmark of the same day.

19           THE COURT:  So I understand when you say commitment

20     that's your goal.  That is your goal.  But, in practice, are

21     you saying that 100 percent of mail that would have been

22     deposited on that day, June the 21st, would be postmarked on

23     June the 21st?

24           THE WITNESS:  In theory, yes.  In practice, no.  It's

25     not ever a hundred-hundred percent.

K7U5gal3                    Tanko - Redirect

1          THE COURT:  Okay.  So, what percentage?

2          THE WITNESS:  We have no way to determine that.  It

3     would be over 98 percent, though.

4          THE COURT:  Okay.  Even if it is the last pick up of

5     the day from that mailbox?

6          THE WITNESS:  Same thing.  There is no difference

7     really in the time because it would get co-mingled by the

8     collectors and things like that so that wouldn't matter.

9          THE COURT:  Okay.  So it gets postmarked by the 21st.

10    Then my question is what is the likelihood that it gets

11    delivered to that Board of Elections within the same

12    three-digit zip area by the 22nd?

13         THE WITNESS:  That would be the 23rd.

14         THE COURT:  You are saying it is not going to be the

15    22nd, you feel confident it would not be the 22nd?

16         THE WITNESS:  No.  The flow of mail does not allow for

17    it to be the same day.  I mean, there is some that could get

18    delivered in advance earlier in the night but the service

19    standard would follow the flow of the mail which we would get

20    it there on the 23rd.

21         THE COURT:  So my question, I just want to make sure

22    we are on the same page.  The mail is deposited in the blue box

23    timely on June 21st.  You are saying it is going to get

24    cancelled on June 21st and it is going to be delivered on June

25    23rd.  Am I correct?

K7U5gal3                          Calabrese – Direct

 1                THE WITNESS:  Yes.

 2                THE COURT:  So is that the same for something mailed

 3      on the 22nd, that it is going to be postmarked the 22nd and

 4      then delivered on the 24th?

 5                THE WITNESS:  Yes.

 6                THE COURT:  And with regard to something placed in the

 7      box on the 23rd, it is postmarked the 23rd and delivered on the

 8      25th; is that correct?

 9                THE WITNESS:  Yes.

10                THE COURT:  And you are saying that those standards

11      are met 98 percent of the time?

12                THE WITNESS:  Yeah.  At minimum.

13                THE COURT:  Okay.

14                Mr. Najmi, do you have questions?

15                MR. NAJMI:  Yes.

16      DIRECT EXAMINATION

17      BY MR. NAJMI:

18      Q.  June 21st is a Sunday; does that change anything about this

19      hypothetical of the Judge?

20      A.  Yes.  So, anything that I responded to in a two-day service

21      standard does not include Sunday.  We do not cancel or postmark

22      or pick up mail on Sunday.

23      Q.  So then, just to revisit the hypothetical to make it clear,

24      if I am a voter and I drop in the blue box on my block a ballot

25      on June 21st, it will not be picked up from the post office and

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

K7U5gal3                    Calabrese - Direct

1  postmarked until June 22nd?

2  A.  So, I mean, I am assuming that the 21st is a Sunday without

3  looking at a calendar.

4  Q.  Yes.

5  A.  Then, yes, the mail would not be postmarked or cancelled

6  until the Monday.

7  Q.  Now, I just want to be clear.  You are at the Morgan plant

8  and you say that you process and postmark letters and flats for

9  all five boroughs?

10  A.  Correct.

11  Q.  Including the Tri-Borough District which also has Brooklyn?

12  A.  Brooklyn, Queens, Staten Island.

13  Q.  All go through your facility?

14  A.  Letters and flats, yes.

15  Q.  And that would include the absentee ballot envelopes?

16  A.  Correct.

17  Q.  Okay, because I am a Little confused because I have heard

18  testimony before that the Tri-Borough district would be done

19  somewhere else.

20  A.  That's not true.

21  Q.  Okay.  So, if I am a voter in Brooklyn and I deposited in a

22  blue mailbox on June 22nd, let's say before the collection

23  time, can you run me through what happens to that ballot, step

24  by step?

25  A.  The piece gets dropped Monday morning, gets collected,

K7U5gal3                    Calabrese - Direct

1    brought from Brooklyn by a collector to Morgan, we cancel it

2    and we run it through the cancellation machine which would sort

3    it back to Brooklyn.  It would go out by 6:00 that morning

4    which is now Tuesday to Brooklyn.  Brooklyn would run it on the

5    Tuesday and deliver it on Wednesday.  The same two-day standard

6    that we have.

7              THE COURT:  What do you mean by run it?

8              THE WITNESS:  Process it through a letter sorting

9    machine just to make sure that it goes back to Brooklyn.  If it

10   is Brooklyn-to-Brooklyn, the machine would sort it based on the

11   destinating address.

12             THE COURT:  Is there some sort of central location in

13   Brooklyn that that's happening in?

14             THE WITNESS:  No, no.  We will run it to the

15   Brooklyn -- anything in Brooklyn goes back to the Brooklyn

16   P&DC.

17             THE COURT:  What does that mean, those letters?

18             THE WITNESS:  Processing and Distribution Center.

19             THE COURT:  In other words that is a central Brooklyn

20   location, it is not an individual post office?

21             THE WITNESS:  No, no, no.  It would go back to the

22   plant-to-plant, like Morgan to Brooklyn plant.

23   BY MR. NAJMI:

24   Q.  If a voter deposited a ballot in a Brooklyn blue box on

25   their block after the collection time on June 22nd, when would

K7U5gal3                         Calabrese - Direct

1   that ballot envelope be postmarked?

2   A.  So, hypothetically collections -- most collection box pick

3   up time is 5:00 p.m.  So say it is 5:01, the box has been

4   picked up, you drop it in at 6:00 p.m., everything goes to the

5   next day, it would be picked up the next day and the process

6   would begin again, the two-day turn around.

7           MR. STEIN:  Your Honor, my apologies.  This is Ilan

8   Stein.  I apologize for interrupting.

9           I wanted to let the Court know that Allen Tanko

10  rejoined the meeting and so I know that there is a concern

11  about witnesses hearing other witnesses' testimony.  I wanted

12  to flag this for the Court.  Mr. Tanko also told me that there

13  is testimony he wants to clarify for the Court.

14          THE COURT:  I will let him come back but he should not

15  be listening in to the testimony of Mr. Calabrese.

16          So, Mr. Tanko, you need to get off the conference.

17          Go ahead, Mr. Najmi.

18          MR. NAJMI:  I would like to ask Mr. Tanko some

19  clarifying questions later.

20          THE COURT:  Yes.  We will bring him back.

21  BY MR. NAJMI:

22  Q.  Mr. Calabrese, are you aware that thousands of ballot

23  envelopes in Brooklyn failed to have a postmark on them when

24  delivered to the Board of Elections?

25  A.  No.

K7U5gal3                          Calabrese - Direct

1    Q.  So, if I told you that 2,000 or more absentee ballot

2    envelopes from voters in Brooklyn were mailed but were received

3    by the Board of Elections without a postmark, you would be

4    surprised?

5    A.  Yes.  I mean, it is the first I am hearing of that.

6    Q.  Can you tell me what processes exist in your plant to

7    ensure a ballot envelope gets a postmark?

8    A.  I could tell what you we did in our facility on that

9    evening because I was, you know, hand-canceling mail that was

10   bypassed on the cancellation machines to ensure that they had

11   the correct same-day postmark.  We were doing so for thousands

12   of ballots because there is, you know, feasibility that mail

13   doesn't, you know, get deposited by a customer or picked up by

14   a collector in a way that ensures the machine cancels it.  So,

15   we have the failsafe of hand-canceling.

16   Q.  Can you walk me through what the process is in your

17   facility on how these ballots and how letters get handled?  I

18   understand there is an automated process and machines that

19   handle this.  Can you describe that?

20   A.  Yes.  The AFCS -- Advanced Facing Cancellation System --

21   and it is really a large series of conveyor belts that letter

22   mail is deposited on.  It runs through the conveyor, it get

23   faced up -- that's the first part, the facer part -- it gets

24   faced up so that the address is facing, you know, up like this,

25   and then, when it goes through the machine, it actually would

1    cancel the stamp or the indicia up top.  So, the mail is dumped

2    onto the machine in the system and the system itself faces and

3    cancels before starting the sortation process of getting it to

4    its destination.

5            So, our process that night was that every single piece

6    of --

7    Q.  Which night?  I'm sorry.  Which night are you referring to?

8    A.  The last night that the ballot -- I guess the due date, the

9    final postmark date of the ballots.  So, the last few days up

10   until then we were -- normally you would isolate mail and skip

11   the cancellation process because it's, you know, prepaid or

12   something like that.  We forced everything through the

13   cancellation machine so that everything would get postmarked.

14   Q.  Can you tell me some more about that?  Did you say that

15   prepaid postage would skip the cancellation process normally?

16   A.  Yes.

17           So, say you have something like, we call it metered

18   mail, something like a Pitney Bowes indicia would be put on it.

19   It has the date on it that the customer sprays so a lot of

20   times prepaid stuff like a ballot would go straight through

21   because it has already been paid for.  So, really, a

22   cancellation mark just validates the postage, you know, like

23   you can't re-use a stamp type of thing?

24   Q.  Right.

25   A.  So, that's the idea.  So, when we are forced to get a

K7U5gal3                          Calabrese - Direct

1    postmark in addition to it, we force everything through the

2    machine instead of bypassing.  Like, that would get bypassed on

3    a retail level, like a clerk coming to the window would say

4    this is already prepaid, it doesn't need to have a cancellation

5    of postage; we can bypass it and it would skip a machine

6    process for us, it would go to just a sorting machine then.

7            So, that night we forced it through to be postmarked.

8    Q.  I want to be clear.  Is it the normal policy then, of the

9    United States Postal Service, that prepaid postage such as the

10   absentee ballot would not normally get a cancellation mark?

11           THE COURT:  Wait a minute.  Wait a minute.  Those are

12   two different things; one is a cancellation, another is a

13   postmark.  Which are you talking about, Mr. Najmi?

14           MR. NAJMI:  Wait.  I would like clarity on what the

15   difference is between postmark and cancellation.

16           THE WITNESS:  Postmark is really just a date.  You

17   know, part of the cancellation marking does have the date so

18   when you cancel the postage you get the mark with the postmark

19   on it.  They're one in the same, essentially, but a type of

20   mail that wouldn't require it is something that is prepaid

21   through a stamp.com or a Pitney Bowes-type vendor.  Now, this

22   mailing did have prepaid postage on it so it wouldn't require

23   it based on the type of mailing.

24   BY MR. NAJMI:

25   Q.  Would it require it?

K7U5gal3                          Calabrese - Direct

1   A.   It requires postmark because ballot mailing requires a

2   postmark.   That's postal policy.

3   Q.   Okay.

4   A.   So you do have to force it through that process.

5   Non-ballot mail of a similar structure wouldn't but, because it

6   is ballot or election mail, it does.

7   Q.   Okay.

8            THE COURT:   But you are receiving individual voters'

9   ballots from many different mailboxes.   Are you able to catch

10  each one to see that it gets that postmark?

11           THE WITNESS:   Yes.   So, we put in like gate keepers,

12  essentially we call them, to filter through anything that

13  didn't go through the cancellation machines and actually pull

14  it out one at a time and hand cancel them.

15           MR. NAJMI:   Is there such a thing --

16           THE WITNESS:   It is not --

17           THE COURT:   You were saying it is not what?

18           THE WITNESS:   It is not a 100 percent process but --

19  it is not something we would normally do but in order to

20  capture ballots, we did that.

21           THE COURT:   When you say it is not something you would

22  normally, do you mean you would not normally do that with

23  prepaid mail that is not a ballot?

24           THE WITNESS:   Correct.   We did it just because of the

25  ballots being in the system that week.

K7U5gal3                        Calabrese - Direct

1               MR. NAJMI:  Judge, may I proceed?

2               THE COURT:  Yes.  I am waiting.

3   BY MR. NAJMI:

4   Q.  I am sorry, I am a little confused based on what I heard

5   before and what I am hearing now and so I have a few questions

6   for you, Mr. Calabresi, just to ensure that I understand this

7   process.

8               Every single ballot in the five boroughs which was

9   mailed went to your facility at Morgan?

10  A.  Should have.

11  Q.  Okay.  And when that ballot comes to your facility it goes

12  through this automated process to be sorted and then

13  postmarked?

14  A.  Yes.  We would put every piece of letter mail collected

15  that day through the AFCS system.

16              THE COURT:  Tell me again, what does AFCS system stand

17  for?

18              THE WITNESS:  Advanced Facer Cancellation System.

19  BY MR. NAJMI:

20  Q.  In your experience, what could go wrong in this automated

21  process that could lead to no postmark being added?

22  A.  At the initial site, you know, you could see that maybe

23  ballot mail that they identified as being Brooklyn-to-Brooklyn

24  never left Brooklyn, that they could have kept it in-house to

25  turn it around faster.  You know, if it was isolated

K7U5gal3                          Calabrese - Direct

1    inappropriately, not co-mingled with regular mail which is what

2    is supposed to happen.  You know, there is things that don't

3    get cancelled by the machine if they're not folded over

4    properly or if it doesn't face it.  Just general mechanical

5    issues.  That would be a one or two-piece type issue but we

6    have that manual process in place that we hand cancel anything

7    like that internally.  To me it would be just grasping at

8    straws for external factors that I can't really attest to.

9    Q.  I want to talk about two of the things you mentioned.  You

10   mentioned a Brooklyn-to-Brooklyn issue.  Are you saying that in

11   this process with the United States Postal Service that

12   something else happened to ballots coming out of Brooklyn?

13            MR. KITZINGER:  Excuse me, your Honor.  It appears

14   that Mr. Stein has left the meeting, counsel from the U.S.

15   Attorney's office.

16            MR. STEIN:  No, I'm here.  I did get disconnected

17   momentarily but I am here.

18            THE COURT:  Good.

19            THE WITNESS:  No, so that would -- that situation

20   would be purely speculation and hypothetical.  I have no

21   knowledge of anything like that happening.  That would just be

22   from things that could possibly have happened that I have seen

23   in my career.  Absolutely not a specific example of something

24   that did happen.

25   BY MR. NAJMI:

K7U5gal3                       Calabrese – Direct

1    Q.  Can you tell me more about what you have seen in the past?

2    I mean, if everything -- how does that happen if the policy is

3    that every piece of mail in the five boroughs is supposed to go

4    to Morgan facility for a postmark and cancellation and

5    automated process, how is it that there could be even a

6    Brooklyn to Brooklyn issue?

7    A.  So, say I live in, you know, New York City.  Right?  I live

8    in the town that I am mailing my friend a package.  Okay?

9    Q.  Uh-huh.

10   A.  I go to the post office, I mail it to them at the post

11   office that is local.  So they say, hey, this is internal, it

12   doesn't necessarily need to leave here, we can just keep it

13   here and deliver it the next day.  It wouldn't go through the

14   process but they would hold it out as local mail.  That's an

15   old practice that doesn't exist anymore but that's something

16   that could have happened.

17         THE COURT:  Well, what percentage of the time does

18   that happen?

19         THE WITNESS:  I would say extremely, extremely rarely.

20         THE COURT:  Can you assign a percentage?

21         THE WITNESS:  Low single digits.  All mail is to be

22   co-mingled and not separated or isolated or given preferential

23   treatment.

24   BY MR. NAJMI:

25   Q.  Is there something called a rejection bin of some kind that

K7U5gal3                    Calabrese - Direct

1   is part of this automated process?

2   A.  Yeah.  So, whether it's mechanical or just the image reader

3   didn't read the sortation of the piece, it would go to a reject

4   bin.  That is what we had the gatekeepers manually postmarking

5   in order to make sure it got the postmark.

6   Q.  And the gate keepers are human beings that work for the

7   post office?  It is not a piece of technology?

8   A.  Yes.  At that level -- at that time it is manual.  There is

9   no -- the reject bin itself is the technological gatekeeper, so

10  to speak, it is supposed to rerun that mail.  If you rerun it

11  and it is still not successful for any sort mechanical or

12  technical reason then, yeah, we have humans getting involved to

13  manually postmark.

14  Q.  And you had mentioned that you did that on the last day,

15  you had a special effort; is that correct?

16  A.  Yes, on the 23rd.

17  Q.  Did you do anything special on the 22nd?

18  A.  No.  I believe we started but I don't recall.  I know it

19  was the last day definitely.  I don't recall the day before.

20  Q.  Mr. Calabrese, earlier in this proceeding yesterday and

21  throughout it has been established that thousands of ballot

22  envelopes arrived to the Board of Elections, especially from

23  Brooklyn, without a postmark.  How do you explain this?

24          MR. CONROY:  Objection.

25          THE COURT:  Overruled.

K7U5gal3                        Calabrese – Direct

1              You may answer.

2              THE WITNESS:  Like I said, the mail could have

3     followed an inappropriate flow.  Being that it bypassed

4     cancellation machine it could have been mailed ahead of the

5     time where we were using those manual postmarks which was like

6     the last day.  So that's possible, it could have followed a

7     proper sortation process but not receive a postmark.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K7UQgal4                          Calabrese - Direct

1              THE COURT:  I'm a little bit confused by your answer.

2      First of all, when you were taking that special step of

3      manually postmarking, was that only on the 23rd of June?

4              THE WITNESS:  That's the only day I recall doing so

5      with a hundred percent certainty.

6              THE COURT:  OK.  I just didn't understand your answer

7      to the last question about what would explain 2,000 pieces

8      arriving without a postmark.  Can you go over that again?

9              THE WITNESS:  Like I said, prepaid mail, which is, you

10     know, it's supposed to technically bypass the cancellation

11     system.  Ballot mail is a prepaid envelope that would flow

12     directly to a machine that doesn't postmark mail.  If it

13     followed that flow, which is technically a correct postal flow

14     for prepaid mail, then it wouldn't have been postmarked.  Most

15     likely, you know, it was timely in sortation and delivery, but

16     it would not receive the postmark through the cancellation

17     system.

18             THE COURT:  So, I'm confused about these ballots.  On

19     the one hand you say that because they're prepaid, they don't

20     normally go through that automated system.  On the other hand,

21     you say they were going through the automated system.  So which

22     one is it?

23             THE WITNESS:  I mean, the question that was asked said

24     how could that have happened.  We were manually placing the

25     mail into that system to ensure that it got the postmarks.

K7UQgal4                              Calabrese - Direct

1    Now, if something happened before we were manually doing so,

2    you know, the last day or two, then it could have, you know,

3    bypassed the cancellation system and gone to the board of

4    elections without a postmark.

5         THE COURT:  When you say manually, are you saying that

6    the prepaid envelopes came in, and they went in the direction

7    that normally prepaid envelopes go, but then you did something

8    to make them instead go through the automated system?

9         THE WITNESS:  Correct.  Normally, like a large amount

10   of prepaid mail would be trayed up, you know, neatly and, you

11   know, at the pickup point or the window line at the station,

12   and it would bypass any sort of manual dumping into the hopper

13   system that we have for the cancellation machine and go right

14   through a sortation machine.  So it's very possible that, you

15   know, some ballots did go through that process.

16        THE COURT:  Well, what do you mean by pickup point?

17   Are you talking about the post office, actual post office?

18        THE WITNESS:  Yes.

19        THE COURT:  So let us say that ten people on June 22

20   brought it to their local Bronx post office.  So you got those

21   ten pieces.  Are you saying that those ten pieces of prepaid

22   absentee ballots would then go with the other prepaid mail?

23        THE WITNESS:  If they were trayed up in that manner in

24   order to bypass, then it very well could have.

25        THE COURT:  Well, I'm saying but what is the norm?

K7UQgal4                           Calabrese - Direct

1        THE WITNESS:  The bypass.  It's supposed to go

2   directly to a sortation machine, not a cancellation machine

3   because it doesn't need to cancel the postage.

4        THE COURT:  OK.  So, are you saying that it was only

5   during the last day or so that you were trying to see that

6   those ballots got postmarked?

7        THE WITNESS:  Correct.  So, if a tray was, you know,

8   put together -- a bypass tray was put together, we were dumping

9   it out into the machine to cancel.

10        THE COURT:  But ballots that went into those bypass

11   trays, let us say on the 20th, the 21st, the 22nd, they did not

12   get canceled.

13        THE WITNESS:  It's possible that some of them did not,

14   I mean, if they were, you know, put into a bypass tray like

15   that.

16        THE COURT:  But I'm trying to understand.  On the one

17   hand, it seems like you're saying that the normal process would

18   be that they would be in a bypass tray, and that it's out of

19   the norm that in the last day or so you made sure to get them

20   through the automated system.  What happened?

21        THE WITNESS:  Well, it depends on the front line, you

22   know, if they follow procedure of putting mail that doesn't

23   need to be canceled because it's prepaid, but, like I said, we

24   were forcing it through that system, so by the thousands so it

25   gets through.

K7UQgal4                           Calabrese - Direct

1        THE COURT:  When was it that you would start forcing

2    it through the system to see that it would get postmarked?

3        THE WITNESS:  The only thing I could say for certainty

4    was the 23rd, so that nothing got past the 23rd.

5        THE COURT:  OK.  So on the 22nd and the 21st and the

6    20th, those absentee ballots could very well have gone straight

7    to the bypass trays, correct?

8        THE WITNESS:  Very possible.

9        THE COURT:  But -- OK, so let's go beyond possibility.

10   Was it likely that they went to the bypass trays and just never

11   made it to the cancellation machines?

12       THE WITNESS:  I have no way of saying that with any

13   certainty.  That's just way too many possibilities and

14   hypotheticals.  It's possible, but not likely and not, you

15   know, easy for me to say that that's something that would have

16   happened.

17       THE COURT:  Well, are you saying ultimately that

18   you're not sure what happened?

19       THE WITNESS:  I would have no way of knowing what

20   happened without actually seeing the mail, you know, within the

21   first day or two after the delivery.

22       THE COURT:  So, is it fair to say that you feel

23   confident that the mail that was being processed on the 23rd

24   was put through manually?

25       THE WITNESS:  Through the cancellation system, yes.

K7UQgal4                    Calabrese - Direct

1             THE COURT:  OK.  So those absentee ballots you feel

2    confident, but the ones on the 22nd you're not certain about.

3    Is that correct?

4             THE WITNESS:  I have no way of being certain.  It's

5    impossible.

6             THE COURT:  OK.  Go ahead, Mr. Najmi.

7             MR. NAJMI:  Thank you, Judge.

8    BY MR. NAJMI:

9    Q.  Mr. Calabrese, did something happen before the 23rd that

10   brought your attention to the fact that there are ballots not

11   being postmarked that triggered you to implement this manual

12   process?

13   A.  No.  More so it was just the fact that we were trying to

14   capture anything that came in late, you know, just to try to

15   get it in at the last minute, anything that, you know, that a

16   customer could, you know, dropped in the last second, just a

17   heightened awareness-type thing.  I don't know that it actually

18   occurred.

19            THE COURT:  Then how did you become aware?

20            THE WITNESS:  It's the same thing with like tax day,

21   you know, when you have to have your taxes canceled on

22   April 15, or July 15 this year, the line might be out the door

23   until midnight, but you got to get it in because they were on

24   line-type thing.  Same premise.

25            THE COURT:  Did you receive an order, a command from a

K7UQgal4                              Calabrese - Direct

 1    higher up to do that?

 2              THE WITNESS:  Yeah.  I mean, the order is that

 3    everything deposited on the 23rd gets postmarked for the 23rd.

 4              THE COURT:  But you don't get that order with regard

 5    to the 22nd and the 21st?

 6              THE WITNESS:  No.  We just get the cutoff date of

 7    being the 23rd.

 8              THE COURT:  Go ahead, Mr. Najmi.

 9              MR. NAJMI:  Thank you.

10    BY MR. NAJMI:

11    Q.  Mr. Calabrese, you understand that the postmarked deadline

12    under the election law was June 23?

13    A.  Yes, it was the 23rd for that primary, I believe.

14    Q.  And is it your testimony that this process of the mail

15    takes one to two days?

16    A.  Two-day service standard for, you know, deliver -- to

17    deliver it to the home or to the business.

18    Q.  Right.  Two-day standard service.  So, shouldn't you have

19    manually postmarked ballots on June 22 also, because they

20    needed a postmark and they would not have gotten to the board

21    of elections till June 24?

22              MR. CONROY:  Objection.

23              THE COURT:  Overruled.  You may answer.

24    A.  Well, I mean, the whole -- the premise still exists that,

25    you know, the mail would be collected and follow the process to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1     go through the AFCS machine, you know, assuming it was

2     deposited by a customer in a blue box or anything like that,

3     and the delivery substandard to the board of elections, I

4     believe, is a week after the postmark date as well.  So it

5     would have all still have been within the time constraints.

6     Q.  Are you aware that on June 22, 34,359 ballots were

7     delivered to the United States Postal Service -- sorry -- to go

8     to voters by the board of elections?

9     A.  The specific number sounds pretty accurate, but yes, we

10    received -- we received them, processed them, and turned them

11    around within the same day.

12              THE COURT:  Did you do anything different with those

13    pieces of mail compared to a regular day?

14              THE WITNESS:  Yeah.  We expedited them out much

15    quicker, you know, than normal mail would have been.

16              THE COURT:  And when did you expect that expedited

17    mail to arrive to the voters?

18              THE WITNESS:  The next morning and then be returned

19    the same day.

20              MR. NAJMI:  Judge, may I proceed?

21              THE COURT:  You may.

22    BY MR. NAJMI:

23    Q.  Can you tell us about what delivery times exist -- when is

24    mail delivered to the board of elections every day during this

25    time?  Let's say June 22 and June 23 and June 24, what time --

K7UQgal4                    Calabrese - Direct

1  A.  I would have no --

2  Q.  Sorry.

3  A.  We don't deliver mail to customers from our facility.  That

4  would be at the local station that -- at whatever the zip code

5  is.  It's not us.  I would have no answer for that.

6  Q.  Well, just -- I have a couple questions just about a

7  process maybe you can answer.  So, the voter sends in the

8  ballot, it eventually -- regardless of where in the city they

9  are from, it gets to Morgan facility.  Then you process it.

10  Then you send it to -- back to another borough office, right?

11  A.  Correct.

12  Q.  What is the process after that?  Once it's gone from Morgan

13  to the local facility where it's supposed to go to the

14  recipient, like if the -- what happens after that?

15  A.  So, say we sort something and like this morning, the stuff

16  that we sent to the station gets delivered today.

17  Q.  To the station.  And then what does the station do with it?

18  A.  They give it to the carriers that deliver the mail.

19  Q.  How long does that take?

20          MR. STEIN:  Objection, your Honor.  Your Honor, my

21  understanding is that Mr. Calabrese, his knowledge is about

22  what happens in the plant.  That's what he testified to --

23          THE COURT:  He has 14 years of experience, and he may

24  very well know the answer to this question.  You may answer if

25  you know.

K7UQgal4                          Calabrese - Direct

1   A.  So I couldn't give you a specific timeline of what occurred

2   in the zip code stations of where the board of elections are,

3   you know, in Brooklyn, in the Bronx, or in Manhattan.  But if

4   the station gets the mail, you know, we -- we're sending trips

5   out up until 6:00 in the morning, all the mail is in the

6   station by 7:00, it's passed out to the individual carriers.

7   The carriers would then leave to deliver the mail by around

8   10:00 a.m.

9   Q.  Is it fair to say that the Brooklyn station, they only make

10  one drop per day to the Brooklyn board of elections, if you

11  know?

12          MR. KITZINGER:  Objection.

13          THE COURT:  Overruled.  You may answer if you know.

14  A.  I would not know.  I have no knowledge of that whatsoever.

15          MR. NAJMI:  Judge, I just want to check my notes one

16  second.

17          THE COURT:  Mr. Calabrese, of those 32,000 absentee

18  ballots that were delivered by the New York City Board of

19  Elections to you on June 22, do you know if they corresponded

20  to the whole city or do you have a sense of what portion went

21  to each borough?

22          THE WITNESS:  The majority of it was Brooklyn and

23  Queens addresses, so it was mostly -- you know, it was valid

24  that the customer had to then return, so the majority of it was

25  Brooklyn, Queens, Manhattan and the Bronx, but there were zip

K7UQgal4                        Calabrese - Direct

1    code ranges throughout the whole country.

2            THE COURT:  So, could you give me a percent for

3    Brooklyn?  Like what percent of that 32,000 was destined for

4    Brooklyn zip codes?

5            THE WITNESS:  Off the top of my head, I believe it was

6    over 50 percent.

7            THE COURT:  And for Queens?

8            THE WITNESS:  Probably 20 percent, you know, maybe

9    combined 60 percent of the whole.  Brooklyn and Queens letter

10   mail is processed, you know, to the final sortation out of the

11   Brooklyn plant, so it would have all went back to Brooklyn from

12   us.  So I would say Brooklyn 60, 65 percent of the whole went

13   to Brooklyn/Queens.

14           THE COURT:  And what percent, if you could just break

15   down the percents for the other boroughs and non-new York City

16   addresses.

17           THE WITNESS:  Non-New York City addresses, very low,

18   less than five percent.  The rest would be Manhattan and the

19   Bronx.

20           MR. NAJMI:  Your Honor, may I proceed?

21           THE COURT:  You may.

22   BY MR. NAJMI:

23   Q.  Where is the postmark applied on the ballot envelope?

24   A.  Top right.

25   Q.  I want to just get a sense of how long it takes to get a

K7UQgal4                          Calabrese - Direct

1   postmark on this ballot envelope once it's at the Morgan

2   facility.  If you could take me -- this hypothetical.  Let's

3   just talk about the 23rd.  If it gets to the Morgan facility at

4   10:00 a.m. on the 23rd, what time would it have a postmark?  I

5   know the postmark is just a date stamp, but at what time would

6   it receive that postmark?

7   A.  Those machines run from 4:00 p.m. till around midnight, so

8   anytime within 4:00 to midnight.

9   Q.  OK.  From 4:00 to midnight is when the postmark process

10  starts on that day?

11  A.  That's every day that we -- you know, Monday through

12  Saturday.  We don't start them before 4:00 p.m. because the

13  mail is not collected and brought here until then.

14  Q.  Is it possible that something could be in your possession

15  on the 23rd and gets postmarked after 12:00 a.m.?

16  A.  If there's an exorbitant amount of volume that would

17  continue running past 12:00 a.m. it would still receive the

18  same collected on day postmark date.  That turnover doesn't

19  happen until 6:00 a.m. the next day for mail collected on day

20  one.

21  Q.  So if it's in your facility on the 23rd by 10:00 a.m., it's

22  going to get put into the automated process sometime between

23  4:00 p.m. and midnight, and it would still have a 23rd postmark

24  even if it's on the belt of the machine after midnight?

25  A.  Correct.

1  Q.  But at around 6:00 a.m. on the 24th, is that when you would

2  start putting a June 24 postmark?

3  A.  Yeah.  The automated computer system would turn over the

4  date on the 6th.

5        THE COURT:  Do you have control over that?  Can you

6  change it?

7        THE WITNESS:  You can, but it's not something we would

8  do.

9        THE COURT:  It's just not done, you're saying?

10        THE WITNESS:  No.  6:00 is really the national

11  standard.

12        MR. NAJMI:  Sorry, Judge.

13        THE COURT:  So, if a piece of mail, one of those

14  ballots was deposited on the 23rd, but it's at the back of the

15  bag and it doesn't get through until 6:30, the postmark is

16  going to be the 24th, is that what you're saying?

17        THE WITNESS:  Yes, but, I mean, we were finished much,

18  much earlier than that, you know, around midnight, 1:00 a.m.

19  I'm sure we finished.  We don't run that late.  That's just a

20  fail-safe in case major, major catastrophic issues.  That did

21  not happen.

22  BY MR. NAJMI:

23  Q.  I just want to be clear -- if I may, Judge -- that on the

24  23rd if the ballots that were in your possession on the 23rd,

25  you were done postmarking by 1:00 a.m. the 24th?

K7UQgal4                    Calabrese - Cross

1   A.  I mean, I could look up the exact time, but, you know, just

2   general speaking, we don't go past midnight most days.  There's

3   not enough mail volume to run that late.

4   Q.  Right.

5           MR. NAJMI:  I don't have anything more, Judge, of

6   Mr. Calabrese.

7           THE COURT:  So we will have cross-examination by

8   Mr. Conroy.

9           MR. CONROY:  Thank you, your Honor.

10  CROSS-EXAMINATION

11  BY MR. CONROY:

12  Q.  Good afternoon, Mr. Calabrese.  My name is Owen Conroy, and

13  I represent the defendants from New York State in this

14  proceeding.

15  A.  Good afternoon.

16  Q.  So I want to first ask, you said that the postal policy is

17  that all ballot mail requires a postmark.  Is that right?

18  A.  Correct.

19  Q.  And that's true whether or not there is a physical stamp

20  affixed to the ballot mail?

21  A.  Well, it shouldn't matter.  Stamp or no stamp, if they're

22  prepaid it still has to be processed and canceled.

23  Q.  Because it's ballot mail?

24  A.  Correct.

25  Q.  Do you know when that policy went into effect?

1  A.  It's as old as I know.  I mean, it's been re-issued more

2  recently, but it's been -- it's been out and existing for as

3  long as I've been in a position where I would know about it.

4  Q.  So, it's not new for this year?

5  A.  No.

6  Q.  I think I want to try to distinguish between the

7  possibility of some individual ballots having some issue and

8  what the sort of general policy or standard is.  As far as you

9  know, was that policy that ballot mail required a postmark

10  being followed throughout this spring primary election season?

11 A.  Yes, there's -- the processing operations management order

12 has been in effect and being issued and reiterated throughout

13 the duration.

14 Q.  So that's true whether we're talking about June 23 or some

15 date earlier than June 23?

16 A.  Correct.

17 Q.  And I would just want to understand.  I think -- so you

18 said there was some additional procedure put into place on

19 June 23 because it was Election Day?

20 A.  Yeah.  The -- we used additional resources to do a manual

21 processing because, you know, the mail goes to reject bin or,

22 you know, for whatever reason it bypass that automated process,

23 then we can manually put the stamp on with a postmark date.

24 Q.  But you weren't saying that absentee ballots prior to

25 June 23 were not receiving postmarks as a matter of general

K7UQgal4                         Calabrese - Cross

1    course?

2    A.  Not that I recall, no.  I just only recall the last day.

3    Q.  The last day was the day you put those extra measures into

4    effect?

5    A.  The 23rd.

6    Q.  Correct.  OK.  But throughout the season as a general rule,

7    absentee ballots were getting postmarks pursuant to U.S.P.S.

8    policy?

9    A.  Correct.

10   Q.  And I also wanted to ask you, so in terms of the timing of

11   delivery of the mail, I think you said -- did you say the

12   standard is one to two days?

13   A.  Two-day service standard.

14   Q.  Two days, OK.  And I think -- did you say that it's

15   possible that there are some pieces of mail that could get

16   delivered on the same day.  I'm sorry.  I didn't hear the

17   response?

18   A.  Not for the same day, no.

19   Q.  OK.

20           MR. CONROY:  I have nothing further.

21           THE COURT:  Redirect.

22           MR. NAJMI:  Judge, I have no redirect.

23           THE COURT:  All right.  Cross by Mr. Kitzinger.

24           MR. KITZINGER:  Thank you, your Honor.

25

K7UQgal4                           Calabrese - Cross

1    CROSS-EXAMINATION

2    BY MR. KITZINGER:

3    Q.  Good afternoon, Mr. Calabrese.  My name is Steve Kitzinger.

4    I'm an attorney with the New York City Law Department, and I

5    represent the New York City Board of Elections in this action.

6              Just to be clear, your testimony is first-class mail

7    is postmarked the date or bears a postmark date the day it

8    comes into custody of the postal service, correct?

9    A.  Yeah, up until the cutoff collection times.  Yes.  Now like

10   if -- if I drop something into a mailbox tonight at 9:00 p.m.

11   and the mailbox has already been picked up for the day, yeah, I

12   dropped it today but it's not going to get picked up until

13   tomorrow.  So up until the cutoff times, same day.

14   Q.  And all of those mailboxes have the cutoff time, the pickup

15   times posted on the mailboxes, correct?

16   A.  Correct.

17   Q.  And you testified that the delivery standard is two days.

18   Does that mean it's never delivered the next day?

19   A.  Not never.

20              THE COURT:  Mr. Conroy just asked the same question.

21   A.  I mean, there is a possibility of things that are canceled

22   earlier in the night to make it in in one-day service, but it's

23   rare and not a requirement.

24              THE COURT:  Just how rare is it?

25              THE WITNESS:  Ten percent or less.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K7UQgal4                         Calabrese - Cross

1    Q.  How often do trucks leave the Morgan facility to go to

2    borough stations?

3    A.  To the 70 local stations here we have several hundred, 800,

4    900 trips day throughout the day.

5    Q.  And when you say the local stations, you're talking about

6    the individual post office from where the letter carriers

7    leave?

8    A.  Yes.

9    Q.  Do you sort by carrier route at the Morgan facility?

10   A.  Letters and flats we do.  We sort it directly to the

11   carrier for 95 percent of their volume.  They do receive some

12   that they have to sort there to the carrier route which we send

13   to the zip code, but most of the mail is, you know, sorted here

14   for the carrier route level.

15   Q.  And you said all of the trucks get to the stations by

16   7:00 a.m. the day after postmarking, correct?

17   A.  The second day after postmarking.  If we postmark up to

18   midnight on the 23rd, the mail would get there by 7:00 a.m. on

19   the 25th, for delivery on the 25th.

20   Q.  Where does it go on the 24th?

21   A.  Internal sortation to get from like a New York City, the

22   three-digit level to the five digit to the carrier route level

23   to our internal processing.

24   Q.  And you said Morgan facility processes mail is handed over

25   the counter at retail facilities as well as that picked up from

K7UQgal4                              Calabrese – Cross

1    the mailboxes throughout the city, correct?

2    A.  Correct, they're essentially one and the same.

3    Q.  And don't some local post offices have separate mail slots

4    for local mail that you refer to?

5    A.  I mentioned that earlier.  I don't believe those exist any

6    more.  That was done away with, but I can't speak for any

7    individual office that still would have that.

8    Q.  And what happens to the mail that's picked up by the letter

9    carriers at a residence, for example?

10   A.  Same thing, it gets deposited back in at the station for

11   the same type of collection receptacle that anything a customer

12   brought straight to the station would be.

13   Q.  You also talked about mail following inappropriate flow

14   which could result in it not being postmarked, correct?

15   A.  It's possible, yes.

16   Q.  And would the city board of elections have any involvement

17   in that inappropriate flow?

18   A.  No.

19   Q.  You also talked about prepaid mail that was trayed up.

20   Would you explain exactly what you mean by that, how that

21   trayed-up mail gets into possession of the postal service?

22   A.  Really, two ways.  The customer, larger customers that mail

23   out thousands of letters a day through like their Pitney Bowes

24   machines would tray it up for us if they're large enough.

25   Other things would go to the retail counter, and the clerk

K7UQgal4                        Calabrese - Cross

1    there would tray it up at the window line.

2    Q.  But if a voter drops a ballot into a mailbox, it would not

3    get trayed up, correct?

4    A.  Correct, it would not.

5    Q.  OK.  So all of those ballots would go through the normal

6    postmark cancellation process?

7    A.  Correct.

8    Q.  Are you familiar with mail piece design analysts?

9    A.  Yes.  I mean, I'm not too familiar with their work, but I

10   know that we have them and that they help create properly

11   addressed mailings.

12   Q.  When you say properly addressed mailings, that would

13   include election mail to ensure that it gets postmarked

14   pursuant to postal service policy, correct?

15   A.  That would be an assumption.  I'm not sure of their

16   involvement with election mail specifically.

17          MR. KITZINGER:  I have nothing further for this

18   witness.  Thank you.

19          THE COURT:  Redirect?

20          MR. NAJMI:  None, your Honor.

21          THE COURT:  OK.  Mr. Calabrese, I have seen news

22   reports that certain steps were being taken at the national

23   level, certain decisions are being taken that would have the

24   impact of slowing down the mail.  Would you comment on that?

25          THE WITNESS:  I -- I don't know what slowing down the

K7UQgal4                    Calabrese - Cross

1   mail means.  We have no mandate to slow anything down here.

2   Our processing is as is.

3        THE COURT:  So you don't know of any changes that are

4   planned that would have the effect of people getting their mail

5   later than normal?

6        THE WITNESS:  Anything being planned should get to

7   customers the same service standard.  It just would alleviate

8   some of the inefficient processes that we have along the way.

9        THE COURT:  Thank you, Mr. Calabrese, for the work

10  that you do in trying to get mail delivered on time.  Thank

11  you.  You are excused.

12       (Witness excused)

13       THE COURT:  Now, we are going to take our one hour

14  lunch, but before we do that, Mr. Stein, has Ms. Simmons gotten

15  it together?

16       MR. STEIN:  Not yet, your Honor.  They tried

17  everything they could with her phone and her computer.  The IT

18  people weren't able to even figure out what the issue is.  What

19  I suggested was that she go try a different computer in a

20  different room to see if that computer might work.  So she is

21  doing that now.

22       THE COURT:  So is she at her location at her office,

23  is that it?

24       MR. STEIN:  That's my understanding, yes, and she said

25  that last night at home, I guess, she has -- my understanding

K7UQgal4                          Calabrese - Cross

1   at least -- a work laptop and it was working last night.  I

2   don't know -- I don't know if she understands exactly what's

3   going on, but she's trying to fix it.

4           THE COURT:  Because we know that Mr. Tanko also works

5   for the U.S.P.S., I'm just wondering whether the tech people in

6   his office might be able to help just because he got it to

7   work.  Could you make that inquiry?

8           MR. STEIN:  Yes.

9           THE COURT:  OK.  So, all right.  It is now 1:37 we.

10  Will resume at 2:37.

11          MR. STEIN:  Would the Court like to hear from

12  Mr. Tanko first at 2:37 and then as to Ms. Simmons?

13          THE COURT:  I think we should get him out of the way

14  and then Ms. Simmons.  Is that the last witness, Ms. Simmons?

15          MR. STEIN:  Yes, as far as I know.

16          MX. GREEN:  Your Honor, I think that given the

17  testimony we just heard and kind of the contradiction between

18  the two witnesses, we might seek to have about ten minutes of

19  rebuttal testimony from a voter, but we're trying to find out

20  whether we have a witness that would fit that description.

21          THE COURT:  All right.  So you will let us know.

22          MX. GREEN:  I will.  I have been frantically calling

23  people.

24          THE COURT:  All right.  Have a good lunch.

25          (Luncheon recess)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K7UQgal4

AFTERNOON SESSION

2:38 p.m.

1

2

3          DEPUTY CLERK:  Good afternoon, everyone.  We are now

4     resuming a hearing in Gallagher et al. v. New York State Board

5     of Elections, et al. Case 20 Civ. 5504.

6          The Honorable Analisa Torres is now presiding.

7          THE COURT:  Thank you.  Welcome back, everybody.

8          Mr. Stein, do we have good news about Ms. Simmons?  Is

9     Mr. Stein with us?

10          MX. GREEN:  If I may, I've managed to find a witness

11     that I think we can get done in -- I have less than 5 minutes

12     of questions for him.  He will have to leave at 3:30.  If the

13     other parties don't object, would it be possible to call him in

14     the next ten minutes or so?

15          MR. CONROY:  This is Owen Conroy.  I'm not sure --

16     counsel said this is a rebuttal witness.  I'm not sure what

17     they're rebutting or why it would be appropriate for them to

18     rebut.  The U.S.P.S. witnesses have been their own witnesses,

19     so what is the rebuttal?

20          MR. KITZINGER:  The city joins in that, and it is

21     utterly confused as to who the witness is, what her

22     qualifications would be, and why they would be rebutting their

23     own testimony.

24          MX. GREEN:  I can represent what the proffer is going

25     to be.  It's going to be somebody who testified they mailed a

K7UQgal4

1    ballot on June 23, and we're going to show a ballot with a

2    June 25 postmark.

3         MR. CONROY:  I think the testimony from the U.S.P.S.

4    witnesses have been that they can testify, you know, with 98 or

5    99 percent certainty that these were the policies, these were

6    the standards, but I think every one of them has been clear

7    that there can always be exceptions, so I'm not sure what that

8    testimony would add to the record.

9         MX. GREEN:  If the parties are willing to stipulate

10   that -- so Mr. Calabrese testified that there is essentially no

11   chance that a ballot would end up with postmark from two days

12   later than it was mailed, and I think the testimony is

13   relevant.  You know, if we had a longer time, I would find a

14   lot more voters, but I think it's germane to the extent that

15   there is an issue.  With us rebutting our own witness, as I

16   understood it, these were witnesses the Court really wanted to

17   hear from, and yes, we subpoenaed them, but I would then ask

18   for permission to treat the witnesses as hostile.

19        THE COURT:  Mr. Kitzinger.

20        MR. KITZINGER:  Thank you, your Honor.

21        To the extent they're raising an issue about untimely

22   postmarks on specific ballots, that should have been presented

23   on their case in chief before they rested.  Their case hinged

24   on postal service testimony from the outset.  It was their

25   claim in the complaint and in the intervenors' complaint that

K7UQgal4

 1   ballots lacked postmarks because the executive order mandated

 2   the use of business reply mail; that is, prepaid postage.  This

 3   is far afield from that.  And also to the extent they were

 4   making an argument about late postmarking and delays in

 5   postmarking, again, that should have been in their case in

 6   chief.  For them to now come in and rebut their own witnesses'

 7   testimony that was necessary to their case in chief seems

 8   highly inappropriate and improper.

 9            MX. GREEN:  And I respond to that, that in fact the

10   witness we actually called testified that postmarks could

11   appear two days later, and it was only when that witness

12   produced another witness that contradicted him that this came

13   up.

14            I think to address something that has come up twice

15   today, our complaint absolutely includes late postmarks.  We

16   put that evidence on through Mr. Kellner.  We put that -- that

17   claim is in our complaint.  That claim is in our memo.  It is

18   an almost mind-boggling view of our argument to say it doesn't

19   include that.

20            MR. KITZINGER:  Your Honor, even to the extent it

21   includes late postmarks, that should have been on their case in

22   chief.  Putting testimony into Mr. Kellner about postal service

23   policies and practices, it was not credible testimony.  It's

24   not the base -- postal service testimony is the only competent

25   testimony about postal service practices.

K7UQgal4

1           THE COURT:  OK.  I agree.  And the request is denied.

2           MR. KITZINGER:  Thank you, your Honor.

3           THE COURT:  Do we have --

4           MX. GREEN:  Your Honor, may I --

5           THE COURT:  No.

6           MX. GREEN:  May I make an offer of proof?

7           THE COURT:  I've made my ruling.

8           What about Mrs. Simmons?  Do we have Mr. Stein on the

9     line here?

10          DEPUTY CLERK:  Judge we just received an email from

11    Mr. Stein.  He has noted that he is having some trouble logging

12    in, and it appears that the issues with Ms. Simmons have not

13    been resolved.  She has been trying, but Mr. Stein is trying to

14    log in at the moment.

15          THE COURT:  So, is there any objection to Mrs. Summons

16    testifying telephonically?

17          MX. GREEN:  Not on our side.

18          MR. KITZINGER:  City board has no objection, your

19    Honor, to expedite this.

20          MR. CONROY:  Same with us, your Honor.

21          THE COURT:  All right then.  So, Mr. Then, would you

22    please email Mr. Stein indicating that we will take the

23    testimony of Mrs. Simmons telephonically because the failure in

24    their offices that they have diligently tried to correct but

25    they have not been able to resolve despite the IT department

K7UQgal4

1    being involved.

2         MR. CONROY:  Your Honor, while we're waiting, I just

3    wanted to mention I had emailed chambers and the parties at a

4    break about a scheduling issue for later today.  I apologize

5    for having to raise that issue, but I just wanted to make sure

6    the Court received my note.

7         THE COURT:  I received a request, I think, stating

8    that you have child care obligations, is it between 5:00 and

9    6:30?

10        MR. CONROY:  That is correct, your Honor.  5:15 I

11   think would be a hard stop for me, and then if your Honor would

12   like to resume, I can be back at a computer screen by 6:30.

13   7:00 would be a little easier, but I can make it work if your

14   Honor would like to resume at 6:30.

15        THE COURT:  I don't have any problem with

16   accommodating that schedule if we need to.

17        MR. CONROY:  Thank you, your Honor.  And I apologize

18   to the other parties as well for that.

19        MR. KITZINGER:  Understandable.  No need to apologize.

20        MR. CONROY:  Thank you.

21        MR. KITZINGER:  Are we going to be finishing with

22   Mr. Tank first?

23        THE COURT:  That's right.  I forgot about him.  So why

24   don't we bring him back.  Then if we can get Mr. Stein on the

25   line and maybe Mr. Stein can appear telephonically, Mr. Then,

K7UQgal4

```
 1    if you could ask him that.

 2              DEPUTY CLERK:  Will do, Judge.  I will note that

 3    Mr. Tank is in the lobby, but I will wait for Mr. Stein to

 4    appear before admitting them both.

 5              MX. GREEN:  Mr. Najmi is a little bit exhausted, and

 6    if there is no objection from other counsel, he has asked if I

 7    can take over questioning for this return.

 8              THE COURT:  I have no problem with him getting some

 9    rest if it's OK with you.

10              MR. CONROY:  No objection.

11              MR. KITZINGER:  I understand why he would be

12    exhausted, and no objection.

13              MX. GREEN:  I have nothing but admiration for the two

14    of you handling this whole case solo.

15              MR. NAJMI:  I am here listening intently though, thank

16    you.

17                              (Pause)

18              DEPUTY CLERK:  Ms. Simmons, was that you that joined

19    by any chance?

20              THE WITNESS:  Yes.  Good afternoon.

21              DEPUTY CLERK:  Is Mr. Stein also on with us?

22              MR. STEIN:  I am, yes.  Can you hear me?

23              DEPUTY CLERK:  Yes, we can.

24              Judge, I believe we now have both Mr. Stein and

25    Mrs. Simmons and telephonically.
```

K7UQgal4                        Simmons – Direct

1            THE COURT:  All right.  Mrs. Simmons, I'm going to

2     administer an oath to you.

3      SHERILYN SIMMONS,

4          called as a witness by the Plaintiff,

5          having been duly sworn, testified as follows:

6     DIRECT EXAMINATION

7     BY MX. GREEN:

8            THE COURT:  I need for you to speak up.  I heard yes,

9     but I do need for you to speak up because that was very low.

10           THE WITNESS:  Yes.

11           THE COURT:  OK.  That's better.  If you would just

12    spell your first and last name, please.

13           THE WITNESS:  I couldn't hear you.  I heard a beep.  I

14    couldn't hear everything you said.

15           THE COURT:  Please spell your first and last name.

16           THE WITNESS:  Yes.  S-H-E-R-I-L-Y-N.  S-I-M-M-O-N-S.

17           THE COURT:  Very well.  You may inquire, Mx. Green.

18           MX. GREEN:  Thank you, Judge.

19    Q.  Ms. Simmons, can you describe for us what your job is?

20    A.  I'm the consumer industry contact manager for the Triboro

21    District. I handle inquiries, deal with customers' complaints,

22    as well as Congress and constituent issues.

23    Q.  And when you say the Triboro, what does that cover?

24    A.  Triboro covers 112, the Brooklyn area, Flushing, Jamaica,

25    Staten Island and –– Staten Island, Brooklyn, Jamaica,

K7UQgal4                              Simmons – Direct

1   Flushing, Far Rockaway area.

2   Q.  Excellent.  You mentioned complaints.  What kinds of

3   complaints would you routinely deal with?

4   A.  Package inquiries, not receiving my packages, not receiving

5   mail, pretty much -- anything dealing with not receiving, the

6   non-delivery of mail, not being consistent with mail

7   deliveries.  It can also be that boxes have, you know, there's

8   a problem with a mailbox inside of a particular building, and

9   they're wondering why they didn't get their mail, things of

10  that nature.  So it's basically a lot of service issues, and it

11  can also be complaining about a particular clerk or manager.

12  Q.  That makes sense.  And so in terms of your personal job

13  responsibilities, what do you do about complaints?

14  A.  Try to get a proper resolution to the customer's inquiry.

15  Q.  Of course.  And can you walk me through kind of how a

16  complaint would come to you and what you would do to resolve

17  it.  And let's just use as an example, let's say somebody came

18  somewhere to the post office, and said I'm not receiving my

19  mail, what would happen?

20  A.  OK, well -- OK, well, if a customer came to the post office

21  and said, I'm not receiving mail, I generally would not get

22  that complaint.  They would have to call our 1-800 number,

23  which is a call center, or they can go to their Congress person

24  and put in a complaint.  In that term, it will now either come

25  to me or go to Washington, which is our government relations

K7UQgal4                         Simmons – Direct

1   office.

2           So I can get it through the call center or through

3   government relations.  And then either way, then I will contact

4   the customer, let them know that I'm working on the inquiry

5   that I received, and I will do follow-up.  I call the station.

6   The station has to do investigation, whether it be speaking to

7   carrier or, you know, looking on their shelf to see if they

8   have a package that the customer is missing.

9           And then upon the investigation, then I will call the

10  customer and let them know that the package is either found or

11  located.  If not, they can put in a claim or, you know, give

12  them other options in order to resolve their problem.

13  Q.  I will apologize if this is an unanswerable question, but

14  in the kind of lost mail sort of things, is there about a

15  percentage of how often you find the mail versus how often the

16  mail is just lost?

17  A.  Can you repeat that, please?

18  Q.  In looking at the kind of lost mail-type situation that you

19  just described, is there -- in your experience is there a

20  percentage of the time that you resolve it by finding the mail

21  versus a percentage of the time that you resolve it by

22  discovering that the mail is just gone?

23  A.  I don't have a percentage, but I can tell you that I had

24  more success in finding the packages than not finding it.

25  Q.  OK.  That makes sense.  And that's exactly what I was

K7UQgal4                          Simmons - Direct

1    asking for.  Thank you.

2              How long have you been in that position?

3    A.  Well, in this position I've been there roughly about three

4    years.  In the post office 35 years.

5    Q.  What did you do before?

6    A.  I started as a distribution clerk.  That's considered

7    sorting mail.  I work on different machinery.  I was

8    accountable clerk who hands out certified mail, you know,

9    express mail, anything with tracking that has to be scanned.

10   That was my job to give it to the carrier for them to take it

11   out into the street.  I also was a window clerk for many years.

12   And then what we call a 204b, which is starting out as being a

13   supervisor.  I worked in retail.  I was a retail lot assistant.

14   That's looking at all stations with cameras and making sure

15   their wait time in line issues.  You know, if customers have a

16   long wait time in line, then I would have to contact the

17   station to let them know they need to get someone else on the

18   window or out in the lobby to assist.  I worked in finance,

19   meaning the finance department at other stations dealing with

20   money situations and counts and stock.  And then I was a

21   manager for a number of years at different stations, and then I

22   came on board as the consumer industry contact.

23   Q.  I take it, it's very fair to say you've worked in a lot of

24   different parts of the post office?

25   A.  Yes.

K7UQgal4                          Simmons - Direct

1   Q.   And you know a whole lot about how the post office is run?

2   A.   Well, I do.

3   Q.   Great.  So, have you had any interaction in all of those

4   experience with the process of doing absentee ballots by mail?

5   A.   Could you repeat that?

6   Q.   In all of your time at the post office, have you had any

7   experience in any capacity handling absentee ballots by mail?

8   A.   Very little.

9   Q.   Very little.  Can you tell me about what that experience

10  is.

11  A.   Well, just making sure the ballots that come in either over

12  the window or through your postal facility that the ballots are

13  postmarked.

14  Q.   OK.  Great.  And so why don't you tell -- that's -- I don't

15  know how much you know about this case, but that issue is very

16  important to this case.  So can you tell us about what you mean

17  by making sure the ballots are marked?

18  A.   Well, if a customer comes in over the window and needed

19  their ballots to be postmarked for -- you know, not for a

20  particular day but for the day they actually brought it in,

21  then we will stamp that ballot because you can never go back to

22  stamp anything.  It has to be for that day.

23       If the ballots gets put in the collection box, of

24  course, now that would go to a different facility because the

25  facility where I worked at the time because I can only

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K7UQgal4                        Simmons - Direct

1   basically tell you when I was a manager at the local post

2   office, then that gets sent out to our main facility.  And the

3   main facility would be like the Morgan post office that handles

4   cancellation.  Among that, then it gets rerouted back to

5   whatever postal facility or at that time it could have been

6   Flushing facility, and that would go to be distributed to the

7   proper station, so to speak.

8           Once it gets to the station -- well, I should say once

9   it gets to either Flushing or the Brooklyn location at the time

10  when I worked, then it would go on a particular machine, and

11  it's like a bar code sorting machine.  Then it gets put into

12  trays.  Once it gets put into trays, then that will go to

13  whatever site it has to go to, whatever zip code.  And once it

14  gets to that zip code --

15  Q.  OK.

16  A.  OK.

17  Q.  No, no, no, please.  Keep going.  This is fascinating.

18  A.  Oh, OK.  Once it gets to that zip code or that site, then

19  you want to say that services, you know, the board of elections

20  or whatever, then it would be up to the employees are manager

21  to ensure that those ballots that are postmarked now get to the

22  particular board of elections, and those that are not

23  postmarked would be postmarked.

24  Q.  OK.  And so I heard a couple different things about

25  postmarks there.  Are there different places that a ballot

K7UQgal4                          Simmons - Direct

1    might get postmarked?

2              MR. KITZINGER:  Objection.

3              THE COURT:  What do you mean by different places on

4    the ballot?

5    Q.  Not on the ballot.  Different post office locations where a

6    ballot might get postmarked.

7    A.  Can you clarify what you mean by that, please?

8    Q.  So, I thought I heard -- and I apologize if I

9    misunderstood --

10   A.  That's OK.

11   Q.   -- that the local post office might postmark something at

12   the window, but there also might be a postmark applied at the

13   Morgan facility?

14   A.  Right.  In other words, I guess if a customer comes to the

15   window and doesn't put it in the collection box, it can be

16   postmarked at that point.

17   Q.  And the collection box, we're just talking about a normal--

18   A.  The collection box now is just getting collect and going on

19   the truck per se to go to whatever facility.

20   Q.  And?

21   A.  You know, whatever process facility, I should say.

22   Q.  Because I do not know the lingo.

23   A.  I'm sorry.

24   Q.  Collection box just means the blue post box on the corner,

25   right?

K7UQgal4                          Simmons – Direct

1    A.  Yes, correct.  I apologize for that.

2    Q.  No, I am the one who doesn't know.

3          So, is there any other location where you might get a

4    postmark, right?  So there's the window.  There's the Morgan

5    facility.  Is there any mail processing facility in Brooklyn

6    where you might also get a postmark or are those the only two

7    options?

8    A.  I'm not aware of any other one.

9    Q.  OK.  So in terms of the path a ballot might follow, let's

10   say I put it in the collection box, is it guaranteed to go to

11   the Morgan facility or are there different things that might

12   happen?

13   A.  Well, that would be the first place where it should go.  I

14   can't -- again, I can't really -- that would be the place.

15   Q.  So, I guess I'm just really trying to understand on a

16   minute level what happens.

17          So, a truck comes and picks it up from the blue box,

18   and that truck, no matter what, unless something very strange

19   is happening, goes to Morgan?

20   A.  Well, when you say the truck comes to -- OK.  I could only

21   state when I was a manager at a facility, it would be an

22   employee usually would go to the box and it could be management

23   that would go to the box, pull out the mail out of the

24   collection box and then that goes on the truck.  It gets

25   sorted, you know, and then go on to the truck.

K7UQgal4                         Simmons – Direct

```
1    Q.  OK.

2    A.  And that truck would --

3    Q.  Please.

4    A.  No, I'm -- that's it.  That truck will go to the next

5    facility where it would have to get processed.

6    Q.  And the next facility for Brooklyn mail, the next facility

7    is always Morgan?

8    A.  Well, it would go to Morgan, right, for this particular

9    processing, and they will do, like I said they go on to the

10   distribution bar code sorting machine.  It's called a DBS, and

11   that will get canceled there, you're talking about the ballots

12   being canceled, and then it would come back to the Brooklyn.

13   Q.  Got it.  And you said this particular process, I think were

14   the words -- I'm sorry if I've gotten them wrong -- but this

15   particular process, in terms of just any mail being put in a

16   blue box, is there a different process that might happen?

17   A.  That I can't -- I wouldn't be able to answer that.

18   Q.  Fair.

19   A.  I am not sure how the other processes might go, but, you

20   know, I don't want to speculate.

21   Q.  I'm really just trying to understand.  You said the other

22   processes might go.  I'm just trying to figure out what those

23   other processes are.  Like what?

24   A.  Maybe it's my terminology.  I guess it's my terminology.

25   So I'm just talking about -- we're talking about the ballots at
```

1    this time or are you talking about mail in general?

2    Q.  Well, I guess what I'm trying to figure out is, is there a

3    way that those are treated differently, right?  So, if I'm a

4    voter and I decide to vote by dropping it in the blue box, I'm

5    trying to figure out, is there a process that involves somebody

6    or some machine sorting ballots from non-ballots before they

7    decide where they're going to drive them?

8    A.  I wouldn't be able to answer that.  I don't know once it

9    gets there do they have a different place where it has to go.

10   I know that it does -- when it's ballots, as far as I know,

11   that it will go to a particular machinery and then come back

12   to, you know, to our facility here and get put into certain

13   trays once it comes off a particular machine that handles that.

14   Q.  Then I would also like to get some idea of the kinds of

15   time lines we're talking about here.  So if we're talking

16   about, let's say, on June 22 I'm a voter and I drop something

17   in a box.  Is there a standard last pickup around Brooklyn or a

18   general time frame that the last pickup is?

19   A.  You asking me for a standard pickup time?

20   Q.  Or -- yes, right.

21   A.  It depends on what --

22   Q.  Yeah.

23   A.  I'm sorry, I don't want to cut you off.

24   Q.  Now *it depends on,* that sounds like exactly the answer I

25   want.

K7UQgal4                          Simmons - Direct

1    A.  OK, it did -- I guess it depends -- and I shouldn't say I

2    guess.  If you drop it off at a particular box and you're --

3    can you just say the question over again and let me just make

4    sure I'm understanding?

5    Q.  Of course.  I'm just trying to get an idea of the range of

6    times that the last pickup would happen in a day.

7    A.  OK, it depends on the particular mailbox.  Each mailbox has

8    a -- and I can't -- I don't recall the name, but it's a

9    collection label on there, and it tells you the time that, you

10   know, the mail will be collected.  So, let's just say most of

11   the time if it's at a station that closes their doors at 5:00,

12   that collection box might say it will be collected like, let's

13   just say, 5:15.

14   Q.  And so it would be surprising, for example, to see a pickup

15   later than, say, 7:00 p.m., a last pickup?

16             MR. KITZINGER:  Objection.

17             THE COURT:  Counsel, on something like this, on these

18   pickup times, are you asking whether there are standards or

19   whether they vary?  I'm not quite sure what you're getting at.

20             MX. GREEN:  I'm not necessarily trying to get at

21   whether they vary.  I'm just trying to figure out about when in

22   the day it's likely to happen.

23             THE COURT:  That the last pickup is.

24             MX. GREEN:  The last pickup, yeah.

25             THE COURT:  At a given mailbox.

K7UQgal4                          Simmons - Direct

 1          MX. GREEN:  Yeah.

 2          THE COURT:  So you can ask that question.

 3   BY MX. GREEN:

 4   Q.  OK.  Is there a, you know, a -- I'm sorry, your Honor, you

 5   phrased it the way you wanted it?

 6          THE COURT:  So, typically what time is the last pickup

 7   at the blue box?

 8          THE WITNESS:  At least daily.

 9   Q.  OK.  So after that last pickup, is it always the case that

10   the Brooklyn trucks make it to Morgan with the mail for that

11   day?

12   A.  Repeat it, please.

13   Q.  So the last pickup of the day, whenever it is, does it ever

14   happen that rather than going to Morgan that the mail either

15   stays in the truck or goes to a local facility for the night

16   and goes -- and arrives at Morgan in the morning instead of in

17   the night?

18   A.  I wouldn't be able to answer that.  I know they stay on the

19   truck.  All mail that is picked up for that day would be going

20   out the same day.  No mail is sitting left behind.

21   Q.  Got it.  And in your experience at the post office, what is

22   the typical turnaround time between dropping a letter in the

23   box and getting a postmark cancellation?

24          MR. KITZINGER:  Objection.  This appears to be beyond

25   the scope of this witness' knowledge.  Moreover, we had a prior

K7UQgal4                          Simmons – Direct

1    witness presented by the postal service in response to a

2    subpoena who was clearly qualified and competent and designated

3    to testify about the postmarking process.

4              THE COURT:  Sustained.

5              Mx. Green, I'm not quite sure what you expect to

6    accomplish at this time.

7              MX. GREEN:  Well, your Honor, I guess the point I

8    would be getting at is that we had two witnesses testify to two

9    completely different things about when we would get a postmark.

10             THE COURT:  Well, we had one witness who is more

11   expert than the other on the subject.

12             MX. GREEN:  Fair.  Fair enough.  OK.

13   BY MX. GREEN:

14   Q.  In your capacity, I think you said customer -- I forget the

15   exact title, I'm sorry -- but in your customer relations

16   position, have you had any interactions with the city board of

17   elections?

18   A.  Yes.

19   Q.  Can you talk to us about your interactions with -- or what

20   interactions were those?

21   A.  What interactions.  I do -- at times I assist -- I'm sorry.

22   At times I assist with outreach, meaning see what we can offer

23   them to see if they have any issues.

24   Q.  And have they had -- have you had any of those

25   conversations within, say the -- withdrawn.  Let me just

K7UQgal4                    Simmons - Cross

1  rephrase.

2         Have you had any of those conversations about the

3  June 23 election?

4  A.  No, I have not.

5  Q.  If that's so, give me a moment, but I don't know that I

6  have any other questions.

7         MX. GREEN:  We have no further questions.  Thank you

8  so much, Ms. Simmons.

9         THE COURT:  One moment, Ms. Simmons I need to do

10  cross-examination.

11         Does the state have any cross-examination for this

12  witness?

13         MR. CONROY:  No, your Honor.

14         THE COURT:  Does the city?

15         MR. KITZINGER:  Your Honor, just very briefly.

16  CROSS-EXAMINATION

17  BY MR. KITZINGER:

18  Q.  Good afternoon, Ms. Simmons.  My name is Steve Kitzinger.

19  I'm a lawyer with the New York City Law Department.  I

20  represent the New York City Board of Elections defendants in

21  this case.

22         Just to be clear, you said -- you just testified that

23  you do not have communications with the board of elections and

24  the City of New York personnel regarding the June 23 primary,

25  correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K7UQgal4                         Simmons - Cross

1   A.  I didn't -- OK, I do outreaches to see if they have any

2   issues regarding, you know, any issues throughout, but I

3   personally did not have any conversation with them dealing with

4   the ballots.

5   Q.  Do you know whether or not others at the postal service

6   did?

7   A.  No, I can't say I have.

8   Q.  Do you know if any -- can you categorically state that

9   nobody at the postal service had conversations with the board

10  of elections?

11  A.  Well, OK -- well, let me just state that we do have someone

12  who is the area board of elections contact person, and she

13  would be their point of contact that they will go through to

14  discuss any issues pretty much.  It could be, you know, the

15  correspondent is to this and she is familiar with this area.

16  Q.  So you would normally be the person who would be contacted

17  by the board of elections if there were a problem, correct?

18  A.  No, not normally.  No.  I do their outreach at times to see

19  if they have any issues, but I normally wouldn't be that

20  person.

21          MR. KITZINGER:  Thank you very much.  Nothing further.

22          THE WITNESS:  You're welcome.

23          THE COURT:  Any redirect?

24

25

K7UQgal4                        Simmons - Redirect

 1   REDIRECT EXAMINATION

 2   BY MX. GREEN:

 3   Q.  Who is that person you were just talking about with

 4   Mr. Kitzinger?

 5   A.  Lisa DelRio.

 6   Q.  Can you spell that name?

 7   A.  L-I-S-A.  D-E-L capital R-I-O.

 8   Q.  And are you aware of any particular conversation that Lisa

 9   DelRio had with the board of elections about this -- OK.

10   A.  No, I am not.

11          MX. GREEN:  OK.  Nothing further.

12          THE COURT:  Mrs. Simmons, thank you very much for your

13   work at the post office and trying to get our mail to us, and

14   I'm excusing you now.  We don't have any further questions for

15   you.

16          THE WITNESS:  OK.  Thank you.

17          (Witness excused)

18          THE COURT:  So, that was the last witness.  The way

19   that we will proceed with oral argument is that I will permit

20   the plaintiffs to go first.

21          MR. STEIN:  Your Honor, my apologies for interrupting.

22   This is Ilan Stein.  I thought that Mr. Tanko was going to

23   provide a little bit more--

24          THE COURT:  I forgot about him.  Thank you for

25   reminding me.  Let's get Mr. Tanko back, please.

K7UQgal4                    Simmons - Redirect

1           MR. STEIN:  So I know that he was in the waiting room.

2      He's emailing me saying that he's getting kicked out.  I told

3      him to log back in immediately and so he should be logging on

4      any moment.

5           DEPUTY CLERK:  Mr. Tanko, could you turn your video on

6      please?

7           THE WITNESS:  Yes.

8           THE COURT:  Hi, Mr. Tanko.  First of all, I am going

9      to re-administer the oath to you.

10     ALLEN TANKO,

11        having been previously sworn, testified further as

12     follows:

13          THE COURT:  I understand, Mr. Tanko, that you wanted

14     to clarify or add something to your testimony?

15          THE WITNESS:  The only thing that we had asked about

16     was the June 24 mailing that was submitted was not a ballot for

17     political mailing it was internal.  So I just wanted to make

18     sure that clarification was presented.

19          THE COURT:  Do the attorneys have any questions on

20     this issue?

21          MR. KITZINGER:  The city does not.

22          MR. CONROY:  The state does not.

23          MR. KITZINGER:  You're muted.

24          THE COURT:  Mx. Green.

25          MX. GREEN:  Sorry.  Mr. Tanko, have you spoken to

K7UQgal4                           Simmons - Redirect

1    anyone since you testified?

2              THE WITNESS:  Excuse me?

3              MX. GREEN:  Have you spoken one since testifying?

4              THE WITNESS:  Yes, I've spoken to many people

5    throughout the day.

6              MX. GREEN:  Fair enough.  Let me be narrower then.

7         What brought about your decision to clarify your

8    testimony?

9              THE WITNESS:  Because I was asked about it earlier

10   that someone asked -- I believe Mr. Kitzinger said that that

11   was -- those were not ballots.  So he asked me to clarify that.

12   I went and clarified that by a picture that we normally take

13   when the mailing comes in.

14             MX. GREEN:  OK.  That was an answer to the question.

15   You took a picture.  And specifically was that a picture of?

16   Was it just one of the ballots -- or not ballots -- was it just

17   of one of the envelopes or was it of the shipment?

18             THE WITNESS:  It was a -- we got clarification from my

19   staff that those were not labeled as ballots that got mailed on

20   the 24th.  It was an internal mailing from the board of

21   elections, but they used the same account so we counted those

22   pieces.  It's the same permit not but it was not ballots.

23             MX. GREEN:  Understood.  Just trying to figure out

24   where it came from.  That's all I have.

25             THE WITNESS:  I promised that I would give that

K7UQgal4                    Summation - Mx. Green

1    information back.  This is why I talked to Mr. Stein about

2    coming back.  OK?

3              MX. GREEN:  I appreciate it so much.  Thank you.

4              THE COURT:  Thank you again, Mr. Tanko.  You're

5    excused.

6              THE WITNESS:  Thank you very much.

7              (Witness excused)

8              MR. KITZINGER:  This is Steve Kitzinger.  Just for the

9    record, lest there be any confusion, I have not had any

10   communication outside of the courtroom with either Mr. Stein or

11   anybody from the postal service; and as far as I know, neither

12   has my client.

13             THE COURT:  All right.  So as far as oral argument is

14   concerned, this is the way we're going to do it:  Plaintiff is

15   going to go first, then the state defendant, then the city, and

16   I will permit a rebuttal by the plaintiff.

17             MX. GREEN:  OK.  Would your Honor like me to just

18   start?

19             THE COURT:  Go right ahead.

20             MX. GREEN:  Thank you.

21             The question in this case is really quite simple.  Is

22   there a constitutional problem in throwing out thousands of

23   votes because of a predictable error.  And while we've had a

24   hearing that has been certainly contentious, I don't think

25   there's really much evidence in dispute.

K7UQgal4                              Summation – Mx. Green

1          The city board witnesses testified about what the city

2     board routinely does.  The state board witnesses testified

3     about what the state board routinely does.  The postal service

4     witnesses testified about what the postal service does, and our

5     witnesses provided the only data uncontroverted about the

6     proportion of votes that are at stake and have been thrown out

7     because of no error of the voters own.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K7U5gal5                         Summations - Mx. Green

1          MX. GREEN:  (Continuing) Before I dig into, as your

2     Honor asked for martialing the evidence, I know you had some

3     additional questions that you put in your order that I think

4     are more legal in nature and we provided a written submission

5     and the state defendants had addressed those in an affidavit

6     but I would just -- does your Honor want me to walk through

7     those answers or is the written submission fine?

8          THE COURT:  No.  The written submission is sufficient.

9          MX. GREEN:  So what remains is merely to apply the law

10    to the facts that we have established.  Initially,

11    Ms. Gallagher came and testified and she testified about how

12    her campaign is grassroots and is based on the idea that there

13    should be more transparency in government and more

14    participation in the government.  That's going to be page 12,

15    lines 14 to 22 of the transcript.  And, importantly, she also

16    testified about the way she is running her campaign which is,

17    in some ways, at odds with the way New York's election system

18    works in general in that she believes that every vote should be

19    counted and doesn't engage in the kind of fight to disqualify

20    every vote for your opponent but many candidates in New York

21    do.  That's transcript 14, line 10 through 12.  She wants every

22    vote to be counted and she, and all the plaintiffs, are seeking

23    to have every duly-cast vote counted.  On page 16 of the

24    transcript she also made that very clear.  I think

25    Ms. Gallagher's testimony also highlighted the importance of

K7U5gal5                        Summations - Mx. Green

1    this decision not just in terms of what it means for particular

2    races but what this election means for people who have

3    participated for the first time who might become jaded if they

4    believe their votes have been just laid aside.  And, I think it

5    speaks to, after a large insurgency against established and

6    incumbent candidates, I think the validity and the counting of

7    every vote in this election matters a lot for what mandate

8    those people come into office with.  And that's going to be on

9    page 17, in particular lines 4 through 11 of the transcript.

10          Next we heard from Mikael Haxby who provided the only

11   information that's made it into the record about what

12   proportion of votes have been thrown out for postmark issues.

13   Mr. Haxby testified at length about the methods he used, about

14   how, exactly, he generated the data that has been admitted.

15   That's going to be page 43 of the transcript, page 45, and that

16   area.  Specifically, in terms of Assembly District 50, of 1,286

17   ballots that were marked as having no postmarks about 903, if I

18   am remembering the number correctly, were thrown out as having

19   no postmark and no other issue.  And that's on page 43 of the

20   transcript.  We also stipulated around there in the transcript

21   to numbers coming in on postmarked ballots that have postmarks

22   of June 24th, 25th, and 26th.

23          In terms of what I think was the core testimony that

24   we heard in this hearing, Mr. Kellner testified at length about

25   his experience at the Board of Elections, his long history and

1    opinion of the post office as being generally untrustworthy and

2    testified also as to a lot of things that I'm going to talk

3    more in depth about as we get into a legal analysis.

4           And so, with that as a summary of where we are going,

5    I am going to dig into the particular legal analysis.

6           I think there is a very easy path to issuing some form

7    of injunction in this case.  There is no dispute that there are

8    thousands of votes at stake.  There were 100 in Assembly

9    District 50 alone.  That's transcript 69.  Rejected for no

10   other reason than they were lacking a postmark and arrived

11   after or on June 24th.  And that's also not including those

12   ballots that we couldn't evaluate because the City Board, in

13   the order to show the Court, produced partial or incomplete

14   ballot envelopes.  That's transcript 54:23 through 55:10.

15          The City Board's witnesses testified 2,000 votes came

16   into the Brooklyn Board of Elections without postmarks on June

17   24th, 2020.  Transcript 187:13-20.  And Mr. Kellner testified

18   that other than the administrative burden, which may involve

19   substantial costs involved in (inaudible) per canvass, there is

20   no harm to the government in counting at least most of the

21   votes at issue and, specifically, those votes received on June

22   24th.  That's transcript 126:11-18.  And, the date on at least

23   some of those votes that we have been discussing all throughout

24   is Plaintiff's Exhibits 2 and 3.

25          As the Florida District Judge put it, "If

K7U5gal5                            Summations - Mx. Green

1    disenfranchising thousands of eligible voters does not amount

2    to a severe burden on the right to vote, then this Court is at

3    a loss as to what does."  That's from Florida Democratic Party

4    v. Detnzer, 2016 Lexis 143620.

5                As I am sure your Honor is sick of hearing from me on

6    various cases, if the burden is severe, then strict scrutiny

7    applies.

8                THE COURT:  I am very familiar with that aspect and so

9    you don't need to walk me through that analysis.  You can walk

10   me through applying the law to the facts, but the law I am

11   okay.

12               MX. GREEN:  Thank you very much, your Honor.

13               So, once strict scrutiny applies all that we need to

14   show to win is that there is a less restrictive alternative.

15   Right?  Strict scrutiny requires least restrictive alternative

16   to be used and the State Board's witnesses outlines numerous

17   ways they might have use a less restrictive alternative.  Most

18   strikingly -- at least if you are asking me -- Mr. Kellner

19   testified that the State Board even considered interpreting the

20   law in issue differently in order to count the votes at issue.

21   And that's going to be in the transcript at 120:11 through

22   120:15.  And then the Board could have, when it realized

23   substantial numbers of ballots were going out very late -- and

24   we heard from the post office on that today -- that even on

25   June 22nd, 30,000 ballots went out, they could have used

K7U5gal5                         Summations - Mx. Green

1   absentee return envelopes through Express Mail, they could have

2   taken the same on collection steps they were taking on the

3   30th, but they didn't.

4           While the City Board arranged for express treatment of

5   them sending late ballots, they didn't arrange for a

6   concomitant express treatment of ballots coming back from

7   voters.

8           Mr. Kellner also testified that, for example, you

9   could easily put what I think the testimony showed was,

10  especially today, a much more reliable indication of what date

11  a ballot was sent by just asking a voter to fill out an

12  affidavit of the date they're sending it on the ballot.  And as

13  far as least restrictive alternative is concerned, we also

14  don't really need to look very far because the legislature

15  already passed the less restrictive alternative.

16          So, let's also move to a little bit of what the Court

17  didn't hear much of.  Until the postal service witnesses

18  testified there was almost no (inaudible) postmarks.  The

19  testimony that came in other than the post office was

20  unambiguous though in that Mr. Kellner agreed, quote,

21  obviously, if you mail -- if you drop a ballot in a mailbox and

22  it doesn't get picked up, you are not going get an election

23  paid postmark.  And most importantly I think, from the voter's

24  perspective -- and I think that's how we have to look at the

25  rules of the game question -- from the voter's perspective --

1          (Reporter interruption)

2          MX. GREEN:  So, I will just back up a little bit.

3          Mr. Kellner testified that the (inaudible), quote,

4     conveys the idea that the voters vote will be counted so long

5     as it makes its way to a USPS post box by the end of election

6     day.  That's transcript 113 --

7          THE COURT:  Mx. Green, I didn't understand that.  What

8     conveys that?

9          MX. GREEN:  The instruction on the ballot conveys the

10    idea that the voter's vote will be counted so long as it makes

11    its way to a USPS post box by the end of election day.

12    Transcript 113:8-13.  The post office witnesses testified, and

13    I think one witness testified that the postmark process can

14    take one to two days while another witness testified that it

15    always happens on the same day except sometimes when it

16    doesn't.

17         However, the post office witnesses I think agreed that

18    the right day to mail a ballot would not be election day at all

19    but probably before that.  As to how they viewed their

20    obligations to the post voters the USPS witnesses testified

21    their commitment was not to the voters but our commitment is to

22    the mailer, and also testified *we are just a conduit.*

23         So, as the Court explored with the first postal

24    service witness, we at least have testimony that it was that

25    likely that you would get a postmark on the 23rd if you mailed

K7U5gal5                          Summations - Mx. Green

1    it on the 23rd.  But, that testimony was ultimately, I think,

2    one of the few fact issues in the case.

3           The other thing we ran into was that a City Board

4    witness testified that there was, quote, no issue -- so, there

5    was no, quote, in the timeliness of printing these ballots and

6    making sure they were mailed out on time.  That's transcript

7    181:2-5.

8           So, as I heard that testimony there are two options.

9    Either, one, the Board doesn't view it as an issue if 30,000

10   voters are not receiving a ballot until election day or the day

11   before; or two, there is a credibility issue for the City's

12   witness although there was not a whole lot of testimony for

13   that credibility issue to impact.  However, we think

14   holistically, under the circumstances -- I asked Mr. Kellner,

15   do certain of the post office's instructions inspire you with

16   confidence?  And he said he doesn't have much confidence at all

17   in the post office.  But I think after the testimony today one

18   of the questions for the Court will be, hearing all of that, do

19   we have any confidence about anything.  I think the credibility

20   answer to that has to be no, that there is no credibility to

21   the statement, yes, we get the postmark on the ballot every

22   single time especially because there was so much contrary

23   testimony on that front.

24          Beyond that, though, under these circumstances, I

25   think there is absolutely sufficient testimony, particularly

K7U5gal5                         Summations - Mx. Green

1    given Mr. Kellner's testimony about what the ballot

2    instructions would likely convey to a voter that "reasonable

3    reliance on the board" would result in a substantial number of

4    voters being disenfranchised.  And that that, under *Farrell*

5    which is 1985 United States District Lexis 16669 -- I think it

6    had three 6s there but that's the right number -- and also

7    relevant on the point is Hirschfeld, 799 Federal Supplement 394

8    and that is a state case on the point in our brief.

9            I think, without spending too much time going through

10   the standards -- because I know your Honor knows them -- we

11   have demonstrated entitlement to relief under any standard and,

12   just like in the *Yang* case, this is going to be a case where it

13   is at the high end of the Anderson verdict sliding the scale

14   because the burden is certainly something.  Or it's, and I

15   think this more than the Yang case, it is a strict scrutiny

16   case because I cannot conceive of a way of throwing out

17   thousands of ballots -- sorry, I said that wrong -- throwing

18   out thousands of votes because -- the ballots don't get

19   physically thrown out -- throwing out thousands of votes is not

20   a severe burden.

21           So, I think for the record that the thing that makes

22   the most sense to me is to walk through the five arguments that

23   the State Board presented in opposition to this motion and so

24   five arguments, as structured in their brief, is a wrong

25   parties argument, a sovereign immunity argument, a likelihood

K7U5gal5                    Summations - Mx. Green

1  of success argument with four parts -- and that's probably

2  going to be most of our discussion -- an irreparable harm

3  argument, and the public interest argument.

4          One and two can disappear right away.  On the wrong

5  parties argument Mr. Kellner unambiguously testified that the

6  state has the power to include the relief requested and,

7  indeed, is the only party with power to do so.  Transcript

8  78;19-24, transcript 19:1-7, transcript 79:4-15.  And, most

9  colorfully, the Court asked Mr. Kellner, putting my question in

10  much better words, whether it is within the authority of the

11  State Board to tell the City Board to follow a Federal Judge's

12  order and he said the answer is obviously yes.  Transcript

13  160:8-17.

14          The sovereign immunity argument only addresses the

15  presence of the board itself who, from my perspective, is just

16  a nominal defendant to make the caption make sense.  I don't

17  think they are actually a party in the same sense that the ex

18  parte young parties are, and it also addresses state

19  constitutional claims which we are not arguing in our motion.

20          And so, I think we have conceded the limitations that

21  the sovereign immunity argument would place on any motion and I

22  don't think we need to address them further.

23          I think somewhere in there was an abstention argument

24  and I think we have addressed that well enough in our brief

25  but, after *Sprint*, there just is absolutely no argument left

K7U5gal5                        Summations - Mx. Green

1    that this kind of case could warrant abstention.

2           Beyond that, I think that there is an interesting

3    wrinkle that I will just flag and if your is interested in the

4    authority I am happy to provide it later, but I actually don't

5    think we would have been able to subpoena the post office if

6    this case had been in state court because I think the post

7    office typically asserts sovereign immunity when they're

8    established in state court.  So, there is also a very

9    interesting adequacy issue that would defeat a younger argument

10   even if *Sprint* hadn't happened.

11          So, for the remaining arguments, three and four which

12   if I got the order right in my head are -- yes, failure to

13   establish likelihood of success and irreparable harm, those are

14   basically the same argument because the ruling in cases like

15   this, as your Honor knows, is basically once there is a

16   constitutional violation, you get the injunction.  And the case

17   for that from the Second Circuit is *Williams v. Salerno*.

18          On the fifth point, though -- I want to stop there and

19   come back.  The fifth point about public interest, the

20   testimony provided ultimately completely undermined the public

21   interest claims:  The State Board's witness, specifically

22   Mr. Kellner, conceded that the only burden here was cost and

23   administrative burden and that counting ballots in this case

24   would actually increase the integrity of the election contest.

25   That's transcript 126 through transcript 127.

1          On administrative costs, of course as your Honor held

2     and the Second Circuit affirmed in the *Yang* case, those are

3     costs that the Board took on when it decided to run a primary

4     election.  And beyond that, here some of those costs are

5     completely a self-inflicted wound.  We talked about how

6     Mr. Kellner testified there were other interpretations

7     available and then, also interestingly, he testified about how

8     he has previously, working at the City Board, employed what he

9     called informal measures to avoid what he thought were bad

10    results in the election.  That's going to be transcript pages

11    95 to 96.

12         So, to the interpretation -- I just want to stop at

13    interpretation of Section 8412 because your Honor said you are

14    going to be the one who interprets that so let's do that.  The

15    relevant text -- and I will note when there is an ellipsis that

16    I am using but I think I have gotten the relevant bits right,

17    the relevant bits of Section 8412 say, "the Court shall cause

18    all absentee ballots... showing a cancellation mark... with a

19    date which is ascertained to be not later than the day before

20    the election and received by such Board of Elections not later

21    than seven days following the day of the election to be cast

22    and counted."

23         So, I think there are two ways -- and Mr. Kellner and

24    my friend for the state board got into this a little bit but

25    there are two ways that I think this could be fairly

K7U5gal5                    Summations - Mx. Green

1    interpreted not to require the result here.  The first is based

2    on what we know about the postal service, the postmark of, say,

3    24 or 25, could easily be ascertained to be mailed "not later

4    than" the election day.  And in the second instance the command

5    in Section 8412 is only an affirmative "shall."  The State

6    Board shall cause these to be counted.  In an ordinary

7    statutory interpretation context I understand the Board does

8    not take this interpretation but certainly one could say, well,

9    okay, all that tells you is what the Board shall do and there

10   are other -- and I think we have talked about them in our

11   brief -- there are other parts of the election law that provide

12   certain requirements for the way that the State Board is

13   supposed to administer election law and among their

14   responsibilities is ensuring access to the franchise.  So,

15   certainly it would be fair interpretation to say we are not

16   going to choose to read a corresponding "shall not" into the

17   statute, particularly in a context where I think, as my friend

18   Mr. Conroy elicited powerfully, that, well, what's going on

19   really here is that there is a pandemic and let's be a little

20   understanding of everybody.  Right?  Let's be a little

21   understanding of the fact that the City Board faced

22   unprecedented challenges.  Let's be a little bit understanding

23   of the fact that the State Board has never faced anything like

24   this and is making novel decisions.  And it seems to me that

25   the problem with the testimony we have heard and the obligation

K7U5gal5                        Summations - Mx. Green

1    of the law being done is the only person not getting that kind

2    of consideration is the voter.

3            Beyond that, in terms of the public interest, I think

4    at the end of the day the point is that any burden here on the

5    state is largely self-inflicted and comes from their failure or

6    their decision to interpret the law a certain way but beyond

7    that is otherwise not the kind of thing that is weighable in

8    this context.  The Supreme Court, in 1963, made very clear,

9    "vindication of conceded constitutional rights cannot be made

10   dependent upon any theory that it is less expensive to deny

11   them and afford them."  That's *Watson v. City of Memphis*, 373

12   US 526 at 537.  There are other cases like, *Califano*, 430 U.S.

13   199, and *Wengler*, 446 U.S. 142, and most recently, although it

14   doesn't include the kind of direct pronouncement, Justice

15   Kennedy's opinion in *Brown v. Plata*, 563 US 493 in 2011, has

16   that kind of thinking pervading it that was a case about the

17   costs of providing livable conditions to inmates in California

18   and it was an Eighth Amendment case.

19           Beyond that, going to the likelihood of success on the

20   merits, I think your Honor put it best in the various questions

21   you have asked kind of asking the parable of the voter in the

22   Bronx.  Right?  This idea that we have a voter here and a voter

23   here and they both do the exact same thing.  Isn't it a

24   constitutional problem if they don't get the same results?  And

25   I think what the testimony has shown in this hearing is that

K7U5gal5                          Summations – Mx. Green

1    that's what happened here and, unfortunately, the state simply

2    has not responded to the *Bush v. Gore* argument at all and I

3    don't know what their response would be or could be because

4    what is happening here is that voters in Brooklyn, in addition

5    to some number of voters elsewhere that we don't know, are not

6    being treated the same as voters in Manhattan.  And that's a

7    real, real problem.

8           So, with that, the last thing I would like to say is

9    just when I was talking to Mr. Kellner before I reach the point

10   about remedies, the last thing on the merits I would like to

11   say is when I was talking to Mr. Kellner yesterday, there was a

12   point he was making about elections where results are

13   statistically determined.  I think Mr. Kellner, as your Honor

14   has said, is a brilliant legal mind but his view on this, which

15   I think we explored thoroughly in the *Yang* case, right, that

16   beauty contest elections don't need to be held, has been

17   rejected by both your Honor and the Second Circuit.  So, while

18   it was a colorable argument, maybe even a persuasive argument

19   to some, it is not an argument that the Second Circuit has

20   bought and the Second Circuit has rejected it.

21          So, beyond that, the real question to my mind

22   remaining is what is the remedy here.  And I think that that is

23   probably the hardest question in this case because, on one

24   hand, I think it seems to me that the testimony conceded that

25   the Court should order no postmarked ballots that were served

K7U5gal5                          Summations - Mx. Green

1    on June 24th to be counted.  There is no state interest in not

2    counting them and there is no risk of any unduly counted

3    ballot -- unduly-cast ballot being counted at all.  And, as

4    Mr. Kellner testified at transcript 162, there is always

5    something of a balancing act between what you may call the

6    curer and the disease here.

7           So, the real question, to me, is how many additional

8    days should we keep counting after June 24 received ballots?

9    In this regard, unlike on the probability of somebody winning

10   the election, I think the probability theory of election law --

11   and that's on transcript 131 -- is the right way to think about

12   it.  So, as the data admitted showed, there is a severe

13   reduction in the number of ballots arriving at the Board as

14   time goes on and I think that's strong evidence that few, if

15   any ballots, were mailed after election day.  So, the pattern

16   for postmarked ballots which we stipulated to in AD 50 was 253

17   late postmarks total; 151 of them on June 24th; 69 on June

18   25th; 22 on June 26th; and then only 11 on June 27th; and then

19   no more.  And it was a very similar curve on no postmark

20   ballots reducing.  If we were in person I probably would have

21   had a very pretty chart printed up showing those graphs or I

22   would have drawn it.  But, the point is that that pattern is

23   itself evidence that there is no fraud going on, that there is

24   no concern and there is no state interest in not counting these

25   votes.

K7U5gal5                         Summations - Mx. Green

1          So, I think the right way to think about this is at

2     the very least we should be thinking about a couple things and

3     in terms of the state interest then, right, if the state

4     interest is what Mr. Kellner asserted which is the

5     administrative burden and the risk -- not the certainty but the

6     risk -- of not counting votes I think the simple fact is

7     because the numbers cut off so sharply the burden for each

8     additional day essentially becomes zero.  And, similarly, the

9     risk I think also becomes close to zero that we are going to

10    count a ballot that was not actually placed in the mail on the

11    right day.

12          I know that in a series of League of Women Voters out

13    of this state various Courts have ordered remedies that include

14    a cure process, right, where you call the voter and you ask

15    them whether they're willing to testify as to what date they

16    mailed the ballot.  I don't think that we really need to do

17    that here but if that's kind of the direction your Honor is

18    going, think I we have talked about RNC before, I think you

19    would give us and the State and the City an opportunity to

20    respond to that request.

21          I think at a minimum we should be looking at ballots

22    through June 26 or June 27th but I don't think that there is

23    really any difference in those two remedies between the June

24    27th remedy and the June 30th remedy, as a practical matter.

25          Beyond that, I don't really have much to say.  I think

K7U5gal5                    Summation - Mr. Conroy

1    that this really is a severe burden case.  This is thousands of

2    votes that are being thrown out because of no fault of the

3    voter and, as your Honor explored thoroughly in your own

4    questioning, the state's arguments require treating voters

5    identically situated differently.  I think it really is, the

6    way they have argued this case, is the problem is that they're

7    only viewing the rules from the perspective of the Board and

8    ultimately I think the only correct perspective to look at the

9    rules of the game -- because, remember, if we are talking about

10   changing the rules we are talking about the effect on the

11   voters and, on that point to one of your Honor's questions, the

12   *Hunter* case out of the Sixth Circuit I think addresses exactly

13   the relief-type questions that your Honor had but, on that

14   question, I think we really should be thinking about what do

15   the voters understand the rules to be.  Here the voters

16   understood the rule to be, as the testimony showed, put your

17   ballot in the mailbox by the end of the day June 23rd and your

18   vote will be counted.  There is no harm and every benefit to

19   the Court ordering exactly that.

20            Thank you.

21            THE COURT:  Thank you.

22            Mr. Conroy?

23            MR. CONROY:  Thank you, your Honor.

24            So, as the Court knows, the burden on plaintiffs here

25   is to show a clear likelihood of success on the merits of their

K7U5gal5                     Summation - Mr. Conroy

1    constitutional claims so I would like to just start by

2    reviewing the legal and factual theory that forms the basis of

3    those claims in the complaint and motion for preliminary

4    injunction because, just now, we heard almost nothing about the

5    claims that form the basis of the complaint in this case.

6            So, the core complaint here is the voter plaintiffs

7    said that they believe that their absentee ballots were marked

8    invalid and should have instead been marked valid and the

9    candidates say there were absentee ballots in our races that

10   were marked invalid but should have been marked valid.  But,

11   plaintiffs chose not to sue the entity that is actually

12   canvassing the ballots and made the decision whether or not

13   their ballots are valid nor New York election law.  That's the

14   New York City Board.  Instead, they sued the State Board of

15   Elections and the state defendants and the basis of their

16   theory that the state defendants violated their constitutional

17   rights is that the state, through an executive order in

18   response to the COVID pandemic, took the step of providing

19   absentee voters with prepaid return envelopes.  And the reason

20   plaintiffs claimed that this step, which is seemingly

21   progressive was a constitutional violation, was because they

22   allege that the state defendants just failed to realize that

23   the USPS would not, as a matter of policy, apply postmarks to

24   absentee ballots in prepaid return envelopes.  So, they call it

25   the election law SNAFU in their complaint.

K7U5gal5                       Summation - Mr. Conroy

1              So, the theory basically was that the state defendants

2       set a trap, basically, for voters.  They set them up for

3       failure because none of these postage prepaid absentee ballots

4       were going to receive postmarks unless the voters somehow knew

5       to make a special request to USPS to apply for a postmark

6       outside of regular USPS policy.  And so, they claimed the

7       result of this massive error was that over 120,000 voters

8       statewide had their ballots marked invalid.  And, again, the

9       theory was because the state defendants had created this

10      problem by switching to prepaid postage envelopes.  It was that

11      affirmative state action that violated plaintiffs'

12      constitutional rights.

13              So the evidence that has come in during this hearing

14      shows that no part of that theory is true.  So, let's start

15      with the evidence of the state's actions.

16              In response to the COVID pandemic and an urgent need

17      to expand access to absentee voting, the governor issued an

18      executive order providing that absentee voters would receive

19      postage paid return envelopes in part so that they wouldn't

20      have to go to the post office on their own during a pandemic to

21      buy stamps.  And that's in the Brehm declaration -- the first

22      Brehm declaration, paragraph 10, and the transcript of the

23      Kellner testimony at page 111:5.

24              So, contrary to plaintiff's allegation that the state

25      defendants were ignorant of USPS postmarking regulations when

K7U5gal5                    Summation - Mr. Conroy

1    they implemented this change it turns out, as the evidence

2    showed, that the state Board of Elections and the local boards

3    had many, many discussions with USPS specifically about how to

4    implement the change in a way that would ensure that ballot

5    envelopes would receive postmarks pursuant to USPS policy.

6    That's in the Brehm supplemental declaration, paragraphs 11

7    through 17, and the exhibits referenced in those paragraphs.

8         As to that USPS policy, it turns out that it is not

9    true that USPS only applies postmarks to envelopes that contain

10   a physical stamp.  On the contrary, USPS applies postmarks to

11   all valid mail and the Board confirmed with USPS that the

12   envelopes used by local boards of election met the postal

13   service's requirements for postmarking.  That's in the Brehm

14   declaration -- the first Brehm declaration, paragraphs 16

15   through 19, and in State Defendant's Exhibit C.

16        Moreover, as Commissioner Kellner testified, USPS

17   expressly pitches these services to state election officials

18   around the country where they confirmed that the postmarking

19   system provides a way for states to use the postmark in a way

20   consistent with all of the other states including New York that

21   rely on a postmark to show the date when an absentee ballot was

22   cast.  That's in Commissioner Kellner's testimony at page 83,

23   line 22.

24        Finally, the evidence is that while there is some

25   chance of error at USPS that can lead to a small percentage of

K7U5gal5                    Summation - Mr. Conroy

1    postage paid ballot mail inadvertently not getting a postmark,

2    there is likewise a chance of error at USPS that may lead to a

3    small percentage of stamped ballot mail also inadvertently not

4    getting a postmark.  That's in the supplemental Brehm

5    declaration at paragraph 6 and in Commissioner Kellner's

6    testimony at page 110,:5.

7         So, there is no evidence -- there is no evidence -- of

8    the so-called election law SNAFU allegedly caused by the state

9    defendants and it is worth, I think, looking at how that

10   evidence applies specifically to each of three constitutional

11   claims expressed in their complaint.

12        First, the First Amendment claim was that "as applied,

13   the postmark requirement, in conjunction with New York

14   executive order 202.26 -- that's the prepaid postage rule --

15   unduly burdened the right to vote."  That's in their complaint

16   at paragraph 91.  So, the first amendment theory here is that,

17   by enacting that executive order, the state defendant

18   accidentally imposed a severe burden on voters that basically

19   they didn't realize it and they meant to do the right thing but

20   they set voters up for failure by providing the envelopes that

21   USPS was never going to postmark.  So, that state action, they

22   said, failed the Anderson verdict test.  Again, the evidence

23   shows that is simply wrong.

24        Second, their equal protection claim was that when the

25   state defendants changed the order to prepaid envelopes, it

K7U5gal5                          Summation - Mr. Conroy

1    forced the postal service into a sudden change in policy that

2    caused or had the results of an unequal application of

3    postmarks throughout the state.  And this is what they say in

4    their preliminary injunction motion at page 3.  *USPS failed to*

5    *change its decades old practice of not stamping prepaid*

6    *envelopes at the State Board's request during a pandemic.*  And

7    this is what they claim led to unequal results.  Again, the

8    evidence clearly shows none of that is true.  USPS has had a

9    policy that's been in effect, the witnesses said, for at least

10   years, that it applies postmarks to ballot mail that meets

11   their guidelines.  And USPS is certainly not an agent of New

12   York State, it adopted its own postmark policies well before

13   this executive order.  None of this had anything to do with

14   this executive order this spring.  So, there is no evidence

15   that any action by the state defendants caused unequal

16   treatment of any voters.

17           Their third and final theory is their due process

18   claim and their theory is that a voter's ballot that is

19   invalidated because of errors resulting from his reasonable

20   reliance on the State Board's guidance, which they claim was

21   erroneous, may state a due process claim.

22           So, again, what plaintiff's theory here was, was that

23   the state actively misled voters, basically, by providing them

24   with prepaid postage envelopes failing to realize that their

25   envelopes were never going to be postmarked by the USPS.

K7U5gal5                    Summation - Mr. Conroy

1    Again, the evidence shows that that's incorrect.

2              THE COURT:  Mr. Conroy, don't you think that the

3    plaintiffs are also accusing the State of not thinking it

4    through and it is general ineptitude?

5              MR. CONROY:  It may well be that the plaintiffs want

6    to claim that but the specific way in which they're suggesting

7    here that the specific State action that they claim violated

8    their constitutional rights was this executive order and I

9    guess the general ineptitude is the claim that no one realized

10   what USPS's postmarking policies were.  Otherwise, I don't -- I

11   have not heard any evidence during the last two days of any

12   ineptitude on the part of the State Board or the state

13   defendants.

14             We heard, certainly, evidence of a complicated system

15   at USPS where it may not be that 100 percent of pieces of mail

16   is always error free, especially when we are talking

17   about millions of pieces of mail a day, but I haven't heard any

18   evidence of any ineptitude by any state official during this

19   hearing.  But I think, and to your Honor's point, I think it is

20   worth talking about something beyond sort of how plaintiffs

21   brought this allegation in their complaint.

22             I think I would also like to turn to the legal theory

23   that was sort of expressed in your Honor's hypothetical during

24   Commissioner Kellner's testimony.  Again, the hypothetical is

25   you have two absentee voters, one is from the Bronx, one is

K7U5gal5                         Summation - Mr. Conroy

1      from Staten Island.  Each one does everything right; they put

2      their ballots in the mailbox on election day, one of them has

3      theirs invalidated because it arrives at City Board after

4      election day and it turns out that USPS inadvertently failed to

5      apply a postmark.

6              So, under that theory there is no intentional State

7      action that caused the voter to have their vote invalidated but

8      the question is should New York's postmark requirement in the

9      election law, should that statute itself be set aside where it

10     is invalidated because of an error by USPS.  The plaintiffs

11     cannot prevail based on that hypothetical for three reasons.

12     The first is that is just not the case that plaintiffs brought

13     to this court.  Their claim is about the Executive Order 202.26

14     and to the extent they've identified irregularities with USPS

15     processing of some absentee ballot envelopes, that has nothing

16     to do with the Executive Order that they claim violated their

17     voting rights, and that's specially where the executive order

18     in question, on its face, increased access to absentee

19     balloting.

20             Second, given the chance at this hearing, we didn't

21     hear from any plaintiff who presented evidence that they are

22     that Staten Island voter in the hypothetical.  We didn't hear

23     from any plaintiff who testified that they put their ballot in

24     the mail on or before election day and that it was declared

25     invalid.  We heard from Ms. Gallagher, who is one of the

K7U5gal5                         Summation - Mr. Conroy

1    candidate plaintiffs, but she hasn't alleged any injury at all.

2    She stated that her own vote was not affected because she voted

3    in person, that was in her testimony at page 18:1; and her

4    candidacy suffered no injury because she won her election, and

5    that's on page 13, line 2.  And there is no evidence that any

6    other plaintiff candidate's race is in dispute or, indeed, any

7    other candidate's race anywhere in New York State.

8           So, the plaintiffs have just not presented the

9    evidence that would tee up the Court's hypothetical for a

10   ruling here.  And third, the legal theory that this

11   hypothetical states just does not state a constitutional claim

12   against the state defendants.

13          So, again I just briefly want to run through what are

14   the possibilities here.  Is there a First Amendment claim?

15   There is not because New York's postmark statute is not a

16   severe burden under the Anderson verdict test and on this point

17   I think it is helpful to recall where the postmark requirement

18   comes from.

19          So, as Commissioner Kellner testified, the majority of

20   states in the country have the rule that absentee ballots must

21   be received by their own boards of elections on or before

22   election day in order to be counted.  Commissioner Kellner

23   testified about that at page 93, line 18, and he testified at

24   that same place that New York was either the first or one of

25   the very first states to expand absentee voting by accepting

K7U5gal5                    Summation - Mr. Conroy

1   ballots received within seven days of election day.  But that

2   expansion of access to absentee balloting came with a

3   condition.  The very reasonable condition that it came with was

4   that Boards of Election must have some objective indication

5   when they receive a ballot after election day that the ballot

6   was actually cast on or before election day.

7            And so, it is not a severe burden for New York, like

8   many other states that are also in the wake of New York's

9   expansion on this issue, also gave voters the chance to avail

10  themselves of that extra seven days of mailing but said if you

11  do that, you have to be sure that it gets postmarked on or

12  before election day so we know that you cast your vote on time.

13  Again, and this is just to the important state purpose that

14  it's a universal rule of elections that votes must be cast on

15  or before election day.  There has to be a deadline -- the

16  polls close and then the votes can be tallied.  Of course, any

17  voter who waits until election day and has a concern about

18  whether the postmark will be applied by USPS has other options.

19  They can hand deliver their ballot to the Board of Elections,

20  they can always vote in person, or they can, as long as they

21  get their ballot in time, send it back early enough that it

22  doesn't have this issue of whether it is so close to the

23  deadline.  And I think it is worth noting, as we are talking

24  about how New York has progressed on these issues and what

25  other states have done, that no state that we are aware of has

K7U5gal5                    Summation - Mr. Conroy

1    the rule that plaintiff suggests is constitutionally mandated

2    here which is that states must count or must consider absentee

3    ballots to be valid as long as they get to the board of

4    elections within seven days of election day whether or not

5    there is a postmark.  No state has that rule.  And so, it is a

6    stretch, to say the least, to claim that it is constitutionally

7    mandated that New York State must have that rule, not to

8    mention the fact that it is very similar to the injunction that

9    the Supreme Court discussed in the recent RNC case.

10          So, those are the hypotheticals stated in the equal

11   protection claim.  It does not -- because there is no

12   allegation that the state has treated anyone unequally.  On the

13   contrary, the rule in the election law is simple and uniformly

14   applied throughout the state.  Ballots that arrive after

15   election day without a postmark are not valid.  We are talking

16   about a potential postmarking error by a third-party non-state

17   actor, and that error cannot create an equal protection

18   violation under those circumstances.

19          THE COURT:  But didn't Commissioner Kellner say that

20   he fully expected the postal service to underperform?

21          MR. CONROY:  So, it's clear that Commissioner Kellner

22   has had many frustrations with USPS over the years.  That's

23   true.  But I think the response to that is that it cannot be a

24   constitutional violation for a state to rely on the USPS as

25   part of its absentee ballot or vote-by-mail system because

1    every state does so and there is -- we have talked here and

2    there over the last couple days about --

3          THE COURT:  Let me put it to you again.  Do you know

4    about the concept of willful blindness?

5          MR. CONROY:  I do, your Honor, and --

6          THE COURT:  Isn't there an argument to be made that

7    both the State and the City were willfully blind to the

8    shortcomings of the postal service?

9          MR. CONROY:  Your Honor, I don't think there is.  I

10   think Commissioner Kellner certainly demonstrated he is not

11   willfully blind to shortcomings by USPS.  But there is two

12   questions, that's the point I was making.  There needs to be an

13   affirmative state act here and there is just not.  And, second,

14   that in order for this reliance on the U.S. Postal Service to

15   be constitutionally impermissible there must at least be some

16   alternative that the state can consider feasibly to craft a

17   system that's better than the one we are discussing here.  And

18   I think it came through, to me at least today in the testimony,

19   this is extremely complicated.  We are talking about millions

20   of pieces of mail even above and beyond just the ballots that

21   move through the mail during election season.

22          So, what are the alternatives that we discussed?

23   Could the state pay for every voter to get Express Mail service

24   at 300 times the cost of First Class Mail?  That cannot be

25   constitutionally required.  Or, Commissioner Kellner talked

K7U5gal5                         Summation - Mr. Conroy

1    about a hypothetical of almost a state-run courier service

2    where you would hire couriers.  That cannot be constitutionally

3    required.  Dropboxes, some states use dropboxes as part of

4    their absentee ballot system that even those systems rely, in

5    some way, on U.S. Postal Service because the ballots have to

6    get from those boards of elections to the voters -- and I

7    apologize, I don't have the cite here because I am going off of

8    my memory rather than my notes -- but Commissioner Kellner

9    testified that in states that had these dropboxes, they are not

10   as numerously located as USPS dropboxes so you would have a

11   situation where, you know, is it better or worse?  At the very

12   least USPS dropboxes are located everywhere throughout the city

13   so that makes it easier for voters in some way.  Would it be

14   better to have a marginally more reliable dropbox run by the

15   local Board of Elections but they're available in only a fifth

16   of the locations or something less than that?

17           So, these are difficult policy questions about what

18   are the options to run an election that relies heavily on

19   absentee ballots or mail-in ballots.  But, when you get into

20   the weeds on this you, I think, have to come to the conclusion

21   that it cannot be constitutionally impermissible for the state

22   to rely on our, the federal postal service, as imperfect as it

23   may be.

24           THE COURT:  So you agree that the governor, he altered

25   the date by which votes needed to be postmarked.  Isn't that

1    so?

2          MR. CONROY:  That's correct.  That is one of the

3    executive orders that gave voters an extra day to obtain the

4    postmark.

5          THE COURT:  So what's the burden on the state counting

6    votes that were received on the 24th but not postmarked?

7          MR. CONROY:  So, the burden on the state is -- so, and

8    I think Commissioner Kellner really spoke to this where he said

9    in his view -- I mean, he was clear that he agrees with that

10   rule.  He thinks that prospectively that's a good way to do it

11   and he talked about -- and let me get the cite is -- I am going

12   to go out of order a little bit so I apologize for this -- he

13   talked about how the legislature has already addressed this

14   issue -- this is in Commissioner Kellner's testimony at page

15   114, line 7, the legislature is addressing this issue

16   prospectively to permitting counting of absentee ballots that

17   arrive the day after election day.

18         THE COURT:  Isn't it the truth that they're doing that

19   because they know how long it takes mail to get to the Board of

20   Elections?  They know that the mail needs to be mailed a couple

21   of days before in order to get that postmark and delivery time.

22   Right?  Don't they know that?  Because Commissioner Kellner has

23   been at this for nearly half a century.

24         MR. CONROY:  That is certainly the policy decision

25   behind that question.  There is no question.  There is no

K7U5gal5                    Summation - Mr. Conroy

1    question that that's --

2            THE COURT:  If that's the policy decision behind the

3    change then why shouldn't we be applying that same reasoning to

4    this election?

5            MR. CONROY:  Two points.  One, although it may or may

6    not be a good policy decision to make that change it is not

7    constitutionally impermissible to apply a clear postmarking

8    rule that says -- I mean, the language of the statute doesn't

9    say as long as you put your ballot in a dropbox by election day

10   that it will count.  It is very clear and the ballot envelope

11   says this, as we reviewed with Commissioner Kellner looking at

12   Plaintiff's Exhibit no. 1, the ballot expressly says to voters

13   that there can be no contusion that you must get a postmark on

14   or before election day.

15           THE COURT:  And this not a problem, even though we

16   know thousands of ballots arrived without the postmark.

17           MR. CONROY:  I would distinguish between what is a

18   problem and what is something that the State Board and Local

19   Board take seriously as something to address going forward, and

20   certainly the legislature, in what is a constitutionally

21   impermissible statute.

22           THE COURT:  It's bad but not that bad.

23           MR. CONROY:  Well, your Honor, so, let me loop back to

24   make a point that I was going to make.  I think it was going to

25   match up.

K7U5gal5                    Summation - Mr. Conroy

1            So, the Second Circuit in the *Shannon* case, and we

2    cite this at page 18 of our opposition brief, so there the

3    Second Circuit held that where a plaintiff brings a federal

4    claim regarding an issue in the administration of an election

5    and the issue there was a broken ballot machine, the Court

6    should look at the allegations and decide whether it is, number

7    one, purposeful state conduct directed at disenfranchising a

8    class or group of citizens; or is it, number two, an election

9    irregularity that does not rise to the level of a federal due

10   process claim because there has been no allegation of

11   intentional state conduct.

12           That distinction is so important here because you are

13   right, there is a problem when any number of absentee ballots

14   is invalidated because of a missing postmark, just as in

15   *Shannon* there was a problem when ballots weren't counted

16   because of a broken ballot machine.  But the Second Circuit

17   clearly limited the scope of federal review on a constitutional

18   claim to issues where there was an allegation of intentional

19   state conduct that actively deprived voters of the right to

20   vote and the Second Circuit stated that "negligent disruption

21   of a local election is the exclusive cognizance of the state

22   courts."  And just a point on that, that the plaintiff

23   candidates have actually availed themselves of that option by

24   bringing actions in state court.

25           So, I think that that distinction, and I don't think

K7U5gal5                     Summation - Mr. Conroy

1    that the State Board would ever say that it is not a problem

2    but that's a different question than is the postmarking

3    requirement that came about as part of an expansion of absentee

4    balloting, is that unconstitutional.  And that ruling would

5    have the perverse incentive somehow of is it the case that

6    states that don't permit any ballots to arrive after election

7    day, that that's constitutionally permissible but because New

8    York allowed an extension of that time, along with the

9    requirement of a postmark, that the constitution forbids that

10   second rule?  And just to sort of close on this point regarding

11   the hypothetical, I think it is not an accident that the

12   plaintiffs drafted their complaint in the way that they did to

13   try to pin the postmark issue on the state defendants alleged

14   SNAFU rather than on USPS for actually committing the error

15   that led to missing postmarks.  And, it was drafted to have

16   that hook of state action that's missing from the discussion

17   that we are having now.

18        So, a few other points.  I sort of agree that I don't

19   know if there is tremendous dispute about what the evidence

20   shows about the numbers we are talking about.  So, in the

21   motion papers and in the complaint the plaintiffs alleged that

22   they believed it was well over a hundred thousand ballots that

23   were invalidated.  The evidence that has come in shows that

24   it's a much, much smaller universe.  Again, we are starting

25   with a universe of well over a million absentee ballots

K7U5gal5                          Summation - Mr. Conroy

1    statewide during the June 2020 primary and that was in the

2    first Brehm declaration at paragraph 9.  And, in terms of

3    non-postmarked ballots Mr. Haxby testified that he had

4    identified 934 such ballots in Assembly District 50 that lacked

5    a postmark but were otherwise valid and that's in Mr. Haxby's

6    testimony at page 69, line 8.  He also testified that he found

7    337 ballots rejected for no postmark in AD 52 and 104 ballots

8    in AD 57.  That's in Haxby direct, page 47, line 25.  So, his

9    total is about 1375 ballots having had this issue in Brooklyn.

10        We heard from Ms. Sandow from the City Board that she

11   knew of about 2,000 ballots that were affected that arrived the

12   day after election day and that's in her testimony at page 187,

13   line 1.  And, to compare upstate numbers, the State Board,

14   through Mr. Brehm's supplemental declaration at paragraph 5,

15   put in evidence that among the upstate local boards that

16   reported their data to the State Board, a very, very small

17   percentage, about 300 total ballots -- well under 1 percent of

18   the total ballots upstate -- were affected.

19        So, again, it is not to minimize that there could be a

20   problem that's worth taking very seriously by the State Board,

21   by the local boards and by the legislature that these numbers,

22   out of well over a million absentee ballots cast, are well

23   within the range of the type of unfortunate, clearly

24   unfortunate but election irregularities that the Second Circuit

25   described in *Shannon* that do not amount to constitutional

K7U5gal5                    Summation - Mr. Conroy

1    violations.

2              On the point about late postmarks.  So, again, that's

3    just not the case that plaintiffs brought.  There is no

4    allegation -- I mean, at least in the complaint they try to

5    link the missing postmarks to state action but there is no

6    allegation whatsoever that any state official had anything to

7    do with USPS applying a postmark on a day after it was actually

8    received by USPS.

9              In terms of the scope of the injunction requested by

10   plaintiffs, the injunction they're seeking is extraordinarily

11   broad and it is far out of proportion to the evidence they have

12   presented.  So, we would request that if the Court is inclined

13   to grant some injunction in this case, that it be at least

14   limited in scope in at least a couple ways.  First, by at most

15   limiting it to, as your Honor identified, the issues with the

16   day after election day -- that's June 24th -- and not going so

17   far out as to capture those further days where there is a much

18   more serious question about when the ballot was cast.  And,

19   second, by limiting the relief to at most the Districts in the

20   plaintiffs' races given that they have identified no evidence

21   whatsoever of issues occurring elsewhere in New York City and

22   certainly not elsewhere in the state.

23             (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K7UQgal6                        Summation - Mr. Conroy

1          THE COURT:  Don't we have the testimony of the postal

2     workers who have said that in other boroughs the board of

3     elections indicated that non-postmarked ballots were received?

4          MR. CONROY:  That's right, your Honor, in very small

5     numbers.  I think Mr. Tanko said that he knew about 40 total

6     out of 135,476 in his district.

7          THE COURT:  So you're suggesting that I would have the

8     authority to grant relief with respect to these particular

9     elections, but I don't have the authority to grant it

10    statewide?

11         MR. CONROY:  Well, I guess my argument is there's

12    certainly no evidence of any issue outside of the locations

13    that we heard testimony about, and to the extent -- I mean, I

14    think it's clear when you look at the numbers.  The number is

15    marginally higher in Brooklyn than elsewhere in the city, and

16    certainly than elsewhere in the state.

17         So, it would certainly be appropriate based on the

18    evidence here to cabin any injunction to focus on at least the

19    districts where any type of a problem of some significance was

20    identified.

21         THE COURT:  Don't you think that it's improper for me

22    to treat the other voters of the state who are in the same

23    predicament, to treat them differently?

24         MR. CONROY:  Well, we just have no evidence of those

25    orders.  We have no evidence.

K7UQgal6                    Summation - Mr. Conroy

1          THE COURT:  You're saying a little evidence though.

2     There's some evidence.

3          MR. CONROY:  We have evidence that is just well within

4     the range of the type of irregularity that the Second Circuit

5     has said is not a constitutional violation, and so it would

6     certainly be appropriate, I think, for the Court to cabin its

7     relief to the plaintiffs, the plaintiffs' races, and, you know,

8     sort of on a final point, another consideration is what is in

9     the public interest here.  And I can't articulate this point

10    better than Commissioner Kellner did.  And, again, he was very

11    candid as a policy matter, as a prospective rule going forward

12    that he is in favor of a system like the one that the

13    legislature recently adopted, but he provided strong and

14    unrebutted testimony that reopening the canvass for the June

15    primary at this point in the process and particularly doing it

16    across the state would impose an incredible burden on election

17    officials to go back and recanvass ballots.  I mean, Upstate

18    that these canvasses have been closed.  We've talked, you know,

19    about the city deadline coming up, and certainly it's coming up

20    very soon, but the Upstate counties have completed this

21    process.

22         THE COURT:  You talk about the city deadline.  There's

23    no statute that requires the certification by August 4,

24    correct?

25         MR. CONROY:  I think that's right other than the state

K7UQgal6                    Summation - Mr. Conroy

1    board's position is that the deadline in the statute has

2    passed, and sort of as a technical matter, we're already beyond

3    that statutory period.  There are certainly practical

4    considerations about all of the compounding effects going

5    forward about what would happen if even just the city board of

6    elections itself had to do this process.  But Upstate they're

7    done.  They've finished their canvasses.

8             THE COURT:  Let me ask you a question.  If I were to

9    give all or part of the relief that the plaintiffs are seeking,

10   does it make any difference if I do it before the city

11   certifies or after?

12            MR. CONROY:  I think as a practical difference, I

13   think everyone would prefer that we know sooner rather than

14   later.  I think that is the primary answer.

15            I think that Commissioner Kellner's testimony was that

16   technically can this process happen?  Can the canvasses reopen?

17   I think he said yes, but that's -- he testified about what that

18   would mean.  And just to note, this is at page 114, line 21.

19   He testified that it would take literally tens of thousands of

20   person hours at a time when local boards around the state are

21   turning their attention to the November general election.  And

22   that election, by the way, is also likely to heavily rely on

23   absentee balloting.  And these boards of election around the

24   state are working on tackling the logistical problems that

25   we've been talking about and that the commissioner identified.

K7UQgal6                          Summation - Mr. Conroy

1    And it would be a detriment to that process of preparing for

2    the general election to force them to redirect those tens of

3    thousands of person hours to looking backward at the June

4    primary.

5              And a further point the commissioner made is that, you

6    know, even if there could be some public interest argument in

7    favor of that course, if we knew about any race, any of the

8    plaintiff's race or even any other race in the state where the

9    result was in doubt and this decision to reopen the canvass

10   would change any of the results, but there is no evidence that

11   there is any such race anywhere in the state that would change

12   as the result of the request of injunction.  So all of that

13   time being redirected away from preparations for the November

14   general election would be spent with no chance of any result

15   changing.

16             So, just finally, you know, their request for

17   injunction seeks to extend the last election's canvass because

18   of alleged irregularities by U.S.P.S. that affected a small

19   percentage of ballots, which had no effect on the outcome of

20   any race.  But granting the request would have the perverse

21   effect of increasing the chances of further errors and

22   irregularities in the November general election and forcing

23   local boards to turn their attention back to the June primary

24   when they're trying to look forward to the general election,

25   which is now less than a hundred days away.  So we would

K7UQgal6

1   respectfully ask the Court not to issue an order that would

2   have that unfortunate result.

3          And unless the Court has further questions, which I

4   would be happy to address, that's all I have.

5          THE COURT:  Thank you.

6          MR. CONROY:  Thank you.

7          THE COURT:  Mr. Kitzinger.

8          MR. KITZINGER:  Your Honor, can I have two minutes

9   before I start?

10          THE COURT:  Yes.

11          MR. KITZINGER:  Thank you very much.

12          MX. GREEN:  Your Honor, if I may jump in, we don't

13   have any claims against the state board, and Mr. Schwartz

14   hasn't necessarily closed --

15          THE COURT:  You mean the city.  You don't have claims

16   against the city.

17          MX. GREEN:  I'm so sorry.  It's been a long week.

18   Yes, we don't have any claims against the city.  I don't know

19   what the city board would respond to that's been said.  I think

20   the city board's response would need to only respond to the

21   intervenors, right?

22          THE COURT:  Yes.

23          MR. KITZINGER:  Your Honor, the city board would like

24   an opportunity to respond to the plaintiffs' claims because it

25   would have a direct impact upon the city board.

K7UQgal6                    Summation - Mr. Kitzinger

1              THE COURT:  So I want to hear the city's response, so

2        I'm going to permit them to respond.

3              MX. GREEN:  Fair enough, your Honor.

4              THE COURT:  Let us know when you're ready, Mr.

5        Kitzinger.

6              MR. SCHWARTZ:  Your Honor, could I just note?  Arthur

7        Schwartz.  I'm back.  I came back from arbitration.  And our

8        complaint actually adopted the allegations of the plaintiffs'

9        complaint and asserted them against the city.  So to that

10       extent, the same issues were raised vis-a-vis the city, so I'm

11       going to disagree with Mx. Green.

12             MX. GREEN:  Just while we're waiting, obviously to the

13       extent intervenors adopt our arguments, I think Mr. Schwartz

14       and I don't actually disagree then.

15             MR. KITZINGER:  I'm back, your Honor.

16             THE COURT:  Please go ahead.

17             MR. KITZINGER:  Thank you very much, your Honor.

18             Initially I'd like to address the issue of standing.

19             Under *Lujan v. Defenders of Wildlife*, to have

20       standing, plaintiffs must show that they've suffered an injury

21       in fact, there's a causal connection between the injury and the

22       conduct of which the plaintiff complains, and it must be likely

23       as opposed as to merely speculative that the injury will be

24       redressed by a favorable decision.

25             Now, starting with the plaintiff intervenors, Kaufer

K7UQgal6                    Summation - Mr. Kitzinger

1    and Felder.  Kaufer -- sorry -- Felder has clearly not suffered

2    an injury because he has won his election or he will have been

3    declared the winner upon certification.

4            Moreover, the undisputed evidence as set forth in the

5    declaration of Bart Haggerty in response to the preliminary

6    injunction motion is that there is absolute zero ballots

7    lacking postmarks from part A of the 28th Assembly District.

8            MX. GREEN:  Objection.  That's not in evidence.

9            THE COURT:  I'm sorry.  I was distracted for a moment.

10   What are you saying was not in evidence?

11           MX. GREEN:  That there was no evidence introduced one

12   way or another on what votes are in or what -- I'm sorry --

13   what the postmark status is of any particular district that

14   ends up getting excluded.

15           MR. KITZINGER:  Your Honor, in response to the written

16   motion, last week at your Honor's direction the board submitted

17   a memo of law and a declaration of Bart Haggerty in opposition,

18   and that declaration stated there were zero ballots that were

19   determined to be invalid in Part A of the 20th Assembly

20   District, which were determined to be invalid solely for a lack

21   of a postmark.

22           THE COURT:  OK.

23           MR. KITZINGER:  And, therefore, they had no claim in

24   connection with that.

25           Moreover, they failed to introduce any evidence

K7UQgal6                    Summation - Mr. Kitzinger

1    whatsoever.  Neither Kaufer nor Felder offered a single piece

2    of evidence in connection with their claims to show that they

3    suffered an injury in fact due to the existence of ballots

4    either bearing late postmarks or lacking postmarks or whether

5    or not such postmarks would alter the outcome which would cause

6    the injury.

7           Contrary to what Ms. Gallagher stated, a psychic or

8    speculative injury or harm does not give rise to standing

9    because there is no injury in fact.  She speculates that she

10   might increase the margin of victory over Joseph Lentol in an

11   election by maybe a couple hundred votes if all of those

12   ballots are opened.  It doesn't change the outcome.

13          Likewise, there is no evidence in the record that

14   candidate Patel, who also offered zero testimony with regard to

15   his election, an election which he has conceded at this point,

16   identifying that there aren't enough unopened ballots to alter

17   the outcome, he has no standing because even if your Honor

18   ordered the ballots to be opened, he would still lose.

19   Therefore, he lacks standing to assert a claim regarding this

20   election.

21          Moreover, they can't meet the second part of the test,

22   and that is the causal connection between the injury and

23   conduct of which the plaintiff complains.  The plaintiffs and

24   the plaintiff intervenors, as Mr. Conroy pointed out in a

25   complaint and complaint in intervention, talk about the

K7UQgal6                    Summation - Mr. Kitzinger

1    election to use business reply mail instead of requiring voters

2    if they chose -- that is, if they chose to return their

3    absentee ballots utilizing the postal service, to affix postage

4    to the envelopes.  They were not required to vote by mail.

5    They had the ability, and it's in the record, and it's in the

6    election law to either return the absentee ballot to a board of

7    elections' office in the City of New York, a poll site within

8    the City of New York, either an Election Day poll site or early

9    voting day poll site.  So they had ten different days on which

10   they personally could have physically delivered the ballot or

11   had the ballot vote returned by someone else.  They elected not

12   do so.  The voters elected to utilize the postage paid return

13   envelope.  The voters elected to rely on the postal service.

14   That is where the injury, if there were any to the individual

15   voters whose ballots were invalidated, would arise.  It was

16   based on their conduct, their election as to how to return the

17   ballot.

18          There is no claim in the complaint or the complaint in

19   intervention regarding the alleged late delivery of absentee

20   ballots.  And, in fact, none of the plaintiffs complain they

21   got their ballots too late to return them.  In fact, the only

22   evidence concerning the timing of the distribution of absentee

23   ballots is that the postal service received the last batch of

24   ballots on the day prior to election.  The Election Law Section

25   8400 makes clear that absentee ballots may be requested by mail

K7UQgal6                    Summation - Mr. Kitzinger

1    postmarked by –– postmarked mail –– mail postmarked seven days

2    prior to the election.  That would be the 16th of June this

3    year.  Uncontroverted testimony is that mail would be delivered

4    two to four days thereafter depending upon where it was coming

5    from.

6              So, for example, if a voter, a registered voter from

7    New York City mailed an absentee ballot application from

8    Florida and had it postmarked on the 16th, that would be valid.

9    It might not arrive at the board of elections until the 20th.

10   At that point it has to be opened, processed to determine

11   whether or not that individual voter qualified for a ballot,

12   and then the ballot would have to be produced and mailed.  And

13   uncontroverted testimony is that all ballots were distributed

14   no later than the 22nd and delivered within the City of New

15   York by the 23rd.

16             The uncontroverted testimony with regard to that was,

17   first, that it was the postal service took it upon themselves

18   to expedite that delivery because they knew and were aware of

19   the board of elections' expectations.  The board had made it

20   clear that this material needed to (A) get out quickly, and (B)

21   return with postmarks.  Plaintiffs make no claims and no

22   plaintiff even submitted proof that they submitted an absentee

23   ballot other than plaintiff Stabile.  And Stabile's absentee

24   ballot envelope as admitted only indicates that it was

25   postmarked after the date of election.  There is no evidence in

K7UQgal6                    Summation - Mr. Kitzinger

1    the record as to when it was received, how it was received,

2    when it was applied for, or anything -- or when it was mailed.

3    There is a complete and total lack of standing on all

4    plaintiffs and plaintiff intervenors in this case because they

5    cannot show any injury.  They have not shown any injury, and

6    they cannot show any causal connection because even had

7    Ms. Stabile received her absentee ballot on the 23rd, it could

8    have been delivered to one of approximately 1200 poll sites in

9    the City of New York on that day.  She also had the option to

10   vote in person on that day or to have someone else deliver it

11   to a board of elections' office or a poll site on that day.

12         And with regard to the causal connection with regard

13   to their claim that the use of the business reply mail caused

14   the ballot envelopes not to be postmarked, it is completely and

15   totally contradicted by all of the competent evidence in the

16   record.  At page 172, Mr. Brehm testified that pursuant to

17   postal service standards, election mail was to be postmarked.

18   Mr. Calabrese testified election mail was supposed to be

19   postmarked.  And testimony from Mr. Brehm and from Ms.

20   Kontzamanis, page 179 to 180, talked about how all ballot

21   envelopes met U.S.P.S. mail piece design analyst standards

22   approved by an analyst for election mail; that is, business

23   return mail that would be postmarked.

24         Moreover, as Ms. Sandow testified, page 182 to 184,

25   the city board of elections has repeated communications with

K7UQgal6                    Summation - Mr. Kitzinger

1    the postal service concerning the need to have all ballots

2    envelopes postmarked and received assurances that they would

3    be.  Mr. Tanko also testified to that effect as well, and the

4    term he used was the board of elections of the City of New York

5    was *adamant* that all ballot envelopes be postmarked.

6    Mr. Calabrese testified unequivocally that in the absence of

7    some error by the post office, whether it does not follow the

8    ordinary proper path of travel for first-class mail or if an

9    envelope happens to be dropped in I believe his description was

10   *slipped through the cracks*, it would be postmarked on the day

11   it was collected.  And that was uncontroverted.  Mr. Tanko's

12   testimony was prefaced by the fact that he is not an operations

13   person and couldn't be sure of the standards, and that is why

14   your Honor directed the postal service to produce an operations

15   witness as pursuant to what the subpoena called for.

16          Now, in addition to the lack of any standing, Kaufer

17   and Felder failed to name their adversaries in this election;

18   they failed to name the necessary parties.  Now, that is the

19   only claim with regard to necessary parties that the board of

20   elections -- Kaufer and Felder's adversaries, Cohen and

21   Koslowitz, would be directly impacted by a change to the

22   process.  While it's true that Cohen's impact could be

23   positive, he may have moved on.  We don't know.  His interests

24   have not been represented here because the plaintiff

25   intervenors elected not to sue him and name him as a defendant

1   as they would have had to do, and as plaintiffs Patel and

2   Gallagher did in state court, as Kaufer and Felder should have

3   done here, and had they gone to state court, they would have

4   had to do.

5          Now, let's turn to a lack of evidence.  Felder and

6   Kaufer offered none, zero.  There is no evidence by the voter

7   plaintiffs that any ballots were ever actually received by the

8   board of elections from them other than Stabile.  They only

9   claim that they mailed them.  They don't identify the postmark

10  dates.  They don't identify whether or not they were received

11  or validated.  That is their obligation.  They have the burden

12  of proof.

13         With regard to the likelihood of success, in addition

14  to the arguments set forth so eloquently by Mr. Conroy, which

15  the board adopts in their entirety, in order to succeed on the

16  constitutional claim under 1983, which is what this is brought

17  under, an intentional act must cause the deprivation.  There is

18  zero evidence that any lack of postmark was caused by the

19  intentional act of a city board defendant or a state board

20  defendant.  To the contrary, the postal service witnesses made

21  clear that the city board and the state board both made it

22  clear that ballot envelopes needed to be postmarked, and that

23  neither the city board nor the state board had any involvement

24  in the envelope processing and postmarking at the postal

25  service facilities.

1          It is also undisputed that postal service assured the

2    board of elections that the ballots had been postmarked.  And

3    as an aside, in addition to the claim that no ballot could be

4    delivered on the same day it's postmarked, it's uncontroverted

5    that Ray Riley, the chief clerk of the Brooklyn Office of the

6    Board of Elections, testified at page 205 to 206 that the board

7    in fact received a ballot postmarked July 20 and received on

8    July 20.  It was postmarked and received at the board on the

9    same day.

10         Furthermore, as the Circuit described it, this is

11   nothing more than a garden-variety electoral dispute.  As set

12   forth in *Shannon v. Jacobowitz*, *Powell v. Power* and *Gold v.*

13   *Feinberg*, in order for election irregularities to give rise to

14   a constitutional violation, they must be the result of an

15   intentional act and not mere negligence, even if such

16   irregularities control the outcome of the election.  Here, as

17   Mr. Kellner testified at page 142 to 143 and then again on page

18   166, I believe that's where he testified, it wouldn't make a

19   difference.  I'm sorry, it's page 156 where Mr. Kellner

20   testified that it would not change the outcome.

21         So, if Second Circuit precedent which is clear that

22   irregularities that could control the outcome of an election

23   don't give rise to a constitutional violation.  *A fortiori*,

24   those that don't control it, can't alter the outcome of an

25   election cannot give rise to a constitutional violation.  The

K7UQgal6                        Summation - Mr. Kitzinger

1    *Shannon* court even noted and recognized the Fifth Circuit case

2    *Johnson v. Hood* where it noted that the arbitrary rejection of

3    ten ballots did not give rise to a constitutional violation

4    remediable pursuant to 42 U.S.C. 1983, which is the exact same

5    statute under which plaintiffs and intervenors seek relief

6    here.  Section 8-412 of the Election Law clearly states that

7    the absentee ballot must be received either prior to the close

8    of the polls or bear a cancellation mark with a date on or

9    prior to the date of the election.

10          There have to be rules and finality.  The *Anderson*

11   court recognized that states have enacted comprehensive and

12   sometimes complex election codes.  Each provision of these

13   schemes, whether it governs the registration qualification of

14   voters, the selection and eligibility of candidates or the

15   voting process itself, inevitably affects, at least to some

16   degree, the individual's right to vote and his right to

17   associate with others for political ends.  Nevertheless, the

18   states' important regulatory interests are generally sufficient

19   to justify reasonable, non-discriminatory restrictions.

20          Here, it's indisputable that these are

21   non-discriminatory restrictions.  In fact, as Mr. Conroy

22   pointed out, many states don't even permit ballots to be

23   returned after the date of the election.  The State of New York

24   made a policy decision to allow ballots that were postmarked,

25   that is, where there is documentary evidence that the ballots

K7UQgal6                        Summation - Mr. Kitzinger

1    were in the possession, custody and control of the U.S. Postal

2    Service, on or before the day of election to count even if they

3    are received up to one week after the date of the election.

4    That is a very generous rule and is in no way required.

5    Therefore, they could have easily adopted a rule that the

6    ballots had to be received by the date of election by the close

7    of the polls.  If that is the case, the fact that it lacks a

8    postmark and was received after the polls closed after the day

9    of the election cannot give rise to a constitutional violation.

10         As Commissioner Kellner stated, there have to be rules

11   and finality.  Lines have to be drawn.  When a voter elects to

12   rely on a postal service, there are risks inherent in that.

13   Again, it's the voter who made that determination and that

14   election to rely on the postal service.  It was not the board

15   of elections' conduct.  The board of elections and both the

16   city and state board nor the election law itself mandates that

17   the ballot be returned by mail.  Commissioner Kellner at page

18   142 to 143 then again at 166 of the transcript.

19         And as this court rightly noted in the *Yang* case, you

20   can't change the rules of the game midstream.  In the *Yang*

21   case -- and obviously the Court knows best on this issue as it

22   issued the opinion -- it relied and solely considered the fact

23   that when the candidates whose names were removed from the

24   ballot suspended their campaigns, they did so with the

25   expectation that their names would stay on the ballot.  It was

1    a settled expectation, as this Court wrote, and the Second

2    Circuit adopted that analysis that it was a settled

3    expectation.  Voters should have had a settled expectation, and

4    their ignorance of the law is no excuse that their ballots had

5    to bear a postmark, and they bore the risk of it not being

6    postal marked, timely or otherwise, if they relied on the

7    postal service for delivery.  That is clear.

8           Now, to the extent that plaintiffs are now asserting a

9    facial challenge to any of the statutes or even executive

10   orders, their claims for intermittent injunctive relief and any

11   injunctive relief with regard to the June 23 election should be

12   barred by the doctrine of laches.  All of the events that they

13   complain about taken by the city and/or the state board of

14   elections or the governor occurred in May.  For them to file

15   suit -- for the plaintiffs to file suit on July 17, more than

16   three weeks after the polls closed, and for intervenors to join

17   the city board a week after that, one week ago today to this

18   proceeding, cannot be countenance as a basis for injunctive

19   relief related to an already held election for events that

20   occurred more than seven weeks prior to the election.

21          Moreover, with regard to the ballots mailed on

22   June 22, there is no connection alleged or made between such

23   ballots allegedly returned with a late or missing postmark.

24   There's no evidence that any of those ballots were received

25   untimely and without postmarks rendering them untimely.  In

K7UQgal6                    Summation - Mr. Kitzinger

1    fact, the suggestion that the board of elections could have

2    afforded voters the opportunity to return those by express

3    mail:  First, the voters did have that option.  But, second,

4    they needed only to be postmarked.  Whether they're postmarked

5    as express mail or first-class mail, it would occur on the same

6    date, and having it delivered on the day after versus four days

7    after would make no difference to a timely postmarked ballot.

8    As Commissioner Kellner stated, it was in bold print on the

9    instructions that the ballots had to be postmarked.  That was

10   clear.

11           With regard to Mr. Kellner's testimony that the state

12   board of elections has the authority to direct local boards of

13   election to follow a federal court order, the city board

14   disagrees with that.  Quite candidly, the federal court order

15   has its own authority that would require the city and county

16   board of elections to follow it.  The state board of elections

17   doesn't have authority independent of the federal court order

18   to mandate certain actions.  What it can do and what it has

19   done is provide guidance as to how such order should be

20   interpreted for that election and future elections, and it has

21   done so.

22           With regard to your Honor's question about the board

23   being willfully blind, the city board submits that neither city

24   board nor the state board were willfully blind or blind in any

25   fashion to the realities of the postal service.  In fact, we

K7UQgal6                    Summation - Mr. Kitzinger

1    believe the postal service performed admirably here.   The

2    undisputed testimony is that every ballot or 98 plus percent of

3    ballots and votes were postmarked not later than the date they

4    were taken into custody and collected by the postal service.

5            And, again, when the ballots are being returned, the

6    return is on behalf of the voter, not the board of elections.

7    Ballots being sent out are mailed on behalf of the board of

8    elections.  So when Mr. Tanko testified their obligation is to

9    the mailer, the obligation there with the return of ballots was

10   not to the board of elections but was in fact to the voter.  To

11   the extent the voters have claims, those claims would lie

12   against the board of elections.

13           Finally, with regard to Mr.  -- or second to last,

14   with regard to Mr. Haxby, his testimony at page 65 was that he

15   does not know the election law, is not familiar with all the

16   requirements for an absentee ballot to be valid, and he further

17   testified that they didn't pursue and follow all of the

18   necessary checks to make such a determination.

19           THE COURT:  So is it your position that his statement

20   that his understanding of the law was incorrect?

21           MR. KITZINGER:  His statement that there were 902

22   absentee ballots from the 50th Assembly District that were

23   valid except for the lack of a postmark is unsupported in fact

24   because he was unable to -- or not unable to, he could have in

25   fact reviewed -- gone to the public terminals of the board's

K7UQgal6                    Summation - Mr. Kitzinger

1    office and reviewed voter registration records and poll records

2    just like the board officer -- board employees did.

3          THE COURT:  So a question then:  My question is you

4    asked him at some point what were the infirmities that would

5    cause the invalidation of the ballot, and he gave an answer.

6    And my question for you is, do you think that his answer was

7    correct?

8          MR. KITZINGER:  Your Honor, do you recall where that

9    question was?  I would have to --

10          THE COURT:  I don't, but -- I'm going to ask my law

11    clerks to look for it, and we will come back.

12          MR. KITZINGER:  OK, your Honor.

13          What I am arguing is that the statement of alleged

14    fact that there were 902 ballots from the 50th Assembly

15    District that would have been valid if they had been postmarked

16    on or before June 23 and were all invalid because they lacked a

17    postmark is unsupported because he did not do each and every

18    step in order to validate and determine whether or not that

19    would be true.  He did not determine whether or not there was a

20    later mailed-in ballot that would have rendered it -- a later

21    dated, later executed ballot that was received by the board of

22    elections that would have superseded.  He did not check to see

23    if they had voted at the poll site, early voting or regular

24    voting.  All of those factors would go to determination as to

25    validity.

1          THE COURT:  Well, those last two factors, he said that

2     he had not checked for, but he did check for a number of other

3     factors, and my question to you is whether you think that there

4     were additional things that he needed to check for that he

5     failed to check for?

6          MR. KITZINGER:  That is my point, your Honor.  That is

7     exactly the point, and, therefore, he is not qualified and his

8     testimony is not competent on the fact of the number of

9     otherwise valid envelopes.

10         THE COURT:  I didn't make my point clear.

11         MR. KITZINGER:  I'm sorry, your Honor.

12         THE COURT:  No, it's me, I'm sorry.  He said that he

13    and his group checked for a litany of infirmities, one of which

14    was the absence of the postmark, the absence of the signature,

15    and, I don't know, maybe the way the envelope was closed, I

16    can't remember what they were.  And then you asked him whether

17    he had looked into whether the individual had voted in person,

18    I think, also whether there may have been an additional paper

19    ballot.  I don't remember exactly what it was, but he made a

20    list of what he did check for, and my question is the only

21    things that he did not check for are what you just stated.  Am

22    I correct?

23         MR. KITZINGER:  To the best of my recollection, that

24    is correct, he did not -- those were the items that I recall

25    him saying that he did not check.

K7UQgal6                         Summation - Mr. Kitzinger

1              THE COURT:  OK.  All right.

2              MR. KITZINGER:  He also admitted that on Exhibit 3

3     there were ballots that were marked that they claim would have

4     been valid but for, I believe, it was a late postmark, but they

5     were actually received after the deadline, they lacked a

6     signature, or they were undated.  So that calls into question

7     his computations and his numbers because he admitted, and

8     Exhibit 3 is clear, that there were additional reasons noted on

9     that chart as to why it was invalid.

10             Lastly, I would note that as Mr. Brehm testified with

11    regard to the traditional nominating conventions, in fact, the

12    delayed certification could actually result in the

13    disenfranchising of additional voters and that is because if

14    the results of the election are not certified -- and this is on

15    page 175 and both 176 of the transcript -- if it is not

16    certified, the delegates who would have been elected had the

17    results been certified would not be seated pursuant to the

18    election.  And, in fact, the members of the party who've been

19    seated have the right to fill vacancies with anybody who is

20    qualified, whether they were on the ballot or not.  So

21    reopening the canvass and delaying the certification at this

22    point would necessarily result in the inability to timely

23    certify traditional convention races, and it's in Mr. Brehm, I

24    believe, it's his initial declaration that there was a

25    contested delegate primary in the 50th Assembly District.  He

K7UQgal6                    Summation - Mr. Kitzinger

1   noted that while in a number of districts, many districts even,

2   there were not contested primaries, in the 50th A.D., which is

3   a large subject of this litigation, it was contested.  And, in

4   fact, if it is not certified, those delegates who were seated

5   can backfill with anybody.  So you'd end up disenfranchising

6   more voters if your Honor were to order the canvass be reopened

7   to review ballots that would have absolutely zero chance of

8   altering the outcome of an election where there has been no

9   showing of standing, no showing of an intentional act by any

10  defendant, and, therefore, no showing of a likelihood of

11  success, no less a clear likelihood of success, as required for

12  such an injunction.

13          Thank you, your Honor.  Unless you have any further

14  questions.

15          THE COURT:  I do.  I do.  I found the section, or, I

16  should say, that my superb law clerks found the page of the

17  transcript I asked for, and they did it very quickly.

18          So, your question to Mr. Haxby on page 67 at the top:

19  "Q. Tell me the rules and requirements for an absentee ballot

20  to be valid.

21  "A. So, again, this is as I understand the rules, the absentee

22  ballot, a valid absentee ballot is one that is -- the ballot

23  itself needs to be sent on time, received on time, signed and

24  dated.  It needs to be sealed properly in the envelope and then

25  it needs not to be invalidated by another action such as voting

K7UQgal6                    Summation - Mr. Kitzinger

1    in person or, I guess, sending in another absentee.  I hadn't

2    heard of that but, sure."

3             And my first question for you is what statute governs

4    the possible infirmities?

5             MR. KITZINGER:  I believe it's Section 9-209 of the

6    Election Law as well as 8-412, which relates to the time it

7    needs to be sent and received.

8             THE COURT:  And so --

9             MR. CONROY:  I'm so sorry to interrupt, your Honor.

10   We are about 5:16, and I think I can stretch just a couple more

11   minutes for my child care issue.  I'm so sorry to interrupt.

12            THE COURT:  Well, I don't have any further questions

13   for you, and I am just winding up.  Do you think -- you say

14   another couple of minutes you have?

15            MR. CONROY:  I think I can wait until 5:20 and still

16   make it.

17            THE COURT:  So my question is, Mr. Kitzinger, his

18   answer, Mr. Haxby's answer, was that an accurate statement of

19   the law?

20            MR. KITZINGER:  I believe it's an accurate statement,

21   but he also admitted that he didn't know about it up until the

22   time I had said it.

23            THE COURT:  Wait a minute.  Wait a minute.  You're

24   saying that he didn't know about a certain aspect of this.

25            MR. KITZINGER:  Correct.

1           THE COURT:  All right.

2           MR. KITZINGER:  He also, your Honor, admitted that

3    they didn't check whether or not the ballots would be

4    invalidated due to another action such as voting in person or

5    sending in a later absentee ballot.

6           THE COURT:  OK.  My last question is for Mx. Green,

7    and my question is whether I have the authority to issue

8    statewide relief and what would be the basis of my authority.

9    And I know, Mr. Conroy, you've already spoken the issue, so if

10   you need to go, you can.

11          MR. CONROY:  Thank you.  I appreciate that, your

12   Honor, and I believe -- I'm just checking if one of my

13   colleagues made it online, I don't know.  I'm checking if

14   counsel is on the line, and he can speak if necessary.

15          MR. ARZ:  Roderick Arz also from the Office of the

16   Attorney General.  I'm on the attorney's phone line.

17          THE COURT:  So you're saying you can step in if

18   necessary?

19          MR. ARZ:  Yes, your Honor.

20          MR. CONROY:  Thank you to Mr. Arz.  I apologize, your

21   Honor.  And thank you for the consideration.

22          THE COURT:  Yes.  So, Mx. Green.

23          MX. GREEN:  So, your Honor, of course the Court can

24   issue statewide relief to the point that Mr. Conroy argued, I

25   think the -- every -- a lot of the things that are being argued

K7UQgal6                        Rebuttal - Mx. Green

1   here are addressed by just looking at what the result was in

2   *Green Party v. State Board of Elections* in the Second Circuit,

3   right, because there, there is no intentional acts, there's no

4   any of this, and it's -- it's an instance in which application

5   of a particular requirement on a local board level was enjoined

6   because it was unconstitutional, and it was enjoined by an

7   injunction against the state board.

8          I think that Mr. Kitzinger's argument is rebutted by

9   literally everyone's testimony, including the city board's own

10  argument that their role is purely ministerial, and I think the

11  place these arguments come from is because they are valid

12  arguments without application of state law and on a statutory

13  level, and these arguments do have to work that way for

14  election law claims and election law remedies, but what we're

15  talking about here is just simply not an election law remedy.

16  It's a constitutional remedy.  I do have more rebuttal, but if

17  your Honor wants to be done, I understand that

18          MR. SCHWARTZ:  Your Honor, could I jump in one second

19  on that too because Mr. Kitzinger said the state board can't

20  tell the county boards what to do, but that is -- I'll find the

21  statute.  It's in my memorandum of law.  The election law says

22  that they can create regulations about what the state board --

23  the county boards can do.  So, to the extent that you direct

24  the state board to do something, they can be directed to tell

25  the county boards to do that same thing under the election law

K7UQgal6                        Rebuttal - Mx. Green

1   of New York State, besides that the First Amendment and equal

2   protection clause, and I will get that section of the election

3   law in a second.

4           THE COURT:  If you have anything further, Mx. Green,

5   you may go ahead.

6           MX. GREEN:  I will try to be brief because I have

7   heard your concern.

8           So, I think one of the things that to start with, in

9   opposing the motion that I made to bring in additional

10  testimony given the post office's testimony when your Honor got

11  them to produce an additional witness, was that there is a

12  concession that errors are being made and errors were made.

13  It's just there's no concession, and they argued, and your

14  Honor sided with them on that, so they argued that there is no

15  question that -- and there's no issue in this case that

16  individual voter testimony would go to on the question of

17  whether one voter had a ballot postmarked late.  So I wanted to

18  address that.

19          I think the biggest sense I get from the arguments

20  generally, and one of the puzzling things about the set of

21  arguments is it seems like my friends take it very personally

22  when we sue the board of elections, whether it's state or city.

23  And I think that they take the allegation that there is some

24  sort of systemic problem that causes results that are

25  unconstitutional as if it is a statement that there is a moral

K7UQgal6                           Rebuttal - Mx. Green

1    failing.  They respond to it in that way.

2          But I think in applying the election law –– and,

3    again, this is *Green Party*, this is *Yang*, this is all of the

4    cases.  You don't need intentional conduct when an

5    unconstitutional result is created by a statute or by an

6    executive order.  And that's, you know, as far as the claims

7    are concerned, that's the difference between a disparate impact

8    claim and a disparate treatment claim.  And I think most

9    tellingly, if you look at *Bush v. Gore*, there is absolutely no

10   allegation in that case that the boards in *Gore* were doing

11   anything other than their best job trying to count very

12   confusing ballots, but the fact that it produced different

13   results in different places was a constitutional problem.

14         In terms of the argument, I just want to correct the

15   argument that we didn't show that any other state uses

16   something like the remedies we're seeking.  Well, the testimony

17   showed that Wisconsin has, and we didn't do testimony about any

18   other state, but I think the focus on individual states in this

19   way and this kind of *well, every state has this*, places the

20   focus in the wrong place because I think the right way to look

21   at these cases is we focus on result.  We don't focus on just

22   the tax, and the tax can be unconstitutional, but what

23   Anderson–Burdick asks is, take this fully in context and look

24   very carefully at what burden as applied this places on voters

25   or places on candidates or places on access to the ballot, and

K7UQgal6                    Rebuttal - Mx. Green

1    here, the burden is unquestionably thousands of votes.

2           In terms of -- I think -- I also just very briefly

3    want to talk about the *Shannon* case.  I think -- and I could be

4    wrong*, Shannon* concerned maybe ten votes, maybe it was a little

5    more.  I can try to find it, but I don't have it in front of

6    me.  But *Shannon* was about one ballot machine malfunctioning on

7    one line in one place.  And I think, you know, the phrase

8    *garden variety election irregularity* is something that

9    personally troubles me, but the circuit disagrees with me, but

10   whatever the garden-variety irregularity is, it cannot be

11   thousands of votes.  Maybe it's tens of votes, maybe it's 50

12   votes, but there has to be a place where that line is drawn,

13   and I certainly think there is no hard question here that

14   thousands is on the other side of it.

15          And to that point, the other point in *Shannon* was this

16   is something that went wrong, right?  And not just wrong in the

17   sense that Mr. Conroy was willing to concede that something was

18   wrong here, but wrong in the sense that the election law was

19   being applied wrong to a voter who voted at a voting machine.

20   So, there was actually a state court remedy, while here we have

21   unambiguous testimony, if we tried do this in state court,

22   obviously it wouldn't have worked.  There is no way that

23   happened.

24          In terms of what's left on Mr. Conroy's rebuttal, and

25   I think consistent with the way I have already -- I will try to

K7UQgal6                    Rebuttal - Mx. Green

1    say very little about Mr. Kitzinger's rebuttal or opposition --

2    there was a claim that there was no evidence about counties

3    out -- or races outside of A.D. 50, and I think we have some

4    data about A.D. 52 and A.D. 57.  I don't think that's quite

5    right.  Your Honor pointed out there was postal office

6    testimony.  But beyond that, the -- I think that there are

7    reasonable inferences that the Court can draw, and the fact is

8    that neither defendant presented any other evidence otherwise

9    rebutting any inferences that might exist in terms of what

10   might have happened statewide.

11       And as I think the testimony showed in terms of what's

12   available to a candidate, you can't really get these things

13   outside of your own race.  So in order to present statewide

14   evidence, I would have had to have a candidate in every

15   possible race.  And I don't think that that is what is

16   required, especially in an emergency litigation like this.

17       And so to that end, I think we at least showed that

18   there's a constitutional problem that might exist across the

19   state.  It certainly exists in the places we looked at, and the

20   only places that numbers were talked about for.

21       And then I think that matches neatly with the last

22   point in response to Mr. Conroy, which is this claim that there

23   are tens of thousands of man hours involved in counting these

24   ballots seems to be completely contrary to the idea that

25   there's also no problem, which is to say, either it's there's a

K7UQgal6                         Rebuttal - Mx. Green

1    lot of ballots to count that have been in the bucket; that is,

2    no postmarks and put in the bucket that is late postmarks or

3    there is -- there are not a lot of ballots to count that have

4    been put in those buckets, but you can't have that both ways,

5    right?  Either there are a tiny number to count and then

6    there's not this really tens of thousands of man hours issue or

7    there are a lot of ballots to count and then you have this

8    profound constitutional issue.

9           I think the only thing I really want to respond to of

10   Mr. Kitzinger's argument is some of what he said about what

11   Mr. Haxby testified to, and I think it was wrong.  In terms of

12   the testimony about the Exhibit 3, if I recall the testimony

13   correctly, it was not that they looked at these ballots and the

14   reasons that the board of elections marked were correct.  It

15   was exactly the opposite of that.  It was that the board of

16   elections had marked the wrong reason, right, it had marked no

17   signature, but the volunteers reviewing it found a signature,

18   or at least it was -- I think the only question that was really

19   asked was:  Does this say that the board of elections marked no

20   signature?  Answer:  Yes.  Right?  And that doesn't actually

21   say anything about what's in the underlying documents and that

22   no testimony got to that.

23          So, beyond that, just one last thought on that.  And I

24   got an enthusiastic text from one of my clients.  Mr. Patel

25   wants to make very clear to the Court he hasn't conceded his

K7UQgal6                        Rebuttal - Mx. Green

1    race.

2              And beyond that, I think the only thing that I want to

3    say is Mr. Kitzinger's argument about the burden of proof here,

4    and then also his concomitant argument about the qualities of

5    proof that we've presented are troubling in combination.  It

6    seems to me his opinion is that no one but the city board can

7    understand the election law or apply it; and then on the other

8    side of that, that even in litigation that the city board has

9    no obligation to show facts that he claims only they know how

10   to evaluate.  And just in terms of the effect on a

11   constitutional system, that is very, very troubling to me.

12             So, in sum, I think that the Court should remember

13   that these kinds of cases, when they make it to the place they

14   are in -- like here are very much about incentives.  They are

15   about incentives that keep the board from disenfranchising

16   thousands of voters like has happened here.  So, it's not just

17   about this election.  It's about is this result something that

18   should trouble us constitutionally.  I think it should.

19             Thank you.

20             MR. SCHWARTZ:  Your Honor, if I could just jump in

21   with that section?

22             MR. KITZINGER:  Your Honor, the city board objects to

23   Mr. Schwartz raising arguments now after everyone else has.

24   His time to present argument was prior to defendants.

25             THE COURT:  Are you presenting argument, Mr. Schwartz?

K7UQgal6                          Rebuttal - Mx. Green

1          MR. SCHWARTZ:  No.  I'm giving the Court a statute

2    about -- the Court asked about whether or not the state board

3    would have authority to or does the Court have statewide

4    jurisdiction, and I was just saying that the state board of

5    elections under Section 3-102, 1 through 14 of the election law

6    has authority to direct local county boards to do -- to take --

7    to take various actions, including to take all appropriate

8    steps to encourage as broad as possible voter participation in

9    an election.  So I think that a direction to the state board as

10   a party would have statewide impact.  That's all.

11         THE COURT:  All righty.  Well, I want to thank all of

12   you for your hard work on this case.  I am going to make

13   findings of fact and conclusions of law in due course.

14         So our hearing is over and I wish all of you well.

15         Thank you.

16         (Hearing concluded)

17

18

19

20

21

22

23

24

25

```
1                      INDEX OF EXAMINATION

2    Examination of:                          Page

3    ALLEN TANKO

4    Direct By Mr. Najmi  . . . . . . . . . . . . . 227

5    Cross By Mr. Conroy  . . . . . . . . . . . . . 279

6    Cross By Mr. Kitzinger . . . . . . . . . . . 283

7    Redirect By Mr. Najmi  . . . . . . . . . . . 295

8    MICHAEL CALABRESE

9    Direct By Mr. Najmi  . . . . . . . . . . . . . 314

10   Cross By Mr. Conroy  . . . . . . . . . . . . . 339

11   Cross By Mr. Kitzinger . . . . . . . . . . . 342

12    SHERILYN SIMMONS

13   Direct By Mx. Green  . . . . . . . . . . . . . 354

14   Cross By Mr. Kitzinger . . . . . . . . . . . 367

15   Redirect By Mx. Green  . . . . . . . . . . . 369

16

17

18

19

20

21

22

23

24

25
```

**Exhibit 9**



# Present First-Class Mail
## Score Breakdown – Processing vs Last Mile



Last Mile Impact represents the score decrease caused by time spent in the last mile (from last processing scan to delivery); Processing score represents service performance from USPS possession to last processing scan at the destination plant measured against the service expectation; Overall score represents service performance from USPS possession to delivery (i.e. it includes the last mile) measured against the service expectation; 1 Extra Day represents the overall score if the mailpiece had 1 extra day to meet service expectations; Scores are NOT weighted and will NOT match the official scores in slide 3 which are weighted.

5

# USPS Marketing Mail
## Score Breakdown – Processing vs Last Mile



Last Mile Impact represents the score decrease caused by time spent in the last mile (from last processing scan to delivery); Processing score represents service performance from USPS possession to last processing scan at the destination plant measured against the service expectation; Overall score represents service performance from USPS possession to delivery (i.e. it includes the last mile) measured against the service expectation; 1 Extra Day represents the overall score if the mailpiece had 1 extra day to meet service expectations; Scores are NOT weighted and will NOT match the official scores in slide 3 which are weighted.
**Does not include Saturation and EDDM.**

17



# Periodicals
## Score Breakdown – Processing vs Last Mile



Last Mile Impact represents the score decrease caused by time spent in the last mile (from last processing scan to delivery); Processing score represents service performance from USPS possession to last processing scan at the destination plant measured against the service expectation; Overall score represents service performance from USPS possession to delivery (i.e. it includes the last mile) measured against the service expectation; 1 Extra Day represents the overall score if the mailpiece had 1 extra day to meet service expectations; Scores are NOT weighted and will NOT match the official scores in slide 3 which are weighted.

26

**Exhibit 10**



Louis DeJoy
Postmaster General, CEO

**UNITED STATES POSTAL SERVICE**

August 31, 2020

The Honorable Ron Johnson
Chairman
Committee on Homeland Security
  and Governmental Affairs
United States Senate
Washington, DC  20510-6250

The Honorable Carolyn B. Maloney
Chairwoman
Committee on Oversight and Reform
House of Representatives
Washington, DC  20515-6143

The Honorable Gary C. Peters
Ranking Member
Committee on Homeland Security
  and Governmental Affairs
United States Senate
Washington, DC  20510-6250

The Honorable James R. Comer
Ranking Member
Committee on Oversight and Reform
House of Representatives
Washington, DC  20515-6143

Dear Chairman Johnson, Chairwoman Maloney, Senator Peters, and Congressman Comer:

During the House Committee on Oversight and Reform hearing on Monday, I committed to providing updated service performance information.  Enclosed is the most up-to-date data available through August 26, 2020.  Also included is up-to-date data regarding our late and extra trips.

I want to note that the internal slide deck shared by the House Oversight Committee and posted on its website reflected data through the week of August 1.  With the August update that provides our most current verified information, we are seeing the expected improvements in service, which is consistent with my testimony.

**Service performance is improving and trucks continue to run on time**

As the charts show, service performance improved across all major mail categories in the weeks prior to my testimony, and this trend has continued through August, rapidly returning to early-July levels.  The trends are even better for competitive products.

This recovery took place while still adhering to our existing transportation schedules.  In other words, we are improving service performance while more consistently running our trucks on time.

As information, the overall percentage reflected in the charts represents service performance by the Postal Service from acceptance of a mailpiece into our system through delivery, measured against our published service standards.  The solid blue line indicates the percentage of volume that is delivered within the service standard window.  The yellow dotted line indicates the percentage of volume that is delivered within one day after the defined service standard.

In this regard, I am committed to improving service while ensuring that we do not incur unnecessary costs associated with an undisciplined transportation network.  These trend charts show that the goals of service and adherence to operational discipline are not mutually exclusive, but go hand-in-hand.

- 2 -

**Election mail performance data**

During the hearing, I was asked whether I could provide performance data for Election Mail. This data cannot be provided in a representatively accurate fashion as a subset of First-Class or Marketing Mail. This is because the Postal Service can only separately measure service performance for ballots accurately when such ballots have a unique IMb, which is only a subset of Election Mail. That said, the overall service performance for those classes which include Election Mail is enclosed.

**New regular updates to Congress**

As requested, in addition to the information attached, we will provide the House and Senate oversight committees with ongoing service performance data on a weekly basis through the end of the year. Specifically, later this week, my staff will provide weekly service performance data at a district, area, and national level from the beginning of the calendar year to present and will continue to provide weekly updates showing the previous weeks' performance going forward.

Please note that the service performance information related to our competitive products is commercially sensitive information which is protected from public disclosure pursuant to the terms of 5 U.S.C. § 552, and 39 U.S.C. § 410(c). Because of the commercial sensitivity of this information, the Postal Service respectfully requests that the committees not publicly disclose the information related to our competitive products.

As I testified, the intervening service declines should not have happened, but the changes are fundamental and necessary, and the Postal Service is strongly committed to fixing the problems by identifying and rectifying their root causes. While there are a number of factors at play related to service performance, including pressures related to the COVID-19 pandemic, natural disasters, and other unforeseen events, I am confident that the Postal Service's performance will continue to improve overall, and that it will ultimately exceed our prior service performance levels. This is an organization-wide commitment.

**Accountability rests with me**

I am ultimately accountable for the decisions I have made as Postmaster General and will provide the data necessary for members of the committees to assess ongoing performance improvements.

On a final note, I look forward to working with both committees and the full Congress on needed postal reform. I appreciate the focus and bi-partisan commitment to ensuring that the U.S. Postal Service is set up for success and on firm financial footing. As I mentioned in my testimony, in addition to COVID-relief, postal reform legislation is necessary to address our unaffordable retirement payments, including Medicare integration and rationalization of our pension funding payments. I stand ready to assist as postal legislation is considered.

Sincerely,

Louis DeJoy

Enclosure



# CONGRESSIONAL BRIEFING:

Transportation & Service
Performance Updates

August 31, 2020



# Transportation Performance

Data Through 8/29/20

2



# Transportation Analysis Overview

**Service Impacts:** USPS transportation and logistics professionals manage an average flow of over 390 million mail pieces daily throughout the Postal Service network, which includes 285 processing facilities and about 35,000 retail locations.

Postal Service facilities are linked by a complex transportation network that depends on the nation's highway, air, rail, and maritime infrastructures. The success of each system affects the success of others. If surface transportation departs late or unscheduled trips are added, the connection between processing facilities, post offices, airlines, and others become misaligned, impacting downstream operations and hindering efforts to meet service performance.

**Financial Impacts:** In FY 2019, the Postal Service spent over $550 million extra in transportation to mitigate delays that occurred in the network:

- $266 million in extra trips;
- $130 million in overtime;
- $14 million in late trips; and
- $140 million in air freight mitigation

**Effectively aligning operational plans and a timely, consistent transportation network will improve service and reduce cost.**

For more information, please reference the Office of Inspector General Audit Report Number 20-144-R20

3



Trips on Time vs. Late and Extra Trips (Weekly)

Trips on time references left axis. Late and extra trips references right axis

Source: SV - Surface Visibility

4



# Late Trips Analysis



Source: SV - Surface Visibility

5



# Extra Trips Analysis



Source: SV - Surface Visibility

Case 3:20-cv-01075-MAS-TJB Document 58-1 Filed 09/25/20 Page 236 of 270 PageID: 1538



# Service Performance

Data Through 8/26/20

7

Case 1:20-cv-06516-VM Document 19-17 Filed 09/02/20 Page 12 of 14

UNITED STATES POSTAL SERVICE®

# Official Scores 52 Week Trend

All scores for current week-to-date (week of 8/22) are through 8/26. USPS Marketing Mail score for current week-to-date does not include Saturation Mail as that data is available after the end of the week i.e. on 9/1



Present First-Class Mail
Score Breakdown – Processing vs Last Mile

- Baseline Period: 3/14 - 7/3
- Current week-to-date: 8/22 - 8/26

Last Mile Impact represents the score decrease caused by time spent in the last mile (from last processing scan to delivery); Processing score represents service performance from USPS possession to last processing scan measured against the service expectation; Overall score represents service performance from USPS possession to delivery (i.e. includes the last mile) measured against the service expectation; 1 Extra Day represents the overall score if the mailpiece had 1 extra day to meet service expectations; Scores are NOT weighted and may NOT match the official scores in slide 1 which are the official scores.

9



First Mile Impact represents the score decrease caused by time spent in collection; Last Mile Impact represents the score decrease caused by time spent in the last mile (from last processing scan to delivery); Processing score represents service performance from USPS possession to last processing scan measured against the service expectation; Overall score represents service performance from USPS possession to delivery measured against the service expectation; 1 Extra Day represents the overall score if the mailpiece had 1 extra day to meet service expectations; Scores are NOT weighted and may NOT match the scores on slide 1 which are weighted.

10





UNITED STATES POSTAL SERVICE ®

# USPS Marketing Mail Score Breakdown – Processing vs Last Mile

- Baseline Period: 3/14 - 7/3
- Current week-to-date: 8/22 - 8/26

**OVERALL**
**8.26%** HIGHER THAN 8/1 – 8/7

**OVERALL**
**0.49%** LOWER THAN BASELINE

**PROCESSING**
**0.10%** LOWER THAN BASELINE

**LAST MILE**
**0.40%** LOWER THAN BASELINE

Last Mile Impact represents the score decrease caused by time spent in the last mile (from last processing scan to delivery); Processing score represents service performance from USPS possession to last processing scan at the destination plant measured against the service expectation; Overall score represents service performance from USPS possession to delivery (i.e. it includes the last mile) measured against the service expectation; 1 Extra Day represents the overall score if the mailpiece had 1 extra day to meet service expectations; Scores are NOT weighted and may NOT match the official scores in slide 1 which are weighted.

# Score Breakdown – Processing vs Last Mile



Last Mile Impact represents the score decrease caused by time spent in the last mile (from last processing scan to delivery); Processing score represents service performance from USPS possession to last processing scan at the destination plant measured against the service expectation; Overall score represents service performance from USPS possession to delivery (i.e. it includes the last mile) measured against the service expectation; 1 Extra Day represents the overall score if the mailpiece had 1 extra day to meet service expectations; Scores are NOT weighted and may NOT match the official scores in slide 1 which are weighted.

12

**Exhibit 11**



# AVP TELEPRESENCE

**July 10, 2020**



AVP Telepresence – July 10, 2020

# 64M
# WORK HOURS

# T-83 DAYS



# BELIEF THAT IT IS

# ACHIEVABLE AND

# WE CAN MAKE IT SO



# ALL IN

# VS

# OPT IN



# AFFORDABLE, EFFICIENT & RELIABLE SERVICE
# VS
# COSTLY & HEROIC SERVICE



# BE PURPOSE DRIVEN INSTEAD OF FEAR DRIVEN



# OUR PURPOSE IS TO OPERATE A FINELY TUNED OPERATIONAL SERVICE MACHINE THAT PROVIDES AFFORDABLE, EFFICIENT & RELIABLE SERVICE



AVP Telepresence – July 10, 2020

# OUR FIRST TEST



AVP Telepresence – July 10, 2020

# NO EXTRA TRANSPORTATION

# NO LATE TRANSPORTATION



# Unauthorized Extra Trips and Late Trips

- Effective July 13 all extra trips and Postal caused late trips are unauthorized contractual commitments



# Unauthorized Extra Trips and Late Trips

- Follow Management Instruction MI SP-G4-2006-2

- Area Vice President is the ratifying official and must ratify and submit to COO

- Area Vice President will call COO daily if extra trips or late trips occur the prior day to discuss next steps

 **UNITED STATES POSTAL SERVICE®**

# AVP Telepresence – July 10, 2020

# B x C x M x D x V x F > R

**B = Belief that change is achievable and confidence we can make it so**

**C = Courage to act in the presence of fear and to take risks**

**M = Message saturation so everyone understands why the change needs to happen and their role, responsibility & expectation**

**D = Dissatisfaction with the status quo**

**V = Vision of what is possible**

**F = First intentional action steps**

**R = Resistance to change**



# Surrender Our Resistance

- Fear of failure

- Fear of repercussions and personal impacts

- Fear of making the wrong decision

- Fear of the unknown

- Fear that the new way may not be better



## Surrender Our Resistance

- No obvious need

- Loss of control

- Closed mindedness

- Unwillingness to learn

- Concern about support systems

- Creatures of habit



**AVP Telepresence – July 10, 2020**

# COVID COMMAND UPDATE

### Simon Storey

**Vice President Employee Resource Management**

Case 3:20-cv-10753-MAS-ZNQ   Document 58-3   Filed 09/25/20   Page 258 of 270 PageID: 1560



## AVP Telepresence – July 10, 2020

## COVID-19 Areas of Focus

- Reinforce social distancing and proper use of face coverings

- Ensure social distancing signage is prominently displayed in all facilities

- Face covering orders by jurisdiction – now available on Playbook tab

- Pulse Report and key metrics





**Exhibit 12**

# The Washington Post

*Democracy Dies in Darkness*

# Internal USPS documents link changes behind mail slowdowns to top executives

Newly obtained records appear in conflict with months of Postal Service assertions that blamed lower-level managers for strategies tied to delivery delays

By **Jacob Bogage**

September 24, 2020 at 9:15 a.m. EDT



A senior executive at the U.S. Postal Service delivered a PowerPoint presentation in July that pressed officials across the organization to make the operational changes that led to mail backups across the country, seemingly counter to months of official statements about the origin of the plans, according to internal documents obtained by The Washington Post.

David E. Williams, the agency's chief of logistics and processing operations, listed the elimination of late and extra mail trips by postal workers as a primary agency goal during the July 10 teleconference. He also told the group that he wanted daily counts on such trips, which had become common practice to ensure the timely delivery of mail. Several top-tier executives — including Robert Cintron, vice president of logistics; Angela Curtis, vice president of retail and post office operations; and vice presidents from the agency's seven geographic areas — sat in.

The presentation stands in contrast with agency accounts that lower-tier leaders outside USPS headquarters were mainly responsible for the controversial protocols, which tightened dispatch schedules on transport trucks and forced postal workers to leave mail behind. Postmaster General Louis DeJoy told a House panel last month that he pressed his team to meet dispatch and mail-handling schedules but did not issue a blanket ban on such trips.

In a statement to The Post, Williams said the slide show was meant to be "motivational" and encourage greater efficiency and accountability — not set new policy.

Yet the mail-handling tactics were among several operational changes — including the removal of hundreds of mail-sorting machines and a crackdown on overtime — that took effect that month and were later blamed for widespread delivery slowdowns. By one estimate, nearly 350 million pieces, or 7 percent, of the country's first-class mail were affected over a five-week span, according to an analysis of USPS and Postal Regulatory Commission data by the office of Sen. Gary Peters (D-Mich.).

The changes caused an uproar, drawing public and congressional scrutiny. Citing DeJoy's history as a GOP fundraiser and ally of President Trump ally, critics contend the changes were politically motivated — which the postal chief has denied — ahead of an election that is expected to see a surge in mail-in ballots due to the pandemic. The president has repeatedly warned without evidence that voting by mail will lead to massive fraud and has also suggested it will hurt Republicans' chances by leading more Democrats to cast ballots.

Williams's presentation was among the documents turned over to the office of Pennsylvania Attorney General Josh Shapiro (D) as part of a lawsuit involving six other jurisdictions against DeJoy and the USPS. The suit, filed in the Eastern District of Pennsylvania, argues the initiatives amount to an unlawful change in delivery service standards, which would require approval from the agency's Board of Governors and an advisory opinion from the Postal Regulatory Commission before implementation.

The documents are key evidence in a case that may determine how the USPS handles mail-in ballots and other mail before the November election, according to Shapiro. Democrats and voting rights advocates worry the operational changes could prevent ballots from reaching voters and election officials. Two federal courts have temporarily barred the Postal Service from adhering to the changes.

The presentation also is a tangible link between USPS leadership and the tactics that led to mail backlogs through the summer, ensnaring prescription medications, bills, benefits checks and election mail — including primary ballots, according to the lawsuit. DeJoy said he would suspend much of the agency's cost-cutting agenda — including the mothballing of mail-sorting machines and public collection boxes, but not his controversial transportation directive — until after the presidential election.

Top agency officials had blamed staffing problems related to the coronavirus pandemic for the delays. They also said lower-tier managers issued instructions that did not accurately represent directives from DeJoy.

But Williams's message reverberated quickly through the agency's ranks. One of his slides dubbed the plan "OUR FIRST TEST." Another said "NO EXTRA TRANSPORTATION" and "NO LATE TRANSPORTATION."

The presentation said late or additional mail trips would be designated "unauthorized contractual commitments" within days. It also encouraged leaders to "surrender our resistance" to new operational plans and overcome their "fear of failure," "fear of repercussions and personal impacts," "fear of making the wrong decision," "fear of the unknown" and "fear that the new way may not be better."

"These documents clearly show USPS leadership actions interrupted and delayed the flow of mail by requiring Postal Service employees to stop extra and late trips to deliver the mail back in July," Shapiro said. "While Postmaster DeJoy has created confusion, it's clear this mandate came from the top — in black and white. We're in court right now to protect the Postal Service from this illegal attack on a critical public service."

Williams, in a statement, said the presentation was "not a communication of official policy."

"This was my opportunity to challenge our leaders to think differently and to inspire greater belief in the direction we are taking to run our operations with greater efficiency and accountability," he said. "As a result we've improved our on-time performance of our truck operations."

USPS spokesman David Partenheimer said that since taking office in mid-June, DeJoy has "reemphasized the need to ensure that the Postal Service's trucks run on time and on schedule, with the goal of mitigating unnecessary late and extra trips."

"This effort does not mean that mail should be left behind, but rather that processing schedules should align with transportation schedules," Partenheimer said in a statement to The Post. "Moreover, the postmaster general has not

banned the use of late or extra trips; when operationally required, late or extra trips are permitted."

He said previous noncompliance with transportation schedules was a "chronic problem."

But at least one area vice president appears to have interpreted the presentation's content as a directive. Shaun Mossman, vice president of the agency's southern area, which comprises parts of Texas, Oklahoma, Arkansas, Louisiana, Mississippi, Alabama, Florida and Georgia, notified staffers on July 10 — the same day of the presentation — about the prohibitions on late and extra trips.

Mossman's instructions were delivered in a "stand-up talk," a USPS announcement read aloud to employees on workroom floors.

"All trips will depart on time (Network, Plant and Delivery); late trips are no longer authorized or accepted," Mossman's memo said, echoing language used in the slide show. "Extra trips are no longer authorized or accepted."

Similar directions began flowing to workers in other areas. On July 13, rural carriers in Buckeye, Ariz., part of the USPS's western region, were required to sign an "Individual Training Record" that said, "We cannot have ANY late trips or extras from delivery into the plant." It also said that trucks could not be held back and that extra trips could not be requested "under any circumstances."

By July 20, the Postal Service had received inquiries from lawmakers about the origin and impact of the changes. USPS leaders downplayed their significance and denied that the agency had made any wholesale changes.

"The documents should not be treated as official statements of Postal Service policy," Thomas J. Marshall, USPS general counsel, wrote to Reps. Carolyn B. Maloney (D-N.Y.), Gerald E. Connolly (D-Va.), Stephen F. Lynch (D-Mass.) and Brenda Lawrence (D-Mich.). Marshall said neither the stand-up talk nor another presentation that described cuts to overtime hours "originated from Postal Service headquarters."

DeJoy made similar comments in sworn testimony before the Senate Homeland Security and Governmental Affairs Committee on Aug. 21 and the House Oversight Committee on Aug. 24. He told the House panel he did not issue a blanket ban on late or extra trips and asked his team only to mitigate them and stick to delivery schedules.

DeJoy told lawmakers that he based those strategies on a report by the Postal Service's inspector general, published shortly before he took office.

He told the Senate committee that the study found $4 billion in extra costs due to late and additional deliveries and late dispatch times. He told the House panel that he saw "several billion dollars in potential savings in getting this system to connect properly."

"And that's why we ran out and put a plan together to really get this fundamental basic principle," DeJoy said. "Run your trucks on time."

"This was not a hard direct, 'Everything must leave on time.' We still have thousands of trucks a day that leave late within a certain time frame, and there are still hundreds of extra trips," DeJoy said earlier in the House hearing. "The intention was to put the mail on the trucks and have the trucks leave on time. That should not have impacted anybody."

But Cintron, the logistics vice president, testified in U.S. District Court in the Southern District of New York that his

department had reported previous two years emphasizing the need to adhere to transportation schedules and that he issued guidance to area vice presidents on July 14 about when late and additional trips were acceptable.

"Postmaster General DeJoy was not involved with the development, planning, or implementation of these guidelines," Cintron stated in written testimony.

---

Updated September 18, 2020

## Voting in the 2020 U.S. Election

**What you need to know:** How to make sure your vote counts in November │ Absentee ballots vs. mail-in ballots │ How to track your vote like a package │ How to prevent your mail ballot from being rejected │ More than 500,000 mail ballots were rejected in the primaries │ Where Biden and Harris stand on voting issues │ Google allows ads with 'blatant disinformation' about voting by mail

**U.S. Postal Service:** Postal Service backlog sparks worries that ballot delivery could be delayed in November │ Why the USPS wanted to remove hundreds of mail-sorting machines │ Can FedEx and UPS deliver ballots? │ The cash-strapped Postal Service │ Overhaul in USPS leadership │ Newly revealed USPS documents show the agency's 2020 ballot pressures, uncertainty

**Map:** Which states can cast ballots by mail

---

**Your profile is incomplete**
Before you can contribute to our community, please visit your Profile page in order to complete your profile.

**Exhibit 13**



*United States Senate Committee on*
## Homeland Security &
## Governmental Affairs
U.S. Senator Gary Peters | Ranking Member

# Failure to Deliver

## Harm Caused by U.S. Postmaster General DeJoy's Changes to Postal Service Mail Delivery

*A HSGAC Minority Staff Report*

## EXECUTIVE SUMMARY

In July 2020, U.S. Postmaster General Louis DeJoy, who had been serving as Postmaster General for less than one month, directed widespread changes to United States Postal Service (USPS) operations. Changes under Postmaster General DeJoy's leadership included the elimination of extra and late mail transportation trips, the reduction of equipment at mail processing plants, the start of a pilot program for mail sorting and delivery policies at hundreds of post offices, and reported reductions of overtime. Within weeks, these changes significantly slowed mail delivery across the entire country and, as Senator Peters wrote to Postmaster General DeJoy and detailed in an interim report, "compromised service for veterans, small businesses, rural communities, seniors, and millions of Americans who rely on the mail for medicines, essential goods, voting, correspondence, and for their livelihoods."[1]

On August 6, 2020, U.S. Senator Gary Peters, Ranking Member of the Senate Committee on Homeland Security and Governmental Affairs, launched an investigation into the Postal Service delays resulting from operational changes directed by Postmaster General DeJoy. As part of his investigation, Senator Peters invited the public to provide information about their recent experiences. He received over 7,700 submissions from Postal Service employees, constituents, and individuals across the country sharing concerns about the impacts of these changes. Senator Peters also repeatedly requested information from the Postal Service regarding these changes, and called on Postmaster General DeJoy to address conflicting prior statements and remaining unanswered questions when he testified before the Senate Homeland Security and Governmental Affairs Committee on August 21, 2020.

At the direction of Ranking Member Peters, this report evaluates the extent of the harm caused by Postmaster General DeJoy's directives, the reliability of claims made about who ordered these changes and how and why they were made, and the extent of service delays as a result of these changes. This report also assesses the Postal Service's procedures for moving election mail and its responses to public concerns about readiness for high volumes of election mail in 2020.

This report finds that on-time mail delivery dropped abruptly throughout the U.S., following Postmaster General DeJoy's July 2020 directives. By the second week of August 2020, on-time delivery of First-Class mail nationwide had fallen nearly 10 percentage points compared to the first week of July 2020, prior to Postmaster General DeJoy's changes – a drop that represents approximately **85 million more late deliveries** in that single week than would have otherwise occurred.[2] Widespread delays have continued over the two months since the changes began. Although service has shown some improvement by the beginning of September 2020, on-time delivery rates remain below the levels of the weeks prior to the beginning of Postmaster General DeJoy's tenure.

---

[1] Letter from Ranking Member Gary C. Peters, to Louis DeJoy, Postmaster General and Chief Executive Officer, U.S. Postal Service (July 17, 2020); Letter from Ranking Member Gary C. Peters et al. to Louis DeJoy, Postmaster General and Chief Executive Officer, U.S. Postal Service (July 30, 2020); United States Senate Committee on Homeland Security & Governmental Affairs, Ranking Member Peters Minority Report, *Interim Report on the Threat of Postmaster General DeJoy's Postal Service Delays* (Aug. 21, 2020).

[2] Estimate based on USPS First-Class mail volume data (4.15 billion pieces of First-Class mail in July 2020). "USPS Financial Dashboard for the month of July 2020," (copy on file with Committee) and staff analysis of USPS Weekly Service Performance data (copy on file with Committee).

In addition, this report finds that Postmaster General DeJoy failed to consider the likely service impacts of the transportation changes he ordered in July 2020. Postmaster General DeJoy did not conduct any analysis of the service disruptions and delays his directives could cause. He moved to abruptly and dramatically cut late and extra trips from processing centers, without addressing underlying factors, despite available information on likely negative impacts. As a result, this report finds that delays were more severe. While he has since admitted to ordering the July 2020 mail transportation changes, Postmaster General DeJoy initially refused to acknowledge his role, has denied playing a role in other changes reported by postal workers and constituents, and has continued to minimize the magnitude of the service problems and the impacts these changes have had on millions of Americans across the country.[3]

---

[3] Letter from David E. Williams, Chief Operating Officer and Executive Vice President, U.S. Postal Service, to Ranking Member Gary C. Peters et al. (Aug. 6, 2020); Letter from Thomas J. Marshall, General Counsel and Executive Vice President, U.S. Postal Service, to Ranking Member Gary C. Peters (July 22, 2020).

## **FINDINGS OF FACT**

1. **Changes directed by Postmaster General DeJoy slowed mail service across the country.**
   On-time mail delivery fell abruptly following Postmaster General DeJoy's July 2020 directives ordering operational changes to mail service and delivery. By the second week of August 2020, on-time delivery of First-Class mail nationwide had fallen nearly 10 percentage points compared to the week preceding the changes. This means approximately **85 million more deliveries were late in a single week**, compared to what the late deliveries would have been that week under on-time delivery rates before the changes.

2. **Some parts of the country saw on-time delivery drop by 15-20 percentage points in the weeks following Postmaster General DeJoy's July 2020 changes.** Every one of the Postal Service's 67 Districts across the country saw a decline in on-time delivery of First-Class mail during the weeks following Postmaster General DeJoy's July 2020 directives. In Central Pennsylvania, Northern Ohio, the Ohio Valley, Detroit, and Honolulu, on-time delivery of First Class mail fell by 15-20 percentage points over the four-week period starting on July 11, 2020, compared to the four-week period preceding Postmaster DeJoy's start at USPS. **In the Detroit District, on-time delivery fell from 84.8 percent to 65.7 percent during this period, a 19.1 percentage point drop.**

3. **Postmaster General DeJoy was not transparent about the operational changes he directed and has downplayed their damaging effects on seniors, veterans, small businesses, and others across the country.** Within one month of beginning his tenure as Postmaster General on June 15, 2020, Louis DeJoy directed significant changes to Postal Service operations but initially declined to acknowledge his role in these changes. He has since failed to fully acknowledge severe and widespread delays even after they were apparent for weeks, and the impact of these delays, including on delivery of needed medicine, or for shipping, payments, and other vital services for small businesses and the public.

4. **Postmaster General DeJoy failed to consider the likely service impacts of the transportation changes he ordered in July.** Mr. DeJoy moved to dramatically cut late and extra trips from processing centers, but did not assess or even request any analysis of the service disruptions and delays his directives could cause. From July 5 – 19, 2020, the Postal Service cut the number of weekly extra trips from approximately 15,000 to under 5,000, and cut weekly late trips from over 30,000 to under 8,000. These actions disregarded the likely negative impacts of displacing the mail carried on those trips, as well as the findings of a previously released Inspector General report that extra and late trips are used to mitigate delays in the network and that USPS should address the underlying causes of delays.

5. **Nearly two months after Postmaster General DeJoy mandated operational changes, on-time delivery has still not fully rebounded.** While there has been improvement following the steep drop in July, as of September 4, 2020, nationwide on-time delivery of First-Class mail remains below the levels during the weeks prior to Postmaster DeJoy's arrival. During the week of August 29 – September 4, 2020, on-time delivery began declining again in many parts of the country.

6. **Accounts from USPS workers contradict Postmaster General DeJoy's statements about the status of certain operational changes, including limitations on overtime – and the Postal Service has still not answered questions about these conflicting reports.**
Postmaster General DeJoy has repeatedly denied making changes to USPS overtime policies. However, information and accounts from employees across the country contradict these claims. The Postal Service has not provided any explanation for these discrepancies.

7. **The Postal Service has robust procedures to swiftly move election mail, but it remains to be seen whether these procedures will be followed.** The Postal Service has provided its election mail procedures in documents to the Committee and made public commitments to follow these procedures as well as unwritten practices – including moving election mail by the First-Class service standard. However, the Postal Service has not consistently followed its election mail procedures during the 2020 election cycle, and further significant delays and backups would jeopardize its ability to do so. The Postal Service has responded to congressional pressure by putting a greater focus on election mail, but additional oversight will be necessary to determine whether USPS will meet its stated objectives.

## RECOMMENDATIONS

1. **The Postmaster General should cease and reverse actions that are causing mail delays.** The Postmaster General failed to analyze the impact of his actions on mail delivery for Americans. Postmaster General DeJoy should halt all changes and practices that continue to cause mail delays for Americans. If the Postmaster General does not halt such changes, the Board of Governors must use its authority to do so.

2. **Congress should pass the *Delivering for America Act,* which Senator Peters has introduced to prevent the Postmaster General from making any further changes that could harm service during the COVID-19 pandemic.** Americans count on reliable service from the Postal Service, particularly during this public health crisis. Making any big changes at the Postal Service during this time is not only risky, it puts Americans' lives at risk. The *Delivering for America Act* would prohibit the Postmaster General and USPS leadership from implementing any changes that would disrupt operations and services during the COVID-19 public health emergency, including:

   - Any change that would prevent the Postal Service from meeting its service standards or cause a decline in service performance.
   - Any change that would have the effect of delaying mail, allowing for the non-delivery of mail to a delivery route, or increasing the volume of undelivered mail.
   - Any closure, consolidation, or reduction of hours of a post office or facility.
   - Any prohibition on payment of overtime to Postal Service officers or employees.
   - Any removal, decommissioning, or other stoppage of mail sorting machines, other than for routine maintenance.

3. **The Postal Service should follow policies and practices for swiftly delivering election mail, including treating all election mail as First-Class mail.** Postmaster General DeJoy must follow through on his promises to follow all election mail procedures. The Postmaster General and Board must ensure the Postal Service continues to strictly follow its practice of treating election mail as First-Class mail, delivering it using the highest service standard. The Postal Service must also carry out proper procedures to ensure mail is swiftly processed and not lost. This requires that leadership first eliminate any changes that are causing backups and delays.

4. **The Postal Service should consult with Congress and stakeholders before enacting any future changes.** Postmaster General DeJoy's changes, portrayed as a necessary approach to cost-cutting at the Postal Service, without regard to the chaos it has caused for Americans, raises significant concerns about his approach to the Postal Service's future. Before making operational changes in the future, the Postmaster General must conduct robust analysis, consult with stakeholders, follow all laws pertaining to Postal Regulatory Commission input and public consultation, and ensure there are no negative effects on mail service. Postmaster General DeJoy and the Board, who are currently formulating a 10-year plan for the Postal Service's operations and solvency, must not take the approach of cutting services to pad the bottom line. They must engage with stakeholders, Congress, and the American people about the future of the Postal Service, which belongs to the people.