**Exhibit 15**

__Our journalism needs your support now. Subscribe to NJ.com »__

Advertisement

__Coronavirus__

# What you need to know about N.J.'s mostly mail-in ballot elections, with all the controversy

Updated Sep 21, 2020; Posted Aug 15, 2020



__N.J. will be mostly mail-in voting during November election__

3,785
shares

By __Brent Johnson | NJ Advance Media for NJ.com__

This fall's elections in New Jersey — including the race for the White House — won't be normal in these not-so-normal times.

Gov. Phil Murphy on Friday signed an executive order for the Nov. 3 elections to be conducted in __a hybrid__ e's active n-person



Support local journalism that serves you.

polling locations across the state where people can cast a paper provisional ballot.

Advertisement

Murphy said you can put your ballot in the mail, drop it in one of several secure boxes to be set up across the state, bring it to polling location on Election Day, or vote provisionally in person.

This comes despite extreme opposition to widespread mail-in voting from President Donald Trump, as well as from other Republicans and some county officials in New Jersey, who warn about the potential for voter fraud.

It also comes after New Jersey's attorney general filed voter fraud charges against candidates in Paterson related to an all-mail-in election earlier this year.

Plus, there's concern over how the U.S. Postal Service will handle mail-in voting this fall. It was revealed later Friday that the agency sent New Jersey and other states a warning letter that it can't guarantee all mail-in ballots will be delivered in time to be counted. One New Jersey congressman wants the state attorney general to conduct a criminal probe into Trump and the postmaster general for "interfering" with state elections.

"As much as we enjoy the time-honored traditions of joining our neighbors on line to cast our ballots on Election Day, and as much as we are energized by seeking packed polling places, we must recognize that this is not a regular election year," Murphy, a Democrat, said Friday during his latest coronavirus briefing in Trenton.

Here's what you need to know about the new voting setup:

**Every active registered voter will automatically receive a ballot with prepaid postage in the mail.**

Usually, you have to request a ballot to vote by mail in New Jersey. But under this order, county clerks must mail ballots with prepaid postage to all of the state's approximately 6.2 million registered voters by Oct. 5.

There will be no sample ballots. What you receive is what you use to vote.

If you vote by mail, all ballots must be sent through the U.S. Postal Service, postmarked by Nov. 3, and received by county election boards by 8 p.m., Nov. 10 — a week after Election Day.

Ballots that lack postmarks because to postal error must be by 8 p.m. Thursday, Nov. 5 to be counted — 48 hours after in-person polls have closed.

The goal of a largely mail-in election is to create more social distancing by cutting down lines at polling locations and to give people concerned about voting in person an alternative.

nj.com  Support local journalism that serves you.

There will be at least one physical polling location in each of New Jersey's 565 municipalities, but most people won't vote via the machines we're all accustomed to using.

Instead, voters will cast paper provisional ballots at those locations, though there will be ADA-conforming voting machines for those with disabilities.

Provisional ballots are counted later, after election officials can verify if you haven't already voted by mail.

Counties must make sure there are enough polling places to accommodate at least half of their voters.

In a normal year, there are 3,400 polling sites in New Jersey. There were 1,600 during the state's mostly mail-in July 7 primary. There isn't a final number for November yet.

You can also bring your mail-in ballot to an in-person site to make sure it's dropped off, Murphy said.

**The state will also set up secure boxes where you can drop your ballot.**

There will be at least 10 in each county, officials said. That's at least twice the 105 used during the July primary.

"Ensuring not only that everyone gets a ballot, but that they have secure ways of returning that ballot, are central to our belief that our democracy stronger when everyone has the opportunity participate in it," Murphys aid. "This mattered before the pandemic and has even greater urgency now."

**All public schools in New Jersey will be closed to in-person instruction on Election Day.**

That, Murphy said, is to allow schools to be used as polling places.

**There will be a new online voter registration system.**

Murphy said it will be up by Sept. 4, "giving new voters an added ability to ensure they get registered."

You can check your registration status on the state's elections website. You have until Oct. 13 to register.

**What if you don't receive a ballot in the mail?**

If you have problems, you ca visit the state's elections website, call the state's Voter Protection hotline at 1-877-NJVOTER, or reach out to your local officials.

**You can also track your ballot on the state's elections website.**

That will show if it gets back to your county's board of elections, New Jersey Secretary of State Tahesha Way said.

"Now expect everything to take time, but stay on top of where your ballot is," Way said.

**New Jersey had a similar setup in the July primaries.**

Voting was mostly mail-in, with some in-person voting across the state. The state also delayed a number of local elections earlier in the year and made those races vote-by-mail only.

Murphy said the primary gave the state "the opportunity to see what worked and where we could make improvements to this kind of election."

**But November will be larger scale — and higher stakes.**

  Support local journalism that serves you.

Of course, there's the big presidential race pitting Trump, a Republican, against former Vice President Joe Biden, his Democratic challenger.

Plus, U.S. Sen. Cory Booker, D-N.J., is running for re-election against Republican Rik Mehta. And all 12 of New Jersey's U.S. House seats are on the ballot. There are local races, as well.

Turnout is expected to be much higher than the primary.

**Trump isn't a fan of widespread mail-in voting.**

He and other Republicans have spoken out against it repeatedly in recent weeks, warning it could lead to fraud and delayed results.

Trump has argued without evidence that the 2020 election could lead to "the greatest fraud in history."

This could set up a collision course between Trump and Murphy after months of playing nice with each other during the pandemic.

**How common is voter fraud?**

Voter fraud in the U.S. is historically rare, according to multiple studies and statistics. Nearly 1 in 4 voters cast ballots in the 2016 presidential election via mail.

**Still, New Jersey has had issues with mail-in voting this year.**

Some voters received the wrong ballots in the mail and some results took weeks to become official. Also, about 1 in 10 people who mailed in ballots in May's special elections had their votes rejected.

And there were allegations of voter fraud in the Paterson City Council race in May. State Attorney General Gurbir Grewal filed voting fraud charges against a city councilman and a councilman-elect.

Murphy said Friday that this is actually "positive" because "law enforcement is all over it."

"If you screw around, you will be caught and be held accountable," he said.

**There's concern about the U.S. Post Office.**

Democratic lawmakers want $3.6 billion in federal funding for mail-in voting and $25 billion to the U.S. Postal Service as part of coronavirus stimulus negotiations. But Trump said he's against that.

"If they don't get those two items, that means you can't have universal mail-in voting because they're not equipped to have it," he said Thursday.

Meanwhile, Thomas Marshall, the Postal Service's general counsel and executive vice president, sent New Jersey's secretary of state a letter July 30 saying that "certain deadlines for requesting and casting mail-in ballots are incongruous with the Postal Service's delivery standards."

That creates a "significant risk" a ballot could be requested and returned too late to be counted, Marshall said.

Still, some of his concerns involved residents requesting to vote absentee, which won't be necessary because everyone will automatically be sent a ballot. Plus, the state is giving a week for clerks to receive ballots after Election Day.

nj .com   Support local journalism that serves you.

Murphy said Friday "it's ridiculous the post office is being politicized."

But, he said, "I believe with all my heart it will be funded and cooler heads will prepare."

U.S. Rep. Bill Pascrell Jr., D-9th Dist., has asked New Jeesey's state attorney general to investigate whether Trump and U.S. Postmaster General Louis DeJoy are trying to subvert the general election by slowing down delivery and refusing to adequately fund the Postal Service.



**Some Republicans blasted Murphy's move.**

State Sen. Kristin Corrado, R-Passaic, said it "makes absolutely no sense."

"If New Jersey residents can stand in long lines at Motor Vehicles, we should be able to wait 6 feet apart at the polls in November," Corrado said. "The reality is most people don't have to stand around too long waiting to vote. Many are in and out of polling centers in a matter of minutes."

State Sen. Michael Testa, R-Cumberland, said the plan will "create unnecessary confusion."

**He's what Dr. Fauci says about in-person voting.**

Dr. Anthony Fauci, the White House's leading infectious disease expert, said recently: "If you go and wear a mask, if you observe the physical distancing, and don't have a crowded situation, there's no reason why you shouldn't be able" to vote in-person.

"I mean, obviously if you're a person who is compromised physically or otherwise, you don't want to take the chance," he added.

**New Jersey is not alone.**

New Jersey is one of four states, plus Washington, D.C., to announce they will proactively mail ballots to voters before the election this year.

Five states already have mostly mail-in elections: Colorado, Hawaii, Oregon, Utah, and Washingon.

*Our journalism needs your support. Please subscribe today to NJ.com.*

*Brent Johnson may be reached at bjohnson@njadvancemedia.com.*

Note to readers: if you purchase something through one of our affiliate links we may earn a commission.

Support local journalism that serves you.

# ADVANCE
## LOCAL

registration on or use of this site constitutes acceptance of our **User Agreement**, **Privacy Policy and Cookie Statement**, and **Your California Privacy Rights** (each updated 1/1/20).

© 2020 Advance Local Media LLC. All rights reserved (**About Us**).

The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

**Community Rules** apply to all content you upload or otherwise submit to this site.

▷**Ad Choices**

**nj**.com  Support local journalism that serves you.

**Exhibit 16**



# Counting the Vote During the 2020 Election

# Introduction

On the evening of November 3, 2020 when the last votes are cast and polling places officially close, hundreds of millions of Americans will tune into news coverage to find out who won the presidential election—except they will not find their answer. Viewers may have to wait days or longer for enough initial results to be reported from decisive swing states for the race to be called.

More ballots than ever before will not be counted at the polls on Election Day—perhaps more than half of all ballots. Instead they will be cast at home and returned to elections offices to be counted centrally. Unlike the handful of states that have voted predominantly by mail for years, reviewing, processing, and tallying ballots in most states is a time-intensive and often manual process—and in some states officials cannot even begin the process until Election Day.

The coronavirus pandemic has greatly disrupted the 2020 U.S. election. One consequence, unusually slow results reporting, poses a serious threat to the election's legitimacy. Election officials and policymakers now have little time to make necessary but implementable adjustments.

There is nothing objectively wrong with a slow vote counting process—many states with extensive mail voting are accustomed to a long period for counting, canvassing, auditing, and certifying election results. In some states like California, election results are not certified for nearly a month. After all, it is better to get the count right than to push results out too quickly, which could cause errors. The real difference this year will be that media organizations may be

**This report is a product of the BPC Task Force on Elections**

By: Tim Harper, Rachel Orey, Collier Fernekes

August 2020

unable to call the race soon after election night because too few ballots have been reported, especially if the race is very close.

Policymakers, political campaigns, and the media are not accustomed to slow returns in decisive states. Without a full understanding of these issues, many may unwittingly spread misinformation or make unfounded claims of fraud or misconduct that will harm voter confidence and distract election officials from the important work of getting the results processed accurately. The resulting impact on voter confidence could undermine the legitimacy of the election.

Counting the vote and results reporting will take longer than usual this year for a variety of reasons. Notably, there will be a massive increase in voting by mail. Based on evidence from primary elections since COVID-19 lockdowns began, BPC has estimated 50%-70% of all ballots will be cast absentee—up from less than 25% nationally in 2018.[1] In some states, absentee voting rates will increase several fold.[2] In many states, election systems are simply not set up to accommodate the expected increase in people voting by mail, and election officials will be overwhelmed.

Other factors will also slow the counting process. Voters unaccustomed to casting absentee ballots may request them late, send them back at the last minute, and are more likely to need to fix signature discrepancies. Election officials will need more time to duplicate a larger number of unreadable ballots and to process provisional ballots, which could increase this year as voters who attempted to request an absentee ballot do not always receive them. Ongoing court action and anticipated record turnout could further draw out the wait for a clear winner.

Election administrators and policymakers can undertake policy interventions to mitigate the length and consequences of a slower-than-normal vote count. This report provides guidance on best practices and key considerations at each step of the counting process up to the reporting of initial results. After the reporting of initial results, steps in the counting process also include canvassing, auditing, and certifying election results, but these components are not discussed in this report. Importantly, implementation of these policies and practices must be an immediate priority.

---

1   "The Election Administration and Voting Survey," The Election Administration and Voting Survey § (2017), pp. 1-226, https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf.

2   In Wisconsin, where 6% of votes are typically cast by mail, 60% voted by mail in the presidential primary election. "April 7, 2020 Absentee Voting Report," Wisconsin Election Commission (2020), pp.1-24, https://elections.wi.gov/sites/elections.wi.gov/files/2020-05/April%202020%20Absentee%20Voting%20Report.pdf

# Summary of Recommendations

The Bipartisan Policy Center's Task Force on Elections comprises state and local election officials from across the country. The Task Force published a full report with recommendations on the entire election administration ecosystem—registering voters, casting ballots, and counting votes—in January 2020. That report, *Logical Election Policy*, remains relevant in spite of the upheaval in elections caused by COVID-19 and forms the foundation of the recommendations included in this report.

The Task Force urges policymakers to consider the following recommendations to improve the vote counting process this election season:

- Remove excessive absentee ballot verification measures, such as requiring witnesses or a notary, to help make absentee voting accessible to all voters. States should instead rely on signature verification—a process already used by thirty-one states.

- Allow sufficient time for voters to cure deficiencies in vote-by-mail ballots, even if this period extends beyond Election Day.

- Request additional points of contact, such as a voter's email address or cell phone number, during the voter registration and absentee ballot application process. This is especially important for jurisdictions which allow signature curing. This information should be exempt from public disclosure.

- Allow election officials to begin processing ballots at least seven days before Election Day. Note, however, election administrators should also be restricted from producing results until the polls have closed.

- Rely on automated processes for unofficial results reporting to reduce the likelihood of human error when entering preliminary results into the jurisdiction's centralized reporting system.

- Communicate any changes to results reporting processes—especially those relating to how potential errors will be addressed—to the public as soon as possible before the election takes place.

- Follow CDC guidelines for how to conduct safe, in-person voting on Election Day, and encourage voters to take advantage of early and vote-by-mail options.

- Consider new, socially distanced ways to distribute teams that conduct signature verification and canvassing. When necessary, larger jurisdictions with a bigger influx of mail ballots should consider renting facilities such as arenas in which the verification, account, and canvassing process can take place.

- Use United States Postal Service resources for mail ballot design and integrate official mail ballot logos, barcodes, and tags, into election mailings. Administrators should also build relationships with the USPS. Coordinating with the USPS can help ensure that mail ballots meet USPS standards, helps the USPS process outgoing mail ballots swiftly, and allows for easy troubleshooting should any issues arise on or near Election Day.

- Provide ballot tracking tools for voters to increase voter confidence and transparency.

- Provide voters with a variety of options to drop off their ballots—in a secure drop box, at the local elections office, or at the polls. This move will help to reduce the number of ballots being channeled through the USPS and helps to address accessibility barriers to voting.

## DEFINING THE COUNTING PROCESS: ENVELOPE OR NO ENVELOPE

When voters cast their ballot, their act of voting is generally over. Voters rightfully expect once they put a ballot in a mailbox or slide it into a tabulator at the polls, it will be counted. But for election officials, receiving the ballot is only one step in a long list of tasks to make sure every vote is accurately counted and reported. The way a ballot is received, whether it is in an envelope or not, is a key component in making those decisions.

The figure below shows the policy and logistical considerations unique to the two primary methods of ballot receipt by administrators. Whether a ballot is in an envelope or not fundamentally changes how election officials handle them. Those cast without an envelope are placed directly into a tabulator or ballot box—the act of verifying those voters is complete so the ballots can be counted without additional review. However, ballots cast in envelopes—whether by mail, dropped off at an elections office or precinct, or cast in person during early voting or in-person absentee voting, as well as on Election Day using a provisional ballot—undergo several additional steps before being placed into a tabulator.

The eligibility of the voter who is casting their ballot away from the polls must be verified, the ballot must be separated from the identifying information, and then sorted so that it can be counted in the correct precinct or ballot style. Unlike in-person ballots, ballots returned in envelopes are most often processed centrally rather than at the polling place.

4

## Inbound ballots



While previously votes were cast mainly in person, this year that balance has flipped: election administrators in many states will receive more absentee and mailed ballots than ever before. The resources allocated to counting ballots at the polls and at central ballot counting facilities will need to be adjusted accordingly. Many jurisdictions are unaccustomed to receiving large quantities of ballots in envelopes and unlike all-mail voting states, have to process and count these ballots without significant automation.

Addressing this change in election administration will define success or failure this year. Therefore, this report will focus on the process of counting ballots cast in envelopes, beginning with signature verification. Importantly, the category of ballots cast in envelopes also include some ballots that are cast in person at a precinct or voting center. Some states have in-person absentee voting or use mail ballot procedures during in-person early voting.[3] Additionally, ballots cast provisionally are also placed in envelopes and undergo additional scrutiny.

While this report focuses on ballots in envelopes, the Task Force on Elections

---

3    "State Laws Governing Early Voting." *National Conference on State Legislatures.* 2 Aug. 2019. Accessed 8 July 2020. Available at: https://www.ncsl.org/research/elections-and-campaigns/early-voting-in-state-elections.aspx#Early%20Voting%20Law%20Table. Twenty states and the District of Columbia allow voters to vote in-person early without relying on a mail ballot, while 16 states offer in-person absentee voting, in which voters submit an absentee ballot in-person at a polling place or vote center before Election Day.

believes it is essential that meaningful in-person voting options remain avail-
able for voters that are not interested in or able to vote by mail. For example,
some voters will not think to request their ballots by mail in time to receive
them and cast them before deadlines. These voters will need an in-person
option. Also, voters with disabilities have limited options when using paper bal-
lots. Fully accessible voting options are available in person. And there are states
that are planning—for now—to run mostly normal Election Day operations.

## SIGNATURE VERIFICATION AND CURING

As absentee and by-mail voting comes under fire as needlessly raising the
risk of fraud, it is helpful to understand the options available to keep absentee
voting secure. In a June 2020 interview with BPC, the state of Washington's
Director of Elections Lori Augino said the "[t]he linchpin of our [mail ballot]
security is signature verification."

Before a mail ballot can be counted, election officials must first confirm the
voter's identity and eligibility to vote. The most common way of doing this is
to compare the signature and other details provided on the absentee ballot en-
velope with those on file at the elections office. Including Washington state—
which has sent mail ballots to all voters since 2005—a total of 31 states use
signature verification to confirm the identity and eligibility of the voter prior to
counting their ballot.

Other states use alternative methods of verifying eligibility, such as requiring
the signature of a witness or notary public or requiring additional identifica-
tion—like a copy of the voter's official identification card—be included with
the ballot or ballot application. Some even require a combination of several of
these steps. Alabama, for instance, requires voters to include a copy of their ID
in addition to signing the ballot and providing a notary or two witness signa-
tures.

Excess notary and identification requirements tend to be an unnecessary
burden for voters and election administrators responsible for reviewing these
additional pieces of information. In applicable states, **policymakers should
consider removing additional verification measures, such as requiring
several witnesses or a notary signature on an absentee ballot**. Signature
matching has proven to be an effective security measure, and removing addi-
tional verification measures makes the voting process less cumbersome and
more accessible.

While effective, not all states are created equal when it comes to signature
verification. As the COVID-19 pandemic forces many states that typically relied
on in-person voting to quickly transition to voting by mail, we are seeing rates
of absentee ballot rejection rise. For instance, in the 2018 general election New

6

Jersey rejected only 3% of absentee ballots, but this number increased threefold to 9.6% in the state's May 2020 special election, conducted largely by mail in the throes of the pandemic.

The increase in ballot rejection rates as more voters cast vote-by-mail ballots indicates the signatures some states have on file are incongruent with the signatures voters use. All vote-by-mail states typically retain a record of all signatures that are received from voters—the original used to register to vote, ones used to sign previous ballots, and updated signatures filed at the DMV. This helps ensure the signatures election officials have on file remain current as voters age and change their signatures over time. Unfortunately, many states that have historically relied on in-person voting only have a single signature on file for each voter, and in many cases, it is several years old. States' reliance on outdated signatures reinforces the need for a comprehensive signature curing option that gives voters the chance to rectify signature errors before their ballot is rejected.

## Signature Curing

While most states use signatures to verify absentee ballots, only 20 states contact voters to notify them of any issues on the returned ballot envelope, such as a missing or mismatched signature.[4] Some states automatically reject such ballots from otherwise qualified voters. The EAC reported in 2016 that 47% of rejected ballots were due to missing or invalid signatures.[5] Signature curing, the process of allowing voters to remedy problems identified on their ballots after submission, safeguards voters' ability to have their ballots counted when errors arise. Contacting voters about signature errors also provides an additional level of protection against fraud. Voters that did not request a ballot, or did not vote their rightful ballot themselves, can communicate this as a reason for signature issues on their ballot.

**BPC's Task Force on Elections urges states to allow sufficient time for voters to cure eligibility deficiencies in vote-by-mail-ballots, even if this period extends beyond Election Day.** Several states allow ballot curing only through Election Day, inadvertently disadvantaging voters who submit their absentee ballots nearer to the date of the election. If voters must fix signature issues by Election Day, those who cast ballots near the deadline may have insufficient time to address signature deficiencies.

New Jersey, a state which saw a threefold increase in absentee ballot rejection

---

4   "Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options" National Conference of State Legislatures. 22 June 2020. Accessed: 23 June 2020. Available at: https://www.ncsl.org/research/elections-and-campaigns/absenteeand-ear

5   "The Election Administration and Voting Survey," The Election Administration and Voting Survey § (2017), pp. 1-226, https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf.

rates during its May 2020 special election, has since made admirable progress in signature curing. Three weeks before the state's scheduled primary, New Jersey reached an agreement requiring county boards of elections to notify voters within 24 hours of a decision to temporarily reject their ballots. Voters were then able to fix any signature deficiencies by filling out a form and returning it to their respective county Board of Elections by July 23, which was 16 days after the close of polls.

New Jersey's move to allow voters to cure signature issues up to 16 days after the primary election—ultimately the result of a federal lawsuit against the state—is an excellent example of a policy that accounts for the entire ecosystem of election reforms (curing and timeline changes), rather than one single aspect (allowing curing alone). While New Jersey's decision to require signature curing was a critical move in protecting voting rights, expanding signature curing does not come without side effects. Namely, signature curing can be an expensive and timely effort, and one that it is likely to delay the reporting of election results even more than already anticipated.

Not only do states need to consider the downstream policy impacts of signature curing, states also need to consider upstream policy changes that are needed to make signature curing more efficient and effective. **BPC's Task Force on Elections also recommends that all states, especially those which allow signature curing, request additional points of contact, such as a voter's email address or cell phone number, during the voter registration and absentee ballot application process, and make this information exempt from public disclosure.** Having additional points of contact on hand beyond the voter's address allows states to have more ways to reach voters during the curing period to ensure their ballots are accepted for counting. Exempting this information from public disclosure can help election administrators make voters feel comfortable providing these personal details because they cannot be sold or collected by campaigns.

BPC has long recommended that states allow voters to cure signature errors; however, when possible, election officials, state legislators, and members of the public should consider the upstream and downstream policy impacts of signature curing—collecting additional points of contact and adjusting ballot counting timelines, respectively—before implementing it.

## PROCESSING ABSENTEE BALLOTS

Processing ballots does take time. Once a voter has been verified, ballots are sorted and placed in batches. They can then be removed from the outer envelope, separated from any privacy envelope, and fed by batch through a ballot scanner.

8

In Ann Arbor, MI, processing a single ballot takes an estimated 45 seconds.[6] For Ann Arbor's estimated 100,000 registered voters, assuming high turnout and anticipated increased voting by mail, these steps might take between 600 and 800 working hours. High speed tabulation equipment will improve the tabulation time, but the time-consuming work is in opening envelopes, matching ballot numbers, removing the ballots from the secrecy pouch and flattening in preparation for tabulation. Currently, laws in Michigan do not allow this work to begin until 7 a.m. on election morning.

The issue is particularly acute this year. In most states, absentee voting typically accounts for a small percentage of all votes cast in an election. In 2018, only about 23% of all votes nationwide were cast absentee.[7] Earlier this year, BPC estimated that as a result of COVID-19, 50%-70% of all votes will be cast by mail and it could be much higher in several states.

The labor and time required to process ballots can be addressed in a few ways: adding additional staff, extending hours, and purchasing machines to automate the process.[8] But **the simplest and cheapest option is to give election administrators more time in advance of the election to complete these steps**. Most states allow election officials to begin processing mail ballots before the election, but 15 states and the District of Columbia do not, including Michigan, Wisconsin, and Pennsylvania.[9] Those three battleground states determined the outcome of the 2016 presidential election and could also decide the 2020 outcome. Without additional time to process ballots, election results reporting could take a long time, opening an opportunity for candidates and groups to sow doubt over the outcome of the election and harming voter confidence in the integrity of the vote.

In some states, such as Michigan, there is another headache for election administrators: a statutory requirement that election officials must remain working

---

6   Data provided by Ann Arbor, Michigan

7   Miles Parks, "Why Is Voting By Mail (Suddenly) Controversial? Here's What You Need To Know," June 4, 2020, https://www.npr.org/2020/06/04/864899178/why-is-voting-by-mail-suddenly-controversial-heres-what-you-need-to-know.

8   Some states have taken action to address the impact of Department of Motor Vehicle closures. In Minnesota, for instance, driver's licenses and identification cards that expired within a certain window will still be considered valid, even after their listed expiration date. Election officials in Minnesota are working closely with the DMV to ensure that no voter is excluded whose official identification expires in this time frame. However, working with the DMV to verify expiration dates and determine if they fall within the timeline adds even more labor and time to the ballot counting process, reaffirming the importance of giving election officials additional time to process ballots in advance of the election.

9   "Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options" National Conference of State Legislatures. 22 June 2020. Accessed: 23 June 2020. Available at: https://www.ncsl.org/research/elections-and-campaigns/absenteeand-ear

until the unofficial count is completed.[10] With heavy turnout and a significant influx of absentee ballots, this could mean volunteers and officials are required to continually count for days on end under current law. This provision was put in place for a very different election system and is unrealistic this year. More-over, requiring these grueling hours could cause exhausted administrators and counting teams to make mistakes.

States hesitant to allow administrators to pre-process mail ballots often cite concerns results may leak in advance of Election Day. But numerous states, including Florida and Ohio, allow pre-processing already, and leaks in advance of Election Day are nearly unheard of. These states provide a model for leg-islative provisions to ensure the safety of results. Ohio law allows ballots to be scanned, but bars officials from printing tabulated results. Pre-processing statutes should also be accompanied by criminal penalties against leaking re-sults. In Florida, where processing mail ballots can usually begin 22 days before the election, officials are subject to third degree felony penalties if results are released early.[11] **BPC's Task Force on Elections recommends that states allow election officials to begin processing ballots at least seven days before election day, but election administrators should also be restricted from producing results until election day.**

## PROCESSING PROVISIONAL BALLOTS

Election officials will also need to consider procedures for processing provi-sional ballots, which are placed in envelopes and are kept separate from other ballots until after the election. Provisional ballots provide a federally-mandated failsafe for voters that show up on Election Day to vote but encounter problems with their eligibility. Eligibility issues could be that a potential voter is not on the voter registration list, arrived to vote at a polling place other than their as-signed precinct, lacked a required identification document, or a number of other reasons as outlined in state law.

These ballots usually account for a small proportion of ballots cast on Election Day.[12] It is possible, however, the number of provisional ballots will increase this year because many jurisdictions have experienced poll worker shortages

---

10  Another state, Minnesota, also has this requirement. However, the deadline for finishing processing absentee ballots was extended three days after Election Day this year.

11  On March 27, 2020, Governor Ron DeSantis issued Executive Order Number 20-149 which, among other election reforms, removed the 22-day preprocessing limit and allowed County Canvassing Boards to begin canvassing mail ballots "upon completion of the public Logic & Accuracy Testing of tabulation machines and equipment."

12  "The Election Administration and Voting Survey," The Election Administration and Voting Survey § (2017), pp. 1-226, https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf.

that have forced polling place closures and consolidations.[13] Limited hours for government services like Department of Motor Vehicles throughout the year could also lower the number of voters that have updated their registration after moving this year.[14] Additionally, some voters that requested an absentee ballot may wish to vote on Election Day for any number of reasons—such as failure to receive their ballot in time or due to fear their ballot did not arrive back to their local election official in time to be counted, which would also entitle voters to provisional ballots in at last 16 states plus the District of Columbia.[15]

Processing provisional ballots can be even more onerous than absentee ballots. Prior to the customary steps for verifying a voter's signature, election officials must review the voter's eligibility on voter rolls and may have to contact the voter for additional information or identification before making a determination of whether to count a provisional ballot. As with absentee ballots, election officials often have extremely compressed timeframes to contact voters for this additional information or identification. Collecting and keeping emails and phone numbers on file can help officials contact voters quickly.

Provisional ballots often remain uncounted for weeks after the election. In some states, these ballots are not included in the count until the conclusion of the canvass, often one to four weeks after the election. This could draw out the race, particularly in a close election that remains too close to call.

This November, election officials could see an increase in the share of provisional ballots received on Election Day. As such, election officials, journalists, policymakers, and members of the public alike should keep in mind the additional layers of security and complexity that provisional ballots pose on the counting process—layers which prolong an already time-intensive path to achieving official results.

---

13  Consolidating polling places into large event venues like convention centers or arenas could help to remedy this issue because voters arriving in the wrong precinct may simply have to walk to a different precinct located in the same facility to cast a regular ballot rather than a provisional.

14  Nine states plus DC require use of a provisional ballot if a voters address or name have changed. "Provisional Ballots," National Conference of State Legislatures, 15 October 2018. Accessed: 17 July 2020. https://www.ncsl.org/research/elections-and-campaigns/provisional-ballots.aspx#voter%20inform

15  Ibid.

# REPORTING UNOFFICIAL RESULTS

Most voters consider the results they see on election night to be the official results of the election. However, election results are often not made official until weeks after Election Day, when election administrators complete an official canvass and certify the results.[16]

States and localities across the country each have different ways of reporting unofficial results on election night. Typically, local election officials are required to submit preliminary results into the state's centralized results reporting system at designated times. These preliminary results are then verified over the coming weeks as election administrators complete their official canvass.

It's important to note that the process of releasing initial and final results is distinct from news organizations "calling" races on election night. A consortium of media organizations works together to facilitate networks "calling" the election. What Americans see on their screens is usually a hard number of ballots counted thus far and an indication of "precincts reporting." That metric—precincts reporting—has become less reliable over time and leads to a misunderstanding of what viewers are seeing.

In many cases, the first results revealed on election night represent the absentee ballots that were returned earliest and totals from in-person early voting. As the percent of the vote cast outside the Election Day precinct rises, these numbers—which generally aren't assigned to "precincts"—become more important. Moreover, any numbers from a precinct tends to constitute "precinct reporting," even if it is not the full data from the precinct. The media consortium uses a number of models and publicly available voting data, but voters must remember what they are seeing is preliminary and incomplete.

Many states have reporting requirements that are not well suited for the high rates of voting by mail that we predict will happen this fall. For example, states which require election officials to work continuously until the count is complete could see a higher frequency of ballot counting errors resulting from fatigue. Because the bulk of mail-in ballots are typically submitted close to or on Election Day, experts predict that completely counting all ballots after the close of polls could take days. Minnesota accounted for this extended timeline by giving election officials an extra two days after Election Day to process absentee ballots and did not stipulate that election officials had to work without interruption to do so.

---

16  This report focuses on counting the vote through the initial reporting of results, but more information about post-election processes, and canvasses specifically, can be found here on the U.S. Election Assistance Commission's website.

As this report is being written, lawmakers in Michigan are working to pass a bill that would allow election officials in cities with at least 10,000 people to work in shifts while processing absentee ballots.

Even with reforms like these in place to reduce the strain on election administrators in the days following the election, officials will still be under extreme pressure from both the public and politicians to produce results in a timely manner. Accordingly, the unfortunate combination of fatigue and public pressure increases the need for automated systems which help prevent human error in the counting process. **BPC recommends that states rely on automated results reporting systems, as they both help identify irregularities and are less prone to error**.

While election officials do their best to ensure that even early results are accurate and reliable, preliminary results are unofficial for a reason. There is simply not enough time on the night of the election to double check all vote totals provided by poll workers to the local election administrator at the end of the evening. Numbers may get transposed or keyed in incorrectly; these errors will be caught. In the unlikely event of a counting process error, states generally have clear procedures for quickly rectifying the error and ensuring all results posted are accurate. That said, **as states continue to make changes to their election laws due to COVID-19, election officials must communicate to the public ahead of the election how they will address errors in the count, should they occur**. This will help increase accountability and transparency and protect against claims of bias or fraud.

Failing to communicate how election officials should address discovered errors can result in mayhem on election night, as demonstrated by Maryland's June 2, 2020 primary. Late on the night of the election, the discovery of a ballot printing error caused unofficial results for Baltimore's mayoral primary to be removed from the state's website without any explanation from state election administrators. This series of events was described as "chaotic" and sowed "widespread confusion"—an unnerving example of the potentially catastrophic implications of failing to communicate how errors should be dealt with when changes to election administration are made.

## PUBLIC HEALTH AND COUNTING THE VOTE

The coronavirus pandemic has raised widespread concerns about how to safely conduct 2020 elections. The CDC has issued guidance to help election officials conduct elections safely, but they mostly focus on reducing risks at the polls. These recommendations include reducing crowds on Election Day by encouraging voters to take advantage of early and mail voting options, promoting social distancing and good hand hygiene, disinfecting shared surfaces, and providing personal protective equipment, or PPE, for poll workers.

13

Election administrators are already heeding this advice and working hard to protect the health and safety of their staff, poll workers, and voters from exposure to the coronavirus—and they are doing it with limited time and resources. According to members of BPC's Task Force on Elections, some of the priorities for administrators include paying for postage on absentee ballots, purchasing counting equipment to accommodate more mail voting, and stocking cleaning supplies and PPE for the polls.

But it is also important for election administrators to apply public health guidance to the counting process as well. This is no small task—many election offices use two-person, bipartisan teams for signature verification and canvassing. These teams typically sit close together in small rooms that make social distancing difficult. With the influx of mail ballots, administrators will need more teams, and will need to put more space between them, to abide by social distancing guidelines.

Small jurisdictions may be able to repurpose their offices to make space for counting mail ballots, but large jurisdictions with a high number of mail voters may need to consider renting larger facilities for processing and reviewing ballots. Of course, providing additional time to process absentee ballots can also help officials limit risk by using a smaller number of volunteers over a longer period to verify signatures.

**In addition to incorporating social distancing, election officials should also create policies to prevent the spread of the virus in counting facilities**. These include providing and requiring masks, rotating staff to clean and sanitize surfaces, practicing hand hygiene frequently, and laying out acceptable reasons for absenteeism, particularly if workers experience symptoms of COVID-19.

Finally, **election administrators should prioritize recruiting polling workers for in-person elections to prevent long lines**. Because most regular poll workers are over 60 and are at high risk of serious health complications from COVID-19, many will stay home this election. Filling the gaps in volunteers will be extremely difficult without new incentives. Therefore, states should increase poll worker pay and pursue other creative solutions, such as advocating for government employees and teachers to work the polls, and should seek out corporate partnerships. States that require potential poll workers to work in the jurisdiction in which they live should relax these provisions to ensure polling places in areas with the most need are staffed. **These steps can help keep as many in-person polling places open as possible and reduce the prevalence of long lines**.

These solutions have associated costs. Fortunately, federal dollars appropriated for elections in the CARES Act can be used for these expenses, according to the EAC. However, additional funding will be necessary. **BPC estimates that an additional $1.1 billion in emergency assistance would be necessary to fully meet the needs of elections administrators for the 2020 election cycle**.

**14**

# MAIL LOGISTICS

## Obstacles to Mail Ballot Delivery and Receipt

During the 2020 primary season, several states—including Georgia, Wisconsin, and the District of Columbia—experienced problems getting mail ballots to voters. Voters reported receiving ballots with little or no time to return them by the deadline, despite requesting them well in advance. Some voters reportedly never received their ballots at all.

These and other problems can cause ballots to arrive late. Data from 2016 shows 23% of all absentee ballots rejected that year were disallowed because they were returned after the deadline, the second most common reason for rejection.

Importantly, many of these ballots are returned late by voters at no fault of election officials or the USPS. However, in some instances policy can make late delivery more likely. For instance, in some states the deadline to request a mail ballot closely abuts election day, making it unlikely voters can return their ballot by mail on time because a it takes several days to get to and from the voter by first class mail. In 2016, BPC found that 17 states allowed voters to request absentee ballots the day before the election, while two states—Florida and Minnesota—allowed requests on Election Day, despite delivery standards of 2-5 days each way.

This year, mail delivery and return issues may be exacerbated. Recent analysis indicates that during the primaries, many states experienced higher than normal rates of ballot rejection due to ballots arriving late. Moreover, the USPS recently changed some internal standards to address budget shortfalls that may slow ballot delivery.

## Best Practices for Mail Voting

Best practices for mail voting require sophisticated approaches to seamlessly designing, printing, sending, tracking, and receiving mail ballots, and doing so in a timely manner. Put simply, diligence to mail logistics can deeply impact the counting process.

One important step is for election administrators to build relationships with the U.S. Postal Service. This means election officials should work with USPS election mail coordinators and mailpiece design specialists to design ballot envelopes that work with USPS standards for election mail. Such coordination helps the USPS to process outgoing mail ballots swiftly and accurately by ensuring all mail ballot envelopes include the proper logos, barcodes, and tags to see them through.

In addition to these services, building relationships with local processing centers can help officials troubleshoot issues that arise during the course of mailing ballots. This is especially important on Election Day, when last-minute

ballots can be removed from the mail stream and picked up by election admin-
istrators directly to ensure they arrive before the deadline.

Election officials should also be aware of the breadth of tools available to them
to diagnose and resolve mailing problems. When they cannot be resolved with
local processing centers, electionmail.org provides administrators the ability
to report mail issues to USPS leadership. Another tool, *Informed Visibility*, can
help election administrators forecast incoming mail ballot volumes so they can
allocate resources when needed to prevent backlogs in processing and counting.

States should also provide ballot tracking tools for voters. At least 19 states
require election administrators to provide a means to track absentee ballots in
the mail stream. An additional 14 states provide this service, but it is not en-
shrined in statute. A gold standard for providing ballot tracking was pioneered
in Denver, CO. The system, Ballot TRACE, allows voters to receive text message
updates about the status of their ballot. Jurisdictions can also use Ballot Scout,
a non-profit tool that allows jurisdictions to opt-in and offer their voters track-
ing tools. Tracking systems increase voter confidence and provide an additional
assurance for election administrators and voters that ballots get where they are
going on time.

Adapting to voting by mail will be more difficult for some states than others. In
states that primarily vote in person, election laws are not designed to account
for the timelines needed to vote by mail. Some states allow voters to request
a mail ballot up until the day before the election. But USPS service delivery
standards for first class mail is 3-5 days each way, meaning many voters who
request ballots within the week before Election Day may not be able to return
their ballot on time if they send it through the mail. Likewise, undecided voters
that hold on to their ballot until close to Election Day may face similar prob-
lems in getting their ballot counted. **BPC recommends providing additional
options to return ballots, such as allowing voters to drop off ballots, either
in a secure drop box at the local elections office or at the polls**.

## Accessibility in Mail Voting

Mail voting can create accessibility barriers. Voters with disabilities who
require assistive technology to read text may struggle with paper ballots and
small print. Elderly voters and voters with physical disabilities may not have
the mobility to return a ballot in-person during the last days before Election
Day, when mailing an absentee ballot may not ensure the ballot arrives before
the deadline. These challenges will be magnified this year, as many polling
places are likely to be closed due to poll worker shortages and moved from assis-
tive living communities to prevent exposure to COVID-19.

Providing more options for ballot return can help reduce these disparities in
access for elderly voters and voters with disabilities. Some voters can request
a ballot by email that can be read through assistive technology more easily.
Depending on the state, these ballots can be returned either through an online

16

portal similar to that provided for military and overseas civilian voters or can be printed and dropped off or mailed.

Accessibility for those who are elderly or have certain disabilities is also a key reason why some states allow ballots to be picked up and dropped off on behalf of a voter by a third party—generally a friend, relative, or a member of the community.[17]

This process, commonly called ballot harvesting or ballot collection, has sparked intense partisan debate. Opponents fear the practice could lead to fraud, in which third parties tamper with voters' ballots or do not return them altogether. Protections do exist in some states, however.  Florida requires the third party to sign an affidavit attesting to their relationship to a voter. Colorado election law stipulates a voter can drop off anyone's ballot for them, but can only do so for up to ten ballots.

# Conclusion

With less than four months before Election Day, election officials and policymakers need to act immediately to mitigate the impact of COVID-19 on the counting process. Even with the interventions outlined in this report, the seismic shifts in the voting landscape caused by the pandemic will mean slower results in some of the most important swing states.

Whether voters choose to vote by mail or in person, the upstream and downstream policy consequences of each step of the counting process must be taken into consideration and clearly communicated to campaigns, media, and the public. The legitimacy of the election may lie in the balance.

---

17  "VOPP: Table 10: Who Can Collect and Return an Absentee Ballot Other Than the Voter." *National Conference of State Legislatures*. 21 April 2020. Available at: https://www.ncsl.org/research/elections-and-campaigns/vopp-table-10-who-can-collect-and-return-an-absentee-ballot-other-than-the-voter.aspx. Twenty-seven states and Washington, DC, permit an absentee ballot to be returned by a designated agent. Of these states, 12 limit the number of ballots an agent or designee may return. Nine states permit an absentee ballot to be returned by the voter's family member. Thirteen states do not address whether an agent or family member may return an absentee ballot on behalf of a voter. One state, Alabama, specifies that an absentee ballot must be returned by the voter either in person or by mail.



**Learn more about Bipartisan Policy Center's
Elections Project at:**

**bipartisanpolicy.org/policy-area/elections/**

**Exhibit 17**



# VOPP Table 16: When Absentee/Mail Ballot Processing and Counting Can Begin

9/9/2020

**This resource is intended to reflect permanent state law. Many states have made changes to election policies that will only be in effect for the 2020 election. Please see Absentee and Mail Voting Policies in Effect for the 2020 Election for more information.**

*Our organization does not run elections and cannot provide legal advice. If you are a voter looking for assistance, please contact your local election official. You can find your local election official's website and contact information by using this database from the US Vote Foundation.*

*This table is part of NCSL's Voting Outside the Polling Place report.*

In many states, processing of absentee ballots can begin before they are actually counted. "Processing" means different things in different states, but typically the first step is comparing the affidavit signature on the outside of the return envelope against the voter's signature on record to ensure a match, or otherwise verify the voter's identity. See the section titled, "Processing, Verifying, and Counting Absentee Ballots."

In some states once the signature is verified the envelope can then be opened and the ballot prepared for tabulation. In essence, states that begin processing before Election Day can "tee up" absentee ballots so that they are ready to be counted as soon as the law allows. By permitting election officials to do a lot of the work ahead of time, the counting process on Election Day (and election results reporting) are quicker. Results are not released ahead of time.

| State | Absentee/Mail Ballot Processing Can Begin | Absentee/Mail Ballot Counting Can Begin |
|---|---|---|
| **Alabama** Code of Ala. §17-11-10 | Noon on Election Day. | After the polls close on Election Day. |
| **Alaska** Alaska Stat. §15.20.201 | Seven days before Election Day. | 8 p.m. on Election Day. |

| State | Absentee/Mail Ballot Processing Can Begin | Absentee/Mail Ballot Counting Can Begin |
|---|---|---|
| **Arizona** Ariz. Stat. §16–550, §16-551 | Tallying can begin 14 days before Election Day. | Tallying can begin 14 days before Election Day, but results may not be released before all precincts are reporting or one hour after the closing of polls on Election Day. Releasing information earlier is a felony. |
| **Arkansas** A.C.A. § 7-5-416 | Seven days before Election Day. | 8:30 a.m. on Election Day. Results are reported after the polls close on Election Day. |
| **California** West's Ann. Cal. Elec. Code § 15101 | Signature verification for all-mail jurisdictions can begin 29 days before Election Day. Processing can begin 19 days before Election Day. Jurisdictions that are not all-mail can start processing at 5 p.m. the day before Election Day. | A vote count can be accessed or released at 8 p.m. on Election Day. |
| **Colorado** C.R.S.A. § § 1-7.5-107.5 | Upon receipt. | Fifteen days before Election Day. The vote count cannot be released until after 7 p.m. on Election Day. |
| **Connecticut** Conn. Gen. Stat. § 9-150a | At the discretion of the local registrar of voters. | At the discretion of the local registrar of voters. |
| **Delaware** 15 Del. C. § 5510 | Friday before Election Day. | Friday before Election Day. The vote count cannot be extracted or reported until polls close on Election Day. |
| **District of Columbia** D.C. Mun. Regs. Tit. 3, § 808 | Signatures can be verified and the secrecy envelope removed prior to tabulation. Exact timing not specified. | After the polls close on Election Day. |
| **Florida** West's F.S.A. § 101.68 | Signature verification can begin at 7 a.m. 22 days before Election Day. | 7 a.m. 22 days before Election Day. Releasing the results early is a felony. |
| **Georgia** O.C.G.A. § 21-2-386 | Signature verification conducted upon receipt. | 7 a.m. on Election Day. |

| State | Absentee/Mail Ballot Processing Can Begin | Absentee/Mail Ballot Counting Can Begin |
|---|---|---|
| **Hawaii**<br>HRS § 15-9, §11-152 | Upon receipt. | Counting may start before Election Day. Exact timing not specified. |
| **Idaho**<br>Idaho Code §34-1005, §34-1008 | Affidavit verified upon receipt. Ballots are not opened until they are delivered to the polls or central location for counting. | After the polls close on Election Day. |
| **Illinois**<br>10 ILCS 5/19-8 | Signature verification must begin within two days of receipt. | 7 p.m. on Election Day. |
| **Indiana**<br>IC 3-11.5-4-12, 3-11.5-5-3 | Upon receipt. | No later than noon on Election Day or immediately after the electronic poll books used at each polling place or vote center have been updated to indicate the county received the absentee ballot. |
| **Iowa**<br>Iowa Code §53.23 | Affidavits may be reviewed the day before Election Day. | On Election Day, at a time set by the election commissioner to allow a reasonable amount of time to complete the count of absentee ballots by 10 p.m. on Election Day. |
| **Kansas**<br>K.S.A. § 25-1134 | Prior to Election Day. Exact timing not specified. | Ballots may be counted prior to Election Day, but final tabulation shall not be completed until Election Day. |
| **Kentucky**<br>KRS § 117.087 | 8 a.m. on Election Day. | Counting begins after all absentee ballots have been processed. |
| **Louisiana**<br>LSA-R.S. 18:1313 | Day before Election Day in a parish with 1000 or more absentee ballots. Prior to the closing of polls on Election Day in a parish with less than 1000 absentee ballots. | Counting may begin before Election Day but no later than 8 p.m. on Election Day. |
| **Maine**<br>21-A M.R.S.A. § 759, 760-B | Four days before Election Day if notice of processing times is posted at least 60 days before the election. | After the polls close on Election Day. |

| State | Absentee/Mail Ballot Processing Can Begin | Absentee/Mail Ballot Counting Can Begin |
|---|---|---|
| **Maryland** MD Code, Election Law, § 11-302 | After the election. | 8 a.m. the Wednesday after Election Day. |
| **Massachusetts** M.G.L.A. 54 § 94 and § 95 | Upon receipt. | No later than an hour after the polls close on Election Day. |
| **Michigan** MCLS §168.765 et seq. | On Election Day. | On Election Day before the polls close at the jurisdiction's discretion. Anyone with access to absentee ballot counting must sign an oath that information related to processing and tallying will not be communicated in any way until after the polls close. |
| **Minnesota** M.S.A. §203B.121 | Verification upon receipt. After the close of business on the seventh day before the election, verified ballots can be opened and deposited in a ballot box. | After the polls close on Election Day. |
| **Mississippi** Miss. Code Ann. § 23-15-639 | On Election Day. | After the polls close on Election Day. |
| **Missouri** V.A.M.S. 115.300 | Five days before Election Day. | On Election Day. |
| **Montana** Mont. Code Anno., § 13-13-241 | Signature verification conducted upon receipt. Three days before Election Day, election officials may open the secrecy envelope and place the ballot in a secured ballot box until tabulation occurs, but this process may not occur on a Saturday or Sunday. | One day before Election Day, if using a vote-counting machine. Tabulation using a manual count may not begin until Election Day. Access to an electronic system containing early tabulation results is limited to the election administrator. |
| **Nebraska** Neb. Rev. Stat. §32-1027 | Verification can begin the second Friday before Election Day. If approved, the envelope can be opened, the ballot unfolded and flattened and placed in a sealed container. | Twenty-four hours before the opening of the polls. No results shall be released until after polls close on Election Day. |

| State | Absentee/Mail Ballot Processing Can Begin | Absentee/Mail Ballot Counting Can Begin |
|---|---|---|
| **Nevada** Nev. Stat. §293.325, §293.333 | Signature verification conducted upon receipt. Ballots are placed in a secured ballot box, unopened until they are delivered to the central counting board. | On Election Day. No results may be reported until after the polls close. |
| **New Hampshire** N.H. Rev. Stat. § 659:49 | At 1 p.m. on Election Day, unless a different time, no earlier than two hours after the opening of the polls, is posted and announced. | After the polls close on Election Day. |
| **New Jersey** N.J.S.A. 19:63-17, 19:63-22 | Signature verification conducted upon receipt. | On Election Day. |
| **New Mexico** N. M. S. A. § 1-6-14 | Any time after mailed ballots have been sent until the fifth day before the election, the county clerk may convene an election board to meet during normal business hours to qualify mailed ballots that are returned. If more than 10,000 absentee ballots are sent, they may be opened and inserted into an electronic voting machine two weeks before Election Day. If fewer than 10,000 absentee ballots are sent, processing may begin four days before the election. | Absentee ballots are inserted into vote-counting machines to be registered and retained before Election Day, but votes are not counted until after the polls close. It is unlawful for a person to disclose the results of a count or tally prior to the closing of the polls or the deadline for receiving mailed ballots. |
| **New York** McKinney's Election Law § 9-209 | On Election Day. | After the polls close on Election Day. |
| **North Carolina** N.C.G.S.A. § 163-230.1 and 163-234 | The fifth Tuesday before Election Day. Counties using optical scan devices may remove ballots from their envelopes and place them in tabulators. | Two weeks prior to Election Day, provided the hour and place of counting is announced. Results shall not be announced before 7:30 p.m. on Election Day. |
| **North Dakota** NDCC, 16.1-07-12 | The day before Election Day. | After the polls close on Election Day. |

| State | Absentee/Mail Ballot Processing Can Begin | Absentee/Mail Ballot Counting Can Begin |
|---|---|---|
| **Ohio**<br>Ohio Rev. Code § 3509.06 | Processing may begin before the time for counting ballots. Exact timing not specified. | Absentee ballots may be scanned prior to the election, but the count may not be disclosed prior to the closing of the polls. |
| **Oklahoma**<br>26 Okl. St. Ann. § 14-125 | 10am on the Thursday before Election Day, or earlier with approval by the secretary of the state election board. | Prior to Election Day with approval by the secretary of the state election board. When counting occurs before the election, the county election board shall remove the election results storage media from the voting device, without obtaining a printout of results, and seal ballots counted that day in a transfer case secured by the sheriff until the time the board next meets to count. Results cannot be reported earlier than 7 p.m. on Election Day. |
| **Oregon**<br>O.R.S. § 254.478, § 260.705 | No sooner than seven days before the election county clerks may begin opening identification and secrecy envelopes and scan ballots into a vote tally system. | A person may not make public the results of the tally of votes from any precinct until after 8pm on election day. |
| **Pennsylvania**<br>25 P.S. § 3146.8 | At 7am on Election Day. | At 7am on Election Day, but the votes may not be recorded or published until after the polls close. |
| **Rhode Island**<br>R.I. Gen. Laws § 17-20-26, §17-22-1 | Fourteen days before Election Day. After processing and certification, envelopes may be opened, ballots removed and scanned through central count optical scan units. | 8 p.m. on Election Day. |
| **South Carolina**<br>S.C. Code § 7-15-420 | 9 a.m. on the day before Election Day. | 9 a.m. on Election Day. Results may not be reported until after the polls close. |

| State | Absentee/Mail Ballot Processing Can Begin | Absentee/Mail Ballot Counting Can Begin |
|---|---|---|
| **South Dakota** SDCL § 12-19-10, § 12-19-46 | Processing may begin when sealed absentee ballots are delivered to precincts with the election supplies, but only if the election board is not otherwise engaged in official duties. | After polls close on Election Day. Prior to this, no person may open, unfold or examine any ballot, or make any communication to any person concerning the marking or contents of the ballot. A violation is a misdemeanor. |
| **Tennessee** Tenn. Code Ann. § 2-6-202, § 2-6-303, § 2-6-304 | Signature verification conducted upon receipt. At that point, the fact that the voter has cast a ballot is recorded, and the absentee ballot envelope is deposited into a ballot box. | On Election Day after the polls open and no later than four hours before closing for general elections, or two hours before closing for all other elections. |
| **Texas** V.T.C.A., Election Code § 87.0241, § 87.041 | Signature and voter verification may be conducted upon receipt. | When the polls open on Election Day. In a jurisdiction with more than 100,000 people, counting can begin at the end of the early voting by personal appearance period. |
| **Utah** U.C.A. § 20A-3-309 | Processing may begin before Election Day. Exact timing not specified. | Counting may begin before Election Day. Exact timing not specified. Results may not be reported until after the polls close on Election Day. |
| **Vermont** 17 V.S.A. § 2546a | The day before the election, at least one hour before depositing ballots in the vote tabulator, absentee ballot envelopes may be examined and inspected by members of the public. | The day before the election, absentee ballots may be deposited in a vote tabulator. The machine is turned on and the ballots tabulated on Election Day. |
| **Virginia** VA Code Ann. § 24.2-709.1, § 24.2-712 | Before Election Day as needed to expedite counting absentee ballots. | Ballots may be inserted into ballot-counting machines prior to the closing of the polls, but no ballot count totals by the machines shall be initiated until the polls close. If absentee ballots are counted by hand, tallying may begin after 3 p.m. on Election Day. Vote counts may not be reported until after the polls close. |

Case 3:20-cv-10753-MAS-ZNQ  Document 58-5  Filed 09/25/20  Page 35 of 41 PageID: 1625

| State | Absentee/Mail Ballot Processing Can Begin | Absentee/Mail Ballot Counting Can Begin |
|---|---|---|
| **Washington**<br>West's RCWA 29A.40.110 29A.84.730 | Upon receipt. | 8 p.m. on Election Day. No person may divulge any results of the count prior to 8 p.m. on Election Day. A violation is a misdemeanor. |
| **West Virginia**<br>W. Va. Code, § 3-3-8 | Absentee ballots are delivered to precincts on Election Day. | On Election Day. Disclosure of any results before the voting has been closed and precinct returns posted on the door of polling places is a violation of the oath taken by the counting board. |
| **Wisconsin**<br>W.S.A. 6.88 | After the polls open on Election Day. | After the polls open on Election Day. |
| **Wyoming**<br>W.S § 22-9-121 | Absentee ballots are delivered to precincts on Election Day. As time permits, election judges examine the affidavits, enter voters' names in poll books, open envelopes, place ballots in a ballot box or vote it on a machine, as applicable. | On Election Day. |

Copyright 2020 by National Conference of State Legislatures

**Exhibit 18**

JOHN BOOZMAN, ARKANSAS
CHAIRMAN
JOHN BOOZMAN, ARKANSAS
BILL CASSIDY, LOUISIANA
MIKE ROUNDS, SOUTH DAKOTA
THOM TILLIS, NORTH CAROLINA
DAN SULLIVAN, ALASKA
MARSHA BLACKBURN, TENNESSEE
KEVIN CRAMER, NORTH DAKOTA
KELLY LOEFFLER, GEORGIA

CAROLINE CANFIELD, STAFF DIRECTOR

RANKING MEMBER
PATTY MURRAY, WASHINGTON
BERNARD SANDERS, VERMONT
SHERROD BROWN, OHIO
RICHARD BLUMENTHAL, CONNECTICUT
MAZIE K. HIRONO, HAWAII
JOE MANCHIN III, WEST VIRGINIA
KYRSTEN SINEMA, ARIZONA

TONY McCLAIN, STAFF DIRECTOR

# United States Senate

COMMITTEE ON VETERANS' AFFAIRS

WASHINGTON, DC 20510

August 24, 2020

The Honorable Louis DeJoy
Postmaster General
U.S. Postal Service
475 L'Enfant Plaza, S.W.
Washington, DC 20260

Dear Mr. Postmaster General:

I am writing to request that as you lead the U.S. Postal Service (USPS) through a period of transformation, you ensure timely delivery of medication to the hundreds of thousands of veterans who rely on USPS every day. In your testimony before the Senate Committee on Homeland Security and Government Affairs, you stated that you have been "fully immersed" in evaluating USPS's business model. As you continue your work, I ask that you pay special attention to the relationship between the Department of Veterans Affairs (VA) and USPS, so that together, VA and USPS can continue and improve service to veterans across the country.

The VA mail order pharmacies provide approximately 120 million outpatient prescriptions to veterans annually, totaling nearly 89 million packages. On a typical day, more than 330,000 veterans receive a VA prescription in the mail, and USPS is responsible for delivering almost 90 percent of them.

VA has informed me that over the past year, its outpatient prescriptions delivered by USPS have experienced delays of nearly 25 percent, with average delivery time rising from 2.3 days in June 2019, to 2.86 days. When packages are out for delivery longer than 3 days, they go onto an Advanced Warning Report, and VA and USPS attempt to monitor their movement throughout the mail system to ascertain whether they are lost or delayed. This seems to be a necessary precaution but an imperfect solution to the overall delay issue.

There is no doubt the COVID-19 pandemic has challenged postal operations as it has so many aspects of our society. In light of the difficult environment, I urge you to remain mindful that ongoing management and operational reforms do not negatively impact important functions that VA and our veterans rely on.

I ask that as operational changes are made, timely and reliable delivery of prescription drugs to veterans remains a priority.

Sincerely,

*Jerry Moran*

Jerry Moran
Chairman

**Exhibit 19**

# LINK

**Link Extra**

## Path forward

**PMG addresses restructuring**

Aug. 13 at 4:18 p.m.

*Postmaster General Louis DeJoy distributed the following memo to USPS employees on Aug. 13:*



Today, I am in my ninth week as Postmaster General. I am grateful to everyone who has welcomed me, and I am thoroughly impressed by the dedication and commitment you have shown since I started June 15.

Last week was extremely busy for all of us with the announcement that we are *restructuring into three operating units*. I purposely timed the announcement with my first open meeting of the Board of Governors to set the stage with public statements emphasizing that we are developing a strategic plan to achieve operational excellence and financial stability. Our plan will be based on facts and data, and together, we can systematically roll out this plan and position ourselves for future success.

*Postmaster General Louis DeJoy*

Let me be clear about the reasons behind our restructuring and the need for our plan. Our financial condition is dire. Ongoing declines in mail volume, a broken business model that Congress and the Postal Regulatory Commission have failed to act upon, and the crippling economic impact of the coronavirus pandemic have all combined to bring us to where we stand today. Our critics are quick to point to our finances, yet they offer no solution. On the other hand, our restructuring and the plan we are developing provide a path to our transformation into a financially stable organization. I repeat again how excited I am to take on these challenges, with your support, to improve the Postal Service and better serve our nation. Together, our leadership team and I are taking aggressive and professional actions to ensure a successful future for the Postal Service.

In order to transform and remain a self-sustaining, mission-focused organization that continues to serve the American people, we must make a number of significant changes that will not be easy, but are necessary. We must re-establish fundamental operating principles and then adhere to them and run on time. It is the only path to consistent, affordable service and it is foundational to our future aspirations and objectives. As you know, we began those efforts right away, as it was imperative for us to strengthen these disciplines immediately by running our trips with mail and packages according to established schedules.

I congratulate you on substantial improvements in our on-time dispatch schedule, which reached 97.3 percent, up from 89.8 percent. We also have reduced extra trips by 71 percent — a tremendous achievement. This means more mail is being moved to its intended destination on time and on schedule than

in quite some time. And we accomplished this in a cost-effective manner. This marks the beginning of our journey toward world-class performance necessary for us to compete and be sustainable.

Unfortunately, this transformative initiative has had unintended consequences that impacted our overall service levels. However, recent changes are not the only contributing factors. Over the years we have grown undisciplined in our mail and package processing schedules, causing an increase in delayed mail between processing facilities and delivery units. We are working feverishly to stabilize this, so that all mail and packages moved for the American people and businesses can benefit from this new cost and schedule discipline. This will increase our performance for the election and upcoming peak season and maintain the high level of public trust we have earned for dedication and commitment to our customers throughout our history.

I also firmly believe that the realignment we announced last week will ultimately help us to stabilize and improve service and provide positive forward momentum as we work to transform our business. We needed to provide greater focus on the core aspects of our business, and the new structure allows that, with clearer lines of authority and accountability. While it will take some time to get the new organizational structure fully in place and achieving our expected levels of high performance, we are confident that it is the right alignment and that it was a change that needed to be made. As I said in my *first video message* to you, "I am decisive, and … when I see problems, I work to solve them." I ask you to bear with me while we work through these changes to transform for the better and continue to provide the excellent service for which we are known.

During my *remarks at the Board of Governors meeting*, I stated that I accepted the job of Postmaster General fully committed to the role of the Postal Service as an integral part of the United States government, providing all Americans with universal and open access to our unrivaled processing and delivery network, as reflected in the mission statement that the board *adopted* April 1. I repeat that statement here, because I meant it.

I fully embrace six-day delivery of mail and packages as one of this organization's greatest strengths. I plan to invest in tools and equipment for our workforce to continue to provide the nation's most trusted public service. I accept the responsibility that the governors gave me to maintain and enhance our reputation and role as a trusted face of the federal government in every community, and I intend to work with postal executives, management associations, managers, union leadership, and our craft employees to do everything I can to put us back on a financially stable path.

Together, I am confident we will chart a path forward that allows us to fulfill our critical public service mission in a financially sustainable manner. I look forward to the challenge, and I know we are up to it.

## Related stories



**USPS restructured**
**PMG announces three operating units**
🕐 2 months ago



**Transformative process**
**PMG DeJoy outlines USPS strategy**
🕐 2 months ago

Link home

**CURRENT STORIES**

Pandemic protection

A cup of Joe

Best of all

Marketing the mail

Raising awareness

On the surface

Serving businesses

Vintage charm

Brain health

Scanning snapshot

Payroll taxes

Be a flu fighter

Staying safe

World of good

Safe houses

 **Coronavirus coverage**

 **About Link**

Archives