Thomas R. McCarthy*
Bryan Weir*
Cameron T. Norris*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Ph.: (703) 243-9423
Email: tom@consovoymccarthy.com

Michael L. Testa Jr.
TESTA HECK TESTA & WHITE P.A.
424 W. Landis Avenue
Vineland, NJ 08360
Ph.: (856) 691-2300
Email: mtestajr@testalawyers.com

*Counsel for Plaintiffs*

\* *Admitted pro hac vice*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., REPUBLICAN NATIONAL COMMITTEE, NEW JERSEY REPUBLICAN STATE COMMITTEE, <br><br> Plaintiffs, <br><br> v. <br><br> TAHESHA WAY, in her official capacity as Secretary of State of New Jersey, <br><br> Defendant. | No. 3:20-cv-10753-MAS-ZNQ <br><br><br> **PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION ........................................................................................... 1

ARGUMENT ................................................................................................... 3

I.   Plaintiffs' claims are justiciable. ........................................................... 3

   A.   Plaintiffs have direct organizational standing. ............................. 3

   B.   Plaintiffs have representational standing. ...................................... 5

II.  A4475 violates federal law. ................................................................... 9

   A.   Pre-Election Day ballot counting conflicts with federal law. ...... 9

   B.   By authorizing the acceptance of non-postmarked ballots two days after Election Day, A4475 conflicts with federal law. ....................................... 13

III. The equitable factors favor Plaintiffs. ................................................ 15

   A.   Plaintiffs will suffer irreparable harm without an injunction. ................... 15

   B.   The public interest and balance of harms favor Plaintiffs. ........................ 17

IV.  *Purcell* is inapplicable here. ............................................................. 18

CONCLUSION ............................................................................................... 19

# TABLE OF AUTHORITIES

## CASES

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
    469 F.3d 129 (D.C. Cir. 2006)............................................................ 4

*Alvarez v. Smith*,
    558 U.S. 87 (2009) ........................................................................... 6

*Arcia v. Fla. Sec'y of State*,
    772 F.3d 1335 (11th Cir. 2014) ....................................................... 3

*Arizona Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ......................................................... 17

*Ass'n of Cmty. Organizations for Reform Now v. Edgar*,
    56 F.3d 791 (7th Cir. 1995) ............................................................. 12

*Badham v. U.S. Dist. Court for N. Dist. of Cal.*,
    721 F.2d 1170 (9th Cir. 1983) ......................................................... 16

*Blunt v. Lower Merion Sch. Dist.*,
    767 F.3d 247 (3d Cir. 2014) ............................................................ 3

*Burson v. Freeman*,
    504 U.S. 191 (1992) ........................................................................ 10

*Bush v. Gore*,
    531 U.S. 98 (2000) .......................................................................... 8

*Cardona v. Oakland Unified Sch. Dist., Cal.*,
    785 F. Supp. 837 (N.D. Cal. 1992).................................................. 17

*Clapper v. Amnesty Int'l*,
    568 U.S. 398 (2013) ........................................................................ 7

*Common Cause of Pennsylvania v. Pennsylvania*,
    558 F.3d 249 (3d Cir. 2009) ............................................................ 3

*Concerned Residents of Taylor-Wythe, Edna Correa v. New York City
    Hous. Auth.*,
    1996 WL 452432 (S.D.N.Y. Aug. 9, 1996).................................... 15

*Council of Alternative Political Parties v. Hooks*,
    121 F.3d 876, 883 (3d Cir. 1997) ............................................. 17, 19

*Crawford v. Marion Cty. Election Bd.*,
    472 F.3d 949 (7th Cir. 2007) ........................................................... 3

ii

*Crosby v. Nat'l Foreign Traide Council*,
  530 U.S. 363 (2000) ................................................................... 11, 13

*D.C. v. U.S. Dep't of Agric.*,
  444 F. Supp. 3d 1 (D.D.C. 2020)................................................... 16

*Disability Rights Pa. v. Pennsylvania Dep't of Human Servs.*,
  2020 WL 1491186 (M.D. Pa. Mar. 27, 2020) ............................... 3, 5

*Donald J. Trump for President, Inc. v. Cegavske*,
  2020 WL 5626974 (D. Nev. Sept. 18, 2020).................................... 5

*E. Bay Sanctuary Covenant v. Barr*,
  964 F.3d 832 (9th Cir. 2020) ....................................................... 16

*Eu v. San Francisco Cty. Democratic Cent. Comms.*,
  489 U.S. 214 (1989) .................................................................... 17

*Foster v. Love*,
  522 U.S. 67 (1997) .............................................................. 1, 6, 9

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
  505 U.S. 88 (1992) ...................................................................... 11

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018).................................................................... 8

*Gonzalez v. Arizona*,
  677 F.3d 383 (9th Cir. 2012) ........................................................ 12

*Gresham v. Windrush Partners, Ltd.*,
  730 F.2d 1417 (11th Cir. 1984) .................................................... 15

*Harkless v. Brunner*,
  545 F.3d 445 (6th Cir. 2008) ........................................................ 12

*Heublein, Inc. v. FTC*,
  539 F. Supp. 123 (D. Conn. 1982).................................................. 15

*Lair v. Bullock*,
  697 F.3d 1200 (9th Cir. 2012) ...................................................... 19

*League of Women Voters of Missouri v. Ashcroft*,
  336 F. Supp. 3d 998 (W.D. Mo. 2018)........................................... 16

*Millsaps v. Thompson*,
  259 F.3d 535 (6th Cir. 2001) .......................................................... 6

*N. Carolina State Conference of NAACP v. Cooper*,
  430 F. Supp. 3d 15 (M.D.N.C. 2019) ............................................ 16

*New Jersey Civil Justice Inst. v. Grewal*,
  2020 WL 4188129 (D.N.J. July 21, 2020) .................................................. 3, 5

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006) ............................................................................... 18

*Rapanos v. United States*,
  547 U.S. 715 (2006) ....................................................................... 12, 13

*Sanchez v. Cegavske*,
  214 F. Supp. 3d 961 (D. Nev. 2016)............................................................ 16

*Scott v. Schedler*,
  771 F.3d 831 (5th Cir. 2014) ................................................................... 3

*Sikkelee v. Precision Airmotive Corp.*,
  822 F.3d 680 (3d Cir. 2016) .................................................................. 14

*Smiley v. Holm*,
  285 U.S. 355 (1932) ............................................................................ 6

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*,
  531 U.S. 159 (2001) .......................................................................... 12

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ........................................................................... 7

*United States v. F.D.I.C.*,
  881 F.2d 207 (5th Cir. 1989) ................................................................. 15

*Voting Integrity Project v. Keisling*,
  259 F.3d 1169 (9th Cir. 2001) .......................................................... 1, 6, 12

*Voting Integrity Project, Inc. v. Bomer*,
  199 F.3d 773 (5th Cir. 2000) ............................................................. 6, 12

## OTHER AUTHORITIES

Cong. Globe, 42d Cong., 2d Sess. 618 (1872) .................................................. 1, 7

Fla Stat. Ann. §101.68 ......................................................................... 12

N.J. Stat. §19:63-31 ........................................................................... 13

## **INTRODUCTION**

Congress established a uniform Election Day to prevent "the distortion of the voting process" that occurs when early vote counts influence those who vote later, *Foster v. Love*, 522 U.S. 67, 73 (1997), and to act as a "check to frauds in elections" and "to double voting," *Voting Integrity Project v. Keisling*, 259 F.3d 1169, 1174 (9th Cir. 2001) (quoting Cong. Globe, 42d Cong., 2d Sess. 618 (1872)). That is why Plaintiffs have challenged A4475, which runs afoul of the federal statutes that establish November 3 as *the* Election Day nationwide. Defendants try to wave away the grave risks of voter fraud as nothing. But the sad truth is that election fraud is not just a risk in New Jersey—it is a reality. Indeed, the State's rush to universal by-mail voting has only magnified the recurring and widespread voter-fraud problems that have plagued New Jersey elections for years. Just this May, a sitting city councilmember and a candidate for the same position committed fraud by gathering and submitting bundles of mailed ballots to get elected. The narrow margin in that race likely means that the candidate won the election as a result of his efforts. A4475 only makes it easier for this sort of conduct to recur.

This is not to say that New Jersey is hamstrung in how it can respond to COVID-19. There are ample ways it could have amended its election laws to respond to the new challenges while also protecting the integrity of its elections. What New Jersey cannot do, however, is change its elections laws in contravention of federal

law. But that is the route it has chosen.

Federal law prohibits counting ballots before Election Day. Federal law also prohibits accepting as valid ballots that are cast after Election Day. Yet A4475 now authorizes both: it instructs election officials to begin counting mail-in ballots ten days before Election Day, and it authorizes election officials to accept as valid votes placed in the mail on November 4 that arrive without postmarks at election offices on November 5. These provisions are thus preempted.

Unless enjoined, A4475 New Jersey will irreparably harm Plaintiffs. A4475 requires Plaintiffs to divert precious resources away from their get-out-the-vote efforts to hire, train, and deploy poll watchers to monitor vote counts both before and after Election Day. This is a well-recognized form of irreparable harm because it will impair Plaintiffs' ability to pursue their mission of getting Republican candidates elected. Moreover, given that A4475 is likely to facilitate the type of mail-ballot election fraud that is common in New Jersey, the resulting vote dilution will irreparably harm Plaintiffs' members. And because the public interest cuts against a state's violation of federal and constitutional law, the Court should enter a preliminary injunction.

## ARGUMENT

### I.    Plaintiffs' claims are justiciable.

"An organization or association may have standing to bring suit under two circumstances." *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 261 (3d Cir. 2009) (cleaned up). It has standing to challenge laws that harm itself directly, and laws that harm its members. *Id.* Plaintiffs have both types of standing here.

### A. Plaintiffs have direct organizational standing.

"An entity has direct organizational standing when the organization itself suffers injuries as a result of the defendant's allegedly unlawful conduct." *New Jersey Civil Justice Inst. v. Grewal*, 2020 WL 4188129, at *3 (D.N.J. July 21, 2020) "This may occur, for example, when an organization must divert its resources to counteract the allegedly unlawful conduct." *Id.* Applied here, a political party suffers a viable diversion-of-resources injury even if "the added cost has not been estimated and may be slight," because standing "requires only a minimal showing of injury." *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007). "[T]he relevant question [is] whether the organization had diverted resources it might use elsewhere." *Disability Rights Pa. v. Pa. Dep't of Human Servs.*, 2020 WL 1491186, at *5 (M.D. Pa. Mar. 27, 2020) (citing *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 312-13 (3d Cir. 2014)); *see also, e.g.*, *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014);

3

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132-33 (D.C. Cir. 2006).

Plaintiffs readily clear that low threshold. A4475 forces NJGOP, DJTFP, and RNC to divert funds and resources from other programs to address A4475's changes to ballot counting. NJGOP will have to divert paid and volunteer resources from its voter contact programs—which are designed to educate and encourage Republicans to vote—to poll watching instead. Steinhardt Decl. ¶¶5-10. That diversion comes at the most critical time for NJGOP's voter contact initiatives—10 days before Election Day. *Id.* ¶10. DJTFP also must "recruit, hire, and train more poll watchers than would otherwise be needed to monitor the counting of ballots for ten additional days before the election." Huguenel Decl. ¶8. And to do so, DJTFP already "has had to hire a new state elections director to respond to the A4475's changes." *Id.* For its part, RNC has transferred funds to NJGOP and the National Republican Congressional Committee to assist them in their efforts to respond to the new counting regime. Voccola Decl. ¶7.  The same is true for A4475's new rule on non-postmarked and "mis-marked" ballots. Steinhardt Decl. ¶¶11-12; Huguenel Decl. ¶¶8-9; Voccola Decl. ¶7. Because each of these plaintiffs has finite resources, these diversions come at the expense of each pursuing its mission in other areas. *See* Steinhardt Decl. ¶¶10, 12-13; Huguenel Decl. ¶10; Voccola Decl. ¶8.

Plaintiffs have thus provided precisely the "specificity" that Defendants

demand. NJ Br. 25-26; DCCC Br. 11-12. These concrete resource-allocation harms

"'perceptibly impair[]' [Plaintiffs'] ability to provide [their] primary services [and]

and carry out [their] mission and have resulted in a diversion of resources."

*Disability Rights*, 2020 WL 1491186, at *4 (quoting *Blunt*, 767 F.3d at 308); *see*

*also New Jersey Civil Justice*, 2020 WL 4188129, at *3. Moreover, because

Plaintiffs have demonstrated that they would not otherwise hire new staff and bring

in additional poll watchers to the extended counting period, they have shown that

their additional "expenditures were not in furtherance of their otherwise typical

activities." DCCC Br. 11-12.[1]

### B. Plaintiffs have representational standing.

The Plaintiffs also have standing on behalf of their members, who have

standing in their own right to challenge A4475. *See New Jersey Civil Justice*, 2020

WL 4188129, at *3–4. Defendants' claim otherwise cannot be squared with the

many cases where voters have challenged various election laws as inconsistent with

Congress's choice to create a single Election Day. Foremost, the Supreme Court

affirmed injunctive relief in *Foster v. Love* for "Louisiana voters who sued … the

State's Governor and secretary of state, challenging the open primary as a violation

---

[1] New Jersey's reliance (at 25-26) on *Donald J. Trump for President, Inc. v. Cegavske*, 2020 WL 5626974 (D. Nev. Sept. 18, 2020), is misplaced. In addition to being wrongly decided, that case is distinguishable because there were no allegations that the law forced the plaintiffs to divert resources to hire and train poll workers as a result of the new law.

of federal law." 522 U.S. 67, 70 (1997). The courts of appeals have reached the merits of similar challenges. *See Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1174 (9th Cir. 2001); *Millsaps v. Thompson*, 259 F.3d 535, 536 (6th Cir. 2001); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 774 (5th Cir. 2000). To Plaintiffs' knowledge, no court has held that voters do not have standing to challenge a state law on the ground that it conflicts with the federal laws setting the uniform Election Day. Adopting Defendant's position here would mean that the Supreme Court's pathmarking decision in *Foster* and all those cases that followed it were disputes "abstracted from any concrete actual or threatened harm." *Alvarez v. Smith*, 558 U.S. 87, 93 (2009). That cannot be right.

Quite the contrary, voters have a personal interest in ensuring that Congress's choice is respected. The federal laws establishing a uniform Election Day are "safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). All courts have recognized that a uniform Election Day was meant to alleviate widespread disenfranchisement, hardship on voters, and fraud that was caused by the practice of multi-day voting. *See Foster*, 522 U.S. at 73-74; *Keisling*, 259 F.3d at 1174 ("Whenever you provide that elections shall take place upon the same day, you do interpose a not inconsiderable check to frauds in elections, to double voting, to the transmission of voters from one State to another, and you do allow the people to vote

6

for their Representatives undisturbed by considerations which they ought not to take at all into account." (quoting Cong. Globe, 42d Cong., 2d Sess. 618 (1872))). It is thus unsurprising that no court has questioned voters' standing to challenge state laws as violating Congress's choice because that choice has always been understood to protect the fundamental right to vote.

A4475's new rules injure Plaintiffs in precisely the way that Congress sought to prevent. First, counting ballots 10 days before Election Day substantially increases the risk of early vote counts becoming public. Defendants' only response is to point out that New Jersey law makes it illegal to release early vote counts, so the parties can safely assume no such leaks will occur. But that view ignores New Jersey's unfortunate history of election fraud—including fraud committed by election insiders just this year—which likewise carries criminal penalties. *See, e.g.*, Pls.' Br. 4-9 (documenting election fraud committed by three separate sitting city council members). Ultimately, Defendants are asking the Court to "require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). But plaintiffs need only show that "there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up). They have done so here. Indeed, the very act of criminalizing this activity shows that the State understands the dangers of an early counting system. Criminal penalties thus do not

obviate the risk stemming from New Jersey's decision to start counting ballots early.

Second, permitting ballots to be cast after Election Day will dilute the votes of Plaintiffs' members. Defendants do not contest that vote dilution is itself a judicially cognizable injury. Nor could they. *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331-32 (1999); *Gill v. Whitford*, 138 S. Ct. 1916, 1920 (2018); *Bush v. Gore*, 531 U.S. 98, 105 (2000) (per curiam). Nor do they contest that a ballot cast after Election Day would cause vote dilution. Instead, they argue that the risk of this injury is speculative. But the USPS has stated, and common sense confirms, that mail sent within the same or nearby zip codes can and often does arrive at its destination the next day. *See* Pls' Ex. 26. That means non-postmarked ballot can be sent the day after the election and be counted as a legitimate vote. And whether such ballots are cast innocently or in furtherance of a fraudulent scheme, they still will cause vote dilution.

This new postmarking rule will also facilitate voter fraud. Millions of ballots will leave election officials' custody and, just like in the July primary, only a fraction of those will be cast as ballots. That means there will be scores of ballots that can be repurposed (as they were in the May election) if the results on Election Day go poorly for a candidate. And while Defendants try to brush away New Jersey's long (and regrettable) tradition of voter fraud, recent experience confirms that there is a "substantial risk" that A4475 will facilitate fraudulent voting. *See* Pls' Br. 4-9.

8

## II.    A4475 violates federal law.

### A. Pre-Election Day ballot counting conflicts with federal law.

The text and structure of the federal laws setting a uniform Election Day confirm that New Jersey cannot begin counting ballots 10 days before November 3. Pls' Br. 18-19. And if there were any doubt, the statutes' purpose should erase it. The specific evil Congress sought to remedy was the practice of multi-day voting, with early counted ballots influencing voters who had yet to cast their ballot and risking fraud. *Id.* at 3-4. Counting ballots early runs directly contrary to those purposes.

Defendants' responses to this straightforward interpretation of the Election Day statutes all fall short. Defendants start by arguing that *Foster* forecloses Plaintiffs' claim because it definitively read these statutes as prohibiting only the consummation of an election before Election Day. NJ Br. 29; DCCC Br. 16-17. That view is directly contradicted by *Foster* itself, which made clear that its decision was a narrow one: "[O]ur decision does not turn on any nicety in isolating precisely what acts a State must cause to be done on federal election day (and not before it) in order to satisfy the statute." *Foster*, 522 U.S. at 72. It was "enough to resolve this case to say that" a law consummating an election before Election Day was preempted. *Id.* That Court left open precisely what the Election Day statutes permit and prohibit. *Id.* at 72 n.4 ("This case thus does not present the question whether a State must

always employ the conventional mechanics of an election.").

Next, Defendants repeat that there is no risk of disclosure because New Jersey makes disclosing the ballot counts punishable as a crime. NJ Br. 32-33; DCCC Br. 14-15. That's like saying there's no risk of voter fraud in New Jersey because the state has long criminalized it. Would that it were. The sad reality for New Jerseyans is that their elections are rife with fraud. And the recent primaries demonstrate that rushing to universal vote-by-mail has only made it worse. Pls' Br. 4-9. In all likelihood, the problem is even worse than New Jersey knows. As the Supreme Court has emphasized, because "law enforcement officers generally are barred from the vicinity of polls to avoid any appearance of coercion in the electoral process, many [unlawful acts] go undetected." *Burson v. Freeman*, 504 U.S. 191, 207 (1992). If anything, New Jersey's decision to criminalize the disclosure of ballot counts is an acknowledgement that its own history demonstrates the very real risk of disclosure and the consequent harm thereof.

But Defendants are not only wrong as a factual matter, they are wrong as a legal matter. When Congress sets out to regulate a federal issue, States must abide by its choice of means. They cannot choose different means that they think work just as well. In other words, the conflict between two statutes "are not rendered irrelevant by the State's argument that there is no real conflict between the statutes because they share the same goals. … The fact of a common end hardly neutralizes

conflicting means." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379-80 (2000) (cleaned up). "Conflict is imminent when two separate remedies are brought to bear on the same activity." *Id.* (cleaned up); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992) ("A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach that goal." (cleaned up)). To prevent the dangers of early vote counts influencing later voters, Congress set out a uniform Election Day so that everyone would vote on the same day. It could have kept the varying election days that States used, allowed early counting of those ballots, and then criminalized the release of those counts until all election days conclude. It chose a more direct solution instead. New Jersey must abide by Congress's choice.

Finally, Defendants argue that the Election Day statutes could not preempt A4475 because other States have similar laws. *See* NJ Br. 31; DCCC Br. 15 n.2. But the existence of other statutes that may also be preempted does not obviate the violation here. *See, e.g.*, *Crosby*, 530 U.S. at 386-87 ("[T]he large number of such [preempted] measures" is "unavailing."). And it bears reminding that States have no inherent sovereign power over the timing of federal elections. "When it comes to time, place, and manner regulations for federal elections, the Constitution primarily treats states as election administrators rather than sovereign entities." *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008); *see also Gonzalez v. Arizona*, 677 F.3d

11

383, 392-93 (9th Cir. 2012); *Ass'n of Cmty. Organizations for Reform Now v. Edgar*, 56 F.3d 791, 794 (7th Cir. 1995). Once Congress speaks on the matter, its voice is the only one that matters, and no presumption against preemption applies.

Even so, claims of congressional acquiescence to a seemingly conflicting state law must be approached "with extreme care," *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 160 (2001), because "Congress takes no governmental action except by legislation," *Rapanos v. United States*, 547 U.S. 715, 750 (2006) (plurality). Congress may be found to have acquiesced only if "Congress considered and rejected the '*precise* issue' presented before the Court." *Id.* Defendants have pointed to no such evidence of Congressional action, and it is just as likely that Congress has not enacted legislation curbing this practice because it "belie[ved] that the courts would eliminate any excesses." *Id.* Indeed, unlike absentee balloting, there is not "[m]ore than a century" of practice counting ballots early for Congress to acquiesce to; nor has there been any "express congressional approval" of early counting to Plaintiffs' knowledge. *See* NJ Br. 30 (quoting *Bomer*, 199 F.3d at 776; *Keisling*, 259 F.3d at 1175). The oldest such provision is from 1996, a recent vintage. *See* Fla Stat. Ann. §101.68(2)(a). Congress may not even be aware of the issue. Without "overwhelming evidence of acquiescence," this Court must be "loath to replace the plain text and original understanding of a statute with" contrary State practice. *Rapanos*, 547 U.S. at 750; *see also Crosby*, 530 U.S. at 387-88.

**B.    By authorizing the acceptance of non-postmarked ballots two days after Election Day, A4475 conflicts with federal law.**

Neither the Secretary nor Intervenors argue that States can count ballots that are placed in the mail after Election Day. *See, e.g.*, N.J. Br. 34 ("New Jersey, of course, agrees" that it "cannot permit ballots cast after Election Day to be counted."). Defendants quibble with the fact that ballots can be mailed on November 4, arrive at election offices the next day, and be counted. And to be sure, they proffer evidence that not *every* ballot mailed will arrive within a day. Yet Plaintiffs never said that was the case; and it makes no difference for Plaintiffs' claims. It is common sense, of course, that some ballots mailed on November 4 may not arrive the next day. But it is also common sense that ballots dropped off at USPS—to be mailed within the same precinct—can and will arrive the next day. More importantly, the USPS says so. *See* Pl.'s Ex. 26. Yet under A4475, *every* non-postmarked ballot cast after Election Day but received within two days will be deemed timely and counted. *See* A4475 §2(m) (codified at N.J. Stat. §19:63-31(m)). A4475 thus permits the very thing that New Jersey concedes it may not allow. It thus conflicts with and is preempted by the Election Day statutes.

Knowing this, Defendants pivot to argue that because Congress has not directly legislated how States may use *postmarks*, there is no conflict between A4475 and the Election Day statutes. NJ. Br. 34-37; DCCC Br. 21-22. The notion that Congress must specifically mention postmarks for it to bar the receipt of non-

postmarked ballots cast after Election Day is absurd. Congress need not mention postmarks any more than it needs to mention colored pens in order to bar the receipt of a ballot marked in blue pen that is cast after Election Day. In any event, a state law is not preempted only when Congress says so in express terms that identify every instance that conflicts with federal law. It is enough that "a challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law.'" *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 688 (3d Cir. 2016). It should be obvious that a state regime that allows ballots to be counted when they are cast after Election Day cannot be reconciled with a federal law that (as Defendants concede) prohibits counting ballots that are cast after Election Day. Even assuming the Election Day statutes do not expressly preempt A4475, at the very least, they preempt A4475 as an "obstacle" to Congress's stated purpose of establishing a uniform Election Day.

Consider the consequences of adopting Defendants' view that, because "federal law is silent" on non-postmarked ballots, they are free to set any postmarking rule they wish. New Jersey could pass a law stating that non-postmarked ballots received seven days after Election Day are valid. After all, New Jersey could claim that receiving a ballot within seven days of the election means it was likely cast "on the election day prescribed by Congress." DCCC Br. 20. But the Election Day statutes would *obviously* preempt such a law because it allows votes

14

to be cast and counted after Election Day. So too here.

### III.   The equitable factors favor Plaintiffs.

#### A. Plaintiffs will suffer irreparable harm without an injunction.

Absent an injunction, Plaintiffs will suffer irreparable harm in multiple respects. To start with, violating federal law necessarily causes irreparable harm. *See, e.g.*, *United States v. FDIC.*, 881 F.2d 207, 210 (5th Cir. 1989) ("[I]f a statutory violation is involved and the statute by necessary and inescapable inference requires injunctive relief, the movant is not required to prove the injury and public interest factor."); *Gresham v. Windrush Partners, Ltd*., 730 F.2d 1417, 1423 (11th Cir. 1984) ("[I]rreparable injury should be presumed from the very fact that the statute has been violated."). The reason for this is simple: "in enacting the statute, Congress declared that violations of the statute are contrary to the public interest and, therefore, cause irreparable harm." *Heublein, Inc. v. FTC*, 539 F. Supp. 123, 128 (D. Conn. 1982) (collecting cases); *see also Concerned Residents of Taylor-Wythe, Edna Correa v. New York City Hous. Auth.*, 1996 WL 452432, at *3 (S.D.N.Y. Aug. 9, 1996)*. This is particularly true in cases challenging a state's election laws. "By their very nature, laws impacting the right to vote create the potential for irreparable harm; once an election occurs, 'there can be no do-over and no redress.'" *N. Carolina State Conference of NAACP v. Cooper*, 430 F. Supp. 3d 15, 51 (M.D.N.C. 2019); *see also Badham v. U.S. Dist. Court for N. Dist. of Cal*., 721 F.2d 1170, 1173 (9th Cir. 1983).

Yet even if that were not true, Plaintiffs would still suffer irreparable harm. "Courts routinely recognize that organizations suffer irreparable harm when a defendant's conduct causes them to lose opportunities to conduct election-related activities, such as voter registration and education." *League of Women Voters of Missouri v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) (collecting cases); *see also E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 854 (9th Cir. 2020) (Fletcher, J.) (holding there was "irreparable harm through diversion of resources"); *Cooper*, 430 F. Supp. 3d at 51-52 (collecting cases) (an organization suffers irreparable harm when it must "divert[] resources away from their other voter-education efforts to respond" and will "continue doing so if the law is not enjoined"); *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 42 (D.D.C. 2020) (collecting cases) ("These harms from the forced diversion of resources are similar to those recognized as irreparable harm in other suits."). Each plaintiff will suffer such injuries due to A4475, *see supra* 3-5, so each plaintiff will suffer irreparable harm if A4475 is not enjoined.

Finally, the dilution of Plaintiffs' members' votes likewise constitutes irreparable harm. *See Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 976 (D. Nev. 2016) ("It is clear that abridgement of the right to vote constitutes an irreparable injury."); *Cardona v. Oakland Unified Sch. Dist., Cal.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes

16

irreparable injury."). Defendants acknowledge that this harm is irreparable, of course, but they contend that A4475 is not likely to dilute any votes. NJ Br. 44-45; DCCC 24-29. Again, New Jersey's regrettable tradition of voter fraud proves otherwise. Plaintiffs have provided extensive documentation that voter fraud is such a regular occurrence in New Jersey elections that it is highly likely to recur as a result of A4475. *See* Pls' Br. 4-9. And once that happens, Plaintiffs will have no remedy because that harm "cannot be alleviated after the election," *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997).

### B.     The public interest and balance of harms favor Plaintiffs.

The public interest weighs in favor of enjoining the government from violating federal law, *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014), "the protection of constitutional rights, including the voting … rights of … political parties, their candidates, and their potential supporters," *Hooks*, 121 F.3d at 884, and "preserving the integrity of the election process," *Eu v. San Francisco Cty. Democratic Cent. Comms.*, 489 U.S. 214, 231 (1989)—which the Election Day statutes were intended to do.

Defendants respond by claiming that an injunction against A4475's early counting and new postmark rule will harm voters because of the increase in mail-in votes that election officials are anticipating. *See* NJ Br. 48-50; DCCC Br. 31-32. But that is a problem of the State's own making when it forced a universal-by-mail

17

election when voting in person is safe for most voters, and standard absentee ballots are available for those at-risk voters. *See* Doc. 33 ¶¶55-70. New Jersey cannot rely on its self-inflicted injury as a competing harm to justify violating federal law.

## IV.   *Purcell* is inapplicable here.

The Supreme Court has cautioned courts not to enjoin election laws when an election is in the near future. "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 5-6 (2006). But this is not such a case. Most obviously, an order requiring election officials not to start counting ballots before Election Day has no bearing on how or when voters cast their ballots. Enjoining that part of A4475 thus cannot cause any "voter confusion" or "incentive[s] to remain away from the polls." Defendants hardly contend otherwise.

New Jersey instead trains its fire on A4475's acceptance of non-postmarked ballots that arrive through the mail after Election Day. Some voters have been advised, New Jersey contends, that "ballots without a postmark received by the Board within 48 hours of the closing of the polls will be counted." NJ Br. 46-47. But what New Jersey ignores is that *it* changed settled practices on the eve of election. *See, e.g.*, *Lair v. Bullock*, 697 F.3d 1200, 1212-14 (9th Cir. 2012) ("[G]iven the imminent nature of the election, we find it important not to disturb *long-established*

expectations that might have unintended consequences." (emphasis added)). Plaintiffs brought this case only days after the challenged provisions were enacted. They could hardly have challenged these provisions before they were enacted, nor could any voters have relied on the provisions before they were enacted. To apply *Purcell* to cases such as this would foreclose any judicial review of late changes to state election procedures.

At any rate, Plaintiffs are not challenging a change in the ballot-receipt deadline; they are challenging only the acceptance of non-postmarked ballots received after Election Day. Whether a voter's mailed-in ballot is postmarked is entirely out of his or her control and thus has no bearing on the procedures by which voters cast their ballots. An injunction would address only whether non-postmarked ballots that arrive after Election Day are accepted as valid. "Since there is no basis for concluding that preliminary relief will negatively impact the November [2020] election," *Hooks*, 121 F.3d at 884, the Court should enjoin the challenged provisions.

## CONCLUSION

For these reasons, the Court should enter a preliminary injunction.

Dated: September 28, 2020                 Respectfully submitted,

                                          /s/ Michael L. Testa Jr.
                                          Thomas R. McCarthy*
                                          Bryan Weir*
                                          Cameron T. Norris*
                                          CONSOVOY MCCARTHY PLLC
                                          1600 Wilson Boulevard, Suite 700
                                          Arlington, VA 22209
                                          Ph.: (703) 243-9423
                                          Email: tom@consovoymccarthy.com

                                          Michael L. Testa Jr.
                                          TESTA HECK TESTA & WHITE P.A.
                                          424 W. Landis Avenue
                                          Vineland, NJ 08360
                                          Ph.: (856) 691-2300
                                          Fax: (856) 691-5655
                                          Email: mtestajr@testalawyers.com


                                          * Admitted pro hac vice