<u>**FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., et al., | |
| Plaintiffs, | Civil Action No. 20-10753 (MAS) (ZNQ) |
| v. | **MEMORANDUM OPINION** |
| TAHESHA WAY, in her official capacity as Secretary of State of New Jersey, | |
| Defendant. | |

<u>**SHIPP, District Judge**</u>

     In response to the COVID-19 pandemic, the New Jersey Legislature authorized the November 2020 General Election to be conducted predominantly by mail. Among other things, the legislation allows election officials to canvass mail-in ballots ten days before Election Day and to canvass mail-in ballots received within two days of Election Day even if those ballots lack a postmark from the United States Postal Service. Plaintiffs Donald J. Trump for President, Inc., the Republican National Committee, and the New Jersey Republican State Committee (collectively, "Plaintiffs") seek to enjoin these provisions, asserting they are preempted by federal law that establishes a national uniform election day for Congress and the Presidency. (ECF No. 35.)

     Defendant Secretary of State Tahesha Way and Defendant-Intervenors DCCC, League of Women Voters of New Jersey, and NAACP New Jersey Conference (collectively, "Defendants") opposed (ECF Nos. 57, 58, 59), and Plaintiffs replied (ECF No. 63). The Court has carefully

considered the parties' submissions, as well as the submissions of amicus curiae, and decides the matter without oral argument pursuant to Local Civil Rule 78.1.

The Constitution "principally entrusts the safety and health of the people to the politically accountable officials of the States." *Andino v. Middleton*, No. 20A55, --- S. Ct. ---, 2020 WL 5887393, at *1 (Oct. 5, 2020) (Kavanaugh, J., concurring in grant of application for stay) (quoting *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief)). "When those officials undertake[] to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad." *Id.* (internal quotation marks and citation omitted) (alteration in original). "It follows that a State legislature's decision . . . to make changes to election rules to address COVID-19 ordinarily should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.* (internal quotation marks and citation omitted). The Court agrees. For the reasons set forth herein, the Court denies Plaintiffs' request for a preliminary injunction.

The Court finds that Plaintiffs fail to establish they are likely to succeed on the merits of their claims. Federal law establishing a national uniform election day does not prevent New Jersey from canvassing ballots before Election Day so long as the election is not consummated and the results reported before the polls close on Election Day. Although federal law prohibits New Jersey from canvassing ballots cast after Election Day, it is within New Jersey's discretion to choose its methods of determining the timeliness of ballots, so long as there is no appreciable risk of canvassing untimely ballots. The Court also finds that Plaintiffs fail to establish they face a likelihood of irreparable harm without their requested injunction, that entering an injunction would

cause greater harm to the State, and that Plaintiffs' proposed preliminary injunction is against the public interest.

## I.   BACKGROUND

### A.   New Jersey's May and July 2020 Elections during the COVID-19 Pandemic

COVID-19, a highly contagious and life-threatening respiratory disease, has sparked an unprecedented public health crisis across the United States, including in New Jersey. The virus has already claimed the lives of over 200,000 Americans and 14,000 New Jersey residents. *See* Centers for Disease Control and Prevention, *Provisional Death Counts for Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm (last visited Oct. 6, 2020).

On March 9, 2020, in response to the rapidly unfolding public health crisis, Governor Phillip D. Murphy ("Governor Murphy") declared a Public Health Emergency and State of Emergency. (Am. Compl. ¶ 55, ECF No. 33.) Soon after, Governor Murphy implemented multiple social distancing policies to the reduce spread of the virus, including Executive Orders 105 and 144. (*See id.* ¶¶ 55–63.) These Orders authorized the May 2020 and July 2020 elections respectively to be conducted primarily via vote-by-mail ballots. (*Id.* ¶¶ 77, 87.)

#### 1.   Allegations of Fraud

News reports after the May 2020 election suggest that the State faced serious challenges in conducting its elections. According to those reports, ten percent of ballots cast were invalidated. (Colleen O'Dea, *One in Ten Ballots Rejected in Last Month's Vote-by-Mail Elections*, NJSPOTLIGHT.COM, June 10, 2020, Ex. 14 to Weir Decl., ECF No. 35-16.) More troubling still, there were allegations of voter fraud in connection with elections in Paterson, New Jersey. (*See* David Wildstein, *Evidence of Massive Voter Fraud in Paterson Election, Court Records Show*, NEW JERSEY GLOBE, June 14, 2020, Ex. 15 to Weir Decl., ECF No. 35-17.) In that incident, a campaign worker reportedly stole ballots out of mailboxes, both completed and uncompleted, at

the direction of a local campaign. (*Id.*) There were also reports that authorities discovered nearly 900 votes that were mailed in bulk from three individual mailboxes, including more than 300 rubber-band-bound ballots from a single mailbox.[1] (*Id.*)

### 2.   USPS and the July 2020 Primary Election

During the July 2020 Primary Election, the State experienced problems arising from the United States Postal Service's ("USPS" or the "Postal Service") postmarking practices. The Postal Service's general policy is to not apply postmarks to postage prepaid envelopes. (USPS, Handbook PO-408 § 1-1.3, Ex. 22 to Weir Decl., ECF No. 35-24.) Notwithstanding that general policy, "the Postal Service has directed personnel to postmark all ballots to assist state election boards." (USPS, OFFICE OF INSPECTOR GENERAL, ELECTION READINESS REPORT 3 (Aug. 31, 2020), Ex. 7 to Lynch Decl., ECF No. 58-2.)

---

[1] Plaintiffs also direct the Court to several instances of voter fraud in New Jersey over the past decade that predate the current public health emergency or the election laws at issue in this matter. *See, e.g.*, Jerry DeMarco, *Elmwood Park Mayor Charged with Voter Fraud, Resigns*, SADDLE BROOK-ELMWOOD PARK DAILY VOICE, Apr. 29, 2019, Ex. 13 to Weir Decl., ECF No. 35-15 (reporting that a New Jersey mayor was charged with completing vote by mail applications and ballot certifications for other voters); John Heinis, *Feds: Hoboken Woman Pleads Guilty to Promoting Vote-by-Mail Fraud Scheme*, HUDSON COUNTY VIEW, Nov. 8, 2018, Ex. 11 to Weir Decl., ECF No. 35-13 (reporting that a New Jersey resident pleaded guilty to paying other voters to cast ballots at payor's direction); Corey McDonald, *Hoboken Man Pleads Guilty to Participating in 2015 Vote-by-Mail Fraud Scheme*, HUDSON COUNTY VIEW, Oct. 8, 2019, Ex. 10 to Weir Decl., ECF No. 35-12 (reporting that a New Jersey resident pleaded guilty to paying other voters to cast ballots at payor's direction); N.J. Office of the Attorney General, *Former Campaign Worker in Essex County Convicted at Trial of Engaging in Ballot Fraud in 2007 Races in 29th Legislative District*, Sept. 28, 2012, Ex. 9 to Weir Decl., ECF No. 35-11 (reporting that a New Jersey resident was found guilty of election fraud for submitting ballots on behalf of voters who had never received a ballot nor casted a vote); Joe Malinconico, *Councilman and Wife Arrested in Voter Fraud Case*, TAP INTO PATERSON, Dec. 2, 2010, Ex. 7 to Weir Decl., ECF No. 35-9 (reporting councilman and wife charged with tampering with absentee ballots). The instances of voter fraud cited by Plaintiffs do not arise from mail-in ballots cast after Election Day or lacking postmarks, and are not related to the early canvassing provision at issue in this case.

Despite the Postal Service's direction to postmark all ballots, a report by the USPS Office of the Inspector General found "it is a challenge for the Postal Service to ensure full compliance." (*Id.*) Some ballots will not be postmarked due to "(1) envelopes sticking together when processed on a machine; (2) manual mail processing; or (3) personnel unaware that all return ballots, even those in prepaid reply envelopes, need to receive a postmark." (*Id.*) For primary elections in other states this year, there is evidence the USPS failed to postmark thousands of ballots.[2] There is no evidence, however, of a correlation between a ballot lacking a postmark and a ballot being mailed after Election Day.

A Camden County official reports the following experiences related to USPS's postmarking practices during the July 7, 2020 Primary. According to the official, "certain mail-in ballots delivered to the Board [of Elections] on the morning of July 8, 2020 and bearing postmarked dates of July 8, 2020 had in fact been received by USPS on or before July 7, 2020." (Campisi Decl. ¶ 5, ECF No. 58-7.) Additionally, "certain mail-in ballots were in possession of USPS on the morning of July 8, 2020 that did not have postmarks. USPS postmarked those ballots with a July 8, 2020 date and delivered them to the Board on July 8, 2020." (*Id.* ¶ 6.) The official further reports that "USPS stated that based on its operational processes, it believed that the mail-in ballots located at a delivery unit on the morning of July 8, 2020 and delivered later that same day, would have been received by USPS on or before July 7, 2020." (*Id.* ¶ 7.) Officials in Essex and Ocean counties report similar communications with USPS regarding ballots returned for the

---

[2] *See Gallagher v. N.Y. State Bd. of Elections*, No. 20-5504, 2020 WL 4496849, at *5 (S.D.N.Y. Aug. 3, 2020) ("[D]espite the postal service's best efforts, there is uncontroverted evidence that thousands of absentee ballots for the June 23 Primary were not postmarked."); (USPS, OFFICE OF INSPECTOR GENERAL, TIMELINESS OF BALLOT MAIL IN THE MILWAUKEE PROCESSING & DISTRIBUTION CENTER SERVICE AREA 3, 5 (July 7, 2020), Ex. 14 to Lynch Decl., ECF No. 58-4 (documenting 390 ballots in Milwaukee with postmark issues).)

July 7, 2020 Primary Elections. (McGuckin Decl. ¶¶ 4–7, ECF No. 58-9; Von Nessi Decl. ¶¶ 4–7, ECF No. 58-11.)

Election officials also struggled to canvass the substantially greater number of mail-in and provisional ballots by statutory deadlines. New Jersey saw a significant increase in mail-in ballots in 2020 compared with 2016.[3] Additionally, New Jersey extended the statutory deadline for the receipt of mail-in ballots by boards of elections by seven days. (Campisi Decl. ¶ 10 (citing N.J. Stat. Ann. § 19:63-22).) But "to ensure that a provisional ballot was not counted from a voter who also submitted a mail-in ballot," New Jersey only reviewed provisional ballots after the deadline for receiving mail-in ballots passed. (*Id.*) The extension of time for receiving mail-in ballots prevented the State from reviewing provisional ballots until July 14. (*Id.*) The combination of these logistical challenges led to petitions from Camden, Monmouth, Middlesex, and Somerset counties for extensions of time to canvass and count ballots. (Giles Decl. ¶ 11, ECF No. 58-6.)

## B. New Jersey's 2020 General Election Legislation

On August 14, 2020 Governor Murphy issued Executive Order 177. (Am. Compl. ¶ 64.) Within two weeks, the State legislature passed Assembly Bill No. 4475 ("A4475"), which codified several of Executive Order 177's voting provisions. Pursuant to A4475, the November 2020 General Election will take place primarily by mail: all active registered voters will be sent a mail-in ballot at least twenty-nine days before the election. *See* N.J. Stat. Ann. § 19:63-31(a).

---

[3] (*See* Campisi Decl. ¶¶ 2–3 (reporting approximately 78,490 mail-in ballots returned in 2020 for Primary Elections in Camden County compared with 20,200 such ballots returned in 2016); McGuckin Decl. ¶¶ 2–3 (reporting more than 90,000 mail-in ballots returned in 2020 for Primary Elections in Ocean County compared with 5,928 such ballots returned in 2016); Von Nessi Decl. ¶¶ 2–3 (reporting approximately 104,925 mail-in ballots returned in 2020 for Primary Elections in Essex County compared with 2,672 such ballots in 2016).)

New Jersey's A4475 also allows voters to return their ballots by mail. N.J. Stat. Ann. § 19:63-31(m). Consistent with the Postal Service's guidance,  ballot return envelopes are required to have prepaid First-Class Postage. N.J. Stat. Ann. § 19:63-31(b); (*see* July 30, 2020 Marshall Correspondence, Ex. 6 to Lynch Decl., ECF No. 58-2 ("[v]oters must use First-Class Mail (or an expedited level of service) to mail their ballots").) The law provides dates by which mail-in ballots must be cast and received to be counted in the election: "Every vote-by-mail ballot that is postmarked on or before November 3, 2020, and that is received by November 10, 2020, at 8:00 p.m. shall be considered valid and shall be canvassed, assuming the ballot meets all other statutory requirements." N.J. Stat. Ann. § 19:63-31(m). According to the Legislature, this provision "ensure[s] that registered voters' efforts to vote are not impacted by delays in the postal service." *Id.* The Legislature's concern is supported by guidance from the Postal Service. (*See, e.g.*, July 30, 2020 Marshall Correspondence (stating that "[w]hile the specific transit times" for First-Class Mail "cannot be guaranteed and depend on factors such as a given mailpiece's place of origin and destination, most domestic first class mail is delivered 2–5 days after it is received by the Postal Service").)

Furthermore, A4475 provides that:

> Every ballot without a postmark, and ballots mis-marked and confirmed by the [Postal Service] that those ballots were received by the [Postal Service] on or before November 3, 2020, that is received by the county boards of elections from the [Postal Service] within 48 hours of the closing of the polls on November 3, 2020, shall be considered valid and shall be canvassed, assuming the ballot meets all other statutory requirements.

N.J. Stat. Ann. § 19:53-31(m).

The law also includes provisions regulating when State election officials can begin canvassing votes. To "account for the increase in vote-by-mail ballots" expected during the November 2020 General Election, A4475 allows election officials to "begin opening the inner

envelopes and canvassing each mail-in ballot from the inner envelopes no earlier than ten days prior to the day of the election." *Id.* New Jersey law requires election officials to certify the November 2020 General Election results by November 20, 2020. N.J. Stat. Ann. § 19:63-31(p). Election officials must then transmit the official November 2020 General Election results to the New Jersey Secretary of State by November 23, 2020. *Id.* These dates cannot be extended "[b]ecause of the need to meet the federal deadlines for the State's electors to meet." *Id.* According to State election officials, "without early counting, it would be difficult, if not impossible, to ensure that all votes [in the November 2020 General Election] are counted within the statutory timeframe." (Campisi Decl. ¶ 16; McGuckin Decl. ¶ 14; Von Nessi Decl. ¶ 14.)

Although A4475 allows State officials to begin canvassing votes before Election Day, election officials may not report the results of any canvassing until polls close on November 3, 2020. N.J. Stat. Ann. § 19:63-31(m) ("The contents of the mail-in ballots and the results of the ballot canvassing shall remain confidential and shall be . . . in no circumstances disclosed prior to the close of polls on the day of the election."). According to the Director of the New Jersey Division of Elections, the "only practical way to obtain a . . . tabulation of the votes is for county elections staff to run the tabulation report[,]" and election officials are prohibited from running a tabulation report before the polls close on Election Day. (Giles Decl. ¶ 23.) Moreover, "the Division of Elections will . . . conduct[] an audit of the county boards of elections to ensure that no tabulation report was run" before the polls close on Election Day. (*Id.*) Finally, under New Jersey law, it is a third-degree crime for election officials to knowingly release the results of the canvass before polls close on Election Day. N.J. Stat. Ann. § 19:34-13(b).

### C.     Procedural Background

Plaintiffs filed their initial Complaint challenging Governor Murphy's Executive Order 177 on August 18, 2020. (Compl., ECF No. 1.) Following the passage of A4475, Plaintiffs

filed an Amended Complaint on September 11, 2020, challenging the law's provisions. (*See generally* Am. Compl.) Counts One and Two allege violations of 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1, (*id.* ¶¶ 109–117); Count Three alleges violations of the right to vote, (*id.* ¶¶ 118–123); and Count Four alleges violations of the Equal Protection Clause, (*id.* ¶¶ 124–37).

Plaintiffs first filed a Motion for an Order to Show Cause on September 16, 2020. (ECF No. 35). The Motion seeks the entry of a preliminary injunction enjoining the State from canvassing ballots ten days before Election Day and from canvassing ballots received up to forty-eight hours after Election Day if those ballots lack a postmark.[4] (*Id.*) Plaintiffs allege these acts violate 2 U.S.C. §§ 1, 7 and 3 U.S.C. §1. Defendants opposed, and Plaintiffs replied.

## II.   **LEGAL STANDARD**

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks and citation omitted). This remedy should be granted only if: (1) Plaintiffs "are likely to succeed on the merits of their claims"; (2) Plaintiffs "are likely to suffer irreparable harm without relief"; (3) "the balance of harm favors [Plaintiffs]"; and (4) "relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017). To establish they are likely to succeed on the merits of their claims, Plaintiffs must show a "reasonable probability of success." *Issa*, 847 F.3d at 131. The burden is on Plaintiffs to "establish every element in [their] favor, or the grant of a preliminary injunction is inappropriate." *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) (citing *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (citations omitted)).

---

[4] Plaintiffs do not seek emergent relief for Counts Three and Four of their Amended Complaint.

## III.    DISCUSSION

### A.    Standing

As a preliminary matter, Defendants each argue that Plaintiffs lack standing. (*See* League of Women Voters/NAACP's Opp'n Br. 10–14, ECF No. 57; Way's Opp'n Br. 20–26, ECF No. 58; DCCC's Opp'n Br. 8–14, ECF No. 59.) After briefing on this matter was complete, DCCC also moved to dismiss the Amended Complaint for lack of subject matter jurisdiction, arguing Plaintiffs lack standing. (DCCC's Mot. Dismiss Br. 7–12, ECF No. 71.)

To satisfy the standing requirement, a plaintiff must show: (1) "it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "the injury is fairly traceable to the challenged action of the defendant"; and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Plaintiffs are each associations or organizations, and thus may have standing to bring suit under two circumstances. *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 261 (3d Cir. 2009) (quoting *Prison Soc'y v. Cortes*, 508 F.3d 156, 162–63 (3d Cir. 2007)). First, by organizational standing, "an organization may be granted standing in its own right to seek judicial relief from *injury to itself* and to vindicate whatever rights and immunities the organization or association itself may enjoy." *Id.* (quoting *Cortes*, 508 F.3d at 163). This may occur when an organization must divert its resources to counteract unlawful conduct. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). Alternatively, by associational standing, "an association may assert claims on behalf of its members, but only where the record shows that the organization's *individual members themselves have standing to bring those claims*." *Common Cause*, 558 F.3d at 261. An entity may establish associational standing on behalf of its members where: (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are

germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Defendants assert that Plaintiffs lack organizational standing because Plaintiffs fail to demonstrate how the regulations in A4475 will require them to expend resources or will result in voter confusion. (Way's Opp'n Br. 25; DCCC's Opp'n Br. 11–13.) Defendants also assert that Plaintiffs lack associational standing on behalf of its members for claims arising from the consideration of ballots lacking postmarks because alleged injuries of vote dilution affect all voters, not just Plaintiffs' members, and thus are impermissibly generalized grievances. (Way's Opp'n Br. 22 (citing *Donald J. Trump for President, Inc. v. Cegavske*, No. 20-1445, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020)); DCCC's Opp'n Br. 9; NAACP's Opp'n Br. 12–14.) Defendants also argue that Plaintiffs' claims that untimely ballots will be canvassed are impermissibly speculative because New Jersey's regulations explicitly prohibit canvassing untimely ballots and A4475's alterations do not raise a substantial risk that untimely ballots will be canvassed. (Way's Opp'n Br. 21–22; DCCC's Opp'n Br. 10–11.) As for Plaintiffs' asserted injuries arising from canvassing ballots before Election Day, Defendants argue that these injuries are too speculative because Plaintiffs fail to present any reason to think election officials would unlawfully release canvassing information before the polls close. (Way's Opp'n Br. 23–24.)

Plaintiffs assert they have both organizational and associational standing. Plaintiffs assert that they have organizational standing because they "will have to divert paid and volunteer resources from . . . voter contact programs . . . to poll watching instead"; they "also must recruit, hire, and train more poll watchers than would otherwise be needed to monitor the counting of ballots for ten additional days before the election"; and they have transferred resources from

national coffers to state organizations to "assist them in their efforts to respond to the new counting regime." (Pls.' Reply Br. 4.) Plaintiffs also argue they have associational standing on behalf of their members, just as other plaintiffs suing on behalf of voters have challenged state statutes as preempted by the federal laws setting a uniform election day. (Pls.' Reply Br. 5–6 (citing *Foster v. Love*, 522 U.S. 67, 70 (1997); *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1174 (9th Cir. 2001); *Millsaps v. Thompson*, 259 F.3d 535, 536 (6th Cir. 2001); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 774 (5th Cir. 2000)).) Plaintiffs argue that A4475 "substantially increases the risk of early vote counts becoming public," citing "New Jersey's unfortunate history of election fraud—including fraud committed by election insiders just this year—which likewise carry criminal penalties." (*Id.* at 7.) Plaintiffs also argue that ballots sent after Election Day that lack postmarks could arrive within forty-eight hours of Election Day, thus diluting the valid votes of Plaintiffs' members. (*Id.* at 8.)

District courts confronting standing issues in cases challenging state regulations for the upcoming November 2020 election—with at least some of the same plaintiffs as this matter—have reached conflicting conclusions. *See, e.g., Donald J. Trump for President, Inc. v. Bullock*, No. 20-66, 2020 WL 5810556, at *6–8 (D. Mont. Sept. 30, 2020) (finding lead plaintiff had standing); *Cegavske*, 2020 WL 5626974, at *4 (finding no plaintiffs had standing). In light of these conflicting decisions and the pending briefing on DCCC's Motion to Dismiss that should clarify the standing inquiries here, the Court finds good cause to defer consideration of standing. Furthermore, as explained below, the Court need not definitively rule on standing at this stage because it finds that Plaintiffs have failed to demonstrate they are entitled to a preliminary injunction. *See Cook Cnty. Republican Party v. Pritzker*, No. 20-4676, 2020 WL 5573059, at *3 (N.D. Ill. Sept. 17, 2020) (citing *Simic v. City of Chicago*, 851 F.3d 734, 737–38, 740 (7th Cir.

2017) (holding that "[a] district court has jurisdiction to decide its jurisdiction, so it can address a motion for a preliminary injunction without making a conclusive decision about whether it has subject matter jurisdiction")).

### B.     Preliminary Injunction

#### 1.     Plaintiffs Fail to Establish They are Likely to Succeed on the Merits of Their Claims.

##### a.     Canvassing Ballots Before Election Day

"Under the Supremacy Clause, state laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991) (internal citation omitted) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824)). The Elections Clause of the United States Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of [choosing] Senators." U.S. CONST. art. I, § 4, cl. 1. The Elections Clause grants the states "comprehensive . . . authority to provide a complete code for the congressional elections, not only as to times and places, but in relation to . . . supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of elections returns," unless Congress should "supplement these state regulations or . . . substitute its own." *Smiley v. Holm*, 285 U.S. 355, 366–67 (1932); *see also Foster*, 522 U.S. at 71 n.2.

"The [Elections] Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." *Foster*, 522 U.S. at 69 (internal citation omitted) (citing *Storer v. Brown*, 415 U.S. 724, 730 (1974); *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)); *see United States v. Classic*,

313 U.S. 299, 311 (1941) (stating that the Elections Clause grants states "wide discretion in the formulation of a system for the choice by the people of representatives in Congress"); *Bomer*, 199 F.3d at 775 ("[A] state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject."). "[I]t is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster*, 522 U.S. at 69 (internal quotation marks omitted) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832–33 (1995)).

One such rule established by Congress that overrides state regulations is the uniform date of election for Congress and the Presidency, set as the first Tuesday after the first Monday in November. *Id.* at 69–70; *see* 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1. New Jersey's A4475 permits election officials to begin canvassing mail-in ballots up to ten days before Election Day. N.J. Stat. Ann. § 19:63-31(m). Plaintiffs, in Count One of the Amended Complaint, assert that permitting the canvassing of mail-in ballots before Election Day is preempted by Congress's legislation setting a uniform federal election day, 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1 (the "Federal Election Day Statutes"), and thus that provision of A4475 is void. (Am. Compl. ¶¶ 109–112.)

In setting a uniform election day throughout the country, Congress sought to avoid "the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other States" as well as "the burden on citizens forced to turn out on two different election days to make final selections of federal officers in Presidential election years." *Foster*, 522 U.S. at 73–74 (citing CONG. GLOBE 42d Cong., 2d Sess., 141 (1871) (remarks of Rep. Butler)). "When the [Federal Election Day Statutes] speak of 'the election' . . . , they plainly refer to the combined actions of voters and officials meant to make a final selection of an

officeholder . . . ." *Id.* at 71 (citing N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 433 (C. Goodrich and N. Porter eds. 1869)). The Court in *Foster* declined to specify "what may constitute the final act of selection within the meaning of the law" or "what acts a State must cause to be done on federal election day (and not before it) in order to satisfy the statute[s]." *Id.* at 72. Instead, the Court only held that an election "may not be consummated prior to federal election day." *Id.* at 72 n.4. Where a state's election laws conflict with the Federal Election Day Statutes by permitting the consummation of the election before the federal election day, those state laws are preempted and void. *Id.* at 74.

Courts of Appeals addressing conflict preemption between the Federal Election Day Statutes and state election laws have found that "some acts associated with the election," such as early voting or absentee voting, "may be conducted before the federal election day without violating the [Federal Election Day Statutes]." *Bomer*, 199 F.3d at 776 (finding early voting seventeen days before Election Day was not preempted where "the polls are open on federal election day and most voters cast their ballots that day"); *see Millsaps*, 259 F.3d at 546 (finding early voting was not preempted by Federal Election Day Statutes, and that under *Foster*, "so long as a State does not conclude an election prior to federal election day, the State's law will not 'actually conflict' with federal law"); *Keisling*, 259 F.3d at 1175 (citing *Foster*, 522 U.S. at 72 n.4). None of these decisions thoroughly discussed the issue of canvassing votes prior to Election Day. The Fifth Circuit in *Bomer*, however, found that early voting was not preempted by the Federal Election Day Statutes where "[n]o election results are released until the votes are tabulated on federal election day," therefore the election "is not decided or 'consummated' before federal election day." 199 F.3d at 775–76; *see also Millsaps*, 259 F.3d at 543 (noting that "tallying results" of early voting did not occur until Election Day).

Plaintiffs urge a broad construction of these statutes: that "nowhere are States given any discretion whatsoever on the timing of the uniform Election Day"; that canvassing must take place only on Election Day; and that the legislative history reveals that Congress sought to prevent multi-day voting. (Pls.' Moving Br. 18–21, ECF No. 35-1); *see Keisling*, 259 F.3d at 1172, 1176 (acknowledging that legislative history supports an interpretation that "all voting in federal elections should take place on a single day").

This broad construction, however, is at odds with Congress's requirement that states permit some form of absentee voting, 52 U.S.C. § 10502(d) ("[E]ach State shall provide by law for the casting of absentee ballots for the choice of electors for President and Vice President . . . ."), as well as Courts of Appeals decisions permitting some election activity prior to Election Day so long as the election is not consummated before Election Day, *see, e.g., Keisling*, 259 F.3d at 1176 ("Although voting takes place, perhaps most voting, prior to election day, the election is not 'consummated' before election day because voting still takes place on that day."). The interpretation that the Federal Election Day Statutes preempt any state discretion on the timing of election-related activity cannot be reconciled with Congress's requirement that states permit absentee voting, but leaving the manner and timing of absentee voting to the discretion of each state. *See* 28 U.S.C. § 10502(d). Moreover, if the Federal Election Day Statutes supplanted all discretion by the states on the timing of the election, it is doubtful that the early and absentee voting schemes discussed in *Bomer*, *Millsaps*, and *Keisling* could be upheld. The Courts of Appeals discounted the persuasive weight of the legislative history in part because it could not be reconciled with Congress's later endorsement of absentee voting prior to Election Day. *See Millsaps*, 259 F.3d at 547 ("[T]he plaintiffs' argument would apply with equal force to absentee voting and result in a declaration that federal law preempts a widely accepted and long-standing electoral

practice."); *Keisling*, 259 F.3d at 1175–76 ("Congress has recently required . . . states to provide for absentee voting in federal elections.").

Contrary to Plaintiffs' argument, the Supreme Court's decision in *Foster* does not support their broad interpretation. There, the Court declined to specify election-related activity that may not occur prior to Election Day. *Foster*, 522 U.S. at 72. The Court only held that an "election . . . may not be consummated prior to federal election day." *Id.* at 72 n.4. Nevertheless, the Court's definition of "election"—"the combined actions of voters and officials meant to make a final selection of an officeholder"—is useful in determining whether A4475 is preempted by the Federal Election Day Statutes. *Id.* at 71.

Here, the Court finds that Plaintiffs fail to establish a reasonable probability of success on the merits of Count One because the Federal Election Day Statutes do not preempt state law permitting the canvassing of ballots before Election Day. The Court finds that the canvassing of mail-in ballots before Election Day may be a combined action of voters and officials, but this action does not make a final selection of an officeholder. Canvassing ballots before Election Day does not consummate the election because that cannot occur before the polls close on Election Day and election officials run a final tabulation report. Accordingly, New Jersey's law permitting the canvassing of mail-in ballots prior to Election Day is not preempted by the Federal Election Day Statutes.

The Court is persuaded by Congress's intent in enacting the Federal Election Day Statutes. "Congress was concerned . . . with the distortion of the voting process threatened when the results of an early federal election in one State can influence later voting in other states." *Foster*, 522 U.S. at 73. Although the Court acknowledges that "Congress considered and rejected the practice of multi-day voting," *Keisling*, 259 F.3d at 1172, the primary concern when enacting the statutes

appears to be the reporting of final election results in some states before other states had yet to open the polls. *See* CONG. GLOBE, 42d Cong., 2d Sess. 112, 141 (1871) (remarks of Rep. Butler); *see also Millsaps*, 259 F.3d at 541–42. Here, Plaintiffs fail to establish an appreciable risk that the results of New Jersey's election will be reported prior to Election Day. New Jersey law specifies that "[t]he contents of the mail-in ballots and the results of the ballot canvassing shall remain confidential and . . . in no circumstances disclosed prior to the close of the polls on the day of the election." N.J. Stat. Ann. § 19:63-31(m). Election boards are required to "implement the measures necessary to ensure the security and secrecy of the mail-in ballots." *Id.* Election staff are prohibited from running a tabulation report prior to the close of polls, and the Division of Elections will conduct an audit to ensure this mandate is followed. (Giles Decl. ¶ 23; *see also* Campisi Decl. ¶¶ 19–22; McGuckin Decl. ¶¶ 15–17; Von Nessi Decl. ¶¶ 15–17.) Finally, it is a crime to reveal the contents of a mail-in ballot prior to the close of the polls. N.J. Stat. Ann. § 19:34-13(b). The Fifth Circuit identified similar criminal sanctions as persuasive in affirming Texas's early voting law. *Bomer*, 199 F.3d at 777 (citing Tex. Elec. Code §§ 61.007, 81.002). Plaintiffs do not identify any reason to suspect that election officials will ignore or intentionally violate these laws and procedures, or that violators will not be prosecuted. The Court, accordingly, finds there is no appreciable risk that this provision of A4475 will result in one of the evils sought to be avoided when establishing a uniform election day.

The Court is also persuaded by the diverse absentee or mail-in voting practices among the states that have grown in the shadow of the Federal Election Day Statutes and the discretion afforded by Congress. Several states allow some form of canvassing or tallying ballots received prior to Election Day. *See, e.g.*, Ariz. Rev. Stat. Ann. §§ 16-550(B), 16-551 (specifying the "tallying of [early] ballots shall not begin any earlier than fourteen days before election day");

Colo. Rev. Stat. § 1-7.5-107.5 ("Counting of the mail ballots may begin fifteen days prior to the election and continue until counting is completed."); Fla. Stat. § 101.68(2)(a) ("The county canvassing board may begin the canvassing of vote-by-mail ballots at 7 a.m. on the 22nd day before the election . . . ."). At least one state prohibits canvassing absentee ballots until *after* Election Day. Md. Code Ann., Elec. Law § 11-302(b)(1) ("A local board may not open any envelope of an absentee ballot prior to 8 a.m. on the Wednesday following election day."). Under Plaintiffs' proposed interpretation, it would seem that either scheme would be prohibited because canvassing may take place on a day other than Election Day. But Congress has not supplanted any of these election laws. This is not dispositive of Plaintiffs' arguments, but cuts against the likelihood of Plaintiffs' ultimate success on the merits and the wisdom of enjoining application of A4475.

The Court must reconcile the Federal Election Day Statutes that establish "*the* day for the election," 2 U.S.C. § 7 (emphasis added), with Congress's endorsement of absentee voting, which necessarily requires some election-related activity prior to Election Day, *see* 52 U.S.C. 10502(d). The Court finds that the Federal Election Day Statutes mandate some "combined action of voters and officials meant to make a final selection of an officeholder" on Election Day so that no state's election is concluded prior to Election Day. *Millsaps*, 259 F.3d at 547. The Federal Election Day Statutes, however, do not prevent all election-related activity prior to Election Day—including early voting by mail and the canvassing of mail-in ballots—so long as that activity does not make a final selection of an officeholder or reveal the results of the canvassing before Election Day. Because there is no final selection of an officeholder until after the polls close on Election Day, New Jersey law prohibits reporting the results of the canvassing before the polls close, and Plaintiffs fail to establish any risk that canvassing results will be reported before the polls close,

the Court finds that Plaintiffs fail to establish they are likely to succeed on the merits of Count One.

   **b.**  **Canvassing Ballots Without Postmarks Received Within Two Days After Election Day**

   Plaintiffs also assert, in Count Two of the Amended Complaint, that the Federal Election Day Statutes, by setting a uniform day for the federal election, preempt the counting of ballots cast after Election Day. (Am. Compl. ¶¶ 113–117.) Plaintiffs argue that "New Jersey cannot permit ballots cast after Election Day to be counted," (Pls.' Moving Br. 21–22), and that A4475 allows the possibility of counting untimely ballots by permitting "ballots that have not been postmarked to be counted if they are received two days after Election Day," (Am. Compl. ¶¶ 114). Plaintiffs argue that a mail-in ballot "is not a legal vote unless it is marked and cast on or before" Election Day, (Pls.' Moving Br. 21), and the Federal Election Day Statutes preempt any state law that permits counting ballots cast after Election Day, (*id.* at 23). Defendants agree that New Jersey cannot permit counting of untimely ballots, and argue that A4475 does not permit it. (Way's Opp'n Br. 34–35.) Instead, according to Defendants, A4475 merely addresses an evidentiary issue: how the State determines whether a ballot was cast by Election Day. (*Id* at 35.)

   As discussed above, "a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject." *Bomer*, 199 F.3d at 775. The Federal Election Day Statutes set a uniform date for the elections of Congress and the Presidency. 2 U.S.C. §§ 1,7; 3 U.S.C. § 1. Congress provides only limited situations where an election for federal office can be held on a later date: (1) where a state requires a majority of all votes to elect a representative and no candidate receives a majority vote on Election Day, *Foster*, 522 U.S. at 71 n.3; *see* 2 U.S.C. § 8; or (2) "to fill a vacancy . . . caused . . . by the death, resignation, or incapacity of a person

elected," 2 U.S.C. § 8; *Millsaps*, 259 F.3d at 541 n.2. Plainly, a state regulation permitting voters to cast ballots after Election Day or permitting the canvassing of ballots cast after Election Day would directly conflict with the Federal Election Day Statutes.

New Jersey, however, does not expressly permit canvassing ballots cast after the polls close. New Jersey law prohibits canvassing the following categories of mail-in ballots: (1) mail-in ballots postmarked on or before Election Day but not received by the county boards of elections by November 10, 2020, at 8 p.m.; (2) mail-in ballots postmarked after Election Day and lacking confirmation from the Postal Service that they were received at the post office by Election Day; (3) mail-in ballots postmarked after Election Day, confirmed by the Postal Service to have been received at the post office by Election Day, but not received by the county boards of elections within forty-eight hours of the closing of the polls; and (4) mail-in ballots lacking a postmark and not received by the county boards of elections within forty-eight hours of the closing of the polls. N.J. Stat. Ann. § 19:63-31(m).

On the other hand, A4475 provides that the following mail-in ballots shall be canvassed: (1) mail-in ballots postmarked on or before Election Day and received by the county boards of elections by November 10, 2020, at 8 p.m.;[5] (2) mail-in ballots postmarked after Election Day but confirmed by the Postal Service to have been received at the post office on or before Election Day and received by the county boards of elections within forty-eight hours of the closing of the polls; and (3) mail-in ballots lacking a postmark but received by the county boards of elections within

---

[5] Plaintiffs do not assert that ballots postmarked by Election Day and received by November 10, 2020 may not be canvassed. (*See generally* Pls.' Moving Br.) Accordingly, the Court does not consider any argument challenging the canvassing of *all* ballots after Election Day—only arguments challenging the canvassing of ballots lacking a postmark received within two days after Election Day.

forty-eight hours of the closing of the polls. *Id*. Plaintiffs challenge the canvassing of the third category of mail-in ballots.

The evidence before the Court shows that all ballots should be postmarked by the Postal Service, but the Postal Service has previously failed to abide by this policy. "A postmark is an official Postal Service imprint applied . . . on the address side of a stamped mailpiece. [It] indicates the location and date the Postal Service accepted custody of a mailpiece . . . ." (USPS, Handbook PO-408 § 1-1.3, Ex. 22 to Weir Decl.) Postmarks "are intended to be a revenue protection mechanism to prevent the reuse of postage," and generally "are not required on all mailings." (USPS, OFFICE OF INSPECTOR GENERAL, ELECTION READINESS REPORT 3 (Aug. 31, 2020).) Ballots are an exception, and must be postmarked under USPS policy to provide a date the ballot was cast. (*Id*. ("[T]he Postal Service has directed [its] personnel to postmark all ballots to assist state election boards."); *id*. at 2 (stating a postmark "provides an official date stamp for ballots").) Notwithstanding this policy, there is evidence that the Postal Service has failed to postmark every ballot in 2020 primary elections in other states. *Gallagher*, 2020 WL 4496849, at *5; (USPS, OFFICE OF INSPECTOR GENERAL, TIMELINESS OF BALLOT MAIL IN THE MILWAUKEE PROCESSING & DISTRIBUTION CENTER SERVICE AREA 3, 5 (July 7, 2020).) There is no evidence, however, that the Postal Service's failure to postmark a ballot is correlated with the date of the ballot's mailing, or that a ballot cast after Election Day will, or is more likely to, lack a postmark.

The evidence also shows that ballots are likely to require no fewer than two days in transit from voters to election officials. According to the Postal Service, "all Election Mail (including ballots) mailed from individual voters to state or local election officials *must* be sent by First-Class Mail." (May 29, 2020 Marshall Correspondence 1, Ex. 4 to Lynch Decl., ECF No. 58-2; *see also* July 30, 2020 Marshall Correspondence 1, Ex. 6 to Lynch Decl., ECF No. 58-2.) The Postal

Service advised the State that First-Class Mail is generally delivered within two to five days. (May 29, 2020 Marshall Correspondence 1 ("Most domestic First-Class Mail is delivered in 2–5 days."); *see also* July 30, 2020 Marshall Correspondence 1). The Postal Service, however, has also advised that, leading up to Election Day, election officials and voters should plan for First-Class Mail delivery timelines of up to one week.[6] (*See* July 30, 2020 Marshall Correspondence 1 ("[T]he Postal Service recommends that election officials use First-Class Mail to transmit blank ballots and allow 1 week for delivery to voters."); *id.* at 2 ("To allow enough time for ballots to be returned to election officials, domestic voters should generally mail their completed ballots at least one week before the state's due date.").) Based on the evidence before it, the Court finds the probability remote that any ballots lacking a postmark and received within forty-eight hours of the closing of the polls are cast after Election Day.[7]

The parties agree that New Jersey cannot permit ballots cast after Election Day to be canvassed. The issue then is whether the Federal Election Day Statutes preempt New Jersey's method of determining whether a ballot received without a postmark—thus lacking that official date stamp indicating when a ballot was cast—was cast on or before Election Day. The Court finds that New Jersey's law permitting the canvassing of ballots lacking a postmark if they are received within forty-eight hours of the closing of the polls is not preempted by the Federal Election Day

---

[6] Plaintiffs, relying on pre-pandemic information on the Postal Service website, argue that ballots can potentially be delivered in fewer than two days. (Pls.' Moving Br. 16–17, 22–23 (citing USPS, FAQs: Types of First-Class Mail? (Jan. 26, 2020), Ex. 26 to Weir Decl. ("In some instances (short distance between ZIP Codes), it is possible for delivery to occur in one day.").) The Court has considered this evidence but finds it unpersuasive compared to the Postal Service's direct communication to New Jersey election officials about the probable timelines near Election Day.

[7] Indeed, New Jersey's procedure for determining the timeliness of ballots lacking postmarks appears more likely to reject timely ballots than canvass untimely ballots. Plaintiffs do not object to probable rejection of timely ballots.

Statutes because the Federal Election Day Statutes are silent on methods of determining the timeliness of ballots.

As discussed above, the Elections Clause grants the states "comprehensive . . . authority to provide a complete code for the congressional elections, not only as to times and places, but in relation to . . . prevention of fraud and corrupt practices, counting of votes, [and] duties of inspectors and canvassers," unless Congress should "supplement these state regulations or . . . substitute its own." *Smiley*, 285 U.S. at 366–67. The Elections Clause grants the states "wide discretion in the formulation of a system for the choice by the people of representatives," *Classic*, 313 U.S. at 311, the only limitation is "the state system cannot directly conflict with federal election laws on the subject." *Bomer*, 199 F.3d at 775. Here, the Court finds no direct conflict between A4475 and the Federal Election Day Statutes cited by Plaintiffs. New Jersey law prohibits canvassing ballots cast after Election Day, in accordance with the Federal Election Day Statutes. Plaintiffs direct the Court to no federal law regulating methods of determining the timeliness of mail-in ballots or requiring that mail-in ballots be postmarked. Where Congress "declines to preempt state legislative choices," the Elections Clause vests the states with responsibility for the "mechanics of congressional elections." *Foster*, 522 U.S. at 69.

Plaintiffs argue that even if Congress has not explicitly addressed the method of determining the timeliness of a ballot, A4475 nevertheless acts as an "obstacle to the accomplishment and execution of the full purposes and objectives" of the Federal Election Day Statutes. (Pls.' Reply Br. 14 (quoting *Sikkellee v. Precision Airmotive Corp.*, 822 F.3d 680, 688 (3d Cir. 2016).) Plaintiffs argue that if A4475 were not preempted here, there would be nothing to stop New Jersey from enacting more lenient methods, such as accepting all ballots lacking a postmark received up to a week after Election Day. (*Id.* at 14–15.)

The Court need not consider the preemption of such hypothetical regulations, only the regulations adopted in A4475. Here, the Court finds there is only a remote possibility that an untimely ballot could be canvassed. This would require an unlikely chain of events where a ballot would be (1) cast after Election Day; (2) happen to lack a postmark against Postal Service policy, which is both rare and not correlated to the date the ballot is mailed; and (3) arrive faster than the Postal Service's most optimistic expectations. Weighing against this remote possibility is Congress's concern in enacting the Federal Election Day Statutes: "that citizens be able to exercise their right to vote." *Bomer*, 199 F.3d at 777. The Court finds, with a high degree of confidence, that ballots lacking a postmark and received within forty-eight hours of the closing of the polls are timely cast. *Accord Gallagher*, 2020 WL 4496849, at *16 (finding with "high degree of confidence" that ballots received within two days of the election day were mailed by the election day). The Court finds that A4475 adopts a conservative method to identify and count timely ballots that might otherwise be rejected through no fault of the voters, and only due to the Postal Service's inability to expeditiously process and deliver the mail or follow its own postmarking procedures. New Jersey's A4475 does not act as an obstacle to the accomplishment and execution of the purposes and objectives of the Federal Election Day Statutes. The Court, accordingly, finds that Plaintiffs fail to establish a likelihood of success on the merits of Count Two.

### 2.   Plaintiffs Fail to Establish They are Likely to Suffer Irreparable Harm Absent Relief.

To demonstrate irreparable harm in the absence of preliminary relief, a movant has the burden of establishing a "clear showing of immediate irreparable injury." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (quoting *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)). "Establishing a risk of irreparable harm is not enough [to warrant a preliminary injunction]." *Id.*; *see also Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d

727, 766 (D.N.J. 1998) ("[T]he claimed injury cannot merely be possible, speculative, or remote." (citation omitted)).

Plaintiffs assert that A4475 "threatens to confuse voters, undermine confidence in the electoral process, and create 'incentive[s] to remain away from the polls,'" (Pls.' Moving Br. 25 (alteration in original) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006))), which is an irreparable harm, (*id.* (citing *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 707–08 (N.D. Ohio 2006))). But Plaintiffs' argument and supporting authority do little to explain how the relief they seek addresses their alleged immediate irreparable injury. For example, Plaintiffs fail to explain how election officials canvassing mail-in ballots ten days before Election Day or canvassing ballots lacking postmarks will confuse voters or deter them from voting. These activities are conducted after a ballot is mailed. Voters need not take any new action and face no discouragement from casting a ballot. Unlike *Blackwell*, cited by Plaintiffs, voters face no threat of criminal charges from New Jersey's regulations.[8] *See* 455 F. Supp. 2d at 707–08. Furthermore, voters have no knowledge or control over when or whether a ballot is postmarked or how quickly the Postal Service delivers the ballot. The Court finds that the election regulations concerning the canvassing of ballots lacking postmarks is unlikely to confuse voters or deter them from voting.

Plaintiffs cite several instances of voter fraud over the last decade for the proposition that more fraud is inevitable. (Pls.' Reply Br. 17 (citing Pls.' Moving Br. 4–9)); *see supra* note 1. Plaintiffs, however, fail to connect these past instances of voter fraud with the relief they now seek. Plaintiffs do not explain how preventing election officials from canvassing ballots before Election

---

[8] Plaintiffs also cite *Purcell*, 549 U.S. at 4–5 (2006), for the proposition that A4475 would incentivize voters to avoid the polls. (Pls.' Moving Br. 25.) The Court notes that that passage concerned the risk that a court order issued on the eve of an election could "result in voter confusion and consequent incentive to remain away from the polls" just as much as any state's election regulations. *Purcell*, 549 U.S. at 4–5.

Day would prevent the kind of voter fraud documented in their submissions. As discussed above, the only credible harm that could arise from canvassing ballots before Election Day is the wrongful early disclosure of election results. The Court has already found this injury is too speculative and remote: Plaintiffs provide no reason to suspect election officials would intentionally violate the law and disclose election results before the polls close, and Defendants have provided evidence of sufficient safeguards to prevent accidental or intentional early disclosure of election results.

Plaintiffs also fail to connect their documented instances of voter fraud to mail-in ballots lacking postmarks or mail-in ballots cast after Election Day. Plaintiffs offer no instances of voter fraud resulting from ballots cast after Election Day, or any reason to suspect that a fraudulent ballot or a ballot cast after Election Day is more likely to lack a postmark. As the Court previously found, there is only a remote possibility that mail-in ballots cast after Election Day and lacking postmarks could reach election officials within forty-eight hours after the closing of the polls. Even if a voter mailed a ballot the day after Election Day, that voter would have no control over the postmarking. The Postal Service would have to neglect to postmark the ballot—counter its policies and an infrequent occurrence in the 2020 primary elections—yet also manage to deliver the mail-in ballot faster than the Postal Service's most optimistic estimate. Plaintiffs fail to establish this unlikely chain of events is more than speculative or remote.

Plaintiffs' only remaining argument is that A4475 undermines voter confidence in the election process. (*See* Pls.' Moving Br. 25.) Plaintiffs' only evidence of this comes from a declaration submitted in its reply papers stating that in "the [Republican National Committee's] experience, major or hasty changes [to a state's election laws] confuse voters, undermine confidence in the electoral process, and create incentive to remain away from the polls." (Voccola Decl. ¶ 5, ECF No. 63-3.) This self-serving statement, lacking any factual support, based on vague

changes to any state's election laws rather than A4475, and submitted for the first time in reply does not establish a sufficient likelihood of irreparable harm. The Court, accordingly, finds that Plaintiffs fail to establish a likelihood of imminent irreparable harm.

### 3.   Plaintiffs Fail to Establish the Balance of Harms is in Their Favor.

Plaintiffs assert that Defendants will suffer no injury and "there is no basis for concluding that preliminary relief will negatively impact the November [2020] election." (Pls.' Moving Br. 25–26 (alteration in original) (quoting *Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 884 (3d Cir. 1997)).) On the other hand, a state generally "has a compelling interest in preserving the integrity of its election process." *Purcell*, 549 U.S. at 4 (citation omitted). The Court identifies at least two harms to Defendants that outweigh the speculative harms set forth by Plaintiffs.

First, if the Court were to enter an injunction, Defendants will face additional logistical challenges in conducting a predominantly by-mail election during a pandemic. To enable social distancing and ensure the safety of voters and election officials, New Jersey has chosen to mail ballots to every registered voter to prevent the typical congregating of voters and poll workers in polling places on Election Day. This choice brings its own logistical challenge: timely canvassing many times the usual number of mail-in ballots. (*See* Giles Decl. ¶¶ 4–5; Campisi Decl. ¶¶ 2–3; McGuckin Decl. ¶¶ 2–3; Von Nessi Decl. ¶¶ 2–3.) As evidenced in the July 2020 Primary Election, election officials required more time to canvass the substantial increase in mail-in ballots. (*See* Giles Decl. ¶ 11; Campisi Decl. ¶¶ 8–11.) But because election officials cannot seek an extension of time to canvass ballots for the general election, New Jersey must either "hire and train additional staff members to review, canvass, and count ballots" or get a head start by employing its existing staff to canvass ballots prior to Election Day. (Campisi Decl. ¶ 15; *see also* McGuckin Decl. ¶ 13; Von Nessi Decl. ¶ 13.) Social distancing and sanitation measures complicate recruiting and

training new staff as well as conducting a typical canvass of ballots with even more employees. (Campisi Decl. ¶ 15; *see also* McGuckin Decl. ¶ 13; Von Nessi Decl. ¶ 13.) Defendants assert that "it would be difficult, if not impossible, to ensure that all votes are counted within the statutory timeframe" without canvassing before Election Day. (Campisi Decl. ¶ 16; *see also* McGuckin Decl. ¶ 14; Von Nessi Decl. ¶ 14.) According to Defendants, enjoining the early canvassing provision "this close to Election Day would disrupt the [boards of elections'] administration of the election" because the Board "would have a minimal amount of time . . . to recruit and train new staff." (Campisi Decl. ¶ 15; McGuckin Decl. ¶ 13; Von Nessi Decl. ¶ 13.) The Court finds this is a significant harm that would result from entering Plaintiffs' proposed injunction.

The Court also finds that entering an injunction would frustrate Defendants' ongoing efforts to educate voters about the new by-mail election. Election officials have already begun educating voters through the media about the new procedures, including that ballots lacking a postmark will be counted if timely received and that voters can cast ballots up to 8 p.m. on Election Day. (*See* Giles Decl. ¶ 19; Von Nessi Decl. ¶ 19; McGuckin Decl. ¶ 20; *see, e.g.*, Brent Johnson, *What You Need to Know About N.J.'s Mostly Mail-In Ballot Elections, With All the Controversy*, NJ.COM, Aug. 15, 2020, Ex. 15 to Lynch Decl., ECF No. 58-5.) Entering an injunction now would force election officials to walk back their education campaign at the risk of time and expense for the State and confusion for the voters.

The Court finds that Plaintiffs face only speculative and remote risk of injury without an injunction, compared to Defendants' more likely and onerous injury if an injunction is entered. Accordingly, Plaintiffs fail to establish the balance of harms weighs in their favor.

### 4.      Plaintiffs Fail to Establish an Injunction is in the Public Interest.

Plaintiffs assert a preliminary injunction is in the public interest because "the public interest obviously weighs in favor of enjoining the government from violating federal law," and more specifically, in preserving the integrity of the election process. (Pls.' Moving Br. 26 (citing *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)); *Berne Corp. v. Gov't of V.I.*, 120 F. Supp. 2d 528, 537 (D.V.I. 2000)).) Because the Court finds that Plaintiffs have failed to establish a reasonable probability of success on the merits of their claims, Plaintiffs' argument that the public interest favors an injunction to prevent a violation of federal law is unpersuasive.

The Court agrees that the public interest favors preserving the integrity of the election process, but finds that an injunction would erode that integrity. It is a general principle that "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell*, 549 U.S. 1 (2006); *Frank v. Walker*, 574 U.S. 929 (2014); *Veasey v. Perry*, 135 S. Ct. 9 (2014)). The Court must consider that enjoining a state's election regulations and procedures on the eve of an election can "result in voter confusion" and incentivize voters "to remain away from the polls." *Purcell*, 549 U.S. at 4–5; (*see* McGuckin Decl. ¶ 20 ("Voters might be confused or frustrated by receiving new instructions so close to the election . . . .").) As discussed above, New Jersey voters have already received news of the changes to the November 2020 General Election. Some voters have already received and cast ballots. Further changes to the State's election procedures on the eve of the election are likely to cause confusion among the electorate that is against the public interest.

Additionally, the Court finds that Plaintiffs' proposed preliminary injunction risks voter disenfranchisement. As previously discussed, the Court finds, with a high degree of confidence, that mail-in ballots lacking postmarks received within forty-eight hours of Election Day are timely

cast. Enjoining regulations that allow these ballots to be canvassed risks rejecting qualified voters' properly cast ballots for no fault of the voters. An injunction that risks such disenfranchisement is against the public interest.

Finally, the Court must not only consider the public's interest in the election, but also the public's interest in the crisis that precipitated New Jersey's new election regulations: the COVID-19 pandemic. Here, the risk is not just voters remaining away from the polls, but also voters *traveling to* the polls. It is foreseeable that an injunction on the eve of the by-mail election could prompt such confusion or distrust that voters opt to avoid the mail system altogether and cast provisional ballots in person. Such an outcome would defeat the purpose of the vote-by-mail election and needlessly force voters and poll workers into close proximity. The Court, accordingly, finds that Plaintiffs fail to establish that a preliminary injunction is in the public interest.

## IV.   <u>CONCLUSION</u>

The Court concludes that Plaintiffs fail to establish any of the preliminary injunction factors in their favor. Plaintiffs fail to establish they are likely to succeed on the merits of their claims because the Federal Election Day Statutes do not preempt the challenged regulations. Plaintiffs fail to establish they are likely to suffer immediate, irreparable harm, and the balance of the harms weighs in favor of Defendants. Finally, Plaintiffs' proposed preliminary injunction is against the public interest. The Court, accordingly, must deny Plaintiffs' request for a preliminary injunction. The Court will enter an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE