Thomas R. McCarthy*
Bryan Weir*
Cameron T. Norris*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Ph.: (703) 243-9423
Email: tom@consovoymccarthy.com

Michael L. Testa Jr.
TESTA HECK TESTA & WHITE P.A.
424 W. Landis Avenue
Vineland, NJ 08360
Ph.: (856) 691-2300
Email: mtestajr@testalawyers.com

*Counsel for Plaintiffs*

\* *Admitted pro hac vice*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., REPUBLICAN NATIONAL COMMITTEE, NEW JERSEY REPUBLICAN STATE COMMITTEE,<br><br>Plaintiffs,<br><br>v.<br><br>TAHESHA WAY, in her official capacity as Secretary of State of New Jersey,<br><br>Defendant. | No. 3:20-cv-10753-MAS-ZNQ<br><br>**PLAINTIFFS' BRIEF IN OPPOSITION TO INTERVENORS' MOTION TO DISMISS** |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION .............................................................................. 1

ARGUMENT ................................................................................... 1

  I.   Plaintiffs have standing. ............................................................ 1

     A.  Plaintiffs have direct organizational standing. ........................... 2

     B.   Plaintiffs have representational standing. .................................. 5

  II.  Plaintiffs adequately allege that A4475 violates federal law. ..................... 12

     A.  Pre-Election Day ballot counting and acceptance of non-postmarked ballots two days after Election Day conflict with federal law. .............. 13

     B.  Plaintiffs adequately allege a vote dilution claim. ................................. 14

     C.  Plaintiffs adequately allege that A4475 will result in arbitrary and disparate procedures in violation of the right to vote. ............................ 18

CONCLUSION ................................................................................ 21

# TABLE OF AUTHORITIES

## CASES

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
  469 F.3d 129 (D.C. Cir. 2006) ........................................................... 3

*Alvarez v. Smith*, 558 U.S. 87 (2009) ...................................................... 6

*Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014) ................................ 3

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................... 13, 21

*Baker v. Carr*, 369 U.S. 186 (1962) ................................................... 6, 12

*Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247 (3d Cir. 2014) ....................... 3, 4

*Bush v. Gore*, 531 U.S. 98 (2000) ................................................... passim

*Clapper v. Amnesty Int'l*, 568 U.S. 398 (2013) ......................................... 8

*Common Cause of Pennsylvania v. Pennsylvania*, 558 F.3d 249 (3d
  Cir. 2009) ........................................................................... 2

*Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347 (3d Cir.
  2014) ................................................................................ 2

*Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007) ......... 3, 4, 14

*DCCC v. Ziriax*, 2020 WL 5569576 (N.D. Okla. Sept. 17, 2020) ..................... 11

*Disability Rights Pennsylvania v. Pennsylvania Dep't of Human
  Servs.*, 2020 WL 1491186 (M.D. Pa. Mar. 27, 2020) ................................. 3, 5

*Doe v. Univ. of Scis.*, 961 F.3d 203 (3d Cir. 2020) ..................................... 13, 18

*Donald J. Trump for President, Inc. v. Bullock*, 2020 WL 5810556 (D.
  Mont. Sept. 30, 2020) ..................................................... 4, 7, 11, 12

*Fair Maps Nevada v. Cegavske*, 2020 WL 2798018 (D. Nev. May 29, 2020) ............................................................................................ 16

*Federal Election Comm'n v. Akins*, 524 U.S. 11 (1998) ................................. 7, 12

*Fla. State Conference of N.A.A.C.P. v. Browning*, 569 F. Supp. 2d 1237 (N.D. Fla. 2008) ..................................................................... 17

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) .............................................. 9, 10, 15, 16

*Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004) .................................... 18

*Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919 (S.D. Ind. 2012) ................... 16

*League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008) ...................................................................................... 18

*Millsaps v. Thompson*, 259 F.3d 535 (6th Cir. 2001) ........................................ 6, 7

*New Jersey Civil Justice Inst. v. Grewal*, 2020 WL 4188129 (D.N.J. July 21, 2020) ................................................................... 2, 3, 5

*Novak v. United States*, 795 F.3d 1012 (9th Cir. 2015) .................................... 6, 12

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278 (3d Cir. 2002) .......................................................... 11

*Scott v. Schedler*, 771 F.3d 831 (5th Cir. 2014) ...................................... 3

*Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680 (3d Cir. 2016) .................. 14

*Smiley v. Holm*, 285 U.S. 355 (1932) ....................................................... 7

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ........................... 8

*Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773 (5th Cir. 2000) ................. 6

*Winer Family Tr. v. Queen*, 503 F.3d 319 (3d Cir. 2007) ........................... 2

**STATUTES**

3 U.S.C. §1 ................................................................................. 13

N.J. Stat. §19:63-31 ......................................................... 14, 19

**OTHER AUTHORITIES**

Colleen O'Dea, *Why So Many Mail-In Ballots Were Rejected in NJ's July Primary Election. Hint: Many Arrived Late*, N.J. Spotlight (Sept. 10, 2020) ................................................. 19, 20, 21

Karin Price Mueller, *If you vote in person on Election Day, your vote probably won't be counted until Nov. 10 in N.J. Here's why*, NJ.com (Oct. 5, 2020) ....................................................... 19

Neil Vigdor, *A New Jersey postal worker was arrested after he threw away nearly 100 blank ballots, prosecutors say*, N.Y. Times (Oct. 7, 2020) ............................................................................... 8

President Jimmy Carter & Secretary of State James Baker, *Report of the Commission on Federal Election Reform, Building Confidence in U.S. Elections* (Sept. 2005) ......................................... 17

**INTRODUCTION**

Donald J. Trump for President, Inc., the Republican National Committee, and the New Jersey Republican State Committee have challenged A4475, a hastily enacted bill that transforms how New Jersey will conduct its November 2020 general election. A4475 conflicts with federal law by altering the timing of the federal election, and violates the Constitution by enabling fraud that will dilute legitimately cast votes and rendering non-arbitrary counting of ballots impossible.

In response, the DCCC has moved to dismiss Plaintiffs' amended complaint, asserting that Plaintiffs' claims allege no judicially cognizable harms supporting standing and fail to state claims that survive Rule 12(b)(6)'s pleading standards. But Plaintiffs' claims specifically demonstrate how A4475 transgresses long-established federal statutory and constitutional requirements. And for each of those claims, Plaintiffs have adequately alleged multiple independently sufficient grounds for standing and sufficient facts establishing violations of their constitutionally and statutorily protected rights. Accordingly, the Court should deny Intervenors' motion to dismiss.

**ARGUMENT**

**I.     Plaintiffs have standing.**

"Constitutional standing requires: (1) an injury-in-fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual

1

or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) that it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Winer Family Tr. v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007) (citing *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 290-91 (3d Cir. 2005)). "In reviewing [this] facial attack" on Plaintiffs' standing, the Court must consider the facts "in the light most favorable to the plaintiff" and "constru[e] the alleged facts in favor of the non-moving party." *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (internal quotation marks omitted). And "because the Court is addressing a factual challenge to subject-matter jurisdiction, it may consider facts outside of the pleadings," including declarations filed in response to other motions. *New Jersey Civil Justice Inst. v. Grewal*, 2020 WL 4188129, at *3 & n.2 (D.N.J. July 21, 2020).

"An organization or association may have standing to bring suit under two circumstances." *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 261 (3d Cir. 2009) (cleaned up)*.* An organizational plaintiff has standing to challenge laws that harm itself directly, and laws that harm its members. *Id.* Plaintiffs have both types of standing here.

### A. Plaintiffs have direct organizational standing.

"An entity has direct organizational standing when the organization itself suffers injuries as a result of the defendant's allegedly unlawful conduct." *New*

*Jersey Civil Justice*, 2020 WL 4188129, at \*3. "This may occur, for example, when an organization must divert its resources to counteract the allegedly unlawful conduct." *Id.* Applied here, a political party suffers a viable diversion-of-resources injury even if "the added cost has not been estimated and may be slight," because standing "requires only a minimal showing of injury." *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd* 553 U.S. 181, 189 (2008). "[T]he relevant question [is] whether the organization had diverted resources it might use elsewhere." *Disability Rights Pa. v. Pa. Dep't of Human Servs.*, 2020 WL 1491186, at \*5 (M.D. Pa. Mar. 27, 2020) (citing *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 312-13 (3d Cir. 2014)); *see also, e.g.*, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014); *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014); *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132-33 (D.C. Cir. 2006).

Plaintiffs readily clear that low threshold. In their amended complaint, Plaintiffs allege that "A4475 forces [them] to divert resources and spend significant amounts of money educating voters on" the changes made by A4475 "and encouraging them to vote regardless." Doc. 33 ¶¶ 13, 16. A4475 thus injures Plaintiffs by compelling them "to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote." *Crawford*, 472 F.3d at 951; *see also* 553 U.S. at 189 n.7 ("We also agree with

3

the unanimous view of [the Seventh Circuit] that the Democrats have standing to challenge the validity of [the election law] and that there is no need to decide whether the other petitioners also have standing."); *see Donald J. Trump for President, Inc. v. Bullock*, 2020 WL 5810556, at *7-8 (D. Mont. Sept. 30, 2020) (finding organizational standing because the challenged law impacted "the Organizational Plaintiffs' purpose of educating Republican voters—especially those who wish to vote in person—on available voting opportunities is necessarily impacted by the Directive").

Intervenors' only answer is to ignore these specific allegations of resource diversion and baldly assert that Plaintiffs "fail to allege why or how they would need to divert resources to address the Election Law." Doc 71, at 9. But Plaintiffs walk through how several separate provisions of A4475's "sweeping changes" cause voter confusion and allege that they must expend additional resources to remedy this confusion amongst their voters. *See* Doc. 33 ¶¶13, 76-90 (detailing past confusion and alleging A4475 will exacerbate this confusion). Thus, Plaintiffs have "show[n] that they would have suffered some other injury if [they] had not diverted resources to counteracting the problem." *Blunt*, 767 F.3d at 285 (internal quotation marks omitted). These concrete resource-allocation harms "'perceptibly impair[]' [Plaintiffs'] ability to provide [their] primary services [and] and carry out [their] mission and have resulted in a diversion of resources." *Disability Rights*, 2020 WL

1491186, at *5 (quoting *Blunt*, 767 F.3d at 308); *see also New Jersey Civil Justice*, 2020 WL 4188129, at *3.

Plaintiffs' declarations erase any lingering doubt. *See New Jersey Civil Justice*, 2020 WL 4188129, at *3 (considering declarations in a motion to dismiss based on standing). Those declarations aver in detail how A4475 forces Plaintiffs to divert funds and resources from other programs because of A4475's changes to ballot counting. Doc. 63-1 ¶¶5-6, 9-13; Doc. 63-2 ¶¶5, 8-10; Doc. 63-3, ¶¶7-8. And Plaintiffs have had to divert funds and resources away from other programs—such as persuasion-based advertising, yard signs, and hiring additional staff—so they can focus on educating their voters on how to vote in a universal vote-by-mail election. Steinhardt 2nd Declaration ¶¶ 3-8. The Court has already explained these harms are sufficient to establish standing. Doc. 75, at 10 (explaining that an organization has standing when it "must divert its resources to counteract unlawful conduct."). DCCC is thus wrong (at 9) that Plaintiffs have not explained how A4475 "will cause Plaintiffs to expend additional resources."

### B. Plaintiffs have representational standing.

The Plaintiffs also have standing on behalf of their members, who have standing in their own right to challenge A4475. *See New Jersey Civil Justice*, 2020 WL 4188129, at *3-4. To start with, DCCC's claim otherwise cannot be squared with the many cases where voters have challenged various election laws as

5

inconsistent with Congress's choice to create a single Election Day. Foremost, the Supreme Court affirmed injunctive relief in *Foster v. Love* for "Louisiana voters who sued ... the State's Governor and secretary of state, challenging the open primary as a violation of federal law." 522 U.S. 67, 70 (1997). The courts of appeals have reached the merits of similar challenges. *See Millsaps v. Thompson*, 259 F.3d 535, 536 (6th Cir. 2001); *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1174 (9th Cir. 2001); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 774 (5th Cir. 2000). Adopting Defendant's position here would mean that the Supreme Court's pathmarking decision in *Foster* and all those cases that followed it were disputes "abstracted from any concrete actual or threatened harm." *Alvarez v. Smith*, 558 U.S. 87, 93 (2009).

The DCCC's contention (at 10)  that Plaintiffs' injury is simply an abstract desire to see the law followed likewise cannot be squared with these precedents. The Court has "squarely held that voters who allege facts showing disadvantage to themselves as individuals have standing to sue," *Baker v. Carr*, 369 U.S. 186, 206 (1962), and the fact that "a harm is widely shared does not necessarily render it a generalized grievance," *Novak v. United States*, 795 F.3d 1012, 1018 (9th Cir. 2015) (quotation marks omitted). Rather, "where a harm is concrete, though widely shared, the Court has found injury in fact." *Federal Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998); *see also Bullock*, 2020 WL 5810556, at *7 ("Because the alleged injuries

to the members' voting rights at issue in this case could conceivably be asserted by any Montanan does not eradicate the standing necessary to assert these claims. On the contrary, the Supreme Court has repeatedly enumerated the principle that claims alleging a violation of the right to vote can constitute an injury in fact despite the widespread reach of the conduct at issue."). Indeed, the "Supreme Court has been clear that 'where large numbers of voters suffer interference with voting rights' the interests related to that are sufficiently concrete to obtain the standing necessary to seek redress in an Article III Court." *Id.* at *7 (quoting *Akins*, 524 U.S. at 24). The DCCC's contention that Plaintiffs assert only an abstract injury thus cannot be right.

Quite the contrary, voters have a personal interest in ensuring that Congress's choice is respected. The federal laws establishing a uniform Election Day are "safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). Courts that have considered the issue have recognized that a uniform Election Day was meant to alleviate widespread disenfranchisement, hardship on voters, and fraud that was caused by the practice of multi-day voting. *See Foster*, 522 U.S. at 73-74; *Millsaps*, 259 F.3d at 541-43; *Keisling*, 259 F.3d at 1174 ("Whenever you provide that elections shall take place upon the same day, you do interpose a not inconsiderable check to frauds in elections, to double voting, to the transmission of voters from one State to another, and you do allow the people to vote for their Representatives

undisturbed by considerations which they ought not to take at all into account." (quoting Cong. Globe, 42d Cong., 2d Sess. 618 (1872))). It is thus unsurprising that no appellate court has questioned voters' standing to challenge state laws as violating Congress's choice because that choice has always been understood to protect the fundamental right to vote.

A4475's new rules injure Plaintiffs in precisely the way that Congress sought to prevent. First, counting ballots 10 days before Election Day substantially increases the risk of early vote counts becoming public. Defendants' only response is to point out that New Jersey law makes it illegal to release early vote counts, so the parties can safely assume no such leaks will occur. Doc. 71-1, at 11. But that ignores Plaintiffs' specific allegations regarding New Jersey's well-documented (and regrettable) history of election fraud. *See, e.g.*, Doc. No. 33 ¶¶ 76-97.[1] Ultimately, Defendants are asking the Court to "require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). But plaintiffs need only allege that "there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up)*.* Given New Jersey's unfortunate history, there is at least a "substantial risk" here.

---

[1] Unfortunately, this record has grown since Plaintiffs filed their complaint. On October 7, a Newark postal worker was charged with willfully discarding hundreds of ballots and other campaign materials. *See* Neil Vigdor, *A New Jersey postal worker was arrested after he threw away nearly 100 blank ballots, prosecutors say*, N.Y. Times (Oct. 7, 2020).

Second, permitting ballots to be cast after Election Day and New Jersey's shift to universal vote by mail will dilute the votes of Plaintiffs' members. DCCC categorically assert that vote dilution is not a cognizable injury in fact outside narrow circumstances. Doc. 71-1, at 11-12. That is ultimately a merits question. *See infra* 13-17. But in any event, vote dilution is indisputably an injury in fact: The "right to vote is 'individual and personal in nature.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). "Thus, 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Id.* (quoting *Baker*, 369 U.S. at 206). And the "'right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Reynolds*, 377 U.S. at 555)); *Reynolds*, 377 U.S. at 555 n.29 ("[T]he right to have the vote counted" means counted "at full value without dilution or discount." (quotation marks omitted)). *See also Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331-32 (1999); *Gill*, 138 S. Ct. at 1920; *Bush v. Gore*, 531 U.S. 98, 105 (2000) (per curiam). Nor do they contest that a ballot cast after Election Day would cause vote dilution. Instead, they argue that the risk of this injury is speculative. But Plaintiffs have specifically alleged that non-postmarked ballots can be sent the day after the election and be counted as a legitimate vote in violation of federal election laws and backed

up this allegation by reference to the Postal Service's own public documents. Doc. 33 ¶108 (citing U.S. Postal Serv., FAQs: What are the Types of First-Class Mail?, Article No. 000003138 (Jan. 26, 2020), https://bit.ly/2EyfERB). Indeed, a special master in Pennsylvania just found that 98% of USPS presorted first class mail were delivered "within 1 day." *Crossey v. Boockvar*, 266 M.D. 2020, at 26 ¶12 (Recommended Findings of Fact and Conclusions of Law of President Judge Mary Hannah Leavitt, Special Master).

Third, conducting a universal-vote-by-mail election will substantially increase the risk of voter fraud and dilution. Again, vote dilution is indisputably an injury in fact: The "right to vote is 'individual and personal in nature.'" *Gill*, 138 S. Ct. at 1929 (quoting *Reynolds*, 377 U.S. at 561). "Thus, 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Id.* (quoting *Baker*, 369 U.S. at 206). And the "'right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell*, 549 U.S. at 4 (quoting *Reynolds*, 377 U.S. at 555)); *Reynolds*, 377 U.S. at 555 n.29 ("[T]he right to have the vote counted" means counted "at full value without dilution or discount." (quotation marks omitted)). *See also Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331-32 (1999); *Gill*, 138 S. Ct. at 1929-30; *Bush*, 531 U.S. at 105. Thus, because Plaintiffs' members have standing in their own right,

10

their interests are germane to those of the organizations, and the members are not necessary parties, Plaintiffs have representational standing to pursue these vote dilution claims. *See Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 283 (3d Cir. 2002) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

This injury is not "conjectural" or "speculative." Doc. 71, at 11. Millions of ballots will leave election officials' custody and, just like in the July primary (Doc. 33 ¶¶ 87-90; Doc. 35-1, at 4-5), only a fraction of those will be cast as ballots. That means there will be scores of ballots that can be improperly and unlawfully repurposed (as they were in the May election, *see* Doc. 33 ¶¶ 81-86) for a particular candidate. The amended complaint outlines in detail how New Jersey's past means this injury is likely to recur, and it confirms that there is a "substantial risk" that A4475 will facilitate fraudulent voting. *See* Doc. 33 ¶¶ 76-97; *Bullock,* 2020 WL 5810556, at *4, *6-*7 & n.4 (holding that individual voters had standing to bring dilution claim on the grounds that it would "open[] the door to voter fraud," among other grounds). Indeed, another federal district court recently declined to impose a deeming provision like that found in A4475 after finding that it "would present a significant risk of voting fraud." *See DCCC v. Ziriax*, 2020 WL 5569576, at *10 (N.D. Okla. Sept. 17, 2020) ("The Court has serious concerns that the plaintiffs' requested remedy – imposing a presumption that a ballot without a postmark was

postmarked by election day and requiring that such vote be counted if received up to a week after election day – would present a significant risk of voting fraud. Under that proposal, ballots could be mailed after election day and would be counted. As a result, the Court finds that remedy to be untenable and unreasonably risky.").

Nor is this harm some "generalized grievance." Doc. 71, at 10. The Supreme Court has "squarely held that voters who allege facts showing disadvantage to themselves as individuals have standing to sue," *Baker*, 369 U.S. at 206, and the fact that "a harm is widely shared does not necessarily render it a generalized grievance," *Novak*, 795 F.3d at 1018 (quotation marks omitted). Rather, "where a harm is concrete, though widely shared, the Court has found injury in fact." *Akins*, 524 U.S. at 24. For that reason, the fact that "the alleged injuries to the members' voting rights at issue in this case could conceivably be asserted by any [New Jerseyan] does not eradicate the standing necessary to assert these claims." *Bullock*, 2020 WL 5810556, at *7. Indeed, "the Supreme Court has been clear that 'where large numbers of voters suffer interference with voting rights' the interests related to that are sufficiently concrete to obtain the standing necessary to seek redress in an Article III Court." *Id.* (quoting *Akins*, 524 U.S. at 24).

## II.   Plaintiffs adequately allege that A4475 violates federal law.

A Plaintiff is required only to provide a complaint that contains "a short and plain statement of the claim showing that the pleader is entitled to relief." *Doe v.*

*Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020). "The complaint must set forth enough factual allegations to 'state a claim to relief that is plausible on its face.'" *Id.* And "[a] facially plausible claim is one that permits a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### A. Pre-Election Day ballot counting and acceptance of non-postmarked ballots two days after Election Day conflict with federal law.

In its order denying Plaintiffs' preliminary injunction motion, this Court held that A4475 does not conflict with the federal statutes establishing a uniform Election Day. Doc. 75, at 17, 23-25. Plaintiffs continue to believe that A4475 conflicts with these federal statues by allowing vote counting before Election Day and counting of ballots that have been cast after Election Day. To recap, first, the text and structure of the federal laws setting a uniform Election Day confirm that New Jersey cannot begin counting ballots 10 days before November 3. Doc. 35-1, at 18-19. And if there were any doubt, the statutes' purpose erases it: The specific evil Congress sought to remedy was the practice of multi-day voting, with early counted ballots influencing voters who had yet to cast their ballot and risking fraud. *Id.* at 3-4. Counting ballots early runs directly contrary to those purposes. Second, Federal law also preempts A4475's authorization of counting votes that may have been cast after Election Day. Doc. 35-1, at 17-24. No party contests that 3 U.S.C. §1 prohibits the counting of ballots that were cast after Election Day. But that is precisely what New Jersey has

13

done in enacting A4475. *Id.* The statute provides that "every ballot without a postmark … that is received by the county boards of elections from the United States Postal Service within 48 hours of the closing of polls … shall be considered valid and shall be canvassed." A4475 §2(m) (codified at N.J. Stat. §19:63-31(m)). In other words, A4475 requires election officials to count votes that could have been cast after Election Day because, without a postmark, those officials have no way of confirming when a ballot has been cast. This directive to count ballots regardless of whether they were cast after the uniform Election Day "conflicts with federal law such that compliance with both state and federal regulations is impossible," *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 688 (3d Cir. 2016), infringes upon Plaintiffs' fundamental right to vote, and is therefore "is void," *Foster*, 522 U.S. at 74.

### B.   Plaintiffs adequately allege a vote dilution claim.

Intervenors argue Plaintiffs have failed to state a dilution claim on the merits and, even if they have, the factual allegations do not support the claim. Neither argument is correct.

To start, "voting fraud impairs the right of legitimate voters to vote by diluting their votes" and "dilution [is] recognized to be an impairment of the right to vote." *Crawford*, 472 F.3d at 952. The DCCC responds that "[v]ote dilution based on the potential for voter fraud, however, is not a cognizable claim." Doc. 71 at 21-22. But

the DCCC's view does not properly account for the Supreme Court's most recent case about vote-dilution claims. In *Gill v. Whitford*, the Court addressed whether plaintiffs had standing to challenge legislative districts as political gerrymanders. *See* 138 S. Ct. at 1929-33. It ultimately held that the plaintiffs there had not established standing because they failed to introduce evidence at trial that they lived in a politically gerrymandered district. *Id.* at 1931-32.

In so doing, however, the Court emphasized that "a person's right to vote is 'individual and personal in nature,'" *id.* at 1929 (quoting *Reynolds*, 377 U.S. at 561), such that "'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage," *id.* (quoting *Baker*, 369 U.S. at 206). To avoid confusion, it repeated that "the holdings in *Baker* and *Reynolds* were expressly premised on the understanding that the injuries giving rise to those claims were 'individual and personal in nature,'" *id.* at 1930 (quoting *Reynolds*, 377 U.S. at 561), "because the claims were brought by voters who alleged 'facts showing disadvantage to themselves as individuals,'" *id.* (quoting *Baker*, 369 U.S. at 206). *Gill* is no isolated instance. *See also Bush*, 531 U.S. at 105 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." (quoting *Reynolds*, 377 U.S. at 555)); *see also Fair Maps Nevada v. Cegavske*, 2020 WL 2798018, at *17 (D. Nev. May 29, 2020) ("Abridgement or dilution of a right

so fundamental as the right to vote constitutes irreparable injury.").

The Court's repeated, unmistakable focus on individual voting rights as the basis for vote-dilution claims makes clear that the racial-gerrymandering and one-person, one-vote cases discussed in *Gill* and cited by DCCC are examples of—not limits on—cognizable vote-dilution claims. "Thus, 'voters who allege facts showing disadvantage to themselves as individuals'"—be it from malapportioned districts or racial gerrymanders or voter fraud may seek "to remedy that disadvantage" in federal court. *Gill*, 138 S. Ct. at 1929 (quoting *Baker*, 369 U.S. at 206). Because a "state has a legitimate interest in preventing that harm from occurring, surely a voter who alleges that such harm has befallen him or her has standing to redress the cause of that harm." *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 924 (S.D. Ind. 2012).

DCCC next asserts (at 21) that Plaintiffs' vote dilution claim is "speculative." But Plaintiffs extensively detail how A4475's provision for the "automatic mailing ballots to all active voters and makes voter fraud and other ineligible voting inevitable—especially given New Jersey's rampant history of voter fraud." Doc. 33 ¶ 119. Plaintiffs specifically allege facts regarding past voter fraud in New Jersey—as recently as this year—to demonstrate that New Jersey's new universal vote-by-mail election will facilitate precisely the type of fraud that has long plagued New Jersey and diluted its citizens' votes. Doc. 33 ¶¶ 47-48, 76-90. Given New Jersey's long and lamentable history of voter fraud, if anything is speculative, it is the

DCCC's suggestion that New Jersey will experience no voter fraud in the November general. Put simply, Plaintiffs have alleged all that is needed at this stage. *Cf. Fla. State Conference of N.A.A.C.P. v. Browning*, 569 F. Supp. 2d 1237, 1251–52 (N.D. Fla. 2008) ("In *Crawford*, the lead opinion cited historical examples of in-person vote fraud, occasional examples in recent times of in-person fraud in other parts of the country, and recent absentee-ballot fraud in Indiana itself.").

Plaintiffs also allege other historical examples of mail-ballot problems and pointed to bipartisan studies in the Amended Complaint that support their vote dilution claim. Doc. 33 ¶¶ 19-30, 36-45. In particular, the bipartisan Carter-Baker Report observed that absentee voting is "the largest source of potential voter fraud." Doc. 33 ¶19 (quoting President Jimmy Carter & Secretary of State James Baker, *Report of the Commission on Federal Election Reform, Building Confidence in U.S. Elections* 46 (Sept. 2005), https://bit.ly/3dXH7rU (*Carter-Baker Report*). "Absentee balloting is vulnerable to abuse in several ways"; ballots are sometimes mailed to the wrong address or to large residential buildings" and "might get intercepted." *Carter-Baker Report* 46. Moreover, voters "who vote at home, at nursing homes, at the workplace, or in a church are more susceptible to pressure, overt and subtle, or to intimidation." *Id.* And "[v]ote buying schemes are far more difficult to detect when citizens vote by mail." *Id.* For these reasons, placing millions of ballots in the mail and outside of election officials' control only increases the risk of voter fraud.

17

*See also Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004) ("[A]bsentee voting is to voting in person as a take-home exam is to a proctored one.").

The DCCC ultimately demands that Plaintiffs' allegations establish with certainty that voter fraud will occur. That is not the standard for a motion to dismiss. Plaintiffs must only "set forth enough factual allegations to 'state a claim to relief that is plausible on its face.'" *Univ. of Scis.*, 961 F.3d at 208. The Amended Complaint's allegations far exceed that bar.

### C. Plaintiffs adequately allege that A4475 will result in arbitrary and disparate procedures in violation of the right to vote.

Plaintiffs have adequately alleged that A4475 violates their rights under the Equal Protection Clause. "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Bush*, 531 U.S. at 104-05. For that reason, a "State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* In particular, the Equal Protection Clause imposes a "minimum requirement for nonarbitrary treatment of voters" and forbids voting systems and practices that distribute resources in "standardless" fashion, without "specific rules designed to ensure uniform treatment." *Id.* at 105-07; *see also League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477-78 (6th Cir. 2008) ("[T]he use of standardless manual recounts' violates the Equal Protection Clause."). As a result, the Supreme Court has instructed that the "formulation of uniform rules" is "necessary" because the "want

of" such rule may lead to "unequal evaluation of ballots." *Bush*, 531 U.S. at 106.

A4475 ensures that there will not be "uniform rules" for voters in the upcoming election. A4475 requires that every in-person voter cast a provision ballot, *see* N.J. Stat. §§19:63-31(g), which means that every such voter will be forced to follow the statutory procedure for voting provisionally. And by deeming every in-person ballot a provisional one, A4475 will massively increase the number of provisional ballots that must be processed. Indeed, in the July primary alone, nearly 200,000 provisional ballots were cast, 12% of all votes. Colleen O'Dea, *Why So Many Mail-In Ballots Were Rejected in NJ's July Primary Election. Hint: Many Arrived Late*, N.J. Spotlight (Sept. 10, 2020), https://bit.ly/33Eo83k. Moreover, demonstrating the strain on the system, it has been estimated that approximately 5,900 of these ballots, over 3% of those cast, were rejected. This massive increase of provisional ballots in the general election will, in turn, cause increased lines and wait times, and it will inhibit the State's ability to properly process each and every provisional ballot. It is no surprise that local election officials are sensing voter confusion and apprehension on the ground as a result of this hybrid mail-provisional ballot system. *See* Karin Price Mueller, *If you vote in person on Election Day, your vote probably won't be counted until Nov. 10 in N.J. Here's why*, NJ.com (Oct. 5, 2020), https://bit.ly/3jWoDeZ (reporting "a lot of confusion and apprehension about the changes that have been made due to the ongoing pandemic"). Because it will be

impossible for county officials to properly inventory, transport, and canvas that volume of provisional ballots according to the statutorily prescribed processes, county officials will be forced to adopt their own alternative procedures for processing the ballots. Doc. 33 ¶¶ 129-135; *see also* O'Dea, *Why So Many Mail-In Ballots Were Rejected in NJ's July Primary Election. Hint: Many Arrived Late* ("[I]t's hard to have proper oversight from the state for things that there should be oversight about. This is the type of thing where, if you have a county that's a clear outlier, there should be a way to look into that, to say, 'Hey what's going on?'"). And A4475 provides no "minimal procedural safeguards" to protect against the "unequal evaluation" of provisional ballots by local officials responding to this inevitable crisis in varying ways. *See Bush*, 531 U.S. at 109. Making matters worse, the Secretary of State's office insists it doesn't even "have the authority to order county officials to change some of their methods." O'Dea, *Why So Many Mail-In Ballots Were Rejected in NJ's July Primary Election. Hint: Many Arrived Late*. This will result in New Jersey's counties "us[ing] varying standards to determine what [i]s a legal [provisional] vote," contrary to the Equal Protection Clause. *Bush*, 531 U.S. at 107.

DCCC's only response is that Plaintiffs' assertions are speculative. Doc. 71-1, at 23-24. But the Complaint alleges that there will be an unprecedented influx in provisional ballots that will overwhelm local election officials. Indeed, events have

borne out Plaintiffs' allegations. Election officials and activists on the ground are already reporting problems resulting from the lack of uniform standards, one of whom observed that "decentralization of elections in the state contributes to electoral problems, including in the design of ballots, recruitment of poll workers and rejection of ballots." O'Dea, *Why So Many Mail-In Ballots Were Rejected in NJ's July Primary Election. Hint: Many Arrived Late*. Such disparate approaches led to wildly differing levels of rejected ballots across counties in the primary. And no procedural safeguards have been implemented to prevent this eminently foreseeable disaster. That is all that is required; a plaintiff needs to allege only "enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 697.

## **CONCLUSION**

For these reasons, the Court should deny DCCC's motion to dismiss.

Dated: October 9, 2020                              Respectfully submitted,

*/s/ Michael L. Testa Jr.*
Thomas R. McCarthy*
Bryan Weir*
Cameron T. Norris*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Ph.: (703) 243-9423
Email: tom@consovoymccarthy.com

Michael L. Testa Jr.
TESTA HECK TESTA & WHITE P.A.
424 W. Landis Avenue
Vineland, NJ 08360
Ph.: (856) 691-2300
Fax: (856) 691-5655
Email: mtestajr@testalawyers.com


* *Admitted pro hac vice*