HERMAN LAW OFFICES, LLC
ROBERT D. HERMAN, ESQ.
NEW JERSEY ATTORNEY ID. NO. 000911998
222 NEW ROAD, SUITE 106
LINWOOD, NJ  08221
rdhesq1@msn.com
(609) 601-8750
FAX: (609) 454-0094
COUNSEL FOR *AMICUS CURIAE*
ATLANTIC COUNTY DEMOCRATIC COMMITTEE

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DONALD J. TRUMP FOR PRESIDENT, INC., REPUBLICAN NATIONAL COMMITTEE, NEW JERSEY REPUBLICAN STATE COMMITTEE,** | **DOCKET NO. 3:20-cv-10753** |
| **Plaintiffs,** | |
| **v.** | **BRIEF OF ATLANTIC COUNTY DEMOCRATIC COMMITTEE AS *AMICUS CURIAE* IN SUPPORT OF INTERVENOR-DEFENDANT DCCC'S ORDER TO SHOW CAUSE** |
| **PHILIP D. MURPHY, in his official capacity as Governor of New Jersey, TAHESHA WAY, in her official capacity as Secretary of State of New Jersey,** | |
| **Defendants.** | |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.......................................................................... ii

INTEREST OF *AMICUS CURIAE*............................................................ 1

INTRODUCTION...................................................................................... 2

ARGUMENT.............................................................................................. 3

    I.     PLAINTIFFS' LAWSUIT IS NOT SUPPORTED BY THE PLAIN TEXT OF THE RELEVANT STATUTES OR ANY INTERPRETIVE CASELAW.

               ................................................................................ 3

        A.     COUNT I: VIOLATION OF 3 U.S.C. § 1, 2 U.S.C. § 7, AND 2 U.S.C. § 1.

               ................................................................................ 3

        B.     COUNT II: VIOLATION OF 3 U.S.C. § 1, 2 U.S.C. § 7, AND 2 U.S.C. § 1.

               ................................................................................ 4

        C.     COUNT III: VIOLATION OF THE RIGHT TO VOTE (42 U.S.C. § 1983).

               ................................................................................ 4

        D.     COUNT IV: VIOLATION OF THE EQ. PROTECTION CLAUSE (42 U.S.C. § 1983).

               ................................................................................ 7

II.     SHOULD PLAINTIFFS CONTINUE TO OPPOSE
        INTERVENOR-DEFENDANT DCCC'S APPLICATION
        FOR AN ORDER TO SHOW CAUSE/MOTION TO
        DISMISS PLAINTIFFS' COMPLAINT, UNDER FED. R.
        CIV. P. 11(c)(3), THE COURT CAN INQUIRE AS TO THE
        PROPRIETY OF THE LITIGATION.
        .............................................................................     8

        A.     VOTER SUPPRESSION.
               ......................................................................     8

        B.     CAUSING A SITUATION WHERE THE ELECTION
               RESULTS CANNOT BE CERTIFIED IN A TIMELY
               MANNER (LITIGATION FOR PURPOSES OF DELAY).
               ......................................................................     11

        C.     FED. R. CIV. P. 11.
               ......................................................................     14


CONCLUSION............................................................................     16

# TABLE OF AUTHORITIES

## Cases

*Adams v. USAA Cas. Ins. Co.*,
  863 F.3d 1069 (8th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Bush v. Gore*,
  531 U.S. 98 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Donald J. Trump for President, Inc. v. Boockvar*,
  2:20-cv-966 (W.D. Pa. 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Foster v. Love*,
  522 U.S. 67 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Jones v. UPS*,
  460 F.3d 1004 (8th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Millsaps v. Thompson*,
  259 F.3d 535 (6th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

*Reilly v. Ceridian Corp.*,
  664 F.3d 38 (3d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Voting Integrity Project, Inc. v. Bomer*,
  199 F.3d 773 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

*Voting Integrity Project, Inc. v. Keisling*,
  259 F.3d 1169 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

## Statutes and Court Rules

2 U.S.C. § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

2 U.S.C. § 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

3 U.S.C. § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

3 U.S.C. §§ 1-15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

Fed. R. Civ. P. 11.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 14, 15, 16

Fed. R. Civ. P. 12.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

N.J. Stat. Ann. § 19:5-3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

N.J. Stat. Ann. § 19:34-13(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Electoral Count Act of 1887. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Atlantic County Democratic Committee ("ACDC" or "the ACDC") is a New Jersey domestic non-profit corporation established pursuant to N.J. Stat. Ann. § 19:5-3 which represents the express interests of over 70,000 registered Democratic voters in Atlantic County, New Jersey. As a county political organization, the ACDC has a substantial interest in the subject matter of Intervenor-Defendant DCCC's Order to Show Cause and the instant litigation as a whole. More particularly, the ACDC is concerned with the prospective effects of Plaintiffs' sought-after relief which appears to be an attempt to frustrate the will of the electorate directly as well as through obfuscation and delay.

## <u>INTRODUCTION</u>

Plaintiffs' entire litigation scheme appears worse than ill-conceived. The statutes upon which Plaintiffs rely do not say what Plaintiffs wish they did and the cases Plaintiffs cite in support either involve vastly different voting laws or factual scenarios other than those present here. As a whole, the litigation by Plaintiffs, and in particular Plaintiff Donald J. Trump for President, Inc. ("the Trump Campaign"), appears it may be part of a massive multi-state effort to suborn the will of the electorate through disenfranchisement and, ultimately, by delay, precluding the timely certification of election results. This is not the first time this effect has been visited; however, it appears the first effort to do so as part of a drawn-out electoral scheme.

If so, this is violative of Fed. R. Civ. P. 11 which, *inter alia*, prohibits the use of litigation for an improper purpose.

The ACDC posits that this Court, utilizing the power and authority granted under *Fed. R. Civ. P.* 11(c)(3) and the case law derived therefrom, should make direct inquiry of Plaintiffs as to the *bona fides* of the instant litigation.

## ARGUMENT

I. **PLAINTIFFS' LAWSUIT IS NOT SUPPORTED BY THE PLAIN TEXT OF THE RELEVANT STATUTES OR ANY INTERPRETIVE CASELAW.**

A. Count I: Violation of 3 U.S.C. § 1, 2 U.S.C. § 7, and 2 U.S.C. § 1.

The first count of Plaintiffs' Complaint claims that pre-election day canvassing of mail-in ballots violates three statutes: 3 U.S.C. § 1, 2 U.S.C. § 7, and 2 U.S.C. § 1. This trio of statutes performs a basic function: it mandates that all congressional and presidential elections be held "on a single November day." *Foster v. Love*, 522 U.S. 67, 69-70 (1997).

Plaintiffs' problem is that none of these three statutes forbids the act of pre-election day canvassing, and not a single case cited by Plaintiffs actually holds that pre-canvassing, standing alone, violates these statutes. Rather, every case to interpret these laws is clear that their fundamental purpose is simply to ensure an election is not "consummated" before the federally-designated election day. *Foster*, *supra*, 522 U.S. at 72 ("a contested selection of candidates for a congressional office **that is concluded as a matter of law before federal election day, with no act in law or in fact to take place on the date chosen by Congress**" violates 2 U.S.C. § 7) (emphasis added); *Millsaps v. Thompson*, 259 F.3d 535, 545-49 (6th Cir. 2001); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 776-77 (5th Cir. 2000); *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175-76 (9th Cir. 2001).

Page 3

The challenged law, A4475, does not "consummate" the election prior to election day because there are still numerous acts – in law and in fact – that take place on that date: 1) in-person voting by provisional ballot; 2) vote-tallying; and 3) announcement of results following the close of polls.[1]   There is no good-faith argument to be made that the challenged law "consummates" the election before November 3 given these completely undisputed facts.  Again, *not one case* holds that the singular act of pre-canvassing violates these statutes.  The allegation in this Count thus finds no support in either the plain text of the relevant statutes or in any decisional authority.

B.     Count II: Violation of 3 U.S.C. § 1, 2 U.S.C. § 7, and 2 U.S.C. § 1.

*Amicus* ACDC will not restate the DCCC's well-reasoned and persuasive argument regarding the "postmark presumption" count.  *Amicus* simply wishes to reinforce an important point:  Plaintiffs have failed to cite even a *single case* holding that a state law establishing a presumption of receipt actually conflicts with the cited trio of statutes.

C.     Count III: Violation of the Right to Vote (42 U.S.C. § 1983).

This is perhaps the clearest example of a Count that makes rote, generalized accusations without so much as a single concrete factual allegation in support:

---

[1] This is not *Foster*, where the election officials announced vote tallies and a winner prior to election day.  The challenged law makes early divulgement of election results is a third-degree indictable offense.  N.J. Stat. Ann. § 19:34-13(b).

- "A4475 . . . makes voter fraud and other ineligible voting inevitable[.]" (Pl.'s Compl. ¶119).

- "New Jersey's new voting system facilitates fraud and other illegitimate voting practices[.]" (Pl.'s Compl. ¶121).

Plaintiffs cannot provide specifics because there are none.[2]

Rather, as Federal Election Commission Commissioner Ellen L. Weintraub has put it, the notion that voting by mail causes or facilitates fraud is a "conspiracy theory" that has "no basis." *See* Ellen Weintraub, *Facts About Voting By Mail* (May 27, 2020).[3] (**Exhibit 3**).  Like most far-reaching conspiracy theories, Plaintiffs' vote-dilution argument is absent grounded factual support and based purely upon supposition.

This is not the only Trump campaign lawsuit with an utter lack of factual predicate for fraud claims.  For example, in *Donald J. Trump For President, Inc. v. Boockvar*, 2:20-cv-966 (W.D. Pa. Oct. 10, 2020), the Hon. J. Nicholas Ranjan,

---

[2] "One of the ironies of the Republicans' obsession with fraud is that theirs is the party with the more significant history of misconduct at the polls." *See* Jeffrey Toobin, *The Legal Fight Awaiting Us After The Election*, The New Yorker (Sept. 21, 2020). (**Exhibit 1**) (available at http://newyorker.com/magazine/2020/09/28/the-legal-fight-awaiting-us-after-the-election).  *See also* Jay Willis, *How Republicans Tried To Rig An Election In North Carolina (And Almost Got Away With It)*, GQ (Sept. 6, 2019). (**Exhibit 2**) (available at http://gq.com/story/north-carolina-ninth-district-fraud).

[3] http://fec.gov/resources/cms-content/documents/2020-05-27-ELW-Facts-About-Voting-by-Mail.pdf.

U.S.D.J., dismissed the Plaintiffs'[4] Complaint because it was based on claims of fraud that were speculative.  Notably, even after extensive discovery, Plaintiffs were only able to show the "'possibility of future injury' based on a series of speculative events – which falls short of the requirement to establish a concrete injury." *Id.*, slip op. at 61.[5] The *Boockvar* court reasoned that, based on the Plaintiffs' "theory of harm," it was "almost impossible for them to present anything other than speculative evidence of injury." *Id.*, slip op. at 63.  There is no reason why Plaintiffs would make a different showing here, even given the opportunity for discovery.

But viewed from the opposite bank, that also assumes Plaintiffs' purpose with this and like litigation in other states was instituted for a proper purpose.[6] See, *infra*, at II.  *See, e.g.* Barton Gellman, *The Election That Could Break America*, The Atlantic (Special Preview Nov. 2020 Issue) at pp. 9-10, 11-15  (https://www.theatlantic.com /magazine/archive/2020/11/what-if-trump-refuses-concede/616424   (discussing

---

[4]Donald J. Trump For President, Inc., and the Republican National Committee are also lead party plaintiffs in *Donald J. Trump For President, Inc. v. Boockvar*, 2:20-cv-966 (W.D. Pa.).

[5] In *Boockvar*, Plaintiffs alleged that the use of ballot drop boxes and certain signature-matching procedures facilitated fraud.  *Id.*, slip op. at 60-68.  This is nothing more than a minor variation on the assertion in the present matter that mail-in voting itself promotes fraud.

[6]See Fed. R. Civ. P. 11(b)(1) (forbidding litigation for "an improper purpose" such as "caus[ing] unnecessary delay"); Fed. R. Civ. P. 11(b)(2) (that "claims . . . and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law"); and Fed. R. Civ. P. 11(b)(3) ("the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery").

discarding of the popular vote by use of state legislatures as electors; competing slates of electors). (**Exhibit 4**)

    D.    <u>Count IV: Violation of the Eq. Protection Clause (42 U.S.C. § 1983)</u>.

Count IV also suffers from a similar variety of problems, the most significant of which is that it is based entirely on the fertile imagination of the Complaint's drafters.  This Count foresees that in-person provisional balloting will result in "increased lines and wait times to vote," negatively impacting the State's "ability to properly process each and every provisional ballot."  (Pl.'s Compl. ¶131).  The Complaint also prognosticates that the county officials will find it "impossible" to "properly inventory, transport, and canvass" the "massively increased volume of provisional ballots," so they will be "forced to adopt alternative procedures for processing [them] and determining their validity."  (Pl.'s Compl. ¶¶132,133).

This is precisely the sort of "speculative" allegation of "hypothetical, future injury" that is not permitted in an Article III court and renders the complaint readily subject to dismissal under Fed. R. Civ. P. 12(b)(6).  *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 41, 42, 46 (3d Cir. 2011).

II.   SHOULD PLAINTIFFS CONTINUE TO OPPOSE INTERVENOR-DEFENDANT DCCC'S APPLICATION FOR AN ORDER TO SHOW CAUSE/MOTION TO DISMISS PLAINTIFFS' COMPLAINT, UNDER FED. R. CIV. P. 11(c)(3), THE COURT CAN INQUIRE AS TO THE PROPRIETY OF THE LITIGATION.

In light of the foregoing, it is apparent that Plaintiffs' Complaint is not based in fact nor supported by caselaw. Then why file the instant litigation?  The first of two answers may be –  as is often the case with this administration – appearing in plain sight: (1) Voter suppression.

A.   <u>Voter Suppression</u>.

Famed statistician and editor-in-chief of 538, Nate Silver, has described this presidential election as "an exceptionally stable race," with Biden never having led Trump by less than 6.6 points nationally.  Nate Silver, *Trump's Chances Are Dwindling. That Could Make Him Dangerous*, FiveThirtyEight (Sept. 30, 2020)[7] (**Exhibit 5**).  The most recent statistical models, in fact, paint a bleaker and bleaker picture of President Trump's re-election, and states that are normally shoo-ins for Republicans are in play for, or even leaning, Democratic.  Nathaniel Rakich, *Biden Got Some Of His Best Polls This Week*, FiveThirtyEight (Oct. 7, 2020)[8] (**Exhibit 6**).

None of this is lost on Plaintiffs, who have deployed a veritable arsenal of

---

[7]http://fivethirtyeight.com/features/trumps-chances-are-dwindling-that-could-make-him-dangerous/

[8]http://fivethirtyeight.com/features/biden-got-some-of-his-best-polls-this-week/

weapons in an effort to suppress Democratic votes.  These efforts include:

- The Trump campaign and the RNC have "backed" numerous challenges to State and local policies aimed at providing more accessible, safer voting options.  "Trump has zeroed in on mail-in voting specifically, making feverish claims that a common method of casting a ballot will lead to voter fraud." These assertions are "based on conspiracy theories, fear, and unproven claims." Clarissa-Jan Lim & Ryan Brooks, *Trump And The Republicans Are Doing Everything They Can To Confuse Voters Before The Election*, Buzzfeed News (Sept. 24, 2020).[9]  (**Exhibit 7**).  The attack on mail-in voting has included the USPS's removal of mailboxes and sorting machines in large cities, something NAACP President Derrick Johnson has called "the most blatant attempt to suppress voters in modern history at least since the voter suppression tactics of the 1960s."  *Ibid.*  This "has served to further disenfranchise communities of color during a time when many are already disproportionately impacted by a deadly virus."  *Ibid.*

- Last month, President Trump said that he wants police officers stationed at polling sites to prevent alleged voter fraud – a clear callback to the off-duty police intimidation at polls in the early 1980s that resulted in a 1982 consent decree barring the RNC from engaging in such tactics.  Yelena Dzhanova, *There's Nothing Stopping The RNC From Using Voter Intimidation Tactics In November Now That A Decades-Old Agreement Has Ended, Experts Warn*, Business Insider (Sept. 13, 2020).[10]  (**Exhibit 8**).  "The Trump campaign has privately acknowledged in November that the end of the 1982 decree was 'a huge, huge, huge, huge deal' for Republicans and for the president."  *Ibid.*

- Republican state officials in Texas and Ohio have implemented directives to reduce the number of ballot drop-boxes per county to *one*, even in counties as populous as Harris, which includes Houston (pop: 4.7M); both directives have been enjoined by federal district courts.  Ross Levitt & Devan Cole, *Federal Judge Issues Scathing Decision To Allow More Ballot Drop Boxes In Ohio*,

---

[9] http://buzzfeednews.com/article/clarissajanlim/trump-republicans-confuse-voters

[10] http://businessinsider.com/rnc-engage-voter-intimidation-because-1982-consent-decree-ended-2020-09

CNN (Oct. 8, 2020)[11] (**Exhibit 9**); Ross Levitt & Chandelis Duster, *Federal Judge Blocks Texas Governor's Directive Limiting Ballot Drop Boxes To One Per County*, CNN (Oct. 10, 2020)[12] (**Exhibit 10**).

- In response to the pandemic, Iowa's Republican secretary of state, Paul Pate, issued an emergency directive extending early voting and issuing an absentee ballot application to every voter for the June primary.  In response, the state legislators hastily passed a law curtailing the secretary of state's authority to do so.  "'Mail in voting wasn't created in this pandemic,' says Janai Nelson, associate director-counsel at the NAACP Legal Defense and Educational Fund.  'It's only when we see the expansion of access to this very practical tool that we see the casting votes being subjected to such scrutiny and malignment.'"  *See* Andy Kroll, *The Plot Against America: The GOP's Plan To Suppress The Vote And Sabotage The Election*, Rolling Stone (Jul. 16, 2020)[13] (**Exhibit 11**).

- A former senior member of Trump's reelection campaign, attorney Justin Clark, gave a "closed-door talk in Wisconsin to a select audience of Republican lawyers," at which he stated: "Wisconsin's the state that is going to tip this one way or the other . . . So it makes EDO [election day operations] really, really, really, important. . . . Traditionally, it's always been Republicans suppressing votes . . . [Democrats'] voters are all in one part of the state, so let's start playing offense a little bit.  And that's what you're going to see in 2020.  That's what's going to be markedly different.  It's going to be a much bigger program, a much more aggressive program, a much better-funded program, and we're going to need all the help we can get."  *Ibid.*

These efforts at voter suppression by the Trump campaign are not new, though they were previously far more furtive about things, at least occasionally.  And a story – recently broken by Britain's Channel 4 News – details how Cambridge Anayltica worked "hand in glove with a team from the Republican National Committee" to

---

[11]http://cnn.com/2020/10/08/politics/ohio-injunction-ballot-boxes-election/index/html
[12]http://cnn.com/2020/10/09/politics/texas-ballot-drop-boxes/index.html
[13]http://rollingstone.com/politics/politics-features/trump-campaign-2020-voter-suppression-consent-decree-1028988/

Page 10

"dissuade" Democratic voters – and African-American voters in particular – from voting in the 2016 election.  Craig Timberg & Isaac Stanley-Becker, *Cambridge Analytica Database Identified Black Voter As Ripe For "Deterrence," British Broadcaster Says*, The Washington Post (Sept. 28, 2020).[14]  (**Exhibit 12**).

The second answer may be equally odious.

B.      Causing a Situation where the Election Results Cannot be Certified in a Timely Manner (Litigation for Purposes of Delay).

To be elected to the office of President of the United States, there are essentially two paths. Generally speaking, the first of these is where a state's populace votes for a particular Presidential candidate and, following certification of the election, the state's electors cast votes for that Presidential candidate at the Electoral College, held on December 14, 2020. Should the election results be incapable of certification and under less than ideal circumstances, then determination of President of the United States can become substantially more nuanced, including the possibility that state legislatures or even Congress determine which slate of electors are sent– no matter the popular vote total. *See* Toobin, *The Legal Fight Awaiting Us after the Election*, Exhibit 1 at 9-11 (discussing in detail the Electoral Count Act of 1887); *see generally* 3 U.S.C. §§ 1-15.

---

[14]http://washingtonpost.com/technology/2020/09/28/trump-2016-cambridge-analytica-suppression/

In a prior incarnation, the State of Florida's 25 electoral votes would determine who would become the next President of the United States. *See generally Bush v. Gore*, 531 U.S. 98; 121 S. Ct. 525; 148 L. Ed. 2d 388 (2000). As reflected in *Bush v. Gore*, this was a singular event. *Bush v. Gore, supra.*, 531 U.S. at 109 ("Our consideration is limited to the present circumstances...."). However, it demonstrated the potential havoc which may be wrought where an appellate stay is provided while election matters wind their way through the courts.

At present, there are a number of other matters which involve voting by mail by Plaintiff Donald J. Trump For President, Inc. and/or Plaintiff Republican National Committee. These matters are currently being litigated, involve recently rendered decisions which may be proceeding on appeal, or which are planned.  See, e.g. *Donald J. Trump for President, Inc. et al. v. Cegavske et al.*, 2:20-cv-01445 (D. Nv. 2020) (Trump Campaign and RNC attempting to undo state law helping expand the franchise during the pandemic); *Donald J. Trump for President, Inc. et al. v. Bullock et al.*, 6:20-cv-00066 (D. Mt. 2020) (Trump Campaign and RNC attempting to undo Montana Governor's emergency order giving Montana counties the choice whether to conduct General Election 2020 by mail); *Donald J. Trump for President, Inc. et al. v. Boockvar et al.*, 2:20-cv-966 (W.D. Pa. 2020) (Trump Campaign and RNC attempting to undo, *inter alia*,  Pennsylvania Secretary of State's directives making it easier to vote during the pandemic)*; Donald J. Trump for President, Inc. et al. v.*

*North Carolina State Bd. of Elec.*, 5:20-cv-505 (E.D.N.C. 2020) (Trump Campaign and RNC effort to undo the consent decree expanding ballot receipt deadline and cure process); and *Republican Nat'l Committee et al. v. Newsom*, 2:20-cv-01055 (E.D. Ca. 2020) (RNC effort to stop California's efforts for a primarily vote-by-mail General Election in 2020); *see* also Toobin, "*What if Trump Refuses to Concede?*" *supra*, at 11-12.

As parsed in the immediately referenced Atlantic Article:

We are accustomed to choosing electors by popular vote, but nothing in the Constitution says it has to be that way. Article II <u>provides</u> that each state shall appoint electors "in such Manner as the Legislature thereof may direct." Since the late 19th century, every state has ceded the decision to its voters. Even so, the Supreme Court affirmed in *Bush v. Gore* that a state "can take back the power to appoint electors." How and when a state might do so has not been tested for well over a century.

Trump may test this. According to sources in the Republican Party at the state and national levels, the Trump campaign is discussing contingency plans to bypass election results and appoint loyal electors in battleground states where Republicans hold the legislative majority. With a justification based on claims of rampant fraud, Trump would ask state legislators to set aside the popular vote and exercise their power to choose a slate of electors directly. The longer Trump succeeds in keeping the vote count in doubt, the more pressure legislators will feel to act before the safe-harbor deadline expires.

. . . .

The Trump-campaign legal adviser I spoke with told me the push to appoint electors would be framed in terms of protecting the people's will. Once committed to the position that the overtime count has been rigged, the adviser said, state lawmakers will want to judge for themselves what the voters intended.

. . . .

In Pennsylvania, three Republican leaders told me they had already discussed the direct appointment of electors among themselves, and one said he had discussed it with Trump's national campaign.

Exhibit 4 at 11-12.

C.     Fed. R. Civ. P. 11.

Fed. R. Civ. P. 11(b) reads that an attorney presenting a pleading, motion, or other paper to the court, certifies that: 1) it is not being presented for any improper purpose, such as to harass; 2) the claims and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending existing law; and 3) the factual contentions have evidentiary support or will have evidentiary support after a reasonable opportunity for discovery. Fed. R. Civ. P. 11(c)(3), meanwhile, empowers the court, on its own motion, to enter an order directing a party to show cause why particular conduct has not violated Rule 11(b).  *See Adams v. USAA Cas. Ins. Co.*, 863 F.3d 1069, 1076-77 (8th Cir. 2017) (explaining a court's inherent authority to *sua sponte* issue a show-cause order under Fed. R. Civ. P. 11(c)(3)); *Jones v. UPS*, 460 F.3d 1004, 1008-11 (8th Cir. 2006) (upholding District Court's imposition of Rule 11 fees following its *sua sponte* show-cause order). And it is respectfully submitted that for the Court to get to a point where an order to show cause is entered as set forth in Rule 11(c)(3), the inherent powers vested with the Court by this Rule permit it to conduct a preliminary inquiry.

None of the statutes or cases cited by Plaintiffs – and indeed none at all – support the propositions that: 1) pre-canvassing, standing alone, is unlawful; and 2) presumptions for un-postmarked ballots are unlawful.  In fact, what caselaw exists, including *Bomer*, *Keisling*, and *Millsaps* – has roundly rejected challenges nearly *identical* to those here.  The claims are thus *not* warranted by existing law.  Fed. R. Civ. P. 11(b)(2).  And the last two counts suffer from a complete dearth of supporting facts.  Further, the third count simply states, in conclusory fashion, that A4475 will facilitate fraud, but it does not say how.  So far as the fourth count is concerned, there are no actual facts pled in support – only a series of imaginative future events and scenarios that have not come to pass, and whose likelihood of occurring is impossible to gauge because it is nothing more than speculation.

At their best, they represent nothing more than a clarion call over imagined facts. At their worst, they represent a ruse utilizing the fictional November Baba Yaga, election fraud.

Accordingly, *Amicus* ACDC respectfully submits that such preliminary inquiry is amply justified in this circumstance.  This lawsuit appears simply another chunk of the massive iceberg that is Plaintiffs' coordinated, nationwide effort to suppress the vote – an effort that has existed, in various states of conspicuousness, for at least four decades – and now appears in the form of a magnum opus as Plaintiff's Presidential campaign is in its most desperate straits.

## <u>CONCLUSION</u>

For all these reasons, *Amicus* Atlantic County Democratic Committee respectfully urges the court to grant Intervenor-Defendant Democratic Congressional Campaign Committee's order to show cause and motion to dismiss for failure to state a claim, and furthermore, to inquire, *sua sponte*, as to Plaintiffs' use of filings under Fed. R. Civ. P. 11.

Respectfully submitted on behalf of
*Amicus Curiae* Atlantic County
Democratic Committee,

Date:  October 12, 2020          By:   /s/ Robert D. Herman_____

Robert D. Herman, Esq.
New Jersey ID. No. 000911998
Herman Law Offices, LLC
222 New Road, Suite 106
Linwood, NJ 08221
(609) 601-8750
Fax: (609) 454-0094
rdhesq1@msn.com

By:   /s/ Elliott Almanza_____

Elliott Almanza, Esq.
New Jersey ID No. 017542012
Goldenberg Mackler
660 New Road, Suite 1-A
Northfield, NJ 08225
(609) 646-0222
Fax: (609) 646-0889
ealmanza@gmslaw.com