**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TAHESHA WAY, in her official capacity as Secretary of State of New Jersey,<br><br>Defendant. | Civil Action No. 20-10753 (MAS) (ZNQ)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendant-Intervenor DCCC's Motion for an Order to Show Cause (ECF No. 71) seeking expedited dismissal of Plaintiffs Donald J. Trump for President, Inc. ("DJTFP"), the Republican National Committee ("RNC"), and the New Jersey Republican State Committee's ("NJGOP") (collectively, "Plaintiffs") Amended Complaint (ECF No. 33). Plaintiffs opposed. (ECF No. 77.) Defendant Secretary of State Tahesha Way supported DCCC's Motion. (ECF No. 78.) DCCC replied (ECF No. 81.) The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Rule 78.1. For the reasons set forth below, DCCC's Motion is granted.

I.      **BACKGROUND**

The parties are familiar with the factual and procedural history of this matter, and therefore the Court only recites those facts necessary to resolve the instant Motion. Plaintiffs bring this action to enjoin enforcement of Assembly Bill No. 4475 ("A4475"). New Jersey's Legislature

passed that law in response to the ongoing COVID-19 pandemic.  Pursuant to A4475, the November 2020 General Election will take place primarily by mail: all active registered voters will be sent a mail-in ballot at least twenty-nine days before the election.  *See* N.J. Stat. Ann. § 19:63-31(a), (j); (State's Resp. Br. 36, ECF No. 78.)[1]  Plaintiffs bring this suit challenging certain provisions of that law.[2]

Plaintiffs maintain that New Jersey's "rushed shift to universal vote-by-mail elections facilitates fraudulent and invalid votes.  Such votes dilute the legitimate votes of honest citizens and deprive them of their right to vote in violation of the Fourteenth Amendment."  (Am. Compl. ¶ 1, ECF No. 33.)  According to Plaintiffs, "voter fraud—or even inadvertent double voting or non-fraudulent illegal voting—is guaranteed when hundreds of thousands of ballots are indiscriminately distributed, regardless of whether a real, eligible, present, or desiring person exists to receive them."  (*Id.* ¶ 96; *see also id.* ¶ 119 ("A4475 requires automatic mailing ballots to all active voters and makes voter fraud and other ineligible voting inevitable").)

Plaintiffs allege that New Jersey's "long history of issues with voting by mail" supports their belief that voter fraud in the November 2020 election is "destined," "guaranteed," or otherwise "inevitable."  (*Id.* ¶¶ 2, 46-48 (collecting incidents relating to vote-by-mail fraud in New Jersey over the past decade).)  Plaintiffs also direct the Court to news reports of voter fraud in Paterson, New Jersey during the City's May 2020 local elections.  (*Id.* ¶¶ 76-86.)  The May 2020 election was largely conducted via vote-by-mail ballots pursuant to an Executive Order from

---

[1] Defendant Secretary of State Way represents to the Court that State boards of elections were required to "place every ballot in the mail by October 5, 2020."  (State's Resp. Br. 36.)  Secretary Way further reports that as of October 9, 2020, county boards had already received over half a million completed ballots.  (*Id.*)

[2] *See Donald J. Trump for President, Inc. v. Way*, --- F. Supp. 3d ----, No. 20-10753, 2020 WL 5912561 (D.N.J. Oct. 6, 2020) (reciting the litigation's factual and procedural background).

Governor Phillip D. Murphy that predated A4475. (*Id.* ¶ 77.) According to news reports, State authorities have since uncovered evidence of "massive voter fraud" in Paterson during the May 2020 election connected to a local campaign. (*Id.* ¶¶ 80-82.) A campaign worker "confessed . . . to having stolen ballots out of mailboxes, both completed and uncompleted, on behalf of and at the direction of" the campaign. (*Id.* ¶ 82.) In their response to DCCC's Motion, Plaintiffs direct the Court to a more recent news report documenting potential mail-in ballot fraud in New Jersey. (Pls.' Opp'n Br. 8 n.1, ECF No. 77.) "On October 7[, 2020], a Newark postal worker was charged with willfully discarding hundreds of ballots and other campaign materials." (*Id.* (citation omitted).)

Plaintiffs also object to the A4475 provisions that allow State officials to canvass ballots lacking a postmark. New Jersey's A4475 provides that

> [e]very ballot without a postmark, and ballots mis-marked and confirmed by the [Postal Service] that those ballots were received by the [Postal Service] on or before November 3, 2020, that is received by the county boards of elections from the [Postal Service] within 48 hours of the closing of the polls on November 3, 2020, shall be considered valid and shall be canvassed, assuming the ballot meets all other statutory requirements.

N.J. Stat. Ann. § 19:63-31(m). Plaintiffs maintain that this provision allows individuals to cast a vote after Election Day and to have that vote counted. (Am. Compl. ¶ 108.) Plaintiffs cite to public documents from the Postal Service suggesting that first-class mail can be delivered within one day. (Pls.' Opp'n Br. 9-10 (citation omitted).) According to Plaintiffs, "permitting ballots to be cast after Election Day . . . will dilute the votes of Plaintiffs' members." (*Id.* at 9.) Plaintiffs also maintain that A4475 violates 3 U.S.C. § 1 and 2 U.S.C. §§ 1, 7 (the "Election Day Statutes") because it extends Election Day beyond the November 3, 2020 date chosen by Congress. (Am. Compl. ¶ 108.)

Furthermore, Plaintiffs challenge the A4475 provision allowing the State to begin canvassing mail-in ballots up to ten days before Election Day. (Am. Compl. ¶ 107.) Like the provision governing non-postmarked ballots, Plaintiffs argue that canvassing ballots ten days before the election violates the Election Day Statutes. Canvassing before Election Day creates a risk that New Jersey's election results will be disclosed to other states and potentially influence the outcome of other states' elections, according to Plaintiffs. (*Id.*) Plaintiffs maintain that this provision contravenes the federal Election Day Statutes, which Plaintiffs argue were passed to prevent this result. (*Id.* (citing *Foster v. Love*, 522 U.S. 67, 73 (1997).)

Finally, Plaintiffs challenge the A4475 provision that requires "every in-person voter to cast a provisional ballot." (Pls.' Opp'n Br. 19 (citing N.J. Stat. Ann. § 19:63-31(g)).) According to Plaintiffs, "by deeming every in-person ballot a provisional one, A4475 will massively increase the number of provisional ballots that must be processed." (*Id.*) "Because it will be impossible for county officials to properly inventory, transport, and canvass that volume of provisional ballots according to statutorily approved processes," Plaintiffs argue that "officials will be forced to adopt their own alternative procedures for processing the ballots." (*Id.* at 19-20.) Plaintiffs maintain that "this risks New Jersey counties adopting arbitrary and varying procedures without 'specific rules designed to ensure uniform treatment'" in violation of the Equal Protection Clause of the Fourteenth Amendment. (Am. Compl. ¶ 134-35 (citing *Bush v. Gore*, 531 U.S. 98 (2000)).) Plaintiffs direct the Court to news articles reporting that "in the July primary alone, nearly 200,000 provisional ballots were cast, 12% of all votes." (Pls.' Opp'n Br. 19 (citing Colleen O'Dea, *Why So Many Mail-In Ballots Were Rejected in NJ's July Primary Election. Hint: Many Arrived Late*, N.J. Spotlight, Sept. 10, 2020).) In their opposition to DCCC's Motion, Plaintiffs do not inform the Court how the July 2020 Primary Election provisional ballot total compares to the number of

provisional ballots cast in past primary elections.  Plaintiffs also allege that in the July 2020 Primary Election, "approximately 5,900 [provisional] ballots, over 3% of those cast, were rejected." (*Id.* (citing O'Dea, *Why So Many Mail-in Ballots Were Rejected*).)  Without explaining how, Plaintiffs conclude that the rejection rate for July 2020 provisional ballots "demonstrate[s] the strain on the system" caused by a "massive increase of provisional ballots."  (*Id.*)

Plaintiffs filed their initial Complaint challenging Governor Murphy's Executive Order 177 on August 18, 2020.  (Compl., ECF No. 1.)  Following the passage of A4475, Plaintiffs filed an Amended Complaint on September 11, 2020 challenging the law's provisions.  (*See generally* Am. Compl.)  Counts One and Two allege violations of 2 U.S.C. §§ 1, 7 and 3 U.S.C. § 1, (*id.* ¶¶ 109-17); Count Three alleges violations of the right to vote, (*id.* ¶¶ 118-23); and Count Four alleges violations of the Equal Protection Clause, (*id.* ¶¶ 124-37).

On September 16, 2020, Plaintiffs filed a Motion for an Order to Show Cause seeking to enjoin enforcement of Counts One and Two.  (ECF No. 35.)  While that motion was still pending, on October 2, 2020, DCCC filed a Motion to Dismiss all four counts in the Amended Complaint for lack of standing and failure to state a claim.  (ECF No. 71.)  DCCC also filed a Motion for an Order to Show Cause seeking expedited briefing for the Motion to Dismiss.  (*Id.*)  The Court ordered an expedited briefing schedule on October 3, 2020.  (ECF No. 72.)  In its October 6, 2020 Opinion denying the Motion for a Preliminary Injunction, the Court deferred consideration of Defendants' challenge to Plaintiffs' standing to bring this action in light of the Motion to Dismiss now before the Court.  *Way*, 2020 WL 5912561, at *6.

## II.      LEGAL STANDARD

Standing "is a threshold jurisdictional requirement, derived from the 'case or controversy' language of Article III of the Constitution."  *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium*

*Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997). "In limiting the Judicial Power to 'Cases' and 'Controversies,'" Article III only authorizes judges "to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law. Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). "This limitation 'is founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Id.* at 492-93 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "Standing is particularly important in the context of election-law cases, including a case like this one, that challenge the laws, regulations, and guidance issued by elected and appointed state officials through the democratic processes." *Donald J. Trump for President, Inc. v. Boockvar*, --- F. Supp. 3d ----, No. 20-966, 2020 WL 5997680, at \*31 (W.D. Pa. Oct. 10, 2020). "Article III standing serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

"Each plaintiff bears the burden of demonstrating standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *N.J. Physicians, Inc. v. President of the U.S.*, 653 F.3d 234, 239 (3d Cir. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Similarly, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). "If they fail to make the necessary allegations, they have no standing." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). "[I]t is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record." *N.J. Physicians*, 653 F.3d at 239.

Where, as here, defendants present a facial challenge contesting the sufficiency of plaintiffs' pleadings at the motion to dismiss stage, (DCCC's Moving Br. 5), district courts "apply the same standard of review we use when assessing a motion to dismiss for failure to state a claim." *Finkelman v. NFL*, 810 F.3d 187, 194 (3d Cir. 2016). District courts must 1) "take note of the elements a plaintiff must plead to state a claim—here, the three elements of Article III standing"; 2) "eliminate from consideration any allegation that, because they are no more than conclusions, are not entitled to the assumption of truth"; and 3) "where there are well-pleaded factual allegations, we assume their veracity and then determine whether they plausibly establish the prerequisites of standing." *Finkelman*, 810 F.3d at 194 (internal quotation marks and citations omitted). "In conducting this analysis, [the Court is] mindful of the Supreme Court's teaching that all aspects of a complaint must rest on 'well-pleaded factual allegations' and not 'mere conclusory statements.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)); *see, e.g.*, *NAACP v. Town of Harrison*, 907 F.2d 1408, 1416 (3d Cir. 1990) (affirming district court's dismissal of "conclusory complaint allegations" relating to standing). "Thus, to survive a motion to dismiss for lack of standing, a plaintiff 'must allege facts that affirmatively and plausibly suggest that it has standing to sue.' Speculative or conjectural assertions are not sufficient." *Id.* (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).

## III.    DISCUSSION

To satisfy the standing requirement, a plaintiff must show: 1) "it has suffered an 'injury in fact' that is a) concrete and particularized and b) actual or imminent, not conjectural or hypothetical"; 2) "the injury is fairly traceable to the challenged action of the defendant"; and 3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81

(2000). Plaintiffs are each associations or organizations, and thus may have standing to bring suit under two circumstances. *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 261 (3d Cir. 2009) (quoting *Prison Soc'y v. Cortes*, 508 F.3d 156, 162-63 (3d Cir. 2007)). First, by organizational standing, "an organization may be granted standing in its own right to seek judicial relief from *injury to itself* and to vindicate whatever rights and immunities the organization or association itself may enjoy." *Id.* (quoting *Cortes*, 508 F.3d at 163). This may occur when an organization must divert its resources to counteract unlawful conduct. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). Alternatively, by associational standing, "an association may assert claims on behalf of its members, but only where the record shows that the organization's *individual members themselves have standing to bring those claims.*" *Common Cause*, 558 F.3d at 261 (quoting *Cortes*, 508 F.3d at 163). An entity may establish associational standing on behalf of its members where: 1) "its members would otherwise have standing to sue in their own right"; 2) "the interests it seeks to protect are germane to the organization's purpose"; and 3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

## A.    Counts Three and Four: Vote Dilution and Equal Protection

### 1.    Associational Standing

Plaintiffs maintain that they "have standing on behalf of their members, who have standing in their own right to challenge A4475." (Pls.' Opp'n Br. 5.) In Count Three, Plaintiffs maintain that A4475's requirement that State officials "mail[] ballots to all active voters . . . makes voter fraud and other ineligible voting inevitable—especially given New Jersey's rampant history of voter fraud." (Am. Compl. ¶ 119.) Accordingly, Plaintiffs allege that mailing ballots to all voters "facilitates fraud and other illegitimate voting practices, and therefore violates the Fourteenth

8

Amendment to the U.S. Constitution." (*Id.* ¶ 121.) Similarly, Plaintiffs allege that the A4475 provision permitting the State to canvass ballots without a postmark up to forty-eight hours after the election dilutes the votes of members who cast timely votes. (Pls.' Opp'n Br. 9-10.) In Count Four, Plaintiffs allege that "[b]y deeming every in-person ballot a provisional ballot, A4475 massively increases the volume of provisional ballots that must be processed." (Am. Compl. ¶ 130.) According to Plaintiffs, "this massively increased volume of provisional ballots raises grave concerns about increased lines and wait times to vote and the State's ability to properly process each and every provisional ballot." (*Id.* ¶ 131.) According to Plaintiffs, the State's inability to process this increased volume will cause counties to adopt "arbitrary and varying procedures without 'specific rules designed to ensure uniform treatment'" in violation of the Equal Protection Clause of the Fourteenth Amendment. (*Id.* ¶¶ 134-35 (citing *Bush*, U.S. at 105-06).)

Although not addressed by the briefs, as an initial matter, the Court observes that Plaintiffs have not "ma[de] specific allegations establishing that at least one *identified* member has suffered or would suffer harm" because of A4475. *N.J. Physicians*, 653 F.3d at 241 (emphasis added) (internal quotation marks and citation omitted) (affirming a district court's grant of a motion to dismiss associational claims following an organization's failure to identify a member). In the Amended Complaint, Plaintiff Donald J. Trump for President, Inc. ("DJTFP") describes itself as "the principal committee for President Donald J. Trump's reelection campaign." (Am. Compl. ¶ 7.) Plaintiff RNC avers that it is a national political party representing "over 30 million registered Republicans in all 50 states" and is "comprised of 168 voting members representing state Republican Party organizations." (*Id.* ¶¶ 8, 10.) Finally, NJGOP avers that it is a political party "represent[ing] over 1.39 million registered Republican voters in New Jersey." (*Id.* ¶ 15.) These averments do not by themselves, however, meet Article III's threshold requirements for an

organization's associational standing to bring suit on behalf of members or voters.  Courts have

held that political parties bringing vote dilution cases on behalf of their members comply with this

requirement by naming at least one member.  *See, e.g., Jacobson v. Florida Sec'y of State*, 974

F.3d 1236, 1249 (11th Cir. 2020) (finding that the Democratic National Committee lacked

associational standing where it "describe[d] itself as having members" but "failed to identify any

of its members").  As the Supreme Court has held, even where "it is certainly possible—perhaps

even likely—that one individual" could be identified by a plaintiff organization as an identified

member alleging harm by defendant's conduct, "speculation does not suffice." *Summers*, 555 U.S.

at 499.  "[T]he Court has required plaintiffs claiming an organizational standing to identify

members who have suffered the requisite harm—surely not a difficult task here, when so many

thousands are alleged to have been harmed." *Id.*[3]

More fundamentally, DCCC and the State maintain that Plaintiffs lack standing because

Plaintiffs' members' vote dilution and equal protection injuries are too speculative.  (State's Resp.

Br. 16-18; DCCC's Moving Br. 11-12.)  The Court agrees and finds that Plaintiffs also lack

standing for this reason.

---

[3] The Court notes that Plaintiffs have submitted several declarations from officials associated with Plaintiffs.  (*See, e.g.*, Steinhardt First Decl. (attesting to NJGOP's need to divert resources from other programs in order to respond to A4475's vote canvassing changes), ECF No. 63-1; Huguenel Decl. (attesting to DJTFP's need to divert resources from other programs in order to respond to A4475's vote canvassing changes), ECF No. 63-2; Voccola Decl. (attesting to the RNC's need to divert resources from other programs in order to respond to A4475's vote canvassing changes), ECF No. 63-3; Steinhardt Second Decl. (attesting to NJGOP's need to divert resources from other programs in response to A4475), ECF No. 77-1.)  Although these declarations allege injuries to the *organizations*, none allege injuries to the *declarants'* rights to vote or be treated equally under A4475.  Nor do these declarations identify other members or voters who have suffered these injuries.  Accordingly, these declarations do not establish the identities of the organizational members who have been injured by A4475.  *Cf. Summers*, 555 U.S. at 498 (holding that "we have required plaintiff-organizations to make specific allegations establishing that at least one identified *member* had suffered or would suffer harm." (emphasis added)).

Plaintiffs must allege that their members or voters have "suffered an 'injury in fact' that is a) concrete and particularized and b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth*, 528 U.S. at 180. As the State and DCCC persuasively argue, however, Plaintiffs' claims are largely conjectural, hypothetical, and lacking in imminence. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks and citations omitted). The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Id.* (internal quotation marks and citations omitted).

The Amended Complaint makes several conclusory allegations regarding the purported imminence of its members' vote dilution and equal protection injuries. (*See, e.g.*, Am. Compl. ¶ 76 (alleging A4475 "is destined to lead to the same disastrous result as the Governor's prior Executive Orders allowing universal vote-by-mail"); *id.* ¶ 95 ("automatically sending ballots (as opposed to applications for ballots) to all voters makes fraud and other forms of illegal voting inevitable" (emphasis omitted)); *id.* ¶ 96 ("voter fraud—or even inadvertent double voting or non-fraudulent illegal voting—is guaranteed when hundreds of thousands of ballots are indiscriminately distributed"); *id.* ¶ 119 (alleging that A4475 "makes voter fraud and other ineligible voting inevitable"); *id.* ¶ 121 ("New Jersey's new voting system facilitates fraud and other illegitimate voting practices").) The Court is "of course mindful that 'at the pleading stage, general factual allegations of injury resulting from defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Finkelman*, 810 F.3d at 201 (quotation omitted). Even at the

pleading stage, however, "we need not accept as true unsupported conclusions and unwarranted inferences." *Id.* The Court "eliminate[s] from consideration any allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 194. Accordingly, the Court construes the foregoing assertions relating to the imminence of Plaintiffs' members' injuries as "bald assertion[s] unsupported by well-pleaded facts" and not entitled to the assumption of truth. *Id.* at 202 (internal quotation marks omitted).

With respect to vote dilution, Plaintiffs' arguments rests on their highly speculative fear that once State officials mail ballots to its voters and members, "there will be scores of ballots that *can* be improperly and unlawfully repurposed (as they were in the May election) . . . for a particular candidate." (Pls.' Opp'n Br. 11 (emphasis added).) As another district court recently found in a similar case brought by RNC and DJTFP, "the problem with this theory of harm is that this fraud hasn't yet occurred, and there is insufficient evidence that the harm is 'certainly impending.'" *Boockvar*, 2020 WL 5997680, at *32. "To be clear, Plaintiffs need not establish actual fraud at this stage; but they must establish that fraud is 'certainly impending,' and not just a 'possible future injury.'" *Id.* (citing *Clapper*, 568 U.S. at 60). Here, Plaintiffs have alleged nothing more than the possibility of a future injury to their members. But this averment resembles the speculative claims rejected by the Supreme Court in *Clapper*. *Clapper*, 568 U.S. at 409 ("[i]n sum, respondents' speculative chain of possibilities does not establish that injury based on potential future surveillance is certainly impending"). Aside from the bald, conclusory allegations that the Court has already rejected as not entitled to a presumption of truth, Plaintiffs have not set forth specific allegations demonstrating that such a scheme is certainly impending.

Moreover, Plaintiffs' vote dilution claims rest on assumptions about the machinations of third-parties intent on committing election fraud. "But these concerns . . . are based solely on a

chain of unknown events that may never come to pass." *Boockvar*, 2020 WL 5997680, at *33. Furthermore, this Court will not abandon its "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414. As the State notes, Plaintiffs' claims are especially speculative where the State "has its own mechanisms for deterring and prosecuting voter fraud." *Donald J. Trump for President, Inc. v. Cegavske*, --- F. Supp. 3d ----, No. 20-1445, 2020 WL 5626974, at *6 (D. Nev. Sept. 18, 2020); (State's Resp. Br. 29-30 (describing several measures intended to prevent fraud, including assigning each ballot a unique barcode and making voter fraud and election interference third-degree crimes).) Any suggestion of these measures' imminent failure is also speculative.

Perhaps the best evidence of imminent harm Plaintiffs present are the several purported instances of ballot fraud reported in New Jersey over the past decade. (Am. Compl. ¶¶ 46-48 (collecting incidents relating to vote-by-mail fraud in New Jersey).) Even if the purported fraud occurred, however, it would still be speculative to find that because there was mail-in ballot fraud in past New Jersey elections, fraud will also occur in the November 2020 General Election. Perhaps it will recur. But perhaps not. It is difficult—and ultimately speculative—to predict future injury from evidence of past injury. This is why the Supreme Court has recognized that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lujan*, 504 U.S. at 564 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

*Lyons* is instructive. In that case, a plaintiff sought an injunction forbidding police from applying certain chokeholds against suspects. *Lyons*, 461 U.S. at 98. The plaintiff argued that he had standing to pursue this relief because he was allegedly subjected to an illegal chokehold by police before bringing his action. *Id.* at 105. He argued that police "regularly and routinely apply

these chokeholds in innumerable situations where they are not threatened by the use of any deadly force whatsoever." *Id.* at 98. According to the plaintiff, there was a sufficient likelihood that he would again be stopped and subjected to the unlawful use of force unless the federal court enjoined the chokehold's use. *Id.* at 99. Indeed, while his case was still pending in the federal courts, the plaintiff amended his complaint to allege several more instances of chokehold-related deaths at the hands of Los Angeles police. *Id.* at 100.

The Supreme Court rejected the plaintiff's claim that he would again be stopped and subjected to an unlawful chokehold. *Id.* at 105. The fact that the plaintiff may have previously been subject to illegal police conduct did not mean a repeat violation of his constitutional rights was imminent. "The additional allegation . . . that the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy between these parties." *Id.* The Court concluded that "it is surely no more than speculation to assert . . . that [the plaintiff] himself will again be involved in one of those unfortunate instances." *Id.* at 108.

Here, as in *Lyons*, despite alleged past experiences with voter fraud in New Jersey, it is no more than speculation to claim that those unfortunate instances will repeat themselves in the November 2020 General Election. Plaintiffs direct the Court to October 2020 news reports indicating that a United States Postal Service worker in New Jersey "was charged with willfully discarding hundreds of ballots and other campaign materials." (Pls.' Opp'n Br. 8. n.1 (citation omitted).) Plaintiffs do not appear to argue that the worker fraudulently submitted the ballots or otherwise diluted their members' votes. In fact, based on Plaintiffs' formulation of vote dilution harm, "it is almost impossible for them to present anything other than speculative evidence of injury. That is, they would have to establish evidence of a certainly impending illegal practice."

*Boockvar*, 2020 WL 5997680, at *34. And having presented that evidence, the State would likely take action to stop the illegal activity. (State's Resp. Br. 29-30). The Court, accordingly, finds that Plaintiffs have not demonstrated a concrete, particularized, and actual or imminent injury to their members' rights to vote fairly traceable to A4475.

Plaintiffs also allege that the A4475 provisions that allow State officials to canvass ballots lacking a postmark will lead to vote dilution. State officials are permitted to canvass such ballots so long as they were received within forty-eight hours of election day. *See* N.J. Stat. Ann. § 19:63-31(m). Plaintiffs maintain that this provision allows individuals to cast a vote after election day and to have that vote counted, (Am. Compl. ¶ 108), because the Postal Service website suggests that first-class mail can be delivered within one day. (Pls.' Opp'n Br. 9-10 (citation omitted).) As this Court has previously found, however,

> [t]he evidence also shows that ballots are likely to require no fewer than two days in transit from voters to election officials. According to the Postal Service, all Election Mail (including ballots) mailed from individual voters to state or local election officials *must* be sent by First-Class Mail. The Postal Service advised the State that First-Class Mail is generally delivered within two to five days. . . . Based on the evidence before it, the Court finds the probability remote that any ballots lacking a postmark and received within forty-eight hours of the closing of the polls are cast after Election Day.

*Way*, 2020 WL 5912561, at *11 (internal quotation marks and citations omitted). "[T]here is only a remote possibility that an untimely ballot could be canvassed." *Id.* at *12. This would require an unlikely chain of events where a ballot would be 1) cast after Election Day; 2) happen to lack a postmark against Postal Service policy, which is both rare and not correlated to the date the ballot is mailed; and 3) arrive faster than the Postal Service's most optimistic expectations." *Id.* The Court, accordingly, finds that Plaintiffs' members' vote dilution claim relating to unpostmarked

15

ballots canvassed after the election is too speculative and remote to satisfy Article III's actual or imminent injury requirement.

With respect to Count Four, Plaintiffs' equal protection claims also fail for similar reasons. Plaintiffs argue that A4475's requirement that every in-person voter cast a provisional ballot means that "A4475 will massively increase the number of provisional ballots that must be processed." (Pls.' Opp'n. Br. 19.) Plaintiffs seem to fear that local election officials will be overwhelmed by the volume of provisional ballots and ignore state law governing how to process and review them, leading to disparate treatment of voters in different counties. (*See id.* at 19-20; State's Resp. Br. 18.) But as the State argues, Plaintiffs do not plead any facts to suggest this scenario is imminent. It may be that the vast majority of New Jersey residents choose to vote by mail rather than venture to in-person polling places in the midst of a global pandemic. In that case, the State could be faced with something less than the "massively increase[d] number of provisional ballots" that Plaintiffs anticipate in Count Four. (Pls.' Opp'n Br. 19.) Based on the current record, the Court cannot say which scenario is likely, let alone imminent for the purposes of Article III standing analysis. *Cf. Clapper*, 568 U.S. at 409 ("[W]e have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." (internal quotation marks omitted)).

Plaintiffs support their equal protection claims by noting that "in the July primary alone, nearly 200,000 provisional ballots were cast, 12% of all votes." (Pls.' Opp'n Br. 19.) Plaintiffs, however, provide no indication this number was a "massive increase" over provisional ballots cast in prior primary elections. Plaintiffs also argue that over 3% of those provisional ballots were rejected. (*Id.*) But Plaintiffs do not explicitly claim that this rejection rate was related to the increased volume. Nor do Plaintiffs claim that the rejection rate was higher than in past years.

Plaintiffs merely insinuate without clearly alleging that the 200,000 provisional ballots cast in July were 1) an increase in volume from past years that 2) resulted in an increased rate of rejections because 3) overwhelmed county officials adopted arbitrary ballot processing procedures. Thus, even with respect to the July 2020 primary, Plaintiffs do not clearly allege that their members' rights to equal protection were violated. And as we have seen, even if they pleaded a past violation of the Equal Protection Clause, past injury alone does not establish entitlement to prospective relief without a non-speculative showing of imminent future injury. *See Lyons*, 461 U.S. at 98. The Court, accordingly, finds that Plaintiffs have not demonstrated a concrete, particularized, and actual or imminent injury to their members' rights to equal protection under the law fairly traceable to A4475.

### 2. Organizational Standing

Plaintiffs also argue that they have organizational standing to bring their members' equal protection and vote dilution claims because "'A4475 forces [them] to divert resources and spend significant amounts of money educating voters on' the changes made by A4475 'and encouraging them to vote regardless.'" (Pls. Opp'n Br. 3 (alteration in original) (quoting Am. Compl. ¶¶ 13, 16).) "A4475 thus injures Plaintiffs by compelling them 'to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote.'" (*Id.* (quoting *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007)).). Plaintiffs support their pleading with a Declaration from the Chairman of the NJGOP. The Chairman avers that "A4475 changed New Jersey's election laws to convert the November [G]eneral [E]lection to a universal vote-by-mail election. That change has had a large effect on how NJGOP allocates its finite resources." (Steinhardt Second Decl. ¶ 3.) Although the Declaration fails to specify exactly which A4475 provisions NJGOP has needed to respond to, the

Chairman describes several programmatic changes intended to "educate[] NJGOP's voters on how to vote under A4475's new scheme." (*Id.* ¶¶ 4-7.) According to the Declaration,

> [b]ecause NJGOP's resources are finite, these efforts have diverted financial and personnel assets away from persuasion-based television, direct mail, and digital advertising, prevented NJGOP from hiring more get-out-the-vote staff, reduced the number of yard signs NJGOP can purchase and place for its candidates, and hampered NJGOP's ability to open additional offices and purchase hardware for its voter contact efforts.

(*Id.* ¶ 8.) Plaintiffs' arguments in favor of organizational standing are similar to those raised by the plaintiffs in *Clapper* and rejected there by the Supreme Court. "Because Plaintiffs' harm is not 'certainly impending,' . . . spending money in response to that speculative harm cannot establish a concrete injury." *Boockvar*, 2020 WL 5997680, at *36 (quoting *Clapper*, 568 U.S. at 416 ("Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.")); *see also Cegavske*, 2020 WL 5626974, at *5 ("Outside of stating 'confus[ion]' and 'discourage[ment]' in a conclusory manner, plaintiffs make no indication of how AB 4 will discourage their member voters from voting. If plaintiffs did not expend any resources on educating their voters on AB 4, their voters would proceed to vote in-person as they overwhelmingly have in prior elections." (alterations in original) (citations omitted)).

The Plaintiffs' citation to *Crawford*, a pre-*Clapper* case, is unavailing. In *Crawford*, the Democratic Party and other organizations challenged a law requiring in-person voters to show state issued identification before voting. *Crawford*, 472 F.3d at 950. Based on the record in front of it, the Seventh Circuit found that "the Indiana law will deter some people from voting." *Id.* at

951. Indeed, the trial court record included allegations from at least one of the organizations "assert[ing] that some of its members have indicated that they would be discouraged from voting" because of the voter identification law. *Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 800 (S.D. Ind. 2006). According to plaintiffs, the law compelled them "to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote.'" *Crawford*, 472 F.3d at 951. The Seventh Circuit found that this was an actual or imminent injury to the Democratic Party. *Crawford*, 472 F.3d at 951. Plaintiffs similarly argue that "A4475 forces the RNC to divert resources and spend significant amounts of money educating voters on those changes and encouraging them to vote regardless." (Am. Compl. ¶ 13.)

The Court is mindful of the different procedural postures of this case and *Crawford*, which was decided at the summary judgment stage. Nevertheless, even at the pleading stage, this Court must "eliminate from consideration any allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Finkelman*, 810 F.3d at 194. Only then, "where there are well-pleaded factual allegations" will this Court "assume their veracity and then determine whether they plausibly establish the prerequisites of standing." *Id*. Here, unlike in *Crawford*, there is no allegation from Plaintiffs that some of its members have indicated that they would be discouraged from voting because of A4475. The Court would, of course, accept such an allegation as true at this stage. Instead, Plaintiffs only assert that A4475 hypothetically "confuse[s] voters, undermine[s] confidence in the electoral process, and create[s] incentive[s] to remain away from the polls." (Am. Compl. ¶ 13.) Under *Finkelman*, the Court cannot credit such conclusory allegations and unwarranted inferences unsupported by well-pleaded facts. Unlike in *Crawford*, Plaintiffs have failed to allege any facts supporting these conclusions about the law's effects.

Moreover, even if Plaintiffs allege that their member voters have experienced confusion, undermined confidence in the electoral process, or have otherwise experienced incentives to remain away from the polls, Plaintiffs fail to make allegations about exactly how A4475 creates these effects in voters. Here, Plaintiffs only make general allegations that A4475 forces them to divert resources in order to educate voters and encourage them to vote "regardless" of certain disincentives. (Am. Compl. ¶ 13.); *cf. Cegavske*, 2020 WL 5626974, at *5 ("Outside of stating 'confus[ion]' and 'discourage[ment]' in a conclusory manner, plaintiffs make no indication of how AB 4 will discourage[] their member voters from voting." (alterations in original) (citation omitted)). But in *Crawford*, for example, the record in front of the Seventh Circuit included specific factual allegations about how the voter identification law deterred voters, including that "the hassle in obtaining and presenting a photo identification at the polls" deterred them from going to the polls. *Rokita*, 458 F. Supp. 2d at 800 n.27; *Crawford*, 472 F.3d at 951 ("even very slight costs in time or bother or out-of-pocket expense deter many people from voting"). The *Crawford* plaintiffs then had to encourage their member voters to vote regardless of these obstacles. *Crawford*, 472 F.3d at 951.

Here, Plaintiffs must allege how the challenged provisions confuse voters, undermine their confidence in the electoral process, or otherwise incentivize them to remain away from the polls. Consistent with *Clapper*, the voters' reasons cannot be speculative, conjectural, or hypothetical. Granting Plaintiffs standing under those circumstances would run afoul of *Clapper*'s admonition that plaintiffs cannot manufacture organizational standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending. *Clapper*, 568 U.S. at 416. The Court, accordingly, finds that Plaintiffs have failed to establish direct organizational standing due to diversion of resources.

### B.    Counts One and Two: A4475's Canvassing Provisions

Plaintiffs maintain that two of A4475's canvassing provisions are preempted by federal law.  In Count One of the Amended Complaint, Plaintiffs assert that permitting the canvassing of mail-in ballots before Election Day is preempted by the Election Day Statutes and thus that provision of A4475 is void. (Am. Compl. ¶¶ 109-12.)  Plaintiffs also assert, in Count Two of the Amended Complaint, that the Election Day Statutes, by setting a uniform day for the federal election, preempt the counting of ballots cast after Election Day. (*Id.* ¶¶ 113-17.)  Specifically, Plaintiffs argue that A4475 allows the possibility of counting untimely ballots by permitting "ballots that have not been postmarked to be counted if they are received two days after Election Day." (*Id.* ¶ 114.)

Plaintiffs assert organizational standing to challenge these allegedly illegal actions. According to Plaintiffs, A4475 forces them "to divert funds and resources from other programs because of A4475's changes to ballot counting." (Pls.' Opp'n Br. 5. (citations omitted).)   DCCC argues that "Plaintiffs fail to allege why or how they would need to divert resources to address" A4475. (DCCC Moving Br. 9.)  Similarly, the State argues that "Plaintiffs' allegations . . . do not describe where they had to divert their resources from and how their expenditures differ from the work they had planned regardless." (State's Resp. Br. 19-20.)

With respect to Count One, challenging the State's decision to canvass votes early, the DCCC and State's response to Plaintiffs' declarations are not a fair reading of those averments. According to Steinhardt, "[i]n a normal election, ballot counting does not begin until Election Day so poll watchers are only needed starting on that day." (Steinhardt First Decl. ¶ 9.)  Steinhardt asserts that "NJGOP will have to hire far more poll watchers than it otherwise would for this election to be at the polls ten days before election day to monitor the counting of mail-in ballots."

(*Id.* ¶ 10.) "This will require NJGOP to divert its volunteer and paid resources from its voter contact activities to poll watching during the most important time period for voter contact, which will undermine NJGOP's ability to encourage Republicans to vote in the election." (*Id.*) Huguenel makes similar averments on behalf of DJTFP, as does Voccola on behalf of the RNC. (Huguenel Decl. ¶ 8; Voccola Decl. ¶¶ 6-7.)

Plaintiffs' beliefs that the State will begin canvassing votes up to ten days before the election is not speculative. By the State's own admission, the early canvassing alleged in Count One is imminent. "Early counting is necessary on account of the anticipated amount of mail-in and provisional ballots for the 2020 General Election." (State's Preliminary Injunction Opp'n Br. 49, ECF No. 58.) The State has also submitted its own declarations from State election officials attesting to the imminence of early counting. (*See, e.g.*, Campisi Decl. ¶ 17, ECF No. 58-7 ("Due to the drastically increased number of mail-in and provisional ballots to be received by the Board and the limited time provided for the review process for provisional ballots, the Board will have to begin canvassing mail-in ballots prior to Election Day.").

Plaintiffs nevertheless fail to establish a non-speculative harm arising from early canvassing that requires resource diversion to either identify or counteract. *Cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding a concrete and demonstrable injury where a non-profit "has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices" (emphasis added) (alteration in the original)). The Court agrees that A4475's early canvassing provisions may require Plaintiffs to divert resources to early poll watching. But unlike in *Havens*, this diversion is not geared toward identifying or counteracting injuries arising from the challenged conduct—A4475's early canvassing provisions. Instead, Plaintiffs appear to allege that they are hiring poll-watchers to identify and counteract the

same problems that used to arise "in a normal election," albeit earlier this year. Although A4475 may require Plaintiffs to shift resources to meet new or ill-timed needs, "[i]njury does not arise because of [plaintiffs'] desire or preference for a different scheme of absentee by mail voting, nor because they adjust their organization's activities in response to the virus and the virus-related changes to the law." *Clark v. Edwards*, --- F. Supp. 3d ----, No. 20-308, 2020 WL 3415376, at *13 (M.D. La. June 22, 2020). As another district court recently held in a COVID-19 related voting rights case, "[i]t cannot follow that every change in voting law that causes voting advocacy groups to 'check and adjust' is an injury." *Id.* The standing doctrine is not so capacious. Instead, consistent with *Havens*, Plaintiffs must show resource diversion undertaken to counteract or identify harms associated with the early voting canvassing.

The most significant *potential* harm associated with the A4475's early canvassing provision that could require identification or counteracting is the risk that state election officials might release results early in violation of the federal Election Day Statutes. (*See* Pls.' Preliminary Injunction Moving Br. 20, ECF No. 35-1.) But the Court has already found that this injury is too speculative and remote: "Plaintiffs provide no reason to suspect election officials would intentionally violate [state and federal] law and disclose election results before the polls close, and Defendants have provided evidence of sufficient safeguards to prevent accidental or intentional early disclosure of election results." *Way*, 2020 WL 5912561, at *13. Accordingly, Plaintiffs' members may not invoke the Court's Article III power to address alleged violations of the federal Election Day Statutes absent an imminent injury fairly traceable to the A4475's early canvassing provisions. Consistent with *Clapper*, Plaintiffs may not manufacture direct organizational standing to challenge the early canvassing provisions by spending money to address a speculative injury.

As to Count Two, for the reasons discussed above, the Court finds that Plaintiffs' alleged injury due to the State's canvassing of allegedly untimely cast ballots lacking postmarks is entirely speculative. Accordingly, Plaintiffs' members may not invoke the Court's Article III power to address alleged violations of the Election Day Statutes that do not create an imminent injury. With respect to Plaintiff-organizations' resource diversion arguments, their declarations attesting to the need to hire and educate poll watchers in order to "challenge[] election officials' decisions on this new issue" are unavailing. (*See, e.g.*, Steinhardt First Decl. ¶ 12.) Once again, Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. The Court, accordingly, finds that Plaintiffs have not demonstrated a concrete, particularized, and actual or imminent injury to their members' rights to vote fairly traceable to unpostmarked ballot provision of A4475.

Finally, the Court finds that any diversion of resources in response to early canvassing or unpostmarked ballots is "more of a generalized grievance, than an organizational injury." *Democracy N.C. v. North Carolina State Bd. of Elections*, --- F. Supp. 3d. ----, No. 20-457, 2020 WL 4484063, at *18 (M.D.N.C. Aug. 4, 2020) (internal quotation marks omitted) (finding in a COVID-19 voting rights case that alleged organizational diversion of resources due to state election laws resulted "not from any actions taken by [d]efendants but rather from the organizations' own budgetary choices." (quoting *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012)). Finding a cognizable injury because an organization spends money on routine costs such as hiring, training, and educating staff in response to a new law "would be to imply standing for organizations with merely 'abstract concerns with a subject that would be affected by an adjudication.'" *Lane*, 703 F.3d at 675 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)). A finding along those lines would imply that a sincere plaintiff could bootstrap

standing by expending its resources merely in response to the actions of another. "Such a rule would not comport with the case or controversy requirement of Article III of the Constitution." *Id.*

## IV.    CONCLUSION

For the reasons set forth above, DCCC's Motion is granted. The Complaint is dismissed without prejudice to Plaintiffs' claims.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE